UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

LARRY PORTER,

                                    Plaintiff,

v.                                                              9:17-cv-0047
                                                                (MAD/TWD)
DONALD UHLER and ANTHONY ANNUCCI,

                                    Defendants.
_____

APPEARANCES:                                      OF COUNSEL:

LARRY PORTER
Plaintiff, *pro se*
88-A-4542
Clinton Correctional Facility
P.O. Box 2000
Dannemora, NY 12929

HON. LETITIA JAMES                                OMAR J. SIDDIQI, ESQ.
Attorney General of the State of New York
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION AND ORDER</u>

## I.      INTRODUCTION

This *pro se* civil rights action, brought under 42 U.S.C. § 1983, has been referred for a

report and recommendation by the Honorable Mae A. D'Agostino, United States District Judge,

pursuant to 28 U.S.C. § 636(b) and Northern District of New York Local Rule ("L.R.") 72.3(c).

Plaintiff Larry Porter, an inmate in the custody of the New York State Department of Corrections

and Community Supervision ("DOCCS"), alleges Defendants Donald Uhler and Anthony

Annucci violated his constitutional rights under the Eighth and Fourteenth Amendments against

cruel and unusual punishment and the deprivation of liberty without due process of law based on his confinement in disciplinary segregation in the Special Housing Unit ("SHU") for twenty-eight years.  (Dkt. No. 1 at 5-7.[1])  Plaintiff seeks significant monetary damages.  *Id*. at 9.

Presently pending before the Court are cross motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (Dkt. Nos. 62, 71.)  Both motions are opposed. (Dkt. Nos. 71, 75.)  For the following reasons, the Court recommends that Defendants' cross motion for summary judgment (Dkt. No. 71) be granted, Plaintiff's cross motion for summary judgment (Dkt. No. 62) be denied, and Plaintiff's complaint (Dkt. No. 1) be dismissed in its entirety with prejudice.

## II.    BACKGROUND[2]

Plaintiff entered DOCCS custody in 1988 and is serving a twelve year to life indeterminate sentence.  (Dkt. No. 71-2 at ¶ 1.[3])  In the complaint, Plaintiff alleges he was subjected to "prolonged" and "extreme" isolation and inhumane conditions in the SHU.  (Dkt. No. 1 at 6, 7.)  He claims he was denied commissary, recreation, personal clothing, and telephone privileges.  *Id*. at 7.

Plaintiff was sentenced to SHU confinement in October 1989, and was not released until September 2017.  *Id*. at 6.[4]  He was housed at Attica, Great Meadow, Elmira, Wende, Sullivan,

---

[1]  Page references to documents identified by docket number are to the numbers assigned by the CM/ECF docketing system maintained by the Clerk's Office.  Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.

[2]  The majority of facts are not in dispute.  (*Compare* Dkt. No. 62-5 *with* Dkt. No. 71-2; *Compare* Dkt. No. 71-1 *with* Dkt. No. 75.)

[3]  *See* http://nysdoccslookup.doccs.ny.gov (DIN 88-A-4542) (last visited Feb. 15, 2019).

[4]  Plaintiff commenced this action on December 1, 2016.  (Dkt. No. 1.)  At that time, he was housed at Upstate and did not expect to be released until 2018.  *Id*. at 6.  However, Plaintiff was released from SHU confinement in September 2017.  (Dkt. No. 71-1 ¶ 48.)

Clinton, Green Haven, Auburn, Southport, Upstate, and Five Points. (Dkt. No. 62-1 at ¶¶ 12, 13.[5])

As outlined in Judge D'Agostino's February 7, 2017, Decision and Order, in the complaint, Plaintiff refers to a lawsuit filed in March 2011 in the United States District Court for the Southern District of New York.[6] (Dkt. No. 6 at 4.) The lawsuit was filed by inmates against various DOCCS officials claiming that lengthy confinements in the SHU created an unconstitutional risk of harm to inmates. *Id.* The plaintiffs in that action sought injunctive and declaratory relief. *Id.* In March 2014 and June 2014, Plaintiff received two letters from attorneys affiliated with the New York Civil Liberties Union ("NYCLU") advising Plaintiff of the aforementioned § 1983 class action. *Id.* In a letter dated October 21, 2014, Elena Landriscina, Esq. informed Plaintiff that the class action did not include a claim for money damages. (Dkt. No. 1 at 6.)

On April 1, 2016, the Court in *Peoples v. Annucci*, approved a private agreement between DOCCS and the NYCLU. (Dkt. No. 71-1 at ¶ 79.[7]) Plaintiff claims the settlement agreement reached in *Peoples v. Annucci* "allowed me to sued for being kept in solitary-confinement on

---

[5] Plaintiff was housed at Attica from October 1989 until April 1990; Great Meadow from April 1990 until July 1991; Elmira from July 1991 until February 1992; Wende from February 1992 until December 1992; Sullivan from December 1992 until May 1993; Clinton from May 1993 until May 1996; Southport from May 1996 until September 1998; Attica from September 1998 until July 1999; Great Meadow from July 1999 until April 2000; Green Haven from April 2000 until July 2001; Auburn from July 2001 until June 2002; Southport from June 2002 until June 2007; Upstate from June 2007, until May 2017; Five Points from May 2017, until September 2017. (*See generally* Dkt. No. 71-14; *see also* Dkt. No. 75 at ¶ 48.) Plaintiff is presently confined at Clinton. (Dkt. No. 76.)

[6] *Peoples, et. al. v. Annucci, et. al.*, No. 11 Civ. 2694 (S.D.N.Y. Apr. 18, 2011).

[7] Plaintiff argues the settlement agreement is not "private" because he is a mandatory class member. (Dkt. No. 75 at ¶ 79.)

monetary damage's." (Dkt. No. 62-1 at ¶¶ 4, 5.[8]) Plaintiff claims "nobody had informed me in 1989 through 2014 that DOCCS solitary confinement were unconstitutional being practices." (Dkt. No. 62-1 at ¶ 11.[9])

Plaintiff alleges that Defendant Uhler, the Superintendent at Upstate, supervised and controlled the SHU and refused to "cut" Plaintiff's SHU time. (Dkt. No. 1 at 7.) Plaintiff asserts that Annucci, the Acting Commissioner, was aware of the widespread DOCCS policy encouraging the use of SHU confinement because Annucci was a defendant in *Peoples v. Annucci*. *Id.* at 5-6.

Upon initial review, Plaintiff's complaint was liberally construed as asserting Eighth Amendment conditions of confinement and Fourteenth Amendment procedural due process claims against Uhler and Annucci. (Dkt. No. 6 at 5-10.) Defendants filed their answer on April 21, 2017. (Dkt. No. 13.)

### A.    Disciplinary Segregation

The undisputed evidence demonstrates DOCCS has procedures in place to implement standards of inmate behavior and discipline inmates who misbehave, which are codified at 7 N.Y.C.R.R. Chapter V and DOCCS Directive 4932. (Dkt. No. 71-1 at ¶ 21.) Between 1988 and 2012, Plaintiff received hundreds of misbehavior reports and was found guilty of charges at approximately one hundred thirty-six Tier III disciplinary hearings and fifty-two Tier II disciplinary hearings. (Dkt. No. 71-2 ¶¶ 41, 63.) Plaintiff committed a range of offenses,

---

[8] Unless indicated, all text quoted from Plaintiff's complaint, deposition, and motion papers is unaltered.

[9] On April 1, 2016, the Court in *Peoples v. Annucci*, approved a private agreement between DOCCS and the NYCLU. (Dkt. No. 71-1 at ¶ 79.) Plaintiff argues the settlement agreement is not "private" because he is a mandatory class member. (Dkt. No. 75 at ¶ 79.)

including assaulting staff, acting violently, performing unhygienic acts, possessing weapons, and disobeying direct orders.  *Id*. at ¶ 42.  Plaintiff remained in the SHU because he kept "getting tickets" and accruing additional disciplinary sentences.  (Dkt. No. 71-2 at ¶ 1; *see also* Dkt. No. 71-6 at 30, 67.)  An inmate may only serve a sentence for one disciplinary hearing at a time. (Dkt. No. 71-1 at ¶ 40.)

Plaintiff was housed at Upstate from June 2007, until May 2017.  *Id*. at ¶ 2.  When Plaintiff was transferred to Upstate, he was already serving a disciplinary sentence of over fifteen years of consecutive SHU time from misbehavior reports he received at other facilities.  (Dkt. No. 71-2 at ¶¶ 45, 47; Dkt. No. 71-13 at 1-14.)  Before Plaintiff completed his prior disciplinary sentences from other institutions at Upstate, he accrued seventeen more disciplinary sentences there.  (Dkt. No. 71-2 at ¶ 43; Dkt. No. 71-13 at 23-25.)  Plaintiff testified:

> Q:  Why do you keep catching tickets?
>
> A:  The solitary confinement is harsh and I was losing my mind at the time.  I was young and it was very harsh back then.  That's -- you know, I was losing my mind, yeah.

(Dkt. No. 71-6 at 66-67.)

> Q:  [I]sn't it true that you kept -- you kept staying in the SHU because you kept racking up tickets?
>
> A:  No.  I kept staying in SHU because the conditions of confinement that -- that you know, my mind was mixed up at the time, so conditions of confinement, my mind was messed up at the time.
>
> Q:  Which resulted in you getting disciplinary tickets?
>
> A:  Yes -- yes.  Yeah.

*Id*. at 67.

> Q:  So every time, you keep staying in SHU because you keep
> getting tickets; right?
>
> A:  Because -- because of my behavior, yeah.

*Id*. at 69.  As a result, each disciplinary sentence was "added" to his SHU time.  *Id*. at 66.  Based

on his disciplinary sentences, Plaintiff testified he was scheduled to remain in the SHU until

2033.  (Dkt. No. 62-1 at ¶ 9; Dkt. No. 71-6 at 66.)

**B.    Time Cuts**

The Special Housing Management Committee ("SHMC") at Upstate routinely reviews

the disciplinary sentence of inmates serving SHU time.  (Dkt. No. 71-1 at ¶ 52.)  The SHMC, in

its discretion, may issue "time cuts" up to twenty-five percent of an inmate's SHU time sentence

or privilege suspension.  *Id*. at ¶ 53.  In determining what cuts to issue an inmate, the SHMC

considers an inmate's behavior in SHU and whether he has accrued further disciplinary

sentences.  *Id*. at ¶¶ 54, 57.  The Superintendent at Upstate, in his discretion, may also issue time

cuts or suspend sentences on an inmate's privileges up to two (2) years, in accordance with the

SHMC guidelines.  *Id*. at ¶ 56.

Beginning in September 2012, Plaintiff stopped "getting tickets" and accruing

disciplinary sentences.  *Id*. at ¶ 63.  Accordingly, from 2013 until his release from the SHU,

Plaintiff was issued eighteen years and four months of time cuts to his SHU confinement and

privilege suspensions.  *Id*. at ¶¶ 55, 58-60.  As a result, Plaintiff was released from the SHU

September 2, 2017, and moved to general population.  *Id*. at ¶ 48.  It is undisputed that had

Plaintiff stopped accruing disciplinary sentences, he would have been placed in general

population sooner.  *Id*. at ¶ 50.

C.    **Conditions of Confinement**

Plaintiff alleges he was subjected to "prolonged" and "extreme" isolation and inhumane conditions in the SHU.  (Dkt. No. 1 at 6, 7.)  From 1989 until 2007, Plaintiff was housed in the SHU at Attica, Great Meadow, Elmira, Wende, Sullivan, Clinton, Southport, and Auburn.  (Dkt. No. 62-1 at ¶¶ 15-17, 22.)  During this time, Plaintiff claims he was frequently subjected to full restraint orders, including handcuffs, waist chain, and leg irons; shield and hatch orders; and other deprivation orders, including no outside exercise, showers, haircut, hot water, cell water, or cell cleanup.  (Dkt. No. 62-1 at ¶¶ 15-17, 22; *see also* Dkt. No. 71-6 at 98; Dkt. No. 71-13.)  Plaintiff states "every 24 hours my status was reviewed and renewed for first 7 days and every 7 days continuously reviewed and renewed on numberous of times's."  (Dkt. No. 62-1 at ¶ 23.)

Plaintiff was housed in the SHU at Upstate from June 2007 until May 2017.  (Dkt. No. 71-1 at ¶ 2.)  Plaintiff claims he was:

> kept in a single-cell 24 hours a day equipped with my own shower and outside-exercise pen enclosed and solid steel door with wire mesh bars plexiglass window partition on side tiny little hole's to talk thru 2 hatch's in middle of door, bottom of door.
>
> Each and every time I leaving my cell for any reasons's being placed in handcuff's remained on while out-of-cell their no full restraint's order requirement.
>
> During feed-up guard's engaged in harassing me constantly tampered with my meal-trays morning, noon, night numberous of times.
>
> Also engaged in constantly RN harassed me by denied sick-call, see MD, medication's on numberous of times's.

(Dkt. No. 62-1 at ¶¶ 29-32.)  Plaintiff further states:

> By me being kept in solitary confinement's I became to be agitated, angry, displayed disruptive violent behavior, threatened to kill myself and harmed myself, hard to falled asleep at night's, enormously weight loss to restricted diet's, talking to myself all the

> time's, provoked to engaged into physical altercation, hungry all
> the time, this above occurred numberous of time's.

*Id*. at ¶ 26.  Plaintiff also was housed in "mental health units in striped-cell being naked at all of the [facilities] numerous of time's " was prescribed "various psyc-medication's."  *Id*. at ¶¶ 27, 28.

Plaintiff claims that from September 2012 until June 2013, Uhler issued and authorized a "mobile protective hatch cover" and "safe distance order."  (Dkt. No. 62-1 at ¶¶ 19-21.)  Plaintiff claims he was also subjected to numerous deprivation orders at various times, including no outside exercise, no cell clean up, no headphones, no law library, no general library, no sick calls, no morning supplies cart, no medical treatment, no prescribed medications, and no laundry. *Id*. at ¶ 25.  The deprivation orders were reviewed daily.  *Id*. at ¶ 24.

Plaintiff subsequently testified that while housed at Upstate he received state-issued clothing, a blanket, daily recreation, a functioning cell, three meals per day, usually four showers per week, personal and legal visitation, prescription medication and eye glasses, hygienic products including soap, shaving cream, toothbrush, and razor, pen and paper, and was allowed to keep legal paperwork and personal items in his cell.  (Dkt. No. 71-6 at 113-21.)  Plaintiff also testified that the conditions in the SHU were "torture" and "basically the same" at all DOCCS facilities.  *Id*. at 73-74, 93, 98-120.  According to Plaintiff, Uhler and Annucci had "full knowledge" and were "aware" of the "policy" of housing inmates in "unconstitutional" SHU and "encouraged" the policy.  *Id*. at 33-44.

### D.      Uhler's Declaration

Plaintiff alleges Uhler supervised and controlled the SHU at Upstate and refused to "cut" Plaintiff's SHU time.  (Dkt. No. 1 at 7.)  Uhler has been employed by DOCCS as the Superintendent of Upstate since May 2014.  (Dkt. No. 71-12 at ¶ 1.)  He was the Deputy

Superintendent of Security ("DSS") at Upstate from October 2009, to May 2014, and would fill in for the Superintendent as needed. *Id.* at ¶¶ 2, 4.

Superintendent Uhler is responsible for the oversight of all administrative, fiscal, and security matters within the facility. *Id.* at ¶ 3. He explains that it is not possible, practical or efficient for him to be personally involved in every decision made concerning the day-to-day operation of the facility. *Id.* at ¶ 9. Uhler delegates the responsibility of conducting Tier II and III disciplinary hearings to subordinate staff at Upstate. *Id.* at ¶ 10. He delegates a captain to review appeals of Tier II disciplinary hearings. *Id.* at ¶ 14. Disposition of Tier III disciplinary hearings may be appealed to the Director of SHU. *Id.* at ¶ 16. Uhler declares he did not conduct any of Plaintiff's Tier II and Tier III disciplinary hearings, nor did he render determinations on any appeals. *Id.* at ¶¶ 15, 17.

Uhler states Plaintiff received "generous" time cuts to his disciplinary sentences in the SHU at Upstate and could have remained in the SHU longer. *Id.* at ¶ 30. From September 30, 2013, until Plaintiff's release from the SHU on September 2, 2017, the SHMC issued ten years and four months in cuts to Plaintiff's SHU time and privilege suspensions. *Id.* at ¶ 34. On February 13, 2013, Uhler, as DSS, issued Plaintiff a one year time cut on his SHU time and privileges suspension while filling in for then-Superintendent Rock. *Id.* at ¶ 58. On October 1, 2013, Superintendent Rock issued Plaintiff a five year time cut on his SHU time. *Id.* at ¶ 59. On January 28, 2016, Uhler, as Superintendent, issued Plaintiff a two year time cut on his SHU time. *Id.* at ¶ 60.

Uhler states it is his understanding that Plaintiff alleges his confinement in SHU was unlawful because he was segregated from the general population, denied congregate recreation, deprived of personal property, and denied privileges such as reduced restraints, additional

options at commissary, personal clothing, and increased telephone use.  *Id*. at ¶ 63.  According to

Uhler, the conditions Plaintiff describes are within the normal range of conditions experienced

by inmates that are incarcerated in the SHU.  *Id*. at ¶ 64.

Uhler states all inmates in the SHU at Upstate are provided with a minimum of: state-

issued clothing, toiletries, bedding, writing materials, the ability to send and receive privileged or

personal correspondence, meals of the same type as meals available to inmates in general

population, daily sick call, mental health services, laundry services, religious counseling, the

opportunity to participate in a cell study program, general library services, law library services,

and access to the Inmate Grievance Program ("IGP").  *Id*. at ¶ 68.

Additionally, Plaintiff was provided with extra privileges due to his Progressive Inmate

Movement System ("PIMS")[10] level.  *Id*. at ¶ 66.  Attendance at congregate meals, congregate

recreation, and congregate religious services is not currently allowed in the SHU at Upstate,

regardless of an inmate's PIMS Level.  *Id*. at ¶ 78.[11]  Uhler states Plaintiff's confinement in the

SHU at Upstate was not unconstitutional or cruel and unusual in any way.  *Id* at ¶ 65.

### E.     PIMS

Uhler explains that PIMS Level I inmates are additionally provided: monthly commissary

purchases of stamps only, two hours of recreation daily, one visit per week, headphones or a

personal radio, and three showers per week.  *Id*. at ¶ 70.  Plaintiff was assigned a PIMS Level I at

Upstate from (1) June 1, 2007, to June 13, 2007; (2) July 2, 2007, to August 5, 2007; (3) August

---

[10]  PIMS is a uniform behavior incentive program for inmates in the SHU.  (Dkt. No. 71-1 at ¶ 67.)

[11]  As part of the settlement agreement in *Peoples v. Annucci*, DOCCS agreed that PIMS Level IV and congregate recreation will be available to inmates participating in the Upstate Confinement Program Plan, which shall be operational by mid-2019.  (Dkt. No. 71-1 at ¶¶ 80, 81.)  Inmates cannot be a PIMS Level IV at Upstate until the facility's Confinement Program Plan is operational.  *Id*. at ¶ 84.

30, 2007, to October 8, 2007; (4) January 27, 2009, to March 6, 2009; (5) March 2, 2010, to

April 19, 2010; (6) May 9, 2010, to June 12, 2010; (7) June 29, 2010, to July 28, 2010; and (8)

September 10, 2012, to October 13, 2012.  *Id*. at ¶ 69.

Further, all inmates at PIMS Levels II, III and IV are also allowed: one deck of playing

cards, books, magazines, newspapers, personal photographs, skin cream, and the option to

purchase stamps, writing pads, legal and carbon paper, toiletries, shower slippers, batteries, and a

knit cap from commissary.  *Id*. at ¶ 77.

PIMS Level II inmates are additionally allowed: some personally-owned items, two hours

of recreation daily, one visit per week, one telephone call every thirty days, headphones or a

personal radio, and three showers per week.  *Id*. at ¶ 72.  Plaintiff was assigned a PIMS Level II

from (1) June 13, 2007, to July 2, 2007; (2) August 5, 2007, to August 30, 2007; (3) October 8,

2007, to November 18, 2007; (4) March 6, 2009, to April 17, 2009; (5) April 19, 2010, to May 9,

2010; (6) June 12, 2010, to June 29, 2010; (7) July 28, 2010, to August 25, 2010; and (8)

October 13, 2012, to June 20, 2013.  *Id*. at ¶ 71.

PIMS Level III inmates are additionally allowed: personally-owned items, personal

shorts, one pair of sneakers, two hours of recreation daily, reduced restraints, one telephone call

every thirty days, two visits per week, headphones or a personal radio, four showers per week,

and the ability to purchase up to $5.00 in non-cookable food from commissary.  *Id*. at ¶ 74.

Plaintiff was assigned a PIMS Level III from (1) November 18, 2007, to January 27, 2009; (2)

April 17, 2009, to March 2, 2010; (3) August 25, 2010, to September 10, 2012; (4) June 20,

2013, to September 23, 2016; and (5) October 26, 2016, to May 25, 2017.  *Id*. at ¶ 73.

PIMS Level IV are additionally allowed some personally-owned items, personal shorts,

one pair of sneakers, a shirt, sweatshirt, sweatpants, two hours of recreation daily, even further

reduced restraints, one telephone call every thirty days, two visits per week, headphones or a personal radio, four showers per week, and the ability to purchase up to $10.00 in non-cookable food from commissary. *Id*. at ¶ 75. Plaintiff was assigned a PIMS Level IV from September 23, 2016, to October 26, 2016. *Id*. On October 26, 2016, Plaintiff was demoted from a PIMS Level IV to a Level III for administrative reasons, not due to any misbehavior. *Id*. at ¶ 82. All other demotions were due to Plaintiff's continued misbehavior in the SHU at Upstate. *Id*. at ¶ 85.

Plaintiff testified that the conditions of his confinement Upstate were generally consistent with the foregoing. (Dkt. No. 71-6 at 73-74, 93, 98-120.)

**F.    Annucci's Declaration**

Plaintiff claims Annucci was aware of the widespread DOCCS policy encouraging the use of SHU confinement because Annucci was a defendant in *Peoples v. Annucci*. (Dkt. No. 1 at 5-6.) Annucci has been the Acting Commissioner of DOCCS since May 2013. (Dkt. No. 71-11 at ¶ 1.) As Acting Commissioner, he is the Chief Executive Officer of DOCCS and is responsible for the overall management of DOCCS, including the confinement and rehabilitation of approximately 50,000 individuals in custody at fifty-four state facilities. *Id*. at ¶¶ 5, 6.

As Acting Commissioner, Annucci relies on Deputy Commissioners, facility Superintendents, and other subordinate staff members to ensure the safe and secure operation of DOCCS. *Id*. at ¶ 7. DOCCS has procedures in place to implement standards of inmate behavior and to discipline inmates who misbehave. *Id*. at ¶ 8. Annucci did not conduct any disciplinary hearings that resulted in Plaintiff serving a disciplinary sentence. *Id*. at ¶ 24. As Acting Commissioner, Annucci is not responsible for reviewing inmate disciplinary sentences, issuing time cuts, or suspending sentences on an inmate's privileges. *Id*. at ¶ 15. Annucci states he has

never reviewed Plaintiff's disciplinary history, issued him any time cuts, suspended sentences on his privileges, or performed any other individualized action. *Id*. at ¶ 16.

## III.    APPLICABLE LEGAL STANDARD

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 273 (citations omitted). The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id.* 426 F.3d at 554 (citation and quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id.* (citation and internal quotation marks omitted). "[T]o satisfy Rule 56(e), affidavits must be based upon 'concrete particulars,' not conclusory allegations." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997) (citation omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008). Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999[12]) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

---

[12]  The Court will provide Plaintiff with copies of unpublished decisions in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76, 76 (2d Cir. 2009) (per curium).

When considering cross motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of New York, N.Y. & Vicinity v. City of New York Dep't of Parks & Recreation*, 311 F.3d 534, 543 (2d Cir. 2002) (quoting *Heublein v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (quotation marks omitted)). "Moreover, the district court considering a summary judgment motion must be mindful of the underlying standards and burden of proof." *Larkins v. Cayuga Cty.*, No. 9:13-CV-219 (NAM/ATB), 2014 WL 4760064, at *4 (N.D.N.Y. Sept. 24, 2014) (quotation marks and alternations omitted). Accordingly, with respect to Plaintiff's motion, "he bears a much greater initial burden; he must show that the evidence supporting his claims is so compelling that no reasonable jury could return a verdict for the defendant." *Id*.

## IV.    LEGAL STANDARDS FOR PLAINTIFF'S CLAIMS

### A.    Eighth Amendment Conditions of Confinement

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. The prohibition extends to prison conditions. *Horne v. Coughlin*, 155 F.3d 26, 31 (2d Cir. 1998). "The Constitution does not mandate comfortable prisons . . . but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (citations and quotation marks omitted). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient" to support a claim for unconstitutional conditions of confinement. *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999).

To state a claim under the Eighth Amendment based upon conditions of confinement, an inmate must satisfy both an objective and a subjective element. *Farmer*, 511 U.S. at 834, 837. To satisfy the objective element, a plaintiff must establish that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of harm." *Id*. at 834. An inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Id*. Health includes the risk of serious damage to "physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)).

Prison officials violate the Eighth Amendment when they "deprive an inmate of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (per curiam)). There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights. *Id.* (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar*, 683 F.3d at 57 (citation and quotation marks omitted). Thus, the question of "whether incarceration in the SHU violates the Eighth Amendment . . . depends on the duration and conditions of the confinement." *Gonzalez v. Hasty*, 802 F.3d 212, 224 (2d Cir. 2015).

To satisfy the subjective element, a plaintiff must establish that the "defendant official acted with a sufficiently culpable state of mind . . . such as deliberate indifference to inmate health or safety." *Walker*, 717 F.3d at 125 (citations and quotation marks omitted). To constitute deliberate indifference under the subjective element, "[t]he prison official must know

of, and disregard, an excessive risk to inmate health or safety." *Jabbar*, 683 F.3d at 57; *see also*

*Trammel v. Keane*, 338 F.3d 155, 162-63 (2d Cir. 2003) (the state of mind for the subjective

element in cases involving prison conditions is "deliberate indifference to inmate health or

safety."). "The official must be both aware of facts from which the inference could be drawn

that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511

U.S. at 837. Mere negligence is not enough. *Id.* at 835.

### B.    Fourteenth Amendment Due Process

The Fourteenth Amendment to the United States Constitution provides that "[n]o State

shall . . . deprive any person of life, liberty, or property, without due process of law." U.S.

Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, . . . or it may

arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545

U.S. 209, 221 (2005) (citation omitted). "Although prison inmates necessarily have their liberty

severely curtailed while incarcerated, they are nevertheless entitled to certain procedural

protections when disciplinary actions subject them to further liberty deprivations such as loss of

good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380

F.3d 57, 69 (2d Cir. 2004) (citations omitted).

To establish a procedural due process claim under § 1983, a prisoner must show that he

(1) possessed an actual liberty interest, and (2) was deprived of that interest without being

afforded sufficient process. *Ortiz v. McBride*, 380 F.3d 649 654 (2d Cir. 2004); *Tellier v. Fields*,

280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998).

"Prison discipline implicates a liberty interest when it imposes atypical and significant hardship

on the inmate in relation to the ordinary incidents of prison life." *Ortiz*, 380 F.3d at 654 (quoting

*Sandin v. Conner*, 515 U.S. 472, 484 (1995)); *Tellier*, 280 F.3d at 80; *Hynes*, 143 F.3d at 658.

As to the first element, in *Sandin*, the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. "The prevailing view in this Circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor." *Liao v. Malik*, No. 9:13-CV-1497 (GTS/DEP), 2016 WL 1128245, at *4 (N.D.N.Y. Feb. 26, 2016) (collecting cases).

"[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). The Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights; however, general guidelines have been defined. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

As to the second element, the Second Circuit has found that disciplinary segregation under conditions of more than 305 days rises to the level of atypicality. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*."). Further, the Second Circuit has suggested that "separate SHU sentences 'should be aggregated for purposes of the *Sandin* inquiry' when they

constitute a sustained period of confinement." *Giano v. Selksy*, 238 F.3d 223, 226 (2d Cir. 2001)

(quoting *Sims v. Artuz*, 230 F.3d 14, 22-23 (2d Cir. 2000)); *see also Sealey*, 197 F.3d at 589

(requiring district court to aggregate sanctions that caused inmate to serve consecutive time in

segregation).

Regarding the process an inmate is due, a disciplinary hearing comports with due process

when an inmate receives "advance written notice of the charges; a fair and impartial hearing

officer; a reasonable opportunity to call witnesses and present documentary evidence; and a

written statement of the disposition, including supporting facts and reasons for the action taken."

*Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004); *Wolff v. McDonald*, 418 U.S. 539, 564-70

(1974).

### C.      Supervisory Liability

The law is clear that "personal involvement of defendants in alleged constitutional

deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson*,

568 F.2d 930, 934 (2d Cir. 1977).  "Because vicarious liability is inapplicable to . . . § 1983 suits,

a plaintiff must plead that each government-official defendant, through the official's own

individual actions, has violated the Constitution."  *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)

("Government officials may not be held liable for the unconstitutional conduct of their

subordinates under a theory of *respondeat superior*.").  Thus, "[h]olding a position in a

hierarchical chain of command, without more, is insufficient to support a showing of personal

involvement."  *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6

(N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also Wright v. Smith*, 21 F.3d

496, 501 (2d Cir. 1994) (noting that a defendant may not be held liable in a § 1983 action merely

because he or she held a high position of authority).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[13]

## V.    ANALYSIS

### A.    Breach of Settlement Agreement in *Peoples v. Annucci*

As an initial matter, Defendants argue that to the extent Plaintiff seeks damages for an alleged breach of the settlement agreement reached in the class action lawsuit *Peoples v. Annucci*, he lacks standing and the Court lacks subject matter jurisdiction.  (Dkt. No. 71-3 at 14.[14])  In response, Plaintiff makes clear he is not suing for breach of the settlement agreement or denied privileges associated with a PIMS level IV.  (Dkt. No. 75 at ¶ 2.)  He explains:

> Plaintiff is suing defendant's Uhler and Annucci for being kept in solitary confinement's subjected to suffered cruel and unusual punishment's barbarous condition's and treatment's under 8th Amendment along with solitary confinement's an atypical and significant hardship in relation to the ordinary incident of prison life under 14th Amendment substantive due process my solitary confinement were dramatically different from basic conditions of

---

[13]  The Second Circuit has thus far expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability.  *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

[14]  The Court notes there was considerable discussion during Plaintiff's deposition regarding the effect, if any, of the settlement agreement in *Peoples v. Annucci* and the case at bar.  (*See, e.g.*, Dkt. No. 71-6 at 22-33, 45-47, 53-56.)

my indeterminate sentence.

(Dkt. No. 75 at ¶ 3.)

Accordingly, on this record, the Court finds, as did the District Court on initial review, Plaintiff brings this action pursuant 42 U.S.C. § 1983, which establishes a cause of action for '"the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz*, No. 6:95-CV- 0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)).  Therefore, the Court finds Defendants are not entitled to summary judgment and dismissal of the complaint on this basis.

**B.    Conditions of Confinement**

Plaintiff has asserted an Eighth Amendment conditions of confinement claims against Uhler and Annucci with regard to his "prolonged" and "extreme" and inhumane conditions of confinement in the SHU.  (Dkt. No. 1 at 6, 7.)  The parties cross move for summary judgment. (Dkt. Nos. 62; 71.)

Construed liberally, Plaintiff argues that his twenty-eight years of consecutive SHU disciplinary confinement constitutes cruel and unusual punishment as a matter of law.  (*See generally* Dkt. Nos. 62-1; 62-2; 62-5.)  In support of their cross motion for summary judgment, Defendants contend summary judgment is warranted because: (1) Plaintiff's claims regarding his conditions of confinement prior to December 1, 2013, are barred under the statute of limitations and doctrine of laches; (2) Plaintiff failed to exhaust his administrative remedies under the Prison

Litigation Reform Act of 1995 ("PLRA"); (3) Plaintiff has failed to establish the personal

involvement of Annucci; and (4) Plaintiff Eighth Amendment claims fail because the conditions

of confinement at Upstate were humane and appropriate, and Uhler and Annucci did not have a

sufficiently culpable state of mind.  (Dkt. No. 71-3 at 15-27.)

Because "[t]here is no question that exhaustion is mandatory under the PLRA and that

unexhausted claims cannot be brought in court[,]" *Jones v. Bock*, 549 U.S. 199, 211 (2007), the

Court addresses Defendants' exhaustion argument first.

### 1.      Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with

respect to prison conditions under [§] 1983 . . . by a prisoner confined in any jail, prison, or other

correctional facility until such administrative remedies as are available are exhausted."  42

U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016).  "[T]he PLRA's

exhaustion requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other

wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," which means using all steps required by the

administrative review process applicable to the institution in which an inmate is confined and

doing so properly.  *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see*

*also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps

that the [government] agency holds out, and doing so properly") (quotation marks omitted).

In New York State prisons, DOCCS has a well-established three-step Inmate Grievance

Procedure ("IGP").  7 N.Y.C.R.R. § 701.5.  First, an inmate must file a complaint with the

facility IGP clerk within twenty-one days of the alleged occurrence.  *Id*. § 701.5(a)(1).  A

representative of the facility's Inmate Grievance Resolution Committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id*. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Office Review Committee ("CORC") for a decision under the process applicable to the third step. *Id*. § 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. § 701.5(d)(3)(ii).

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.") (internal quotations and citations omitted)).

While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, §

1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]" (quotation marks and citations omitted)).  In the PLRA context, the Supreme Court has determined "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859 (quotation marks and citations omitted).

The *Ross* Court identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA.  *Id*. at 1859-60.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id*. at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id*.  Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."  *Id*. at 1860.

In *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016), the Second Circuit noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]"  The illustrations of unavailability in *Ross* nonetheless guide the Court's inquiry.  *See Mena v. City of New York*, No. 13-CV-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Because non-exhaustion is an affirmative defense, defendants bear the burden of showing that a prisoner has failed to satisfy the exhaustion requirements.  *See Jones*, 549 U.S. at 216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  Plaintiff must then demonstrate that the DOCCS IGP was unavailable to him under *Ross*.  *See Jones*, 549 U.S. at 216.

## 2.    Plaintiff's Failure to Exhaust

Rachel Seguin, DOCCS Assistant Director of the IGP, has submitted a declaration in support of Defendants' cross motion.  (Dkt. No. 71-9 at ¶¶ 1, 2.)  Seguin is the custodian of records maintained by CORC and is fully familiar with the grievance procedure available to inmates for filing complaints in New York State.  *Id*. at ¶¶ 1, 3.  CORC maintains files of grievance appeals to CORC in accordance with DOCCS Directive #4040, which stipulates it is Department policy to maintain grievance files for the current year and the previous four calendar years.  *Id*. at ¶ 10.  Further, the CORC computer database contains records of all appeals of grievances received from the facility Inmate Grievance Program Supervisor ("IGPS"), as well as those reviewed under the expedited procedure of 7 N.Y.C.R.R. § 701.8, which were heard and decided by CORC since 1990.  *Id*.  Seguin explains the database also contains a great deal of historical data with respect to appeals to CORC dating back to 1986, including data on many of the individual appeals.  *Id*.  The IGPS at each DOCCS facility is responsible for titling a grievance complaint and giving it a grievance number.  *Id*. at ¶ 20.

Seguin and CORC staff searched CORC records for determinations upon grievance appeals brought by Plaintiff.  *Id*. at ¶ 12.  A copy of the computer printout from the CORC database reflecting the results of that search is attached to her declaration as Exhibit A.  (Dkt. No. 71-10.)

DOCCS records reflect that Plaintiff filed eighteen grievance appeals to CORC between 1991 through 2006, before his transfer to Upstate, none of which complained of "prolonged" and "extreme" isolation in the SHU or inhumane conditions of confinement.  *Id*. at 3.  DOCCS records reflect that from 2007 through 2016, Plaintiff filed thirty-one grievance appeals to CORC from Upstate before filing the complaint in this action, none of which relate to Plaintiff's

"prolonged" and "extreme" isolation in the SHU or inhumane conditions of confinement. *Id*. at 2. DOCCS records indicate Plaintiff has seven "active" grievance appeals to CORC, all of which were filed after Plaintiff commenced this action and, in any event, do not relate to Plaintiff's claims in this action. *Id*. at 1.

The Second Circuit has stated that in order to exhaust, an inmate's allegations must provide "enough information to 'alert the prison to the nature of the wrong for which redress [was] sought.'" *Espinal v. Goord*, 558 F.3d 119, 127 (2d Cir. 2009) (quoting *Johnson v. Testman*, 380 F.3d 691, 697 (2d Cir. 2004)). While an inmate need not "specifically identify the responsible parties in his grievance in order to later name them as defendants in [a] lawsuit," an inmate does need to "to provide a specific description of the problem." *Id*.

Based on the foregoing, the Court finds Defendants have satisfied their burden of showing Plaintiff failed to exhaust his administrative remedies under the IGP with regard to his Eighth Amendment conditions of confinement claims against Uhler and Annucci based on his "prolonged" and "extreme" isolation in the SHU or inhumane conditions of confinement.

In his opposition to Defendants' cross motion, Plaintiff argues his Eighth Amendment conditions of confinement claims against Uhler and Annucci are exhausted. (Dkt. No. 75 at 3.) Plaintiff states, "Leroy Peoples is lead representative Plaintiff had indeed exhausted all of his administrative remedies on behalf to class-member." *Id*. Similarly, in his deposition, Plaintiff testified:

> Q: Did you ever take a formal grievance form and grieve the fact that you were being --- you were in SHU with these conditions of confinement?
>
> A: Not me, per se, but the -- the Plaintiff did --
>
> Q: Okay.

>A:  -- that represented -- that represented me.

(Dkt. No. 71-6 at 130.)

>Q:  Did you ever grieve Annucci and Uhler?  Did you ever name them in any of these grievances?
>
>A:  The Plaintiff is representing me.
>
>Q:  But that's not what I'm asking you.  I understand that he filed grievances.
>
>A:  Yeah -- yeah.
>
>Q:  What I'm asking is did you file grievances, as well?
>
>A:  Well, that's my response.  The Plaintiff represented and the -- in the *Peoples* case that represented me.

*Id*. at 130-31.

When questioned why he did not file a grievance regarding his conditions of confinement

in the SHU before learning about the class action *Peoples v. Annucci*, Plaintiff testified:

>Q:  [B]efore you knew about this lawsuit [*Peoples v. Annucci*] even existing, why did you not file a grievance at Upstate?
>
>A:  I didn't need to.  I mean I'm going by the *Peoples*, by the representative that representing me.

*Id*. at 146.

Regarding his health, Plaintiff testified:

>Q:  Do you know if -- if you ever told the I.G.R.C. like, hey, I'm losing my mind in here kind of thing, or would you have not grieved something like that?
>
>A:  Well, about me being in solitary confinement, Department of Correction already know the condition that they're doing is harmful.  So they all -- they already know that.
>
>Q:  Okay.  So you did not -- you don't recall grieving it, because you think that they already knew?

A: Yes -- yes, it had been grieved.  Yeah, the Plaintiff did all that.

*Id*. at 142.

Plaintiff appears to misunderstand the exhaustion requirement.  Prior to *Ross*, 136 S. Ct. at 1856, the Second Circuit suggested that grievance procedures might be found unavailable where an inmate was "unaware of the grievance procedures or . . . did not understand those procedures."  *Ruggiero*, 467 F.3d at 178; *see also Hemphill v. State of New York*, 380 F. 3d 680, 686 (2d Cir. 2004) (establishing a three-part inquiry to determine whether, *inter alia*, a plaintiff's failure to exhaust available administrative remedies could nevertheless be justified by "special circumstances."[15]).  Post-*Ross*, however, a plaintiff must show more than mere unawareness of an existing grievance procedure; he must show that he was unaware because, for example, DOCCS personnel were unable or unwilling to make him aware, or prevented him from becoming aware "through machination, misrepresentation, or intimidation."  *Ross*, 136 S. Ct. at 1859-60.  Thus, Plaintiff's misunderstanding does not render the grievance procedure unavailable.

The IGP specifically provides that "[a]ll grievances must be filed in an individual capacity."  7 N.Y.C.R.R. § 701.3(b).  As such, the IGP "cannot be reasonably interpreted to allow an inmate to file a grievance on behalf of a class of inmates."  *Kravitz v. Fischer*, No. 9:12-CV-1011 (LEK/TWD), 2014 WL 4199245, at *11 (N.D.N.Y. Aug. 22, 2014) (rejecting the plaintiffs' argument that their failure to exhaust First Amendment free exercise claims should be excused, pre-*Ross*, because another inmate grieved the issue "on behalf of all the Jewish

---

[15]  Generally, the "special circumstances" exception was applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterpreted the statutory requirements of the appeals process.  *Giano v. Goord*, 380 F.3d 670, 676 (2d Cir. 2004).

inmates" and they were advised that the filing of a single grievance on the matter was sufficient

to address the issue); *see, e .g.*, *Shariff v. Coombe*, 655 F. Supp. 2d 274, 286 (S.D.N.Y. 2009)

(relying on § 701.3(b) in rejecting the plaintiff's argument that where there are issues affecting a

class of inmates, the issues should be grievable as a class action); *see also Torres v. Cormier*,

No. 5:12-CV-63, 2012 WL 5330980, at *3 n.3 (D. Vt. Sept. 19, 2012) (a plaintiff cannot rely on

the fact that another inmate filed a grievance "as evidence that he has in any way initiated (let

alone exhausted) the administrative grievance procedure himself"); *Jamison v. Franko*, No. 12 C

0242, 2013 WL 5166626, at *2 (N.D. Ill. Sept. 13, 2013) (finding failure to exhaust where the

plaintiff attempted to rely on a grievance filed by another inmate, and the applicable IGP did not

authorize one inmate to file on behalf of another); *Douglas v. Marvin*, Civil No. 12-2070, 2013

WL 2631875, at *3 (W.D. Ark. June 12, 2013) (finding failure to exhaust where plaintiff failed

to submit a grievance and attempted to rely on the grievance of another inmate); *Roberson v.*

*Martens*, No. 1:09-cv-861, 2010 WL 3779544, at *6 (W.D. Mich. Aug. 25, 2010) (finding

grievance filed by another inmate "did not exhaust plaintiff's administrative remedies, because it

was not plaintiff's grievance [and] was written and filed by another inmate [and the] directive

does not authorize one prisoner to prepare and file grievances on behalf of another").

　　Similarly, Plaintiff's contention that DOCCS was aware and knew the conditions of his

solitary confinement were "harmful" is unavailing.  *See, e.g.*, *Tapp v. Seppio*, No. 05-CV-6485

(CJS-JWF), 2012 WL 125284, at *4 (W.D.N.Y. Jan. 17, 2012) (rejecting inmate's argument that

his failure to exhaust an Eighth Amendment conditions of confinement claim should be excused

because the defendants were aware of the condition at issue).  Nor does an inmate's belief that

administrative remedies would be futile demonstrate unavailability.  *See, e.g.*, *Harrison v.*

*Goord*, No. 07 Civ. 18063(HB), 2009 WL 1605770, at *4 (S.D.N.Y. June 9, 2009) (holding

"[p]risoners are required to exhaust their administrative remedies even if they believe that administrative remedies would be ineffective or futile").

Finally, none of the exceptions outlined by the Supreme Court in *Ross* apply here. Plaintiff, who has the burden of establishing that the IGP grievance procedure was unavailable to him, has submitted no evidence, admissible or otherwise, suggesting the grievance procedure was unavailable to him under *Ross*.  *See Jones*, 549 U.S. at 216; *Ross*, 136 S. Ct. 1859-60. Defendants note Plaintiff testified that he was familiar with the IGP and has appealed many grievances to CORC.  (Dkt. No. 71-3 at 20); *see, e.g.*, *Davis v. Grant*, No. 15-CV-5359 (KMK), 2019 WL 498277, at *8 (S.D.N.Y. Feb. 8, 2019) ("Nor can Plaintiff show that the IGP is "so opaque that it [is] . . . incapable of use," given that Plaintiff successfully used the IGP, filing eight grievances while at Sing Sing between 2014 and 2017, [and] appealing thirty-nine grievances to CORC since he has been in prison[.]"); *Mckinney*, 170 F. Supp. at 516-17 (finding the plaintiff failed to present a question of fact as to whether the grievance process was available to him where the record showed the plaintiff appealed and exhausted twenty grievances during his twenty-nine years of incarceration including four during the relevant period).  Moreover, Plaintiff makes no allegations that anyone or anything prevented him from filing grievances. (*See* Dkt. No. 71 at 20.)

Based upon the foregoing, the Court recommends that Defendants be granted summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies.

### 3.    Dismissal with Prejudice

Dismissal without prejudice on a failure to exhaust administrative remedies is appropriate when "a prisoner who brings suit without having exhausted these remedies can cure the defect simply by exhausting them and then reinstituting his suit."  *Berry v. Kerik*, 366 F.3d 85, 87 (2d

Cir. 2004) (citing *Snider v. Melindez*, 199 F.3d 108, 111-12 (2d Cir. 1999)).  Conversely,

dismissal with prejudice is appropriate "where a plaintiff is effectively barred from

administrative exhaustion."  *McCoy v. Goord*, 255 F. Supp. 2d 233, 252 (S.D.N.Y. 2003); *see*

*also Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 240 (W.D.N.Y. 2010) (dismissing claim with

prejudice "[s]ince the time limits for plaintiff to file an administrative appeal have long since

passed, administrative remedies are no longer available to him[.]"); *see also Ramos v. New York*,

No. 9:17-CV-0259 (BKS/CFH), 2018 WL 7133696, at *5 (N.D.N.Y. Dec. 27, 2018)

(recommending dismissal with prejudice where the plaintiff failed to exhaust his Eighth

Amendment conditions of confinement claim and the time to do so "had long since passed"),

*report-recommendation adopted by* 2019 WL 330869, at *1 (N.D.N.Y. Jan. 25, 2019).

Here, Plaintiff remained in the SHU until September 2, 2017, when was moved to general

population.  (Dkt. No. 71-1 at 48.)  More than seventeen months has passed since Plaintiff was

housed in the SHU.  Because Plaintiff's failure to exhaust is at this point an incurable grievance,

the Court recommends granting Defendants summary judgment for failure to exhaust

administrative remedies, and that the dismissal be with prejudice.

###    4.    Statute of Limitations, Doctrine of laches, Personal Involvement, and Merits

Because the Court is recommending that summary judgement be granted to Defendants

on this claim for failure to exhaust administrative remedies, the Court declines to reach the

parties' remaining arguments.

###    C.    Fourteenth Amendment Procedural Due Process

Plaintiff claims he was denied due process because his SHU confinement was "an

atypical and significant hardship in relation to the ordinary incident of prison life" and was

"dramatically different from basic conditions of [his] indeterminate sentence."  (Dkt. Nos. 1, at

5,6; 75 at ¶ 2.)  On initial review, Plaintiff's complaint was liberally construed as asserting a

procedural due process claim against Uhler and Annucci.  (Dkt. No. 1 at 5-7.)  The record

evidence demonstrates Plaintiff was confined to disciplinary segregation from 1989 until 2017 at

various DOCCS facilities.  Accordingly, there can be no doubt that Plaintiff's twenty-eight years

of consecutive SHU confinement satisfies the *Sandin* inquiry based on duration alone.

"A disciplinary hearing comports with due process when an inmate receives advance

written notice of the charges; a fair and impartial hearing officer; a reasonable opportunity to call

witnesses and present documentary evidence; and a written statement of the disposition,

including supporting facts and reasons for the action taken."  *Luna*, 356 F.3d at 487.

In their cross motion, Defendants point out that although the complaint was initial

construed as stating a procedural due process claim, Plaintiff clarified during his deposition that

he is only asserting a substantive due process claim and testified that he was given procedural

due process during the disciplinary hearings that led to his SHU confinement.  (Dkt. No. 71-3 at

3 n.1.)  Indeed, Plaintiff testified:

> Q:  Was there anything that was actually wrong --was your due
> process violated during these actual hearings or anything like that?
> Or your problem is just the actual process of being in S.H.U.?
>
> A:  My problem is the conditions of confinement in S.H.U.
>
> Q:  Uh-huh.
>
> A:  It's harsh.
>
> Q:  Okay.
>
> A:  That's torture.

*Id*. at 73.  Plaintiff stated again, "I'm not suing for no hearing . . . I was suing for my condition of

confinement."  *Id*. at 74.  Plaintiff also testified, however, that "they sentenced me to S.H.U.

confinement, it was too harsh, the sentence." *Id.*  Plaintiff explained, "They ain't got no guidelines, how much S.H.U. time that they give to prisoner.  They give prisoner a thousand years, they figured that was due process.  They ain't had no guidelines on it.  And that's a due process claim[.]" *Id.*

Defendants argue to the extent Plaintiff alleged he was sentenced to excessive SHU time during the disciplinary hearings, the record reflects Plaintiff was sentenced within DOCCS guidelines.  (Dkt. No. 71-3 at 3 n.1.)  For example, Defendants note that pursuant to DOCCS sentencing guidelines, it is not "excessive" for an inmate charged with assault on staff for the third time in ten years to be sentenced to twenty-four months in the SHU.  *Id.*; *see* Dkt. No. 71-8 at 1.  Plaintiff does not address this argument in his opposition submission.

Plaintiff does, however, explain that it was "never" his "intention" to bring a procedural due process claim.  (Dkt. No. 75 at ¶ 2.)  Rather, as set forth above, Plaintiff alleges he was:

> kept in solitary confinement's subjected to suffered cruel and unusual punishment's barbarous condition's and treatment's under 8th Amendment along with solitary confinement's an atypical and significant hardship in relation to the ordinary incident of prison life under 14th Amendment's substantive due process my solitary confinement were dramatically different from basic condition's of my indeterminate sentence.

*Id.* at ¶ 3.

In light of the foregoing, the Court finds Plaintiff has abandoned his Fourteenth Amendment procedural due process claims and recommends granting summary judgment to Defendants.  *See, e.g.*, *Martien v. City of Schenectady*, No. 1:04-CV-679 (FJS/RFT), 2006 WL 1555565, at *2 (N.D.N.Y. June 2, 2006) (finding where a *pro se* plaintiff did not address a claim in response to the defendant's summary judgment motion, the court deemed the claim abandoned and granted the defendant summary judgment) (collecting cases).

### D.    Fourteenth Amendment Substantive Due Process

Construing Plaintiff's submissions broadly, Plaintiff may be asserting a substantive due process claim.  (*See generally* Dkt. Nos. 1, 62, 75.)  Defendants argue Plaintiff's Fourteenth Amendment substantive due process claims fails.  (Dkt. No. 71-3 at 23-24.)  The Court agrees with Defendants.

"To state a substantive due process claim, a plaintiff must allege that (1) the complained-of state action compromised a constitutionally-protected liberty or property right, and (2) the state action that deprived him of that interest was oppressive or arbitrary."  *Rother v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 970 F. Supp. 2d 78, 100 (N.D.N.Y. 2013).  Regarding the second factor, "[s]ubstantive due process protects individuals against government action that is arbitrary, . . . conscience-shocking, . . . or oppressive in a constitutional sense, . . . but not against constitutional action that is incorrect or ill-advised."  *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994).  Within the context of the prison setting, "[v]ery few conditions . . . . have been found 'shocking' enough to violate a prisoner's right to substantive due process."  *Samms v. Fischer*, No. 9:10-CV-0349 (GTS/GHL), 2011 WL 3876528, at * (N.D.N.Y. Mar. 25, 2011) (citing *Sandin v. Conner*, 515 U.S. 472, 479 n.4, 484 (1995) (noting that an involuntary transfer to a state mental hospital or the involuntary administration of psychotropic drugs "give rise to protection by the Due Process Clause of its own force," i.e. state a substantive due process claim)).

Here, Plaintiff's disciplinary segregation and conditions of his confinement in the SHU are not conscious shocking or arbitrary or oppressive in a constitutional sense, but rather was based on his own continued misbehavior.  The undisputed evidence demonstrates Plaintiff was housed in the SHU at various DOCCS facilities from 1989 until 2017, due to his continued

misbehavior and accrual of disciplinary sentences. (Dkt. No. 71-1 at ¶¶ 43, 44; Dkt. No. 75 at ¶¶ 43, 44.) As discussed above, between 1988 and 2012, Plaintiff received hundreds of misbehavior reports and was found guilty of charges at approximately one hundred thirty-six Tier III disciplinary hearings and fifty-two Tier II disciplinary hearings. (Dkt. No. 71-2 ¶¶ 41, 63.) Plaintiff committed a range of offenses, including assaulting staff, acting violently, performing unhygienic acts, possessing weapons, and disobeying direct orders. *Id*. at ¶ 42. Plaintiff remained in the SHU because he kept "getting tickets" and accruing additional disciplinary sentences. (Dkt. No. 71-2 at ¶ 1; *see also* Dkt. No. 71-6 at 30, 67.) It is undisputed that an inmate may only serve a sentence for one disciplinary hearing at a time. (Dkt. No. 71-2 at ¶ 40.) Thus, if Plaintiff had stopped accruing disciplinary sentences, he would have been placed in general population sooner. (Dkt. No. 71-1 at ¶ 50; Dkt. No. 75 at ¶ 50); *cf. Walker v. Bellnier*, No. 9:17-CV-1008 (GTS/CFH), 2017 WL 5135702, at *9 (N.D.N.Y. Nov. 3, 2017) (dismissing substantive due process claim where the inmate's administrative segregation was based on, among other facts, his alleged violent history); *Parson v. Miller*, No. 9:16-cv-167 (DNH/CFH), 2018 WL 4233810, at *11 (N.D.N.Y. May 25, 2018) (finding "plaintiff's conditions of segregated confinement were not so egregious or outrageous to shock the 'contemporary conscience'" where his confinement was based on past behavior and threat to the safety and security of the facility and where inmate received three meals a day, daily exercise, legal research materials, and visits from his family members and attorney).

Moreover, the Court finds Plaintiff's substantive due process claims fails for another reason. "If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier*, 520

U.S. 259, 272 n.7 (1997).  Applying this principle, courts have held "[t]here is no sustainable substantive due process claim in the alternative to a claim governed under the Eighth Amendment."  *Graham v. Poole*, 476 F. Supp. 2d 257, 261 (S.D.N.Y. 2007) (collecting cases). Stated differently, where "Eighth Amendment and Fourteenth Amendment due process protections overlap, the due process claim will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protections to prisoners."  *Felix-Torres v. Graham*, 521 F. Supp. 2d 157, 164 (N.D.N.Y. 2007) (collecting cases); *see, e.g.*, *Madison v. Mazzucoa*, No. 02 Civ. 10299, 2004 WL 3037730, at *11 (S.D.N.Y. Dec. 30, 2004) ("Because [plaintiff's] deliberate indifference claims are covered by the Eighth Amendment, the substantive due process claims are duplicative[.]  Therefore, the substantive due process claims are dismissed as to all [d]efendants.").

Here, because it appears Plaintiff's substantive due process claim is based on the same facts that support his unexhausted conditions of confinement and abandoned procedural due process claims, his clams are not appropriately analyzed under the rubric of substantive due process.  *See Jean v. Barber*, No. 9:09-CV-0430 (MAD/GHL), 2011 WL 2973957, at *4 (N.D.N.Y. June 28, 2011) (dismissing Fourteenth Amendment substantive due process claim where plaintiff alleged overlapping Eighth and Fourteenth Amendment violations [s]ince the Eighth Amendment offers greater protection to prisoners[.]").

Based on the foregoing, the Court recommends granting summary judgment to Defendants on Plaintiff's substantive due process claims.

VI.    **CONCLUSION**

After reviewing the entire record in this matter, the applicable law, and for the above-stated reasons, the Court recommends granting summary judgment to Defendants and dismissing Plaintiff's complaint in its entirety with prejudice.

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' cross motion for summary judgment (Dkt. No. 71) be **GRANTED** on the following grounds (1) Plaintiff failed to exhaust his Eighth Amendment conditions of confinement claims; (2) Plaintiff abandoned his Fourteenth Amendment procedural due process claims; and (3) the Fourteenth Amendment substantive due process claim fails to state a claim upon which relief may be granted; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 62) be **DENIED**; and it is further

**RECOMMENDED** that Plaintiff's complaint (Dkt. No. 1) be **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[16]  Such objections shall be filed with the Clerk of the

---

[16]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL**

**PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing

*Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C.

§ 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: February 19, 2019
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

 **\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the

gate officer before being released to attend the services. (Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048– 49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 41 of 183

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at \*3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at \*5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

B. *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

1     In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall

have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4760064

2014 WL 4760064
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Ronald LARKINS, Plaintiff,
v.
CAYUGA COUNTY and David Gould,
Sheriff in Official Capacity, Defendants.

No. 9:13–CV–219 (NAM/ATB).
|
Signed Sept. 24, 2014.

**Attorneys and Law Firms**

Ronald Larkins, Auburn, NY, pro se.

Bryan Georgiady, Esq., The Law Firm of Frank W.
Miller, East Syracuse, NY, for Defendants.

**MEMORANDUM–DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Senior District Judge.

**INTRODUCTION**

*1 Plaintiff Ronald Larkins, an inmate in the custody
of the New York State Department of Corrections
and Community Supervision, brought this action for
declaratory and monetary relief under 42 U.S .C. §
1983, alleging that defendants Cayuga County and Sheriff
David Gould denied him adequate medical care by failing
to provide him with eye glasses while he was confined
at the Cayuga County Jail ("CCJ"). Plaintiff's motion
(Dkt. No. 25) and defendants' cross-motion (Dkt. No.
26) for summary judgment were referred to United States
Magistrate Judge Andrew T. Baxter for a report and
recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and
Local Rule 72.3(c).

Magistrate Judge Baxter issued a Report and
Recommendation (Dkt. No. 34) in which he recommends
that the Court deny plaintiff's motion for summary
judgment, grant defendants' cross-motion for summary
judgment and dismiss the complaint in its entirety.
Magistrate Judge Baxter's recommendation is based on
his conclusion that there is no evidence that Cayuga

County had a "policy or custom" that caused plaintiff any
constitutional violation. Magistrate Judge Baxter further
concluded that no reasonable fact finder could conclude
that defendant Sheriff Gould, or anyone else at CCJ, acted
with deliberate indifference to plaintiff's medical needs.

Plaintiff objects to Magistrate Judge Baxter's conclusion
and asserts that Cayuga County's policy of prohibiting
prisoners from covering their eyes and keeping the lights
on "24/7" is sufficient to establish municipal liability. Dkt.
No. 37, p. 2. Plaintiff also objects to dismissal of Sheriff
Gould for lack of personal involvement asserting that
there is evidence that Sheriff Gould, and others at CCJ,
were aware he was suffering from headaches and that his
vision was deteriorating. Dkt. No. 37, pp. 2, 5. Defendants
oppose plaintiff's objections. Dkt. No. 38.

**DISCUSSION**

The Court adopts Magistrate Judge Baxter's summary of
the facts and applicable law. The Court does not repeat
them here.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court reviews *de
novo* those parts of a report and recommendation to which
a party specifically objects. Where a party interposes
only general objections to a report and recommendation,
the Court reviews for clear error or manifest injustice.
*See Davis v. Chapple,* 2010 WL 145298, *2 (N.D.N.Y.
Jan. 8, 2010), *Brown v. Peters,* 1997 WL 599355,*2–
* 3 (N.D.N.Y.), *aff'd without op., 175 F.3d 1007 (2d
Cir.1999).* Failure to object to any portion of a report
and recommendation waives further judicial review of the
matters therein. *See Roldan v. Racette,* 984 F.2d 85, 89 (2d
Cir.1993).

Viewing the facts in the light most favorable to plaintiff,
the Court concludes, as did Magistrate Judge Baxter, that
there is sufficient evidence from which to assume that
plaintiff has raised an issue of fact as to whether his
medical need for prescription eyeglasses was sufficiently
serious, in satisfaction of the first prong of the deliberate
indifference analysis. *See e.g., Thomas v. Toporek,* No.
6:13–CV–6371, 2014 WL 897097, at*5 (W.D.N.Y. Mar. 6,
2014) (assuming that plaintiff's assertion "that he suffered
eye strain and migraines from not having the proper
strength prescription glasses for a period of time, and that
he allegedly almost went 'legally blind' " was sufficient to

allege a serious medical condition). The Court, however, further concludes, as did Magistrate Judge Baxter, that there is:

> *2 no evidence from which a reasonable factfinder could conclude that any of plaintiff's medical providers were aware that he was suffering from severe headaches, that his vision was deteriorating to any great extent, or aware of any other information that would indicate that plaintiff was suffering from a condition requiring urgent medical care.

Dkt. No. 34, p. 13. To establish deliberate indifference, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan,* 511 U.S. 825, 837 (1994). The grievances plaintiff submitted contained complaints regarding his vision, but they only stated that his vision had "gotten worse". Plaintiff did not request stronger pain medication and did not request a visit with the doctor. Moreover, following plaintiff's June 2011 grievance, Nurse Wallace made a number of attempts to and eventually succeeded in finding an eye care provider to see plaintiff and scheduled an appointment. Even viewing the evidence in the light most favorable to plaintiff, there is no basis on which a factfinder could concluded that Nurse Wallace or any other prison official could infer that a substantial risk of serious harm existed if plaintiff was not seen promptly by an eye care provider. Thus, plaintiff has failed to raise a genuine issue of material fact as to whether defendants were deliberately indifferent to plaintiff's serious medical need.

## CONCLUSION

Upon *de novo* review, the Court accepts and adopts the Report–Recommendation and Order in its entirety.

It is therefore

**ORDERED** that the Report–Recommendation (Dkt. No. 34) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that plaintiff's motion for summary judgment (Dkt. No. 25) is **DENIED** and it is further

**ORDERED** that defendants' motion (Dkt. No. 26) for summary judgment is **GRANTED** and the case dismissed with prejudice; and it is further

**ORDERED** that the Clerk of the Court is directed to serve copies of this MemorandumDecision and Order in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

## REPORT–RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. Local Rule 72.3(c). Presently before the court are plaintiff's motion and defendants' cross-motion for summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt. Nos. 25 and 26). Plaintiff has filed a reply. (Dkt. No. 31). For the following reasons, this court will recommend that plaintiff's motion for summary judgment be denied, that defendants' cross-motion for summary judgment be granted, and that the complaint be dismissed in its entirety.

## I. *Facts*

Plaintiff brings this pro se civil rights complaint under § 1983 based on events arising out of his confinement at the Cayuga County Jail ("CCJ"). Plaintiff, who first began wearing prescription glasses in 2006, arrived at CCJ without these glasses on or about August 24, 2010. During the intake interview conducted by Nurse Wallace, plaintiff noted that he wore glasses, but did not have them with him, and did not discuss any other significant concerns during the interview. (Dkt. No. 26–3 ("Wallace Aff.") at ¶¶ 8, 11, 14). In October 2010, plaintiff submitted an Inmate Request Form for an eye exam, explaining that he was "constantly squinting because of nearsightedness" and that he had two pair of glasses at home but lost them.

(*Id.* at Ex. B). Nurse Wallace responded that the Jail did not have an optometrist for routine vision care and would not be able to provide glasses. (*Id.* at ¶¶ 15, 17, and Ex. B).

**\*3** In November 2010, plaintiff woke up with blurry vision in his left eye. (Dkt. No. 26–1 ("Def. Rule 7.1 Statement") at ¶ 16). Though this problem did resolve on its own, (Def. Rule 7.1 Statement at ¶¶ 18–19), plaintiff saw Dr. Kooi regarding his left eye and his deteriorating vision on December 30, 2010. (Dkt. No. 26–4 ("Kooi Aff.") at ¶ 3–4). During this visit, plaintiff complained of nearsightedness, explaining that his vision had been getting worse for two weeks. (Wallace Aff. at ¶ 22; Kooi Aff. at ¶ 4). He did not, however, mention any problems with headaches. (Wallace Aff. at ¶ 22). Dr. Kooi examined plaintiff and found the pupils of plaintiff's eyes to be equal, round, and reactive to light and accommodation, the fundus of each eye in good condition and noted that plaintiff was not in any distress. (Kooi Aff. at ¶¶ 6, 7). Dr. Kooi recommended that plaintiff see an outside ophthalmologist, if possible, but did not believe he was in need of emergency medical care. (Kooi Aff. at ¶¶ 9, 11).

In light of Dr. Kooi's recommendation, Nurse Wallace contacted Dr. Speck, the doctor who CCJ generally used for inmates' optometry issues. When Nurse Wallace spoke with someone at Dr. Speck's office, Nurse Wallace was told that the doctor declined to see plaintiff, but would reconsider if "something further" developed. Based on Dr. Kooi's findings, Nurse Wallace states that she did not recognize any indications of an urgent need for medical care. (Wallace Aff. at ¶ 27). When Nurse Wallace relayed the message from Dr. Speck's office to Dr. Kooi he did not specifically tell the nurse to attempt to schedule an appointment with another provider. Plaintiff never contacted the infirmary again regarding problems with his vision. (Wallace Aff. at ¶ 34).

A few months later, plaintiff filed a grievance regarding the fact that he had not yet been scheduled to see an outside optometrist. In this grievance, plaintiff asserted that his vision was "no better." (Dkt. No. 26–5 ("Gleason Aff."), Ex. A). Following this grievance, Nurse Wallace contacted additional providers in the area, even though as far as she knew nothing about plaintiff's vision had changed. However, she was unable to locate a provider who was willing to see plaintiff. (Wallace Aff. ¶¶ 36–37). Plaintiff filed a second grievance in June 2011, stating that his vision had "gotten worse." (Gleason Aff., Ex. B). After

making additional attempts to locate an optometrist, Nurse Wallace found a provider, but was unable to schedule an appointment until February 6, 2012. (Wallace Aff. at ¶¶ 40, 41). Plaintiff was transferred out of the Jail on December 29, 2011. During his vision screening at Elmira Correctional Facility, his vision was found to be 20/70. (Wallace Aff, Ex. D). In February 2012, it was found to be 20/200. (Wallace Aff. Ex. E).

Plaintiff brings this action against Sheriff Gould and the County of Cayuga alleging that he was denied adequate medical care while at CCJ.

## II. *Summary Judgment*

**\*4** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1224 (2d Cir.1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord,* 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc .,* 369 U.S. 654, 655 (1962); *Salahuddin v. Goord,* 467 F.3d at 272.

Where, as here, cross motions for summary judgment are filed, "the standard is the same as that for individual motions for summary judgment." *Natural Res. Def. Council v. Evans,* 254 F.Supp.2d 434, 438 (S.D.N.Y.2003).

2014 WL 4760064

"The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Id.* (citation omitted). Moreover, "[t]he district court considering a summary judgment motion ... must ... be 'mindful of the underlying standards and burdens of proof ...' " *U.S. S.E.C. v. Meltzer,* 440 F.Supp.2d 179, 187 (E.D.N.Y.2006) (citations omitted). Accordingly, with respect to plaintiff's motion, he bears a much greater initial burden; he "must show that the evidence supporting [his] claims is so compelling that no reasonable jury could return a verdict for the defendant." *Id. Accord, McCarthy v. Wachovia Bank, N.A.,* 759 F.Supp.2d 265, 273 (E.D.N.Y.2011).

## III. *Defendants*

### A. Applicable Law

#### 1. Municipal Liability

In *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights, and it must be the moving force behind the violation. *Id.; Dominguez v. Beame,* 603 F.2d 337, 341 (2d Cir.1979). The plaintiff must allege facts demonstrating: "(1) the existence of an officially adopted policy, custom, or practice and (2) a direct and deliberate causal connection between that 'policy, custom, or practice' and the violation of plaintiff's federally protected rights." *Best v. City of New York,* No. 11 Civ. 4475, 2012 WL 5458054, at *3 (S.D.N.Y. Nov. 8, 2012) (quoting *Bd. of Cnty. Commis of Bryan Cnty. v. Brown,* 520 U.S. 397, 403–404 (1997)).

**\*5** A municipality may not be held liable on a "respondeat superior" theory. *Monell,* 436 U.S. at 691. However, a policy, custom or practice of an entity may be inferred where the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction. *Patterson v. County of Oneida,* 375 F.3d 206, 226 (2d Cir.2004) (quoting *Kern v. City of Rochester,* 93 F.3d 38, 44 (2d Cir.1996)). However, a single incident of illegality does not ordinarily rise to the level of a custom or policy.

*Vaher v. Town of Orangetown,* 916 F.Supp.2d 404, 440 (S.D.N.Y.2013) (citations omitted).

#### 2. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and *respondeat superior* is an inappropriate theory of liability. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citation omitted); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). In *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability. A supervisory official is personally involved if the supervisor directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007).

### B. Application

Plaintiff names the County of Cayuga as a defendant. However, plaintiff fails to state a claim for municipal liability against Cayuga County. There is no evidence of a "policy or custom" of Cayuga County that caused plaintiff any constitutional violation. The County cannot be liable simply because plaintiff was housed in its jail. Consequently, Cayuga County may be dismissed on this basis alone.

Sheriff Gould is named as a defendant in the caption of the complaint, but plaintiff's only factual allegations regarding defendant Gould are that he was aware of plaintiff's medical needs through two grievances and that he is "statutorily responsible for inmates medical care." [1] (Compl. at 5). Despite the sparse allegations and evidence regarding defendant Gould, the court has considered the merits of plaintiff's claim against him and has also considered whether to allow plaintiff an opportunity to amend the complaint to name another individual who was personally involved in the alleged violations. [2]

2014 WL 4760064

Defendants have already submitted affidavits from Dr. Kooi and Nurse Wallace-the individuals involved in plaintiff's medical care, and the court finds that plaintiff's claim fails on the merits. For the reasons described herein, the court has determined that no reasonable fact finder could conclude that anyone at CCJ acted with deliberate indifference.

1   However, the grievances do not appear to have been directed to Sheriff Gould. The only indication that Sheriff Gould was even aware of plaintiff's situation is a September 6, 2011 letter from the Chairman of the Citizens Policy and Complaint Review Council to Sheriff Gould explaining that the Council accepted plaintiff's grievance and that facility officials shall ensure that inmates[ ] are afforded the medical treatment prescribed by the responsible licensed medical professional. (Dkt. No. 31–3 at 8).

2   Plaintiff attempted to amend his complaint on October 31, 3013. (Dkt. No. 22). It appeared that plaintiff sought to add a medical malpractice claim against Dr. Kooi. (Dkt. No. 22 at 1). This court denied the motion without prejudice on November 8, 2013 and gave plaintiff thirty days to submit a new motion to amend, explaining that plaintiff would need to include a complete proposed amended complaint and could not name Dr. Kooi as a defendant and include only a state law negligence claim against him. (Dkt. No. 24 at 4). On November 14, 2013, plaintiff submitted his motion for summary judgment. (Dkt. No. 25). Plaintiff did not submit a new motion to amend.

### IV. *Denial of Medical Care*

#### A. Applicable Law

**\*6** In order to state a claim based on constitutionally inadequate medical treatment, [3] the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

3   Plaintiff's claim arose while he was a pretrial detainee at the Cayuga County Jail, and is, therefore, properly analyzed under the Fourteenth Amendment. *See, e.g., Caiozzo v. Koreman,* 581 F.3d 63, 69 (2d Cir.2009). However, regardless of whether a deliberate indifference claim is brought pursuant to the Eighth or Fourteenth Amendment, the standard is the same. *Id.* at 72.

The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' " *Bellotto v. County of Orange,* 248 F. App'x 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto,* 248 F. App'x at 236 (citing, *inter alia, Chance v. Armstrong* 143 F.3d at 702).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837. The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer v. Brennan,* 511 U.S. at 844. Thus, the court stated in *Salahuddin* that the defendant's

belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin v. Goord,* 467 F.3d at 281.

**\*7** Even negligence in diagnosing or treating an inmate's medical condition does not constitute deliberate indifference. *Farmer v. Brennan,* 511 U.S. at 835. Therefore, any claims of medical malpractice, or disagreements with treatment are not actionable under section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.1992), *aff'd* 970 F.2d 896 (2d Cir.1992) (table).

### B. Application

Plaintiff accuses defendants of deliberate indifference to plaintiff's serious medical needs when they failed to ensure that he be scheduled for an optometry appointment so that he could obtain prescription eye glasses in a reasonably timely fashion. Defendants argue that plaintiff cannot meet either the subjective or the objective prong of the standard.

With respect to the objective prong, defendants contend that plaintiff's medical needs were not "serious." Among the relevant factors for determining whether a serious medical need exists are "the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702 (citation omitted). Diminished eyesight can, under certain circumstances, be sufficiently serious to provide the basis for a claim for the denial of medical care. *See Koehl v. Dahlsheim,* 85 F.3d 86, 88 (2d Cir.1996) (holding that a prisoner who was denied prescription eyeglasses necessary to correct double vision and a loss of depth perception, resulting in headaches and injuries from walking into objects as a result, had a serious medical condition).

Plaintiff alleges that he suffered severe headaches or migraines during the time that he did not have prescription glasses. *See Johns v. Goord,* No. 9:09–CV–1016 (NAM/RFT), 2010 WL 3907826, at \*4 (N.D.N.Y. Sept. 30, 2010) (explaining that plaintiff's allegations of "extreme eye pain, excruciating headaches, a loss of vision and loss of balance" were sufficient to withstand defendants' motion to dismiss). Defendants contend that plaintiff failed to complain about headaches while at CCJ, but have

presented no evidence to show that he did not suffer from the severe headaches alleged. It appears that plaintiff had a standing order for ibuprofen and tylenol and could receive up to 3 tables 4 times per day without contacting medical staff. (Dkt. No. 31 at 14). Plaintiff alleges that he would take 3 ibuprofen at a time for the pain. (Dkt. No. 26–6 at 46). Additionally, plaintiff's medical records from Auburn Correctional Facility confirm that he has consistently complained that he experienced severe headaches during his time at CCJ. (Dkt. No. 25–3 at 21).

Moreover, plaintiff asserts that his eyesight deteriorated significantly due to the fact that he did not have prescription glasses for over a year, resulting in permanent damage. *See Davidson v. Scully,* 155 F.Supp.2d 77, 87 (S.D.N.Y.2001) ("Where a prisoner's vision will degenerate in the absence of corrective glasses, the need for vision correction can be a sufficiently serious need.") (citing *Koehl,* 85 F.3d at 87). Defendants have not produced any evidence that the delay did not cause the degeneration.[4]

[4]    Defendants argue that this deterioration occurred after his time at CCJ, and therefore, defendants are not responsible for the deterioration. It does appear that after he left the Jail in December 2011, plaintiff's vision was 20/70, and two months later it was 20/200. However, it is not clear that the year that plaintiff spent at the Jail without glasses did not cause this deterioration. Based on the record now before this court, a reasonable juror could find that the delay in care caused plaintiff's vision to further deteriorate.

**\*8** Defendants argue that because plaintiff spent time in the law library and did legal research, his daily activities were not impacted. However, the court notes that plaintiff was having trouble with distance vision, not reading. Therefore, the fact that he could still read and write without incident did not mean that his long-distance vision was not deteriorating, or causing significant issues. Indeed, plaintiff asserts that he had difficulty identifying other inmates. (Dkt. No. 26–6 at 63–64 (explaining that he could only see people at the end of the hall if he squinted)). Under these circumstances, the court will assume that there is an issue of fact as to whether plaintiff's medical needs were serious.

However, turning to the subjective prong of the test, the court finds that plaintiff cannot show that anyone at CCJ acted with deliberate indifference, and therefore

recommends dismissing plaintiff's medical indifference claim on the merits. In order to establish "deliberate indifference," plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin v. Goord,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 835–37). Instead, plaintiff must show that the defendant acted with the equivalent of subjective recklessness. *Id.* (citing *Farmer,* 511 U.S. at 839–40).

Here, the record is devoid of evidence from which a reasonable factfinder could conclude that any of plaintiff's medical providers were aware that he was suffering from severe headaches, that his vision was deteriorating to any great extent, or aware of any other information that would indicate that plaintiff was suffering from a condition requiring urgent medical care. To the extent plaintiff asserts that CCJ employees should have been aware of his worsening condition based on his grievances, the information provided in these grievances is insufficient to alert the staff that plaintiff suffered from a serious medical need. In his first grievance, plaintiff simply stated that his vision was "no better." (Gleason Aff., Ex. A). Even the second grievance only stated that his vision "has gotten worse" with no additional details about problems that the vision was causing, the extent to which it deteriorated, or that he was suffering in any other way. (Gleason Aff., Ex. B). After his visit on December 30, 2011, plaintiff never contacted the infirmary again regarding his vision. [5] (Wallace Aff. at ¶ 34). Plaintiff also never requested a visit with the doctor to request stronger pain medication for his headaches. [6]

[5]    Plaintiff explains that he assumed he "would be seen in a reasonable time frame." (Dkt. No. 31–3 at 3). However, this does not change the fact that officials at CCJ had no reason to believe that serious harm could occur.

[6]    Plaintiff himself does not assert that he informed anyone in the medical unit who would be able to assist with his vision issues that his vision was deteriorating, instead only claiming that he told Sergeant Gleason and other inmates that it was getting worse. (Dkt. No. 31 ("Pl. Response to Rule 7.1 Statement") at ¶ 39).

Plaintiff asserts that Nurse Wallace ignored Dr. Kooi's orders and that this demonstrates deliberate indifference. Although under certain circumstances, ignoring the orders of a doctor could demonstrate deliberate indifference, [7] the court finds that based on the undisputed facts, Nurse Wallace did not ignore Dr. Kooi's orders. As detailed above, she contacted CCJ's usual eye care provider who declined to see plaintiff at that time, and told Nurse Wallace to let his office know if plaintiff's condition became more urgent. She relayed this message to Dr. Kooi, who did not tell her to call other providers. (Wallace Aff. at ¶ 32). Nurse Wallace states that she believed Dr. Kooi would have told her to do so had plaintiff's condition been urgent. (*Id.* at ¶ 33). Dr. Kooi explains that he did not believe immediate eye care was required, and he was not aware of any other significant changes in plaintiff's vision prior to his transfer. (Kooi Aff. at ¶¶ 11, 12). Nurse Wallace's actions do not rise to the level of deliberate indifference. Indeed, Nurse Wallace explained that based on Dr. Kooi's examination of plaintiff she did not personally recognize an urgent need for medical care, and that she never received any information that plaintiff's vision had a material impact on his ability to live or function in the jail or that his health or safety was in danger. (Wallace Aff. at ¶¶ 27, 45, 46). Plaintiff presents no evidence to suggest that Nurse Wallace knew that plaintiff suffered from a substantial risk of serious harm.

[7]    See *Paul v. Bailey,* 09 Civ 5784, 2013 WL 2896990, at * 16 (S.D.N.Y. June 13, 2013) ("Ignoring the express orders of a doctor is more than merely negligent and is sufficient to withstand a motion to dismiss.") (citing *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)) (Report and Recommendation).

**\*9** No evidence suggests that any officials at CCJ were aware that serious harm could occur if an appointment with an ophthalmologist was not scheduled immediately. The court finds that no reasonable juror could conclude that personnel at CCJ were deliberately indifferent to plaintiff's condition, meaning that they "kn[ew] of and disregard[ed] an excessive risk to [plaintiff's] health or safety" and that they were "both ... aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and ... also dr[e]w the inference. *Farmer,* 511 U .S. at 837. The court will, therefore, recommend denying plaintiff's motion and will recommend granting defendants' cross-motion for summary judgment.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that plaintiff's motion for summary judgment (Dkt. No. 25) be **DENIED,** and it is

2014 WL 4760064

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 25) be **GRANTED** and that the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

File June 27, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4760064

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Liao v. Malik, Not Reported in Fed. Supp. (2016)
2016 WL 1128245

2016 WL 1128245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Shihsiang LIAO, a/k/a Shih-
Siang Shawn Liao, Plaintiff,
v.
Faisal MALIK,[1] Defendant.

[1]   The remaining defendant in this action is identified
      in plaintiff's complaint as S. Malik. *Dkt. No. 1 at
      3*. It is clear from his motion papers, however, that
      defendant's first name is "Faisal." See, e.g., *Dkt.
      No. 41-2 at 1*. The clerk of the court is respectfully
      directed to adjust the court's records accordingly.

Civil Action No. 9:13-CV-1497 (GTS/DEP)
|
Signed 02/26/2016

**Attorneys and Law Firms**

FOR PLAINTIFF: SHIHSIANG LIAO, Pro se, P.O.
Box 472, Wassaic, NY 12592.

FOR DEFENDANT: HON. ERIC T.
SCHNEIDERMAN, New York State Attorney General,
The Capitol, KEITH J. STARLIN, ESQ., Assistant
Attorney General, Albany, NY 12224.

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. MAGISTRATE JUDGE

**\*1** This is a civil rights action brought by *pro se* plaintiff
Shihsiang Liao, a former New York State prison inmate
who has also identified himself as Shih–Siang Shawn
Liao, against four employees of the New York State
Department of Corrections and Community Supervision
("DOCCS"), including its former commissioner and
current acting commissioner, pursuant to 42 U.S.C. §
1983. While his complaint contains additional claims, the
sole remaining cause of action in this case is asserted
against defendant Faisal Malik based on allegations that
he denied plaintiff due process while assisting him in
preparing for a disciplinary hearing by failing to interview
and obtain witnesses identified by plaintiff.

Currently pending before the court is a motion brought
by the defendant Malik requesting the entry of summary
judgment dismissing plaintiff's remaining claim. For the
reasons set forth below, I recommend that defendant's
motion, which plaintiff has not opposed, be granted.

I. *BACKGROUND*[2]

[2]   In light of the procedural posture of this case, the
      following recitation is derived from the record now
      before the court, with all inferences and ambiguities
      resolved in plaintiff's favor. *Terry v. Ashcroft,* 336
      F.3d 128, 137 (2d Cir. 2003).

Prior to his release from prison in or about September
2014, *Dkt. No. 25,* plaintiff was an inmate held in
the custody of the DOCCS.[3] *See generallyDkt. No. 1.*
At the times relevant to his remaining claim, plaintiff
was confined initially in the Ogdensburg Correctional
Facility ("Ogdensburg"), located in Ogdensburg, New
York, and later the Gouverneur Correctional Facility
("Gouverneur"), located in Gouverneur, New York. *Id.*;
*Dkt. No. 41–6 at 19.*

[3]   It appears that following his release from prison in
      New York, plaintiff served time in two correctional
      facilities in Ohio. Dkt. Nos. 25, 30; *see alsoDkt. No.
      41–6 at 129.*

On November 19, 2010, plaintiff was issued a series
of misbehavior reports accusing him of violating prison
rules arising from conduct occurring while housed in
Ogdensburg. *Dkt. No. 1 at 4,* 21–24; *Dkt. No. 41–7.* The
charges set forth in those misbehavior reports accused
the plaintiff of (1) soliciting goods or services without
consent from the superintendent or his designee; (2)
the unauthorized exchange of personal items without
authorization; (3) possession of contraband; (4) taking
state property; (5) providing incomplete, misleading, and/
or false statements or information; (6) impersonation; and
(7) providing legal assistance to another inmate without
prior approval from the superintendent or his designee.
*Dkt. No. 1 at 21–24; Dkt. No. 41–7.* Those charges were
based upon a search of plaintiff's cell, conducted on
November 19, 2010, and the resulting confiscation of
several prohibited items. *Dkt. No. 1 at 4,* 21–24; *Dkt. No.
41–7;see alsoDkt. No. 41–6 at 17–19.*

Following the issuance of the misbehavior reports,
plaintiff was transferred to a special housing unit ("SHU")

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 52 of 183

in Gouverneur to await a Tier III disciplinary hearing concerning the pending charges.[4] *Dkt. No. 41–6 at 16,* 19. In preparation for the Tier III hearing, defendant Faisal Malik, who at the time was a vocational instructor at the facility, was assigned to assist plaintiff. *Dkt. No 1 at 7; Dkt. No. 41–2 at 1,* 6–7. After receiving the assignment, defendant Malik met with plaintiff on November 22, 2010. *Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 28.* While the parties generally disagree as to what occurred after their meeting on November 22, 2010, both plaintiff and defendant appear to agree that plaintiff provided defendant with several names of individuals who he wished to have testify on his behalf at the upcoming disciplinary hearing. *Dkt. No. 1 at 7; Dkt. No. 41–2 at 7; Dkt. No. 41–6 at 21.* One of the individuals was identified by plaintiff as Ronlad Gantt, an inmate in Ogdensburg. *Dkt. No. 41–2 at 7.* Another potential witness was Tom Lawrence, the facility law librarian at Ogdensburg. *Id.*; *see also Dkt. No. 41–6 at 32.* The other witnesses plaintiff identified to defendant Malik during their meeting were (1) May Liao, plaintiff's sister, who lived in Seattle, Washington; (2) Scot Liao, plaintiff's father, who lived in Taiwan; (3) Ronald Abraham, an administrative law judge who lived in Brooklyn, New York; (4) Imam Settles, the Imam assigned to Ogdensburg; and (5) an individual plaintiff indicated worked as a volunteer for an organization called Chan Meditation. *Dkt. No. 1 at 26; Dkt. No. 41–2 at 7; Dkt. No. 41–3.* Plaintiff expected that defendant Malik would contact each of the individuals and ensure that they would be available to testify at the hearing by way of personal appearance, telephone, or written affidavit. *Dkt. No. 41–6 at 40–41.*

[4]    The DOCCS conducts three types of inmate disciplinary hearings. *See* 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir. 1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

**\*2** A Tier III hearing was conducted by Hearing Officer Randy Abar, beginning on November 30, 2010, to address the charges lodged in the misbehavior reports dated November 19, 2010. *Dkt. No. 41–8.* On December 2, 2010,

at the close of the hearing, plaintiff was found guilty on all counts, with the exception of the charge of unlawful soliciting. *Dkt. No. 41–8 at 28.* Based upon that finding, Hearing Officer Abar imposed a penalty that included six months of disciplinary SHU confinement, with a corresponding six-month loss of recreation, packages, commissary, and telephone privileges, and additionally recommended that plaintiff forfeit three months of good time credits. *Id.* The hearing officer's determination was administratively reversed on May 9, 2012, based upon a review by Corey Bedard, the DOCCS's Acting Director of Special Housing/Inmate Disciplinary Program. *Dkt. No. 1 at 38.*

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on or about December 5, 2013. *Dkt. No. 1.* As defendants, plaintiff's complaint names K. Trimm, a corrections sergeant; Faisal Malik, a civilian employee; Ann Charlebois, the former DOCCS Acting Superintendent; Brian Fischer, the former DOCCS Commissioner; and Anthony J. Annucci, the Acting DOCCS Commissioner, and sets forth several causes of action against those individuals. *See generally id.* Upon initial review of plaintiff's complaint and accompanying application for leave to proceed *in forma pauperis* ("IFP"), pursuant to 28 U.S.C. §§ 1915(e) and 1915A, Chief District Judge Glenn T. Suddaby issued a decision and order on June 4, 2014, granting plaintiff's IFP application and dismissing all claims with the exception of plaintiff's procedural due process cause of action against defendant Malik. *Dkt. No. 11.*

On July 9, 2015, following the close of discovery, defendant Malik moved for summary judgment, requesting dismissal of plaintiff's remaining claim against him on a variety of grounds. *Dkt. No. 41.* That motion, to which plaintiff has failed to respond, is now ripe for determination and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Plaintiff's Failure to Oppose Defendant's Motion*
Before turning to the merits of defendant's motion, a threshold issue to be addressed is the legal significance of plaintiff's failure to oppose defendant's motion, and

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

specifically whether that failure should be construed as a consent to the dismissal of his complaint.

Pursuant to Local Rule 7.1(b)(3), by failing to oppose defendant's motion, plaintiff has effectively consented to the granting of the relief sought. That rule provides as follows:

> Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y. L.R. 7.1(b)(3); *see also Jackson v. Fed. Express,* 766 F.3d 189, 194 (2d Cir. 2014) (holding that the district courts may enter summary judgment in favor of the moving party where the non-moving party fails to respond in opposition, but not without first "ensur[ing] that each statement of material fact is support by record evidence sufficient to satisfy the movant's burden of production" and "determin[ing] whether the legal theory of the motion is sound").

In this case, plaintiff has not responded to defendant's motion. The motion was properly filed by defendant Malik, and defendant, through his motion, has met his burden of demonstrating entitlement to the relief requested. With respect to the question of whether defendant has met his burden, I note that the "burden of persuasion is lightened such that, in order to succeed, his motion need only be 'facially meritorious.' " *See Rodriguez v. Goord,* No. 04–CV–0358, 2007 WL 4246443, at *1 (N.D.N.Y. Nov. 27, 2007) (Scullin, J., *adopting report and recommendation by* Lowe, M.J.) (finding that whether a movant has satisfied its burden to demonstrate entitlement to a dismissal under Local Rule 7.1(b)(3) "is a more limited endeavor than a review of a contested motion to dismiss" (citing cases)). [5]

[5] Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

**\*3** Because defendant has accurately cited both proper legal authority and evidence in the record supporting the grounds on which his motion is based, and plaintiff has failed to respond in opposition to the motion to dismiss, I find that defendant's motion is facially meritorious. *Jackson,* 766 F.3d at 194. Accordingly, I recommend that the court grant defendant's motion on this basis.

It should also be noted that there are additional consequences flowing from plaintiff's failure to file an opposition to defendant's Local Rule 7.1(a)(3) Statement of Material Facts. Local Rule 7.1 provides, in relevant part, that *"[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."* N.D.N.Y. L.R. 7.1(a)(3) (emphasis in original). Courts in this district have routinely enforced this rule in cases where a non-movant has failed to properly respond. *See, e.g., Elgamil v. Syracuse Univ.,* No. 99–CV–0611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2010) (McCurn, J.) (listing cases). Undeniably, *pro se* litigants are entitled to some measure of forbearance when defending against summary judgment motions. *Jemzura v. Public Serv. Comm'n,* 961 F.Supp. 406, 415 (N.D.N.Y.1997) (McAvoy, J.). The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with the failure to comply with the court's local rules. *Robinson v. Delgado,* No. 96–CV–0169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J., *adopting report and recommendation by* Hurd, M.J.). Stated differently, "a pro se litigant is not relieved of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Latouche v. Tompkins,* No. 09–CV–0308, 2011 WL 1103045, at *1 (N.D.N.Y. Mar. 23, 2011) (Mordue, J.).

Here, because plaintiff was warned of the consequences of failing to properly respond to defendant's Local Rule 7.1 Statement, *Dkt. No. 41 at* 3, and he has failed to do so, I recommend that the court deem the facts contained in defendant's Local Rule 7.1(a)(3) Statement as having been admitted to the extent they are supported by accurate record citations. *See, e.g., Latouche,* 2011 WL 1103045, at *1; *see also Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). As to any facts not contained in defendant's Local Rule 7.1(a)(3) Statement, in light of the procedural

**Liao v. Malik, Not Reported in Fed. Supp. (2016)**

2016 WL 1128245

posture of this case, the court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of plaintiff. *Terry,* 336 F.3d at 137.

**B.** *Summary Judgment Standard*
Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of N.Y.,* 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*4** A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson,* 477 U.S. at 255; *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

**C.** *Analysis of Plaintiff's Procedural Due Process Claim*

In his remaining claim, plaintiff contends that defendant Malik deprived him of procedural due process as guaranteed under the Fourteenth Amendment while assisting him in preparing for his Tier III disciplinary hearing. *Dkt. No. 1 at 7–8.* To prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir. 1996).

As to the first element, in *Sandin v. Conner,* 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation and (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84; *Tellier,* 280 F.3d at 79–80; *Hynes,* 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See, e.g., LaBounty v. Coombe,* No. 95–CV–2617, 2001 WL 1658245, at \*6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin,* No. 94–CV–0985, 2001 WL 118598, at \*6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under Sandin.

Atypicality in a *Sandin* inquiry is normally a question of law.[6] *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998) (citing *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to

Case 9:17-cv-00047-MAD-TWD Document 78 Filed 02/19/19 Page 55 of 183

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

undergo a detailed analysis of these considerations. *Arce,* 139 F.3d at 336; *Hynes,* 143 F.3d at 658.

[6]    In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir. 2000); *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir. 1999).

**\*5** As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis,* 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis,* 576 F.3d at 133 (citing *Colon,* 215 F.3d at 232–33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.' " *Davis,* 576 F.3d at 134 (quoting *Welch v. Bartlett,* 196 F.3d 389, 392–93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents prison life to require procedural due process protections under *Sandin*.").

In this instance, although Hearing Officer Abar sentenced plaintiff to six months of disciplinary SHU confinement, plaintiff testified at his deposition that he served approximately five months, or 150 days, in the SHU, having been released early for good behavior. *Dkt. No. 41–6 at 118.* Because this period of disciplinary confinement falls between 101 and 305 days, in order to determine whether plaintiff suffered an atypical hardship, and therefore has been deprived a liberty interest, the court is required "to articulate specific findings of the conditions of the imposed confinement relative to the ordinary prison conditions[.]" *Reynoso v. Selsky,* 292 F. App'x 120, 123 (2d Cir. 2008). While plaintiff's testimony from his deposition suggests that the conditions of his SHU confinement were not extraordinary in any way,[7] defendant has not provided the court any evidence with respect to the conditions of ordinary prison life in support

of his motion. Because the court is without this evidence, it cannot undertake the type of specific fact-finding required to determine, on summary judgment, whether plaintiff suffered an atypical and significant hardship during his confinement. *See Reynoso,* 292 F. App'x at 123 (reversing the district court where it had neglected "to articulate findings as to why the 150–day total sentence was not 'atypical and significant' " and commenting that "[s]uch a determination is anything but simple, and cannot be resolved summarily"). For this reason, I have assumed, for purposes of this report, that plaintiff was deprived of a liberty interest by way of his five-month SHU confinement and have proceeded to analyze whether defendant Malik provided plaintiff with constitutionally adequate assistance prior to his disciplinary hearing.

[7]    Plaintiff testified that, while confined in the SHU, he (1) requested legal materials from the law library daily and that they were delivered to him approximately four days later; (2) was permitted to choose non-legal books to read once per week when a corrections officer would do rounds with a cart of books; (3) was permitted to shower three times per week; (4) was provided access to the outdoors for a period of recreation time one hour per day; (5) ate three meals per day; and (6) was allowed to write, send, and receive mail and otherwise correspond with corrections staff by way of "interview slips." *Dkt. No. 41–6 at 119–26.*

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell,* 418 U.S. 539 (1974). In its decision in *Wolff,* the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–69; *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985); *Luna,* 356 F.3d at 487–88.

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

**\*6** Plaintiff's only contention against defendant Malik is centered upon the duty under *Wolff* to provide assistance in preparing a defense. As the Second Circuit has noted, "[p]rison authorities have a constitutional obligation to provide assistance to an inmate in marshaling evidence and presenting a defense when he is faced with disciplinary charges." *Eng v. Coughlin,* 858 F.2d 889, 897 (2d Cir. 1988). That requirement is particularly acute when an inmate faces obstacles in defending himself, including "being confined full-time to SHU[.]" *Eng,* 858 F.2d at 897. Although the Second Circuit in *Eng* specifically declined to define the extent of an assistant's obligations in helping an inmate to prepare for a disciplinary hearing, it offered the following observation:

> Although this is not the occasion to define the assigned assistant's precise role and the contours of the assistant's obligations, such help certainly should include gathering evidence, obtaining documents and relevant tapes, and interviewing witnesses. At a minimum, an assistant should perform the investigatory tasks which the inmate, were he able, could perform for himself.

*Id.* at 898; accord, *Samuels v. Selsky*, 166 F. App'x 552, 556 (2d Cir. 2006). [8]

[8] The constitutional requirement to provide an assistant to an inmate to aid in preparing for a disciplinary hearing is echoed in New York by regulation. 7 N.Y.C.R.R. §§ 251–4.1, 251–4.2; *see also Brooks v. Prack,* 77 F.Supp.3d 301, 315 (W.D.N.Y.2014); *Fernandez v. Callens,* No. 06–CV–0506, 2010 WL 4320362, at \*9 (W.D.N.Y. Oct. 29, 2010).

The scope of the assistance that must be provided to an accused inmate, as contemplated under *Wolff* and *Eng,* is not unlimited, and clearly does not require the assignment of counsel or of the functional equivalent of a private investigator. *See Samuels,* 166 F. App'x at 556 ("The required assistance does not equate to legal counsel."); *Fernandez,* 2010 WL 4320362, at \*9 ("The Supreme Court has held that a prisoner's right to assistance as

a matter of federal constitutional law is more limited, determining that the institutional concerns implicated in prison administration would not be furthered by entitling inmates to legal counsel in the form of a retained or assigned attorney."); *Gates v. Selsky,* No. 02–CV–0496, 2005 WL 2136914, at \*6 (W.D.N.Y. Sept. 2, 2005) (citing cases). The assigned assistant is required only to perform those functions that the plaintiff would have, had he not been hampered through SHU confinement, and need not go beyond the inmate's instructions. *See Silva v. Casey,* 992 F.2d 20, 22 (2d Cir. 1993) ("[A]n assistant must be assigned to the inmate to act as his *surrogate* – to do what the inmate would have done were he able." (emphasis in original)); accord, *Samuels,* 166 F. App'x at 556; *see also Lewis v. Murphy,* No. 12–CV–0268, 2014 WL 3729362, at \*12 (N.D.N.Y. July 24, 2014) (Mordue, J., *adopting report and recommendation by* Hummel, M.J.). Significantly, any claim of deprivation of assistance is reviewed for harmless error. *Pilgrim v. Luther,* 571 F.3d 201, 206 (2d Cir. 2009).

In support of his motion, defendant Malik, a vocational instructor who is periodically assigned to assist inmates in connection with disciplinary hearings and has received DOCCS training for serving in that role, has submitted a declaration detailing his efforts to assist plaintiff in mounting a defense to the charges against him. *See generally* Dkt. No. 41–2. According to that declaration, after being assigned to the matter, defendant Milak met with plaintiff on November 22, 2010, to discuss the charges against him. *Dkt. No. 41–2 at 6–7.* After reviewing the charges and insuring that plaintiff understood them, defendant Malik inquired as to what assistance plaintiff desired. *Id.* at 7. Liao identified several witnesses who he contemplated calling as witnesses at the hearing, including inmate Gantt; Ogdensburg Law Librarian Tom Lawrence; May Liao, plaintiff's sister; Scot Liao, plaintiff's father; Ronald Abraham, an administrative law judge; Imam Settles assigned to Ogdensburg; and an unidentified individual who plaintiff referred to as a volunteer at Chan Meditation. *Id.*; *see also* Dkt. No. 41–3. Plaintiff told defendant Malik that he would like all of those individuals to testify at the upcoming hearing, either in person or by phone, notwithstanding that plaintiff's sister lived in the State of Washington, plaintiff's father was located in Taiwan, and Ronald Abraham resided in Brooklyn. *Dkt. No. 41–2 at 7.* Uncertain of the extent of his obligation with regard to plaintiff's requested witnesses, defendant Malik contacted the prison disciplinary office and learned that inmate Gantt had been

Liao v. Malik, Not Reported in Fed. Supp. (2016)

2016 WL 1128245

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 57 of 183

released on November 17, 2010. *Id.* at 8; *see also Dkt. No. 41–4.* Defendant was informed by the disciplinary officer on duty that employee assistants are not required to track down non-inmate potential witnesses outside of the facility or to arrange for or schedule the testimony of non-inmates who are "outside the correctional facility." *Dkt. No. 41–2 at 8.*

**\*7** Immediately following his discussion with the disciplinary office, defendant Malik reports that he returned to plaintiff's cell and informed him of Gantt's release from Ogdensburg, and advised plaintiff that he would have to provide contact information for the other desired witnesses who were not inmates and/or working in a DOCCS facility. *Dkt. No. 41–2 at 9.* Defendant Malik informed plaintiff "that he would then have to tell the hearing officer that he wanted them to testify, that the hearing officer would then decide if they could testify, and that if he/she decided to allow them to testify, their testimony would then be scheduled and arranged." *Id.* According to defendant, plaintiff responded by providing defendant Malik the phone number for his sister, and defendant wrote that number down on the assistant form. *Id.*; *Dkt. No. 41–3.* Plaintiff also told defendant that he would obtain the contact information for the other witnesses, aside from Tom Lawrence, from his sister. *Dkt. No. 41–2 at 9–10.* Plaintiff "did not tell [defendant Malik] that he needed assistance with anything else," and defendant then asked plaintiff to sign and date the assistant form, and plaintiff complied. *Id.* at 10. Defendant Malik did not hear anything further from plaintiff in connection with his assignment as plaintiff's assistant. *Id.* at 10.

Although plaintiff's version of the interaction with defendant Malik on November 22, 2010, differs to some degree, the factual disputes are not material. Plaintiff contends that defendant Malik forced plaintiff to sign the assistant form at the end of their meeting, which plaintiff alleges lasted only fifteen minutes, by threatening plaintiff with an additional misbehavior report for failing to comply with a direct order. *Dkt. No. 1 at 7–8; Dkt. No. 41–6 at 23.* Additionally, plaintiff alleges that he did not see or speak with defendant Malik again after their first meeting. *Dkt. No. 41–6 at 29.* Defendant Malik disputes these allegations by plaintiff. *Dkt. No. 41–2 at 9–11.*

Even assuming plaintiff's allegations are true – that he was forced to sign the assistant form and did not see or

hear from defendant Malik again after their first meeting – there is no record evidence that supports plaintiff's claims that defendant Malik did nothing to assist him. In fact, on the first day of the disciplinary hearing, plaintiff was under the impression that defendant Malik was contacting witnesses for him. *Dkt. No. 41–6 at* 58. While defendant Malik has offered a detailed account of his efforts to provide plaintiff assistance, Dkt. No. 41–2, plaintiff has failed to adduce any evidence, nor is there any in the record, that suggests defendant Malik provided plaintiff with constitutionally inadequate assistance. It is clear from plaintiff's deposition testimony that he expected defendant Malik to undertake the role of plaintiff's advocate by contacting his requested witnesses, explaining plaintiff's circumstances, and arranging for them to testify in person, by phone, or by way of a prepared affidavit. Dkt. No. 41–6 at 34–36, 38–41. Additionally, plaintiff expected defendant Malik to arrange a settlement of the misbehavior report between him and facility security to avoid the need for a disciplinary hearing. *Id.* at 84.

Plainly, plaintiff's expectations for his assigned assistant were unreasonable and exceeded the constitutional requirements under *Wolff* and *Eng.* Both the Supreme Court and courts in this circuit have unequivocally held that the constitution does not require inmate assistants to serve as legal counsel or investigator for prisoners. *Wolff,* 418 U.S. at 570; *Samuels,* 166 F. App'x at 556; *Gates,* 2005 WL 2136914, at *6. Setting aside plaintiff's unsupported allegations that defendant Malik did not assist him in any way, the uncontroverted record evidence in this case reflects that defendant met with plaintiff ahead of the hearing, explained to him the charges, asked for a list of potential witnesses, clarified his role as plaintiff's assistant with the disciplinary office, and informed plaintiff that he would be responsible for gathering the contact information for the witnesses that were not employed at Ogdensburg and then requesting them as witnesses during the hearing. *See Dkt. No. 41–2.* This conduct satisfies the due process to which plaintiff was entitled. In any event, even assuming defendant Malik's assistance fell short, any error was harmless in light of Hearing Officer Abar's rejection of plaintiff's requests to call the potential witnesses plaintiff alleges defendant Malik should have contacted prior to the hearing. [9] *Dkt. No. 41–6 at 99; Dkt. No. 41–8 at 2,* 3, 4, 16, 26. Based upon the foregoing, I recommend defendant Malik's motion be granted. [10]

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 58 of 183

Liao v. Malik, Not Reported in Fed. Supp. (2016)
2016 WL 1128245

**9**    At the hearing, plaintiff did not request to call Imam Settles or the individual referred to by plaintiff as a volunteer at for Chan Meditation as witnesses. *See generally* Dkt. No. 41–8.

**10**    In light of my recommendation that defendant's motion be granted on the merits, I have not addressed the additional arguments set forth in his motion. With respect to whether plaintiff exhausted the available administrative remedies prior to filing this action, however, it is worth noting that there is no dispute that plaintiff failed to file a grievance through the DOCCS's inmate grievance program regarding the alleged inadequate assistance he received from defendant Malik. *Dkt. No. 41–6 at 104.* Plaintiff's vague and unsupported allegations that he did not file a grievance because he "was afraid of retaliation" is not sufficient to excuse that failure. *See, e.g., Baines v. McGinnis,* 766 F.Supp.2d 502, 504 (W.D.N.Y.2011) (citing *McCloud v. Tureglio,* No. 07–CV–0650, 2008 WL 1772305, at *11 (N.D.N.Y. Apr. 15, 2008) (Mordue, J., *adopting report and recommendation by* Lowe, M.J.)). While it is true that an appeal from a disciplinary hearing that raises the precise procedural infirmities asserted in a section 1983 action may be sufficient to exhaust administrative remedies, *LaBounty v. Johnson,* 253 F.Supp.2d 496, 502 n. 5 (W.D.N.Y.2013), there is no record evidence reflecting whether plaintiff raised his claim regarding defendant Malik in his appeal of Hearing Officer Abar's determination that was ultimately reversed. It seems unlikely that plaintiff would have included this ground as a basis for his appeal in light of his insistence that he did not file a grievance through the facility because of a fear of retaliation and that, by naming a particular person in a grievance or complaint, he would be targeted by corrections officers. See *Dkt. No. 41–6 at 138–40,* 156–57, 162. Accordingly, while I do not recommend dismissal of defendant's complaint on this basis, and do not intend to render any findings on this issue, it does appear likely that plaintiff's complaint is procedurally barred based on his failure to exhaust the available administrative remedies prior to filing suit.

## IV. *SUMMARY AND RECOMMENDATION*

**\*8**    Defendant has moved for summary judgment dismissing the sole remaining claim in this action, relating to plaintiff's allegation that he was denied procedural due process as a result of defendant's failure to render proper assistance to him in preparing for a disciplinary hearing. Because plaintiff has failed to oppose defendant's motion, and I find that it is facially meritorious, I recommend that it be granted on this basis. Moreover, the record before the court, including a declaration from defendant Malik detailing his efforts on plaintiff's behalf, demonstrates both that there are no genuine disputes of material fact for trial and that no reasonable factfinder could conclude that defendant deprived plaintiff of procedural due process. Accordingly, it is hereby respectfully

RECOMMENDED that defendant's motion for summary judgment *(Dkt. No. 41)* be GRANTED and that plaintiff's remaining claim in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

**All Citations**

Not Reported in Fed. Supp., 2016 WL 1128245

---

**End of Document**                                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

**Attorneys and Law Firms**

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

***MEMORANDUM DECISION and ORDER***

Hon. GLENN T. SUDDABY, District Judge.

 **\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of the New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.)[1]  For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

[1]     This is the fourth civil rights action filed by Plaintiff
        in this District. Generally, two of these actions arose
        out of Plaintiff's refusal to consent to a strip search
        and the subsequent actions taken against Plaintiff
        as a result of his refusal. *See Groves v. New York,*
        09–CV–0406, Decision and Order (N.D.N.Y. filed
        May 11, 2009) (Hurd, J.) (*sua sponte* dismissing
        complaint pursuant to 28 U.S.C. § 1915[e][2][B] );
        *Groves v. The State of New York,* 9:09–CV–0412,
        Decision and Order (N.D.N.Y. filed Mar. 26, 2010)
        (Sharpe, J.) (granting defendants' motion to dismiss
        the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).
        The third action alleged numerous violations of
        Plaintiff's constitutional rights during the period July
        23, 2009, and August 26, 2009, and was dismissed
        without prejudice upon Plaintiff's request in October,
        2010. *See Groves v. Maxymillian,* 9:09–CV–1002,
        Decision and Order (N.D.N.Y. filed Oct. 8, 2010)
        (Suddaby, J.). As a result, it does not appear that
        the current action is barred because of res judicata,
        collateral estoppel, and/or the rule against duplicative
        litigation.

**I. RELEVANT BACKGROUND**
On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.)[2]  Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See*

*generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

2        At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis.* (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis,* "(2) ... the court shall dismiss the case at any time if the court determines that —... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

3        The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2**  It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by

the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

[4]    *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[5]    *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[6]    It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [7]

[7]    *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them

that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4**  Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an

Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

### 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp.

35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

[8]     Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

[9]     Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment

when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.[10] Rather, this claim is hereby dismissed with prejudice.

10    The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[11]

11    *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not

2012 WL 651919

establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011). [13]

[12]   See also *Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

[13]   See also *Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force

on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted

unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

 **\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill,

Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

# V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

[14]  For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2)

it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

[15]  Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED** without prejudice; and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED** with prejudice pursuant to 28

**Groves v. Davis, Not Reported in F.Supp.2d (2012)**
Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 68 of 183

2012 WL 651919

U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* ***DISMISSED without prejudice and with leave to amend*** in this action in accordance with Fed.R.Civ. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* ***DISMISSED without prejudice and with leave to be reinstated*** as a Defendant in this action in accordance with Fed.R.Civ. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General,

together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 69 of 183

Myers v. Wollowitz, Not Reported in F.Supp. (1995)

1995 WL 236245

1995 WL 236245
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James N. MYERS, Jr., Plaintiff,

v.

Heather WOLLOWITZ, Attorney, Defendant.

No. 95–CV–0272 (TJM) (RWS).
|
April 10, 1995.

**Attorneys and Law Firms**

James N. Myers, Jr., Troy, NY, pro se.

*DECISION AND ORDER*

McAVOY, Chief Judge.

*I. Background*

**\*1** Presently before this Court is the above-captioned plaintiff's application to proceed in forma pauperis and civil rights complaint. Plaintiff has not paid the partial filing fee required to maintain this action.

For the reasons stated below, plaintiff's complaint is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as without arguable basis in law.

In his *pro se* complaint, plaintiff seems to claim that plaintiff was represented by defendant Wollowitz, a public defender for the County of Rensselaer, in a County Court proceeding. Plaintiff alleges that after a criminal proceeding in that Court, plaintiff was "sentenced to a illegal sentence." *Id.* at 2. Plaintiff contends that due to the ineffective assistance of his counsel, defendant Wollowitz, his constitutional rights were violated. For a more complete statement of plaintiff's claims, reference is made to the entire complaint filed herein.

*II. Discussion*

Consideration of whether a *pro se* plaintiff should be permitted to proceed in forma pauperis is a two-step process. First, the court must determine whether the plaintiff's economic status warrants waiver of fees and costs under 28 U.S.C. § 1915(a). If the plaintiff qualifies by economic status, the court must then consider whether the cause of action stated in the complaint is frivolous or malicious. *Moreman v. Douglas,* 848 F.Supp. 332, 333 (N.D.N.Y.1994) (Scullin, J.); *Potnick v. Eastern State Hosp.,* 701 F.2d 243, 244 (2d Cir.1983) (per curiam).

In the present case, upon review of the plaintiff's inmate account statements, the Court has determined that plaintiff's financial status qualifies him to file or "commence" this action in forma pauperis. 28 U.S.C. § 1915(a). Turning to the second inquiry, a court may "dismiss the proceeding under 28 U.S.C. § 1915(d) if the court thereafter determines that ... the action is frivolous or malicious." *Moreman,* 848 F.Supp. at 333 (citation omitted).

In determining whether an action is frivolous, the court must look to see whether the complaint lacks an arguable basis either in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). Although the court has the duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and extreme caution should be exercised in ordering sua sponte dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983), there is a responsibility on the court to determine that a claim is not frivolous before permitting a plaintiff to proceed with an action in forma pauperis. Dismissal of frivolous actions pursuant to 28 U.S.C. § 1915(d) is appropriate to prevent abuses of the process of the court, *Harkins v. Eldredge,* 505 F.2d 802, 804 (8th Cir.1974), as well as to discourage the waste of judicial resources. *Neitzke,* 490 U.S. at 327. *See generally Moreman,* 848 F.Supp. at 334.

**\*2** 42 U.S.C. § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights. *See, e.g., Von Ritter v. Heald,* 91–CV–612, 1994 WL 688306, *3, 1994 U.S.Dist. LEXIS 17698, *8–9 (N.D.N.Y. Nov. 14, 1994)* (McAvoy, C.J.). A party may not be held liable under this section unless it can be established that the defendant has acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3rd 625, 628 (2d Cir.1994) (noting state action requirement under § 1983); *Wise v. Battistoni,* 92–Civ–4288, 1992 WL 380914, *1, 1992 U.S.Dist. LEXIS 18864, *2–3 (S.D.N.Y. Dec. 10, 1992)* (same) (citations omitted).

1995 WL 236245

In the present case, the sole defendant named by plaintiff is the Rensselaer County public defender who apparently represented plaintiff in the criminal proceeding discussed in his complaint. *See* Complaint at 2. However, "[i]t is well settled that an attorney's representation of a party to a court proceeding does not satisfy the Section 1983 requirement that the defendant is alleged to have acted under color of state law...." *Wise,* 1992 WL 380914 at *1, 1992 U.S.Dist. LEXIS 18864 at *2–3; *see also D'Ottavio v. Depetris,* 91–Civ–6133, 1991 WL 206278, *1, 1991 U.S.Dist. LEXIS 13526, *1–2 (S.D.N.Y. Sept. 26, 1991).

Since the plaintiff has not alleged any state action with respect to the Section 1983 claim presently before the Court, plaintiff's complaint, as presented to this Court, cannot be supported by any arguable basis in law and must therefore be dismissed pursuant to 28 U.S.C. § 1915(d). *Neitzke,* 490 U.S. at 328.

Accordingly, it is hereby

ORDERED, that leave to proceed or prosecute this action in forma pauperis is denied, and it is further

ORDERED, that this action is dismissed pursuant to 28 U.S.C. § 1915(d) and Local Rule 5.4(a) of the General Rules of this Court as lacking any arguable basis in law, and it is further

ORDERED, that the Clerk serve a copy of this Order on the plaintiff by regular mail.

I further certify that any appeal from this matter would not be taken in good faith pursuant to 28 U.S.C. § 1915(a).

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp., 1995 WL 236245

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 71 of 183

Mena v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 3948100

2016 WL 3948100
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jonathan MENA, Plaintiff,

v.

CITY OF NEW YORK, et al., Defendants.

No. 13-cv-2430 (RJS)
|
Signed 07/19/2016

**Attorneys and Law Firms**

Jonathan Mena, Stormville, NY, pro se.

Omar Javed Siddiqi, Ryan Glenn Shaffer, New York City Law Department, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff Jonathan Mena, who is currently incarcerated and proceeding *pro se*, brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983") against Correction Officer Benjamin Eason ("Defendant"), alleging violations of the Eighth Amendment. Now before the Court is Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. BACKGROUND

A. Facts [1]

[1] The following facts are drawn from Defendant's unopposed Local Civil Rule 56.1 Statement. (Doc. No. 55 ("56.1 Statement" or "56.1 Stmt.").) In deciding Defendant's motion for summary judgment, the Court has also considered Plaintiff's submission in opposition to summary judgment (Doc. No. 58 ("Opp'n")), and has conducted an independent review of the record, notwithstanding Plaintiff's failure to submit a statement compliant with Local Civil Rule 56.1. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d. Cir. 2001) (noting that district court "may in its discretion opt to conduct an assiduous review of the record even when" a party has failed to comply with Local Civil Rule 56.1 (citations and quotation marks omitted)).

On September 9, 2012, while incarcerated at the Otis Bantum Correctional Center ("OBCC") on Rikers Island, Plaintiff was placed in an intake cell in the OBCC's receiving area, which he shared with two other individuals. (56.1 Stmt. ¶¶ 2–3.) Plaintiff alleges that the cell was extremely cold, vermin-infested, and too small to accommodate three men. (*See* Doc. No. 54-1 ("Compl.") 4, 8.) Plaintiff further alleges that these conditions, coupled with the constant noise made by the two other inmates, prevented him from sleeping for the entire 60-hour period that he was held in the cell. (*See id.* at 4.) Consequently, he asked Defendant, who was on duty, to transfer him to a different cell. (56.1 Stmt. ¶¶ 7–8.) According to Plaintiff, Defendant responded that there was "nothing he could do" about the situation. (*Id.* ¶ 9; *see also* Doc. No. 54-2 ("Mena Dep.") 59:5-8.)

Plaintiff avers that he filed a grievance with the OBCC to complain about his experience in the cell. (*See* Compl. at 7.) The New York City Department of Correction ("DOC") has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), for inmates housed at facilities such as the OBCC. The IGRP, which was available and in effect at all times relevant to this lawsuit, requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act. (56.1 Stmt. ¶¶ 11–12; *see also* Doc. No. 54-3 ("IGRP Directive") § IV(D)(1).) The IGRC then attempts to resolve the grievance informally within five days, and if the grievance is not informally resolved, then the inmate may request a formal hearing before the IGRC. (56.1 Stmt. ¶ 12; *see also* IGRP Directive §§ IV(G)-(H).) An inmate may appeal the IGRC's decision to the commanding officer, or her designee, and subsequent appeals may be taken to the Central Office Review Committee ("CORC"). (56.1 Stmt. ¶ 13; *see also* IGRP Directive §§ IV(I)-(J).) The CORC's decision is the final and binding decision of the DOC; if an inmate disputes the decision of the CORC, he may independently appeal to the Board of Correction. (IGRP Directive at 47.) Finally, if an inmate does not receive a timely disposition at any point throughout the grievance process, he has the option of either granting an extension of time to the relevant decisionmaker (i.e., the IGRC, the commanding officer, or the CORC) or appealing and

Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 72 of 183

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

proceeding to the next level of review. (56.1 Stmt. ¶ 14; *see also* IGRP Directive §§ IV(D)(9)(b), (10).)

**\*2** As Plaintiff himself acknowledges, after submitting the grievance and receiving no response, he neither granted the DOC an extension of time nor appealed. (*See* Compl. 7–8; Opp'n 6.) In his Complaint, Plaintiff admits that he is "still waiting" for a disposition of his grievance, but does not indicate any steps he has taken to appeal any decision before the IGRC. (*See* Compl. 7.) In response to a question on the Southern District of New York Prison Complaint form asking a plaintiff to "set forth any additional information that is relevant to the exhaustion of your administrative remedies," Plaintiff repeated a number of his substantive allegations against the OBCC staff, but did not state any information relevant to the grievance process. (*Id.* at 5.) And in his opposition brief in connection with this motion, Plaintiff again notes that he filed "several grievances about the issues in question," but he does not indicate any specific steps he took to appeal to the IGRC or to pursue any other avenue of appellate review within the IGRP. (Opp'n 6.)

### B. Procedural History

On April 11, 2013, Plaintiff commenced this action by filing a complaint against the City of New York, Correction Officer Jaquon Pickwood ("Pickwood"), Correction Officer Sauda Abdul-Malik ("Abdul-Malik"), and Defendant (collectively, "Defendants"), pursuant to Section 1983, asserting violations of his constitutional rights under the Eighth and Fourteenth Amendments. (*See* Doc. No. 1.) On December 9, 2013, Defendants moved to dismiss the Complaint. (Doc. No. 18.) On September 17, 2014, the Court granted Defendants' motion to dismiss with respect to Plaintiff's claims against the City of New York, Pickwood, and Abdul-Malik, and Plaintiff's Fourteenth Amendment claims against Defendant for failure to state a claim upon which relief can be granted, but denied Defendants' motion to dismiss with respect to Plaintiff's Eighth Amendment claim against Officer Eason. (Doc. No. 29.) On September 11, 2015, following the completion of discovery, Defendant filed the instant motion for summary judgment, along with his brief and his 56.1 Statement, arguing that Plaintiff failed to exhaust administrative remedies, that his Eighth Amendment conditions of confinement claim failed on the merits, and that in any event, Defendant was entitled

to qualified immunity. (Doc. Nos. 53–55, 57.) Defendant also filed a notice pursuant to Local Civil Rule 56.2 alerting Plaintiff of his obligation to submit a responsive statement and informing him of the consequences of not doing so. (Doc. No. 56.) In accordance with Local Rule 56.2, this notice included copies of Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1. (*Id.*) On October 14, 2015, Plaintiff filed a brief opposing summary judgment and submitted several exhibits (*see* Doc. No. 58), but he failed to submit a responsive 56.1 Statement. Defendant submitted his reply on October 22, 2015. (Doc. No. 59 ("Reply").)

### II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining whether a fact genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart*, 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of

Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 73 of 183
Mena v. City of New York, Not Reported in Fed. Supp. (2016)
2016 WL 3948100

the [nonmoving party's] position," *Anderson*, 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

**\*3** Typically, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n.1 (2d Cir. 1998)). "This general rule applies equally" to cases involving a *pro se* nonmoving party who has been provided adequate notice of the consequences of failing to properly respond to a summary judgment motion. *Pierre-Antoine v. City of N.Y.*, No. 04-cv-6987 (GEL), 2006 WL 1292076, at \*3 (S.D.N.Y. May 9, 2006); *see also Gilliam v. Trustees of Sheet Metal Workers' Nat'l Pension Fund*, No. 03-cv-7421 (KMK), 2005 WL 1026330, at \*1 n.2 (S.D.N.Y. May 3, 2005). Even so, the Court "may in its discretion opt to conduct an assiduous review of the record even where one of the parties has failed to file such a statement," *Holtz*, 258 F.3d at 73, and the Court is obligated to construe *pro se* litigants' submissions liberally, *see McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004).

Here, Plaintiff failed to submit a responsive Rule 56.1 statement, even though Defendant, pursuant to Local Civil Rule 56.2, sent Plaintiff notice of his obligations under Local Civil Rule 56.1 and Federal Rule of Civil Procedure 56 and sent copies of both rules. (Doc. No. 56). In light of Plaintiff's *pro se* status, the Court has exercised its discretion to independently review the record, which reveals no controverted facts. *See Holtz*, 258 F.3d at 73. In fact, as discussed below, Plaintiff's own submissions confirm the material facts contained in Defendant's Rule 56.1 Statement.

## III. DISCUSSION

Defendant argues that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act of 1995 (the "PLRA"). The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (citations and quotation marks omitted)). Accordingly, "the law is well-settled that the failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin v. Rivera*, No. 13-cv-7054 (RJS), 2015 WL 3999180, at \*3 (S.D.N.Y. June 29, 2015); *accord Johnson v. N.Y.C. Dep't of Corr.*, No. 13-cv-6799 (CM), 2014 WL 2800753, at \*6 (S.D.N.Y. June 16, 2014) ("Assuming that [p]laintiff filed a timely grievance ... and received no response within five business days[,] ... [p]laintiff ... could have taken the next step and requested a hearing."); *Leacock v. N.Y.C. Health Hosp. Corp.*, No. 03-cv-5440 (RMB) (GWG), 2005 WL 483363, at \*7 (S.D.N.Y. Mar. 1, 2005) ("[T]hat [plaintiff] allegedly did not receive a response to her grievance does not excuse her from failing to exhaust the appellate remedies available to her."); *Burns v. Moore*, No. 99-cv-966 (LMM) (THK), 2002 WL 91607, at \*8 (S.D.N.Y. Jan. 24, 2002) ("Thus, even if [p]laintiff received no response to his initial grievance, [p]laintiff could have sought the next level of review, in this case, to the prison superintendent.").

**\*4** At the OBCC, where Plaintiff was incarcerated, an inmate must exhaust several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (56.1 Stmt. ¶ 12–14.) Here, as Plaintiff reveals in his own complaint and brief in opposition to the motion for summary judgment, he did not exhaust the OBCC administrative procedure. (Compl. 7–8; Opp'n 6.) Rather, he indicates that he filed a grievance but otherwise did not appeal or seek further review through the IGRP process. (Compl. 7–8 (noting that he is "still waiting" for disposition of his grievances and did not seek review at the next levels within IGRP); Opp'n 6 (noting that he filed "several grievances about the issues in question,"

Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 74 of 183

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

but omitting reference to any specific steps taken to appeal)). Accordingly, Plaintiff failed to satisfy the PLRA exhaustion requirement.

The Court next considers whether there is any basis for excusing Plaintiff's failure to exhaust administrative remedies at the IGRP. Last month, the Supreme Court forcefully disapproved of judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. *See Ross*, 136 S. Ct. at 1862 ("Courts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement.") In doing so, the Supreme Court expressly rejected the Second Circuit's prior framework under *Giano v. Goord*, 380 F.3d 670 (2d Cir. 2004), and, by extension, *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004), which recognized a "special circumstances" exception to the PLRA's exhaustion requirement. *See Williams v. Priatno*, No. 14-4777, ___ F.3d. ___, ___, 2016 WL 3729383, at *4 (2d Cir. July 12, 2016) ("[T]o the extent that our special circumstances exception ... permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.").

Thus, post-*Ross*, the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are "available" to him. *Ross*, 136 S. Ct. at 1862; *see also* 43 U.S.C. § 1997e(a). An inmate's failure to exhaust may therefore be excused when his prison's grievance mechanisms are literally or constructively "unavailable." *Ross*, 136 S. Ct. at 1858–59. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief," and therefore unavailable. *Id.* While not exhaustive, these illustrations nonetheless guide the Court's inquiry. *See Williams*, 2016 WL 3729383, at *4 n.2. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." *Ross*, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. *Id.*; *see also Booth v. Churner*, 523 U.S. 731, 736, 738 (2001) ("[T]he modifier

'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." *Id.* To meet this high bar, the administrative remedy must be "essentially 'unknowable.' " *Id.* Finally, "a grievance process is rendered unavailable when prison administrators thwart inmates from taking advantage of it through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1860.

Here, Plaintiff has not alleged – let alone shown – that the administrative procedures at the OBCC were unavailable to him. Although Plaintiff's initial grievance received no response, this alone is insufficient to show that the IGRP acted as a mere dead end. As stated earlier, "the law is well-settled" that an inmate's "failure to take an available administrative appeal, even when the initial grievance receives no response, constitutes a failure to exhaust available administrative remedies." *Garvin*, 2015 WL 3999180, at *3 (collecting authorities). In short, the DOC's untimeliness in this case is not enough to demonstrate the unavailability of an administrative remedy. This is especially true in light of the IGRP's built-in appeal mechanism, whereby inmates may directly proceed to the next level of review in the event of the DOC's failure to respond to a grievance. (*See* IGRP Directive § IV(D) (9)(b), (10).) Furthermore, Plaintiff has not introduced any facts to indicate that prison officials at OBCC are "consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 136 S. Ct. at 1859.

**\*5** Nor has Plaintiff pointed to any evidence that the IGRP was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially unknowable." *Ross*, 136 S. Ct. at 1859. While the Second Circuit recently found that certain administrative grievance procedures at a different New York State facility met this standard, the Second Circuit's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams*, 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams* was housed in a special housing unit and segregated from the regular prison population; therefore, he gave his grievance complaint to a correction officer to file on his behalf. *Williams*, 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.*, and because the Second Circuit concluded that

Case 9:17-cv-00047-MAD-TWD Document 78 Filed 02/19/19 Page 75 of 183

Mena v. City of New York, Not Reported in Fed. Supp. (2016)

2016 WL 3948100

the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the District Court's dismissal for failure to exhaust. Here, by contrast the IGRP expressly guides inmates in Plaintiff's position who have filed a grievance but have not received a timely response and directs them to either grant an extension of time to the relevant decisionmaker or to appeal to the next level of review. (*See* IGRP Directive §§ IV(D)(9)(b), (10).) In light of the IGRP's unambiguous directive, Plaintiff has clearly failed to show that the IGRP was "essentially unknowable." *See Ross*, 136 S. Ct. at 1859.

Finally, the Court turns to the third scenario contemplated by the Supreme Court, in which "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859. Plaintiff has not demonstrated, or even suggested, that prison administrators obstructed or interfered with his access to administrative remedies. *See, e.g., Winston v. Woodward*, No. 05-cv-3385 (RJS), 2008 WL 2263191, at *10 (S.D.N.Y. May 30, 2008) (concluding that plaintiff's failure to exhaust administrative remedies was not excused in light of his "failure to put forth any corroborating evidence, either direct or circumstantial, to support his claims that he suffered retaliation in the form of threats, harassment and mail tampering"). Thus, this exception to the exhaustion requirement is also clearly inapplicable.

Therefore, the Court concludes, as a matter of law, that Plaintiff has failed to exhaust administrative remedies available to him through the IGRP and has failed to offer any facts to prove that administrative remedies were not available to him. Because Plaintiff's claims are barred

for failure to comply with the administrative exhaustion requirement of the PLRA, Defendant's motion for summary judgment is granted. [2]

[2]   Although Defendant has raised other grounds for summary judgment, including that Plaintiff has failed to establish an Eighth Amendment conditions of confinement claim, and that Defendant is entitled to qualified immunity, the Court finds it unnecessary to address these other arguments because of Plaintiff's failure to exhaust remedies.

## IV. CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED that Defendant's motion for summary judgment is GRANTED.

Although Plaintiff has paid the filing fee in this action and has not applied to proceed *in forma pauperis*, the Court nevertheless certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis*, any appeal would not be taken in good faith.

The Clerk is respectfully directed to terminate the motion pending at docket number 53, to mail a copy of this order to Plaintiff, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 3948100

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 5330980
Only the Westlaw citation is currently available.
United States District Court, D. Vermont.

Lester TORRES, Plaintiff,
v.
Al CORMIER, Fred Gorham, Officer
Dingham, and Officer Forrtier, Defendants.

Civil Action No. 5:12–CV–63.
|
Sept. 19, 2012.

**Attorneys and Law Firms**

Lester Torres, St. Johnsbury, VT, pro se.

Jana M. Brown, Vermont Office of the Attorney General, Montpelier, VT, for Defendants.

### REPORT AND RECOMMENDATION

(Doc. 10)

JOHN M. CONROY, United States Magistrate Judge.

**\*1** Plaintiff Lester Torres, a Vermont inmate, brings this action *pro se* under 42 U.S.C. § 1983 claiming that Defendants violated his constitutional rights. Specifically, Plaintiff contends that, on December 25, 2011, after the toilet in his cell overflowed, insufficient steps were taken to clean and sanitize the cell, and, thereafter, he had to remain in the unsanitary cell to eat Christmas dinner. He brings his claim under the Due Process Clause of the Fifth and Fourteenth Amendments, as well as the Eighth Amendment's prohibition on cruel and unusual punishment. Defendants, various officials at the correctional facility, move to dismiss under Fed.R.Civ.P. 12(b)(6) for four reasons: (1) the claims against Defendants in their official capacity are barred by the Eleventh Amendment; (2) Plaintiff has failed to exhaust his administrative remedies; (3) Plaintiff has failed to allege personal involvement on the parts of Defendants Cormier, Gorham, and Dingham; and (4) Plaintiff has failed to state a valid claim under the Eighth Amendment. (Doc. 10.) Plaintiff has not filed a response to the pending motion to dismiss.

For the reasons that follow, I recommend that the motion to dismiss be GRANTED and that this case be DISMISSED with leave to amend.

### *Factual and Procedural Background*

For purposes of the motion to dismiss, all facts alleged in the Complaint (Doc. 5) will be accepted as true. On December 25, 2011, Plaintiff's cell at the Northeast Regional Correctional Facility, a state prison run by the Vermont Department of Corrections where he was incarcerated, flooded due to an overflow of his toilet. (*Id.* at 4.) Plaintiff stood on a chair to avoid contact with the "feces and urine" that had fallen onto the floor, (*id.*) but when Officer Forrtier offered him a plastic bag to cover his feet, Plaintiff had no choice but to walk in the waste to retrieve the bag. (*Id.* at 4–5.) Plaintiff mopped up the mess, and was also "forced to clean [the cell] and sanitize" it without boots, gloves, or other "hazmat gear." (*Id.* at 5.) Thereafter, Plaintiff was unable to spend time with his family for Christmas dinner, because he was forced to eat the meal in the dirty cell, which still smelled of sewage. (*Id.*)

Having been granted leave to proceed *in forma pauperis* (Doc. 3), Plaintiff filed his Complaint on March 26, 2012. (Doc. 5.) In the Complaint, Plaintiff argued that the above set of facts constituted a violation of the Eighth Amendment to the United States Constitution, as well as a violation of the due process guarantees of the Fifth and Fourteenth Amendments. (*Id.* at 5.) Plaintiff seeks damages in the amount of $1,000,000. (*Id.* at 6.)

### *Discussion*

**I. Legal Standard**

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 677 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678. This does not require a plaintiff to provide "detailed factual allegations" to support his claims, *Twombly,* 550 U.S. at 555, but

2012 WL 5330980

"[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.*

**\*2** The Court has the added obligation in this case to "construe a *pro se* complaint liberally," *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009), by "reading such submissions 'to raise the strongest arguments they suggest.' " *Berlin v. United States,* 478 F.3d 489, 491 (2d Cir.2007) (quoting *Burgos v. Hopkins,* 14 F .3d 787, 790 (2d Cir.1994)). This admonition applies with particular force when a plaintiff's civil rights are at issue. *See McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). *Pro se* litigants, however, "remain subject to the general standard applicable to all civil complaints under the Supreme Court's decisions in *Twombly* and *Iqbal.*" *Brickhouse v. City of New York,* No. 09 CIV. 9353, 2010 WL 3341845, at \*2 (S.D.N.Y. Aug. 16, 2010).

As noted above, Plaintiff has not filed a response to the motion to dismiss. Nonetheless, a plaintiff's failure to oppose a Rule 12(b)(6) motion does not by itself merit dismissal of a complaint. *See Goldberg v. Danaher,* 599 F.3d 181, 183–84 (2d Cir.2010); *McCall v. Pataki,* 232 F.3d 321, 322–23 (2d Cir.2000). "[T]he sufficiency of a complaint is a matter of law that the court is capable of determining based on its own reading of the pleading and knowledge of the law. If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal." *Goldberg,* 599 F.3d at 184 (citing *McCall,* 232 F.3d at 322–23).

## II. Eleventh Amendment Immunity

Defendants first argue for dismissal of all claims brought against them in their official capacities, maintaining that, to whatever extent they have been sued in such capacities (which is unclear from the face of the Complaint), they are immune from suit under the Eleventh Amendment to the United States Constitution.[1] (Doc. 10 at 3.) It is, of course, doctrinal that federal jurisdiction over suits against unconsenting states or state officials "was not contemplated by the Constitution when establishing the judicial power of the United States." *Hans v. Louisiana,* 134 U.S. 1, 15 (1890). As a consequence, unless the state consents to suit or provides an express or statutory waiver of immunity, the Eleventh Amendment bars suit in federal court for damages against states, state agencies, and state officials acting in their official capacity. *Woods v. Rondout*

*Valley Cent. Sch. Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006). Any waiver of Eleventh Amendment immunity by a state must be unequivocally expressed. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 238 n. 1 (1985).[2]

[1]  The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. Although the Amendment, by its terms, bars only federal suits against state governments by citizens of another state or foreign country, it has also been interpreted to bar federal suits against state governments by a state's own citizens. *See Hans v. Louisiana,* 134 U.S. 1, 15 (1890).

[2]  Congress also may abrogate the Eleventh Amendment pursuant to Section 5 of the Fourteenth Amendment, *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456 (1976), which it has not done in any way relevant to this case. Further, the Supreme Court has recognized that Congress did not intend to abrogate sovereign immunity by the enactment of § 1983. *See Quern v. Jordan,* 440 U.S. 332, 340–41 (1979).

As relevant to this case, the state has not waived immunity from a § 1983 suit in federal court. Indeed, the state has expressly preserved its immunity under the Eleventh Amendment. *See* 12 V.S .A. § 5601(g). Accordingly, the damages claims against Defendants in their official capacities should be DISMISSED.

## III. Failure to Exhaust Administrative Remedies

**\*3** Defendants next argue that the Complaint should be dismissed because Plaintiff failed to exhaust his administrative remedies. (Doc. 10 at 3–5.) In his Complaint, Plaintiff admits that he has not filed a grievance, as "others are pursuing this course." (Doc. 5 at 2.) Plaintiff further maintains that he declined to file a grievance because "[n]othing is usually done," (*id.* at 3) so he decided he would "go ahead and sue." (*Id.* at 2.)

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Suits related to "prison conditions" under the

PLRA include "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532 (2002). Proper exhaustion of administrative remedies under the PLRA requires inmates to comply with and complete the prison grievance procedures in place at the institution to which they are confined. *See Jones v. Bock,* 549 U.S. 199, 218 (2007). As relevant to this case, I note that "[e]ven when the prisoner seeks relief not available in grievance proceedings, notably money damages, exhaustion is a prerequisite to suit." *Porter,* 534 U.S. at 524.

The grievance process at the facility, succinctly stated, allows the inmate to file an informal grievance, followed by a formal grievance if the inmate is not satisfied, which can then be appealed to the facility superintendent. (Doc. 10–1, Murphy Aff. ¶ 3.) Ultimately, the inmate can appeal the superintendent's decision to the Commissioner of the Department of Corrections, who is the final arbiter of the inmate's grievance. (*Id.* at ¶ 4.) Thus, appeal to the Commissioner and subsequent disposition of the grievance by the Commissioner constitute exhaustion of administrative remedies in this setting.

Although the exhaustion requirement is "mandatory," *id.,* the Second Circuit has recognized certain caveats that can apply in limited circumstances. "These caveats fall into three categories: when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a[ ] way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006), citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004).

At all times relevant to this incident, the Vermont Department of Corrections had this grievance procedure, which was thus formally "available" to Plaintiff. (Doc. 10–1, Murphy Aff. ¶ 2.) But the formal availability of a grievance procedure does not necessarily end the inquiry. *See Hemphill,* 380 F.3d at 687. Although Plaintiff admits that he did not file a grievance, (Doc. 5 at 2) he states in his Complaint that "[n]othing is usually done" in response to grievance filings, (*id.* at 3) so he decided to skip the ineffectual process and "go ahead and sue." (*Id.* at 2.)

While the Second Circuit takes a functional approach to the question of the availability of grievance procedures, *see Hemphill,* 380 F.3d at 687, the test for availability remains "an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available," *id.* at 688 (internal quotation marks omitted). As such, an inmate's unilateral expression of the futility of filing a grievance is insufficient to negate the PLRA's exhaustion requirement and absolve him of the failure to exhaust. *See Shariff v. Coombe,* 655 F.Supp.2d 274, 286 (S.D.N.Y.2009) (inmate's perception of futility insufficient to excuse his failure to exhaust); *Harrison v. Goord,* No. 07 Civ. 1806, 2009 WL 1605770, at *4 (S.D.N.Y. June 9, 2009) (inmates are required to exhaust their remedies "even if they believe that administrative remedies would be ineffective or futile"); *see also Booth v. Churner,* 532 U.S. 731, 741 n. 6 (2001) (construing PLRA, Court stated that it would not "read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise"). Thus, despite Plaintiff's perception that filing a grievance would have been ineffective, administrative remedies remained available to him for the purposes of the PLRA, and he was required to exhaust those remedies before filing a claim in this Court. [3]

[3]
  Similarly, Plaintiff cannot rely on the fact that another inmate has filed a grievance, which he avers in his Complaint (Doc. 5 at 2), as evidence that he has in any way initiated (let alone exhausted) the administrative grievance procedure himself. *See Shariff v. Coombe,* 655 F.Supp.2d 274, 286 (S.D.N.Y.2009) (concluding that inmate cannot rely on grievance filed by another inmate as evidence of exhaustion).

**\*4** Furthermore, Plaintiff has identified no reason why Defendants should be estopped from raising his failure to exhaust as a defense, and has pointed to no special circumstances that would justify his failure to file a grievance. Accordingly, the damages claim against Defendants should be DISMISSED.

## IV. Personal Involvement

Defendants Cormier, Gorham, and Dingham—officials from the Northeast Regional Correctional Facility—next maintain that the claims against them should be dismissed for Plaintiff's failure to allege their personal involvement in the claimed constitutional violations. (Doc. 10 at 5–6.)

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). "When monetary damages are sought under § 1983, the general doctrine of *respondeat superior* does not suffice and a showing of some personal responsibility of the defendant is required." *Johnson v. Glick,* 481 F.2d 1028, 1034 (2d Cir.1973). As it relates specifically to supervisors, mere "linkage in the prison chain of command" is insufficient to implicate a state commissioner of corrections or a prison superintendent in a § 1983 claim. *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985); *see also Wright,* 21 F.3d at 501 (noting that a defendant in a § 1983 action may not be held liable for constitutional violations merely because he held a high position of authority).

Nonetheless, under certain limited circumstances, a supervisor may be held liable for unconstitutional conduct. The Second Circuit has held that

> [s]upervisor liability under § 1983 "can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring." *Hernandez,* 341 F.3d at 145; *see also Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

*Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *see also Iqbal,* 556 U.S. at 676 ("Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

In his Complaint, Plaintiff does not claim that any of these three Defendants were either directly involved in, or even aware of, his claims. He identifies only Officer Forrtier, the fourth Defendant, in his recitation of the facts forming the basis of his complaint. (Doc. 5 at 4.) He also does not allege that a policy or custom existed sanctioning the conduct at issue. Finally, he does not claim

that either Cormier, Gorham, or Dingham were made aware of the problem through a report, nor does Plaintiff allege negligent supervision or that these Defendants failed to take corrective action based on information provided to them. On this basis, I recommend that the Court GRANT the motion to dismiss all claims against Defendants Cormier, Gorham, and Dingham.

## V. Eighth Amendment

**\*5** Finally, Defendants argue that, at bottom, Plaintiff's allegations—that he was exposed to an overflowing toilet water without being permitted to sanitize his cell—fail to state a valid Eighth Amendment claim. The Eighth Amendment's prohibition against "cruel and unusual punishments," U.S. CONST. amend. VIII, requires prison conditions to be "humane," though not necessarily "comfortable." *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001) (internal quotation marks omitted) (citing *Farmer v. Brennan,* 511 U.S. 825, 832 (1994), and *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). "To establish an Eighth Amendment violation, an inmate must show: '(1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities[;] and (2) a sufficiently culpable state of mind on the part of the defendant official, such as deliberate indifference to inmate health or safety.' " *Jabbar v. Fischer,* 683 F.3d 54, 57 (2d Cir.2012) (quoting *Gaston,* 249 F.3d at 164).

The objective component of this test calls for the alleged prison conditions to be "evaluated in light of contemporary standards of decency." *Blissett v. Coughlin,* 66 F.3d 531, 537 (2d Cir.1995) (citing *Rhodes,* 452 U.S. at 346). In making this assessment, the Second Circuit has held that "prisoners may not be deprived of their basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health." *Jabbar,* 683 F.3d at 57. As relevant to this case, "reasonably adequate sanitation and the ability to eliminate and dispose of one's bodily wastes without unreasonably risking contamination are basic identifiable human needs of a prisoner protected by the Eighth Amendment." *Whitnack v. Douglas County,* 16 F.3d 954, 958 (8th Cir.1994).

The subjective component, "deliberate indifference," requires "more than mere negligence," *Farmer,* 511 U.S. at 835; "[t]he prison official must know of, and disregard,

Torres v. Cormier, Not Reported in F.Supp.2d (2012)

2012 WL 5330980

an excessive risk to inmate health or safety." *Jabbar,* 683 F.3d at 57. It is not enough to show that an officer should have been aware that a prisoner was in immediate danger. Rather, the evidence must allow a reasonable juror to conclude that the officer "was actually aware of that immediate danger." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009); *see Farmer,* 511 U.S. at 837 ("the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference").

Plaintiff's claim fails on both fronts. As to the objective seriousness of the claimed deprivation, I note that, while chronic exposure to human waste may give rise to a colorable Eighth Amendment claim, "where exposure to such waste is intermittent or limited to a matter of hours, courts normally will not entertain such actions." *Ortiz v. Department of Corrections,* No. 08 Civ. 2195, 2011 WL 2638137, at *7 (S.D.N.Y. April 29, 2011), *adopted in full,* 2011 WL 2638140 (S.D.N.Y. July 5, 2011). For example, in *Gaston v. Coughlin,* 249 F.3d 156, 165–66 (2d Cir.2001), the Second Circuit reinstated an inmate's Eighth Amendment claim against two prison officers where the area in front of his cell was filled with human waste for several consecutive days. But courts of this circuit have repeatedly held that, where the claimed exposure lasts only a matter of hours rather than days, an inmate cannot make a colorable claim under the Eighth Amendment. *See Ortiz v. Department of Corrections,* 2011 WL 2638137, at *7 (collecting cases). Because Plaintiff only alleges a temporary exposure to waste, his claim is insufficiently serious to violate the Eighth Amendment.

**\*6** Furthermore, Plaintiff has not sufficiently alleged "deliberate indifference" on the part of prison officials for his claim to survive the motion to dismiss. The Complaint recites the steps that prison officials took to assist him after his toilet began to overflow. When informed of the problem, officers handed him plastic bags to cover his feet, and later provided a mop with which Plaintiff could clean up the mess. (Doc. 5 at 4–5.) Although Plaintiff was never provided with boots, gloves, or other "hazmat gear" to clean the cell, "[t]here is a clear difference between cases where defendants allegedly knew about unsanitary conditions but did nothing and cases where officials actually acted to resolve or alleviate the problem, as they are alleged to have done here." *Ortiz v. Department of Corrections,* 2011 WL 2638137, at *9. Prison officials made some, admittedly imperfect, efforts to help Plaintiff

clean his cell in the circumstances of this case. Such attempts are hardly indicative of indifference.

Because Plaintiff's claims do not rise to the level of unconstitutional conduct under the Eighth Amendment,[4] I recommend that claims against all Defendants be DISMISSED.

[4]    As an inmate, Plaintiff's rights are protected under the Eighth Amendment, rather than the Fourteenth Amendment, which applies to pre-trial detainees. *See Bell v. Wolfish,* 441 U.S. 520, 535 n. 16 (1979). As a consequence, to whatever extent Plaintiff has brought his claim under the Due Process Clause of either the Fifth or Fourteenth Amendments (Doc. 5 at 5), he has failed to state a valid claim under those amendments as well.

## VI. Leave to Amend

The Second Circuit has emphasized that a district court should not dismiss a *pro se* filing "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation marks omitted). "[E]ven after *Twombly,* dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases." *Boykin v. KeyCorp,* 521 F.3d 202, 216 (2d Cir.2008). Here, given the exceedingly high bar of unsustainability the claim must clear for Plaintiff not to be given leave to amend, as well as the liberal reading due his *pro se* pleading, Plaintiff should be granted an opportunity to amend his Complaint.

If Plaintiff chooses to submit an amended filing, the filing shall be entitled "Amended Complaint" and must contain all claims against all parties, as it will supersede the original Complaint in all respects. The Court should also require that the Amended Complaint be filed within thirty days of its ruling on this Report and Recommendation. Failure to so amend should result in the dismissal of all claims with prejudice.

### *Conclusion*

For the reasons set forth above, I recommend that Defendants' motion to dismiss (Doc. 10) be GRANTED and the case be DISMISSED. I further recommend

that, if this Report and Recommendation is adopted by the Court, Mr. Torres be allowed thirty days to file an Amended Complaint. Failure to file an Amended Complaint should result in the dismissal of the case with prejudice.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 5330980

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 5166626
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Sylvester JAMISON, (R21155) and
Ali Evans, (K83175), Plaintiffs,

v.

Commander William FRANKO, and
Superintendent Scott Bratlien, incorrectly
sued as Scott Bradley, Defendants.

No. 12 C 0242.
|
Sept. 13, 2013.

**Attorneys and Law Firms**

Sylvester Jamison, Canton, IL, pro se.

Ali Evans, Mt. Sterling, IL, pro se.

Nile N. Miller, James Charles Pullos, Michael L.
Gallagher, Chicago, IL, for Defendants.

***MEMORANDUM OPINION AND ORDER***

RONALD A. GUZMAN, District Judge.

**\*1** *Pro se* plaintiffs Sylvester Jamison and Ali Evans,
Illinois Department of Corrections inmates, have sued
Cook County Jail Commander William Franko and
Superintendent Scott Bratlien pursuant to 42 U.S.C. §
1983, claiming that defendants wrongfully kept them in
disciplinary segregation at Cook County Jail ("the Jail").
Defendants have filed a Federal Rule of Civil Procedure
("Rule") 56 motion for summary judgment. For the
reasons set forth below, the Court grants the motion.

***Discussion***

As an initial point, defendants are correct that plaintiffs
failed to comply with the requirements of Local Rule
56.1. However, plaintiffs are proceeding *pro se.*[1] Due
to plaintiffs' *pro se* status, the Court has reviewed the
record in full. It is clear that the parties do not dispute

the facts at issue, and the record does not suggest any
"unanswered questions" from discovery that remain as
a result of plaintiffs' *pro se* status. *Junior v. Anderson,*
——F.3d ——, 2013 WL 3886791, at \*4 (7th Cir. July
30, 2013). Thus, the Court proceeds with the summary
judgment ruling.

[1]     Plaintiffs never asked the Court to recruit counsel to
        assist them, perhaps because they were assisted by
        fellow inmate Larry Maurice Banks, who is extremely
        litigious. *See In re Banks,* No. 13 C 1014 (N.D.Ill.).

"The Court shall grant summary judgment if the movant
shows that there is no genuine dispute as to any
material fact and the movant is entitled to judgment
as a matter of law." Fed.R.Civ.P. 56(a); *Wackett v.
City of Beaver Dam,* 642 F.3d 578, 581 (7th Cir.2011).
The Court may not weigh conflicting evidence or
make credibility determinations, but the party opposing
summary judgment must point to evidence demonstrating
a genuine dispute of material fact. *Omnicare, Inc. v.
UnitedHealth Grp., Inc.,* 629 F.3d 697, 705 (7th Cir.2011)
(citations omitted). The moving party has the initial
burden of showing there is no genuine dispute and he is
entitled to judgment as a matter of law. *Carmichael v.
Vill. of Palatine,* 605 F.3d 451, 460 (7th Cir.2010) (citing
*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548,
91 L.Ed.2d 265 (1986)). If the moving party meets this
burden, the non-moving party must respond with specific
facts showing that the jury could find in his favor, and that
there is a genuine dispute that needs to be adjudicated at
trial. *Carmichael,* 605 F.3d at 460 (citing *Anderson,* 477
U.S. at 251–52; *Matsushita Elec. Indus. Co. v. Zenith Radio
Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538
(1986)).

The Prison Litigation Reform Act provides that "[n]o
action shall be brought with respect to prison conditions
under section 1983 ..., or any other Federal law, by a
prisoner confined to any jail, prison, or other correctional
facility until such administrative remedies as are available
are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v.
Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 165 L.Ed.2d 368
(2006); *Dole v. Chandler,* 438 F.3d 804, 808 (7th Cir.2006).
A prisoner is required to utilize a jail grievance system
before filing a section 1983 claim so that jail officials have
an opportunity to take remedial action. *Porter v. Nussle,*
534 U.S. 516, 524–25, 122 S.Ct. 983, 152 L.Ed.2d 12
(2002); *Dole,* 438 F.3d at 809; *Massey v. Helman,* 196 F.3d
727, 733 (7th Cir.1999). Exhaustion requires "a prisoner

2013 WL 5166626

[to] file complaints and appeals in the place, and at the time, the prison's administrative rules require." *Brengettcy v. Horton,* 423 F.3d 674, 682 (7th Cir.2005) (quotation omitted).

**\*2** There is no dispute that Jamison did not file a grievance at any time. (*See* Def.'s Ex. A, Jamison Dep. at 141–42.) Instead, he attempted to rely upon the grievance filed by fellow inmate Larry Maurice Banks. (*Id.*) As the Court has previously ruled, however, Jamison cannot rely on Banks' grievance to satisfy the exhaustion requirement. *Jamison v. Franko,* No. 12 C 0098, 2013 WL 1093118, at *4 (N.D.Ill. Mar.15, 2013); *see* Defs.' Ex. D, Johnson Aff. ¶ 4 ("The Inmate Grievance Procedure does not authorize one inmate to prepare and file grievances on behalf of another."). Because the record establishes that Jamison did not exhaust administrative remedies, defendants are entitled to summary judgment on his claim.

Turning to Evans, the record shows that he submitted a grievance on November 30, 2011. (Def.'s Ex. B, Evans Dep. Ex. 4, Grievance.) According to the Jail's grievance system, correction officials had thirty days, or until December 30, 2011, to respond to it. Evans did not receive a response by that date. (*See* Def.'s Ex. D, Johnson Aff. ¶ 8.) Thus, on January 12, 2012, he filed this suit. [2]

[2]    In theory, the suit was filed earlier than January 12, 2012. January 12th is the date the complaint was received by the Court. There is no proof of service to show when the complaint was submitted to jail officials with sufficient postage to allow for the benefit of the mailbox rule of *Houston v. Lack,* 487 U.S. 266, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988). The Court uses the January 12th date because it is the most favorable date possible for Evans in the record.

There is no dispute that Evans did not file an appeal of his grievance, which is required to exhaust administrative remedies. He claims, however, that he could not appeal because the Jail did not respond to his grievance, effectively making the process unavailable to him. *See Dole v. Chandler,* 438 F.3d 804, 809 (7th Cir.2006) (stating that the exhaustion requirement is excused if jail officials' failure to respond to a grievance renders the grievance process unavailable).

But as *Ford v. Johnson,* 362 F.3d 395 (7th Cir.2004) illustrates, a grievance process is not unavailable simply because the prison's response to a grievance is tardy.

Though the prison officials in *Ford* were required to rule on inmate appeals within sixty days "whenever possible," it took them six months to rule on Ford's appeal. *Id.* When the sixty-day period set forth in the regulations had elapsed, Ford filed suit, arguing that he had exhausted all of the remedies that were available to him. *Id.* The Seventh Circuit disagreed:

> [The] regulation provides that decision will be rendered within 60 days of the appeal "whenever possible." That means, Ford contends, that once 60 days have expired without a decision, the administrative process is no longer "available" and the prisoner may start the litigation. That's a non-sequitur. An aspiration to act quickly "whenever possible" does not mean that the prison system tosses out the papers and closes the files after two months.... Some appeals are simple and will be wrapped up within two months; others are more complex.... Section 1997e(a) applies to all grievances, not just to the simple ones. Illinois made a process available to Ford; he had to stick with that process until its conclusion rather than make a beeline for court just because the administrative officials gave his appeal the time needed to resolve it.

**\*3** *Id.; see Dole,* 438 F.3d at 812 (stating that an inmate must do "all that is reasonable to exhaust his administrative remedies"). Like the plaintiff in *Ford,* Evans made a "beeline" to court—getting his complaint through the prison and U.S. Mail systems and on file with this Court less than two weeks after the response was due—as soon as the Jail's response time elapsed. As in *Ford,* however, Evans' haste does not mean the Jail's grievance process was unavailable to him. [3]

[3]    Exactly where the line is between a late response and an unavailable process is unclear. What is clear, however, is that the prison's delay and the inmate's

2013 WL 5166626

efforts must be far greater than in this case for the process to be deemed unavailable. *See Dole,* 438 F.3d 807–08 (process unavailable to inmate who, over eighteen-month period, filed three different grievances and repeatedly asked jail officials about them before filing suit); *Brengettcy,* 423 F.3d at 678 (grievance process unavailable given Jail's failure to respond to inmate's grievance and inquiries about it and his follow-up grievance during four-month period after response was due).

### Conclusion

The record establishes that Jamison and Evans did not exhaust administrative remedies before filing this suit. Accordingly, the Court grants defendants' motion for summary judgment [23], and dismisses plaintiffs' claims without prejudice for failure to exhaust. *See Ford,* 362 F.3d 395, 401 (7th Cir.2004) ("*[A]ll* dismissals under § 1997e(a) should be without prejudice .") (emphasis original). This case is terminated.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 5166626

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 2631875

2013 WL 2631875
Only the Westlaw citation is currently available.
United States District Court,
W.D. Arkansas,
Fort Smith Division.

Ryan Michael DOUGLAS, Plaintiff.

v.

Captain Jeff MARVIN, Crawford
County Detention Center, Defendant.

Civil No. 12–2070.
|
June 12, 2013.

**Attorneys and Law Firms**

Ryan Michael Douglas, Calico Rock, AR, pro se.

Nicholas Rudolph Windle, C. Burt Newell, The Law
Office of C. Burt Newell, Hot Springs, AR, for Defendant.

### *MEMORANDUM OPINION*

JAMES R. MARSCHEWSKI, United States Chief
Magistrate Judge.

**\*1** This is a civil rights action filed pursuant to 42 U.S.C.
§ 1983. The Plaintiff, Ryan M. Douglas, proceeds *pro se*
and *in forma pauperis.* The case is before me on the consent
of the parties (Doc. 12).

Before me for decision is the Defendant's motion
for summary judgment (Docs.15–17). Plaintiff filed a
response (Doc. 24) to the motion. The motion is ready for
decision.

### *1. Background*

Plaintiff is now incarcerated in the Arkansas Department
of Correction, North Central Unit. At all times relevant
to this complaint, he was incarcerated in the Crawford
County Detention Center (CCDC).

On or about February 8, 2012, Douglas and another
inmate, Jesse Darnell, were placed in lock-down.
*Plaintiff's Response* (hereinafter *Plff's Resp.*) at ¶ 2. On
the day in question, guards were passing out commissary.
*Plff's Resp.* at ¶ 2. Deputy Stevens responded to a

commotion coming from cell 4. *Defendant's Exhibit*
(hereinafter *Def't Ex.*) A. Stevens' incident report states
that he saw inmate Douglas grabbing Mark Thornsberry's
commissary and "tossing it all over the room." *Id.* A
search of Douglas and Inmate Darnell revealed that they
were in possession of Thornberry's missing commissary
items. *Id.* The incident was reported to Captain Marvin;
he informed Stevens and Deputy Ridenour to place both
inmates on lock down in cell 2C for 5 days for theft
of property. *Id.* According to Stevens, he informed the
inmates of their right to a lock down hearing. *Id.*

Douglas does not deny he was involved in the commotion
or that he had another inmate's commissary items.
Instead, he merely asserts that Stevens saw him kicking
another inmate's commissary not tossing it around. *Plff's
Resp.* at ¶ 6.

With respect to the lock down cell, Douglas alleges there
was no light in the cell and no hot water. *Plff's Resp.* at
¶ 1. He had access to cold water but says the toilet was
turned off. *Id.* at ¶ 4(a). He asserts that he was unable
to sterilize his hands without hot water. *Id.* As a result
of these conditions, Douglas asserts that he "got a little
cold." *Id.*

He was provided three meals a day. *Plff's Resp.* at ¶ 4(b).
He had a mattress to sleep on. *Id.*

Because there was no light, he asserts that he could not
write his attorney. *Plff's Resp.* at ¶ 3. He maintains his
criminal case was adversely affected because his attorney
failed to inform him of the witnesses who would testify
against him and he was unable to write his attorney to
obtain this information. *Id.* at ¶ 3(a).

Douglas maintains he was locked down for approximately
two weeks. *Plff's Resp.* at ¶ 1. He did not file a grievance
about being on lock down. *Id.* at ¶ 5. He states he asked for
a grievance form on two occasions but was not provided
one. *Id.* Towards the end of his lock down, Douglas
maintains Inmate Teas wrote a grievance for him. *Id.*
Douglas also maintains that neither he nor Darnell were
told they had a right to a lock down hearing. *Plff's Resp.*
at ¶¶ 9–11.

**\*2** On February 17th, Douglas submitted a grievance
requesting that twenty-one cents (21¢) be placed back on
his books. *Plff's Resp.* at ¶ 12; *Def't Ex.* B. The grievance

makes no mention of the lock down or the conditions of the cell. Additionally, the grievance form indicates Douglas was off lock down and in cell block 2B. *Plff's Resp.* at ¶¶ 13–14.

Douglas believes Marvin violated his constitutional rights but putting him on lock down in "harmful, non-healthy, conditions." *Plff's Resp.* at ¶ 15. Douglas believes Marvin was aware of the conditions in the cell. *Id.* Douglas asserts that after he was released from lock down Marvin had the lights repaired. *Id.* Douglas maintains that he should not have to ask to have the hot water fixed or the lights repaired. *Id.* at ¶ 17. He asserts that all detention center staff were aware of the problem. *Id.*

### 2. *Applicable Standard*

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed.R.Civ.P. 56(c).* "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the nonmoving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *National Bank of Commerce v. Dow Chemical Co.,* 165 F.3d 602, 607 (8th Cir.1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *National Bank,* 165 F.3d at 607 *(citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id. (citing Metge v. Baehler,* 762 F.2d 621, 625 (8th Cir.1985)).

### 3. *Discussion*

Marvin has moved for summary judgment on a variety of arguments. First, he notes that Douglas was aware of the CCDC grievance procedure but never filed any grievances relating to the subject matter of this lawsuit. Second, Marvin contends that no claim has been stated against him. Third, Marvin argues that Douglas was notified of his right to a lock down hearing and chose not to take

advantage of the right. Finally, even assuming Douglas was housed in a dark cell with no hot water for two weeks, Marvin maintains that given the short duration of the confinement it is not sufficiently serious to amount to a constitutional violation.

I will address the exhaustion issue first as a finding in favor of the Defendant on the exhaustion issue is fatal to Douglas' claims. Marvin maintains that Douglas' claims must be dismissed because Plaintiff did not exhaust his available administrative remedies as required by the Prison Litigation Reform Act (PLRA) prior to filing this lawsuit.

**\*3** The PLRA, 42 U.S.C. § 1997e(a), mandates exhaustion of available administrative remedies before an inmate files suit. Section 1997e(a) provides: "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

The Supreme Court has held that the "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 534 (2002). In *Booth v. Churner,* 532 U.S. 731, 738–39 (2001), the Court held that "exhaustion is required where administrative remedies are available even if the available administrative remedies do not provide the precise, or full, relief sought." *Walker v. Maschner,* 270 F.3d 573, 577 (8th Cir.2001). "If an inmate fails to exhaust one or more discrete claims raised in a § 1983 complaint, the PLRA requires only that the unexhausted claim or claims be dismissed—it does not require that the complaint be dismissed it its entirety." *Id.*

In this case, Douglas has sworn under penalty of perjury that he requested grievance forms and was denied those forms while he was on lock down. When detention center officials deny an inmate access to grievance forms, they cannot rely on the defense that the inmate failed to exhaust his remedies. *See e.g., Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001)(prisoner's allegations that prison officials denied his requests for grievance forms could raise inference that he was prevented from utilizing prison's administrative remedies; remedy that prison officials

2013 WL 2631875

prevent prisoner from utilizing is not "available" under § 1997e(a)). The evidence in this case establishes that by no later than February 17th, Douglas had access to those forms.

In this case, there is no question that a grievance procedure existed; Douglas was aware of it; and he failed to submit grievances regarding the claims at issue in this case. Douglas cannot rely on a grievance filed by another inmate to comply with the exhaustion requirement. *See e.g., Roberson v. Martens,* 2010 WL 3779544 (W.D.Mich. August 25, 2010)(Grievance filed by another inmate "did not exhaust plaintiff's administrative remedies, because it was not plaintiff's grievance"); *Cf Shariff v. Coombe,* 655

F.Supp.2d 274, 288 (S.D.N.Y.2009)("Plaintiffs' related argument that a grievance filed by one inmate that receives a favorable determination should suffice for all inmates is ... unavailing.").

### *4. Conclusion*
For the reasons stated, Defendant's motion for summary judgment (Docs.15–17) will be granted. A separate order in accordance with this opinion will be entered.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 2631875

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 3779544
Only the Westlaw citation is currently available.
United States District Court,
W.D. Michigan,
Southern Division.

Nicholas ROBERSON, Plaintiff,

v.

Joseph MARTENS, et al., Defendants.

No. 1:09–cv–861.
|
Aug. 25, 2010.

**Attorneys and Law Firms**

Nicholas Roberson, Baraga, MI, pro se.

A. Peter Govorchin, MI Dept. Attorney General,
Lansing, MI, for Defendants.

*REPORT AND RECOMMENDATION*

JOSEPH G. SCOVILLE, United States Magistrate Judge.

**\*1** This is a civil rights action brought by a state
prisoner under 42 U.S.C. § 1983. Plaintiff's complaint
concerns conditions of his confinement at the Ionia
Maximum Correctional Facility (ICF). He named three
State of Michigan employees as defendants: Resident Unit
Officer (RUO) Joseph Martens, RUO Todd Rikkers,
and Corrections Officer Brian Chaffee. Plaintiff alleges
that the defendants used excessive force against him on
June 4, 2009, in violation of his Eighth Amendment
rights. (Second Am. Compl. ¶ IV, docket # 7). He sues
defendants in their official and individual capacities and
seeks an award of monetary damages and declaratory and
injunctive relief. (*Id.* at ¶ V).

The matter is before the court on defendants' motion
for summary judgment. (docket # 16). [1] For the reasons
set forth herein, I recommend that plaintiff's claims for
declaratory and injunctive relief be dismissed as moot and
that his claims for damages against defendants in their
official capacities be dismissed with prejudice because
they are barred by Eleventh Amendment immunity. I
further recommend that defendants' motion for summary
judgment on the remaining damage claims against

defendants in their individual capacities be granted on
grounds of exhaustion.

[1]   On January 29, 2010, the court entered an order
    converting defendants' motion to dismiss into a
    motion for summary judgment because defendants
    relied on exhibits outside the pleadings. (docket #
    19). The order notified plaintiff of his opportunity to
    submit evidence in opposition to defendants' motion.
    (*Id.*). *See Bruce v. Correctional Med. Servs., Inc.,* No.
    08–6339, 2010 WL 2842736, \* 2–3 (6th Cir. July 21,
    2010). On April 1, 2010, plaintiff filed his response to
    defendants' motion for summary judgment. (docket #
    s 25, 26).

*Applicable Standards*

**A. Summary Judgment Standards**
Summary judgment is appropriate when the record reveals
that there are no genuine issues as to any material fact in
dispute and the moving party is entitled to judgment as a
matter of law. FED. R. CIV. P. 56(c); *Griffin v. Hardrick,*
604 F.3d 949, 953 (6th Cir.2010). The standard for
determining whether summary judgment is appropriate is
"whether 'the evidence presents a sufficient disagreement
to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of
law.' " *Moses v. Providence Hosp. Med. Centers, Inc.,*
561 F.3d 573, 578 (6th Cir.2009) (quoting *Anderson v.
Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct.
2505, 91 L.Ed.2d 202 (1986)). The court must consider all
pleadings, depositions, affidavits, and admissions on file,
and draw all justifiable inferences in favor of the party
opposing the motion. *See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89
L.Ed.2d 538 (1986).

When the party without the burden of proof seeks
summary judgment, that party bears the initial burden of
pointing out to the district court an absence of evidence to
support the nonmoving party's case, but need not support
its motion with affidavits or other materials "negating"
the opponent's claim. *See Morris v. Oldham County Fiscal
Court,* 201 F.3d 784, 787 (6th Cir.2000); *see also Minadeo
v. ICI Paints,* 398 F.3d 751, 761 (6th Cir.2005). Once
the movant shows that "there is an absence of evidence
to support the nonmoving party's case," the nonmoving
party has the burden of coming forward with evidence
raising a triable issue of fact. *Celotex Corp. v. Catrett,*

Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 89 of 183
Roberson v. Martens, Not Reported in F.Supp.2d (2010)
2010 WL 3779544

477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Everson v. Leis,* 556 F.3d 484, 496 (6th Cir.2009). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1478 (6th Cir.1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].' " *Dominguez v. Correctional Med. Servs.,* 555 F.3d 543, 549 (6th Cir.2009) (quoting *Anderson,* 477 U.S. at 252); *see LaQuinta Corp. v. Heartland Properties LLC,* 603 F.3d 327, 336 (6th Cir.2010).

**\*2** Where, however, a moving party with the burden of proof seeks summary judgment, he faces a "substantially higher hurdle." *Arnett v. Myers,* 281 F.3d 552, 561 (6th Cir.2002); *Cockrel v. Shelby County Sch. Dist.,* 270 F.3d 1036, 1056 (6th Cir.2001). As shown above, the moving party without the burden of proof needs only show that the opponent cannot sustain his burden at trial. "But where the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States,* 799 F.2d 254, 259 (6th Cir.1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact,* 99 F.R.D. 465, 487–88 (1984)). The United States Court of Appeals for the Sixth Circuit has repeatedly emphasized that the party with the burden of proof faces "a substantially higher hurdle" and " 'must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.' " *Arnett,* 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56–138 (3d ed.2000)); *Cockrel,* 270 F.2d at 1056 (same). Accordingly, a summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie,* 526 U.S. 541, 553, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999). This higher standard applies to defendants' motion for summary judgment because lack of exhaustion under 42 U.S.C. § 1997e(a) is an affirmative defense.

**B. Standards Applicable to the Affirmative Defense of Failure to Exhaust Remedies**

Defendants have asserted the affirmative defense of plaintiff's failure to exhaust administrative remedies and they seek dismissal of plaintiff's claims on that basis. A prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust available administrative remedies before filing his complaint. 42 U.S.C. § 1997e(a); *see Jones v. Bock,* 549 U.S. 199, 220, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Booth v. Churner,* 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001). A prisoner must exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *See Porter,* 534 U.S. at 520; *Booth,* 532 U.S. at 734. In *Jones v. Bock,* the Supreme Court held that "exhaustion is an affirmative defense, and prisoners are not required to specifically plead or demonstrate exhaustion in their complaints." 549 U.S. at 216. The burden is on defendants to show that plaintiff failed to properly exhaust his administrative remedies. The Supreme Court reiterated that "no unexhausted claim may be considered." 549 U.S. at 220. The Court held that when a prisoner complaint contains both exhausted and unexhausted claims, the lower courts should not dismiss the entire "mixed" complaint, but are required to dismiss the unexhausted claims and proceed to address only the exhausted claims. 549 U.S. at 219–24. Claims that are not fairly presented through the grievance process remain unexhausted. [2]

> [2] "Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a full and fair opportunity to adjudicate their claims." *Woodford v. Ngo,* 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

**\*3** Further, in order to exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules established by state law. *See Jones v. Bock,* 549 U.S. at 218–19. In *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), the Supreme Court held that the PLRA exhaustion requirement "requires proper exhaustion." 548 U.S. at 93.

"Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Id.* at 90. Thus, when a prisoner's grievance is rejected by the prison as untimely because it was not filed within the prescribed period, the prisoner's claim is not "properly exhausted" for purposes of filing a § 1983 action in federal court. *Id.* at 90–93; *see* 42 U.S.C. § 1997e(a); *Scott v. Ambani,* 577 F.3d 642, 647 (6th Cir.2009). The procedural bar does not apply where the State declines to enforce its own procedural rules. *See Reed–Bey v. Pramstaller,* 603 F.3d 322, 325 (6th Cir.2010).

MDOC Policy Directive 03.02.130 requires that the prisoner name within the body of his grievance the person whose conduct is challenged. [3] In *Sullivan v. Kasajaru,* 316 F. App'x 469, 470 (6th Cir.2009), the Sixth Circuit held that this policy directive "explicitly required [the prisoner] to name each person against whom he grieved," and it affirmed the district court's dismissal of a prisoner's claim for failure to properly exhaust his available administrative remedies. *Id.* at 470.

[3]   Defendants' Exhibit 1A is a copy of the policy directive. (docket # 17–3, ID # s 95–101).

Policy Directive 03.02.130 is not limited to the requirement that the individual being grieved be named in the prisoner's grievance. The following is an overview of the grievance process. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id.* at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days after the attempted oral resolution. *Id.* The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id.* at ¶¶ W, X. Prisoners are required to use "a Prisoner/Parolee Grievance (CSJ 247A) [form] to file a Step I grievance." *Id.* at ¶ R. If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten business days after the response was due. *Id.* at ¶ BB. The respondent at Step II is designated by the policy. The Warden is generally the Step II respondent. *Id.* at ¶ DD. If the inmate is dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the

same appeal form. *Id.* at ¶ FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶ FF. The Grievance and Appeals Section is the Step III respondent. *Id.* at ¶ GG. Time limitations shall be adhered to by the inmate and staff at all steps of the grievance process. *Id* . at ¶ S. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved in writing ...." *Id.*

**\*4** Ordinarily, a prisoner must pursue appeals of his grievance through Step III of the administrative process. An argument that it would have been futile to file a grievance does not suffice. Assertions of futility do not excuse plaintiff from the exhaustion requirement. *See Hartsfield v. Vidor,* 199 F.3d 305, 309 (6th Cir.1999) ("[A]n inmate cannot simply fail to file a grievance or abandon the process before completion and claim that he has exhausted his remedies or that it is futile for him to do so because his grievance is now time-barred under the regulations."); *see also Booth v. Churner,* 532 U.S. at 741 n. 6 ("[W]e will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise."); *Jones v. Douglas,* 108 F. App'x 254, 256 (6th Cir.2004).

### Proposed Findings of Fact

The following facts are beyond genuine issue. Plaintiff is serving a lengthy prison sentence on his second-degree murder conviction. On June 4, 2009, he was an inmate at ICF. Plaintiff did not file any grievance alleging that defendants had subjected him to excessive force on June 4, 2009, and he did not appeal such a grievance through a Step III decision before he filed this lawsuit. (docket # 17–3, Stapleton Aff. ¶ 15, ID # 93).

### A. June 7, 2009 Grievance

Plaintiff has submitted to the court a copy of a document purporting to be a handwritten grievance, bearing the date of June 7, 2009 (docket # 26–4, ID # 138), in which plaintiff claims that he was assaulted by defendants. There is no evidence that plaintiff filed this grievance. [4] This purported grievance was never received by the grievance

coordinator and consequently it has no grievance number. (Stapleton Aff. ¶ 15, ID # 93).

[4]     Plaintiff's brief contains a statement to the effect that he filed the unnumbered grievances dated June 7 and June 14, 2009. (Plf. Brief at 4, ID # 128). It is well established that statements appearing in a party's brief are not evidence. *See Duha v. Agrium, Inc.,* 448 F.3d 867, 879 (6th Cir.2006).

### B. *Grievance Number ICF–09–06–1357–12B1*

On June 10, 2009, plaintiff wrote and filed a grievance complaining that the counseling he was receiving at ICF was inadequate. (docket # 26–5, ID # 140, Grievance No. ICF–09–06–1357–12B1). This grievance did not assert any claim against these defendants. Plaintiff pursued his grievance regarding psychological counseling through a Step III decision. (*Id.* at ID # s 143–45).

### C. *Grievance Number ICF–09–06–1369–27Z*

On June 16, 2009, ICF's grievance coordinator received a grievance dated June 5, 2009. It was a grievance against defendants drafted and filed by another ICF prisoner using plaintiff's name and forging his signature. The grievance coordinator assigned Grievance Number ICF–09–06–1369–27Z. (docket # 26–3, ID # 132). On June 16, 2009, the grievance was denied at Step I because it was not written or signed by plaintiff:

> Your grievance is being denied as it is a non-grievable issue. Per PD–03.02.130, pg. 3, M, "Wardens and FOA Area Managers shall ensure prisoners and parolees are provided assistance in completing a grievance form, if needed. In such cases, assistance shall be provided by a staff member who is not involved in the grievance." It appears this grievance was not authored by you. Based on other grievances written by you, the handwriting and signature on this grievance is not yours. In checking you do have the ability to read and write; in fact you have written and submitted grievances yourself, which have been processed for response. It is highly evident that you can read and write and to preserve the integrity of the grievance process, then you should be writing your own grievances.

**\*5**   (*Id.*).

On June 27, 2009, plaintiff prepared a handwritten statement in support of a Step II appeal. Plaintiff did not dispute the Step I findings that he did not write or sign the grievance. He acknowledged that it had been written by another prisoner and that it contained factual inaccuracies:

> Due to the noise level on the wing, facts in [this] matter are only partially correct. For instance, I never exited my cell. Writer was trying to determine what I said amongst several translators and antagonists.

(docket # 26–3, ID # 134). Plaintiff offered the excuse, "prisoner was unable to write at the time." (*Id.*). The denial of the grievance was upheld on appeal because the grievance had been written and filed by another prisoner. (docket # 17–3, ID # 110; docket # 23–6, ID # 137).

### D. *June 14, 2009 Grievance*

Plaintiff has submitted a grievance dated June 14, 2009. (docket # 26–4, ID # 139). This grievance was never received by the grievance coordinator and it has no assigned grievance number. This purported grievance states, "On 6–5–09, I had a grievance submitted on my behalf due to my physical and mental state. This other person simply wrote down 'my' words." It is apparent that plaintiff manufactured this grievance sometime after June 16, 2009, when he received the Step I response denying Grievance Number ICF–09–06–1369–27Z. As plaintiff never submitted this grievance, it was not processed at any step of the grievance procedure. (Stapleton Aff. ¶ 15, ID # 93).

### *Discussion*

### I. *Mootness*

Plaintiff is currently an inmate at the Baraga Maximum Correctional Facility (AMF). (docket # 28). Defendants are employed by the State of Michigan at ICF. Plaintiff's claims for declaratory and injunctive relief are moot. *See Cardinal v. Metrish,* 564 F.3d 794, 798–99 (6th Cir.2009); *Kensu v. Haigh,* 87 F.3d 172, 175 (6th Cir.1996); *see also Colvin v. Caruso,* 605 F.3d 282, 289 (6th Cir.2010).

## II. *Eleventh Amendment Immunity*

All plaintiff's claims for damages against defendants in their official capacities are barred by Eleventh Amendment immunity. The Eleventh Amendment bars suit in federal court against a state and its departments or agencies unless the state has waived its sovereign immunity or unequivocally consented to be sued. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The State of Michigan has not consented to civil rights suits in federal court. *See Johnson v. Dellatifa,* 357 F.3d 539, 545 (6th Cir.2004); *Abick v. Michigan,* 803 F.2d 874, 877 (6th Cir.1986). A suit against a state officer in his or her official capacity is simply another way of pleading an action against the state. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Grinter v. Knight,* 532 F.3d 567, 572 (6th Cir.2008). Furthermore, States and their departments are not "persons" within the meaning of 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police,* 491 U.S. at 71. Defendants are entitled to judgment in their favor as a matter of law on plaintiff's claims for monetary damages against them in their official capacities.

## III. *Exhaustion of Administrative Remedies*

**\*6** Defendants seek dismissal of plaintiff's claims against them on the ground that plaintiff did not exhaust his available administrative remedies before filing this lawsuit. Upon review, I find that plaintiff did not properly exhaust his administrative remedies as required by 42 U.S.C. § 1997e(a).

"The exhaustion provision of the PLRA states: 'No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted.' " *Jones v. Bock,* 549 U.S. at 204 (quoting 42 U.S.C. § 1997e(a)). Exhaustion is mandatory. *Woodford,* 548 U.S. at 85 (citing *Booth v. Churner,* 532 U.S. 731, 739, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "[N]o unexhausted claim may be considered." *Jones v. Bock,* 549 U.S. at 220. In order for a claim to be exhausted, it must be fairly presented to prison officials through the grievance process. *Woodford,* 548 U.S. at 94. In addition, the PLRA exhaustion requirement "requires proper exhaustion." 548 U.S. at 93. "Proper exhaustion demands compliance

with an agency's deadlines and other critical procedural rules." *Id.* at 90.

None of the documents submitted by plaintiff is sufficient to satisfy the exhaustion requirement. The purported grievance of June 7, 2009 was never submitted. The June 10 grievance is irrelevant to the claims raised in this case. Grievance Number ICF–09–06–1369–27Z did not exhaust plaintiff's administrative remedies, because it was not plaintiff's grievance. It was written and filed by another prisoner. The MDOC's policy directive does not authorize one prisoner to prepare and file grievances on behalf of another. If a prisoner requires assistance, "assistance shall be provided by a staff member who is not involved in the grievance." (Policy Directive 03.02.130, ¶ M, ID # 97). [5] The June 14 grievance was never submitted.

[5]      Plaintiff's proffered excuse that he was unable to write his own grievance (Plf. Brief at 5, ID # 129) is patently false. Plaintiff had, at minimum, five business days after the purported assault within which to file his Step I grievance. *See* Policy Directive 03.02.130 ¶ P. The assault allegedly occurred on Thursday, June 4, 2009, making June 11, 2009, his earliest possible deadline for filing a Step I grievance. On June 10, 2009, plaintiff wrote his grievance regarding psychological counseling. (docket # 26–5, ID # 140, Grievance No. ICF–09–06–1357–12B1). Elsewhere, plaintiff represents to the court that he drafted one of his unnumbered grievances on June 7, 2009. (docket # 26–4, ID # 138).

Plaintiff sent an informal complaint or "kite" to the MCOC's Internal Affairs Division and received a response dated October 6, 2009 (docket # 26–6, ID # 147). Plaintiff argues, without the benefit of supporting authority, that his action outside the MDOC's grievance process should be deemed adequate to exhaust his available administrative remedies. (Plf. Brief at 3, ID # 127). Plaintiff cannot bypass the entire MDOC grievance process through the mere expedient of sending his complaints to MDOC's Internal Affairs Division. The MDOC's policy directive authorizes prisoners to file a Step I grievance with the prison's inspector if the grievance falls within the jurisdiction of Internal Affairs. (Policy Directive 03.02.130, ¶ Q, ID # 97). All grievances must be filed on a Step I grievance form. (*Id.* at ¶ R). There is no evidence that he filed a Step I grievance form with ICF's inspector and he did not pursue such a grievance through a

Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 93 of 183
Roberson v. Martens, Not Reported in F.Supp.2d (2010)
2010 WL 3779544

Step III decision. (Stapleton Aff. ¶ 15, ID # 93). Plaintiff's claims against defendants remain unexhausted.

**\*7** The only remaining question is whether the dismissal should be with or without prejudice. Generally, the dismissal of claims for failure to exhaust administrative remedies as required by 42 U.S.C. § 1997e(a) is without prejudice. *See Bell v. Konteh,* 450 F.3d 651, 654 (6th Cir.2006). Defendants have not presented any developed argument why dismissal with prejudice would be appropriate.

It is virtually certain that any grievance plaintiff might now file against defendants would be rejected as untimely at Step I, and upheld on that basis at Steps II and III. A grievance so rejected would provide a basis for dismissing plaintiff's claims with prejudice because "proper exhaustion still requires compliance with the grievance policy's critical procedures such as timeliness." *Vandiver v. Correctional Med. Servs., Inc.,* 326 F. App'x 885, 889 (6th Cir.2009) (citing *O'Sullivan v. Boerckel,* 526 U.S. 838, 848, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) and *Walker v. Thompson,* 288 F.3d 1005, 1009 (7th Cir.2002) (stating that dismissal for failure to exhaust is without prejudice and does not bar the reinstatement of the suit, unless it is too late to exhaust)). However, the

Sixth Circuit's recent decision in *Reed–Bey v. Pramstaller* suggests that the court should not anticipate a future events and should wait and see whether the State enforces its procedural rules. 603 F.3d at 325–26.

### Recommended Disposition

For the reasons set forth herein, I recommend that plaintiff's claims for declaratory and injunctive relief be dismissed as moot and that his claims for monetary damages against defendants in their official capacities be dismissed with prejudice because they are barred by Eleventh Amendment immunity. I further recommend that defendants' motion for summary judgment (docket # 16) be granted and that all plaintiff's remaining claims against defendants be dismissed without prejudice for failure to exhaust his available administrative remedies as required by 42 U.S.C. § 1997e(a). The court should enter an order implementing these recommendations and a final judgment closing the case.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 3779544

**End of Document**     © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 94 of 183
Kravitz v. Fischer, Not Reported in F.Supp.3d (2014)
2014 WL 4199245

2014 WL 4199245
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jay KRAVITZ; and Michael Stoddard, Plaintiffs,

v.

Brian FISCHER, et al., Defendants.

No. 9:12–CV–1011 (LEK/TWD).
|
Signed Aug. 22, 2014.

**Attorneys and Law Firms**

Jay Kravitz, Fishkill, NY, pro se.

Michael Stoddard, Leroy, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Cathy Y. Sheehan, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

*DECISION and ORDER*

LAWRENCE E. KAHN, District Judge.

## I. INTRODUCTION

**\*1** This *pro se* action under 42 U.S.C. § 1983 comes before
the Court following a Report–Recommendation filed on
June 19, 2014, by United States Magistrate Judge Thérèse
Wiley Dancks, pursuant to 28 U.S.C. § 636(b) and Local
Rule 72.3(d). Dkt. No. 72 ("Report–Recommendation").
Judge Dancks recommends that Defendants' Motion
for summary judgment be granted and Plaintiffs Jay
Kravitz and Michael Stoddard's ("Plaintiffs") Complaint
be dismissed with prejudice.[1] Report–Rec. at 31; Dkt.
Nos. 53 ("Motion"); 1 ("Complaint"). Only Plaintiff
Jay Kravitz ("Kravitz") filed Objections. Dkt. No.
76 ("Objections"). For the following reasons, the
Report–Recommendation is adopted in its entirety.

[1]  The Motion for summary judgment was filed on
behalf of all named Defendants other than Defendant
Bell, who has yet to be served. *See* Mot.; *see also*
Report–Rec. at 2. Plaintiffs have also named two
unidentified Defendants. Compl. at 1.

## II. STANDARD OF REVIEW

When a party makes a timely objection to a Report–
Recommendation, it is the duty of the Court to "make a
*de novo* determination of those portions of the report or
specified proposed findings or recommendations to which
objection is made." 28 U.S.C. § 636(b). Where, however,
an objecting "party makes only conclusory or general
objections, or simply reiterates his original arguments,
the Court reviews the Report and Recommendation only
for clear error." *Farid v. Bouey,* 554 F.Supp.2d 301,
307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517
F.Supp.2d 672, 679 (S.D.N.Y.2007)) (citations omitted);
*see also Brown v. Peters,* No. 95–CV–1641, 1997 WL
599355, at \*2–3 (N.D.N.Y. Sept. 22, 1997). "A [district]
judge ... may accept, reject, or modify, in whole or in part,
the findings or recommendations made by the magistrate
judge." 28 U.S.C. § 636(b).

## III. DISCUSSION

Kravitz first objects that Defendants impermissibly filed
their Motion for summary judgment after the filing
deadline had expired. Objs. at 1. However, Judge
Dancks' Order dated January 17, 2014, explicitly granted
Defendants an extension to file their Motion by February
12, 2014, and Defendants complied. Dkt. No. 52; Mot.
Relatedly, Kravitz also objects that the Motion was
improperly formatted as a motion to dismiss, rather
than for summary judgment. Objs. at 2. Judge Dancks
previously addressed this discrepancy, and by text order
dated March 3, 2014, converted the Motion into one for
summary judgment. Dkt. No. 54.

Kravitz next argues that Plaintiffs' failure to exhaust
administrative remedies should be excused because
"Plaintiffs were advised that the filing of a single
grievance on the matter was sufficient to address the
issue. Therefore, Plaintiffs were unfairly barred, by
defendant employees, from exhausting administrative
remedies under the PLRA." Objs. at 2.

Under *Hemphill,* a defendant may be estopped from
presenting non-exhaustion as an affirmative defense
where the "defendant's own actions inhibit[ed] the
inmate's exhaustion of remedies." *Hemphill v. New York,*
380 F.3d 680, 686 (citing *Ziemba v. Wezner,* 366 F.3d
161, 163 (2d Cir.2004)). That Plaintiffs were "advised"
that one grievance would be sufficient to address their
issue is not equivalent to them being prevented from

Kravitz v. Fischer, Not Reported in F.Supp.3d (2014)

2014 WL 4199245

filing further grievances under the standard set forth in *Hemphill. See, e.g., Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008) (finding defendants estopped from asserting non-exhaustion defense due to defendants' "failure to provide grievance deposit boxes, denial of forms and writing materials, and a refusal to accept or forward plaintiff's appeals"). Furthermore, even assuming the unspecified grievance was denied, Plaintiffs have not alleged that they attempted, and were prevented, from appealing an unfavorable administrative decision. *See id.* Therefore, Plaintiffs have failed to show that they were prevented from filing grievances such that they could not exhaust administrative remedies.

 **\*2** Additionally, "the court should consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 686 (quoting *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004)). "Findings of special circumstances have been primarily established where plaintiffs acted pursuant to reasonable interpretations of the regulations, thus preventing exhaustion. For example, in *Hemphill,* the Court remanded the case to the district court to consider the plaintiff's arguments that regulations were manifestly unclear and that he justifiably interpreted rules as permitting him to appeal directly to the Superintendent." *Winston v. Woodward,* No. 05 Civ. 3385, 2008 WL 2263191, at \*10 (S.D.N.Y. May 30, 2008) (citing *Hemphill,* 380 F.3d at 689). Here, Plaintiffs have not alleged any form of misinterpretation of the regulations. Rather, Plaintiffs merely failed to appeal the alleged unfavorable administrative decision. Therefore, Plaintiffs have failed to show special circumstances excusing their failure to exhaust administrative remedies.

Kravitz next objects that Plaintiffs have sufficiently alleged a substantial claim of supervisor liability, as evidenced by insubordinate correctional officers ignoring their supervisors' directives and written procedures concerning inmates' observance of the Jewish holidays. Objs. at 3. However, Plaintiffs have not alleged any personal involvement by Defendants Fischer and Rasbatt, the only two supervisors named as defendants in this action. *See* Objs. at 3; Report–Rec. at 24. For that reason, Plaintiffs' argument must fail. *See McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."); *see*

*also Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondent superior.*").

Finally, Kravitz argues that the Complaint establishes a "pattern of discrimination and harassment of Jewish inmates." Objs. at 3. The Court agrees with Judge Dancks that the alleged comments and threats made to members of the Jewish faith were "unprofessional, reprehensible, and totally unacceptable." Report–Rec. at 23. However, as Judge Dancks notes, verbal threats and harassment alone, even when they concern race or religion, do not constitute violations of an individual's constitutional rights under the First or Eighth Amendments. *Id.* at 23; *see also Cole v. Fischer,* 379 F. App'x 40, 43 (2d Cir.2010).

Furthermore, to establish a pattern of religious discrimination, Plaintiffs must show "purposeful discrimination" by Defendants based on Plaintiffs' religion. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). The evidence in the record does not support such a finding. Specifically, Plaintiffs concede that the Jewish inmates were provided with a "Holiday Booth" for group prayer during the Jewish holiday of Sukkot; that Deputy of Programs Frank acted on behalf of Jewish inmates on a number of occasions, including attempts to condemn the disparaging remarks by certain correctional officers, as well as allocating funds for Jewish books; that the Jewish inmates were eventually provided "numerous excellent books" and permitted to participate in regular study sessions with a Rabbi; and that after Jewish inmates were provided books to study Judaism, the correctional facility's administration was "very kind-hearted towards the Jewish inmates." Report–Rec. at 8, 27, 29. Therefore, Plaintiffs have failed to allege sufficient facts to demonstrate a pattern of religious discrimination.

 **\*3** Having found Kravitz's Objections to be without merit, the Court reviews the remainder of the Report–Recommendation for clear error and finds none.

## IV. CONCLUSION

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 72) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that Defendants' Motion (Dkt. No. 53) for summary judgment is **GRANTED;** and it is further

**ORDERED,** that Plaintiffs' Complaint (Dkt. No. 1) is **DISMISSED with prejudice** against Defendants Bell, John Doe # 1, and John Doe # 2; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

### *ORDER and REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate Judge.

*Pro se* Plaintiffs Jay Kravitz and Michael Stoddard (referred to individually herein as "Kravitz" and "Stoddard" and collectively as "Plaintiffs") have commenced this action pursuant to 42 U.S.C. § 1983, alleging the deprivation of their rights under the First, Eighth, and Fourteenth Amendments to the Constitution while confined in the Riverview Correctional Facility ("Riverview") in 2011 and 2012. Plaintiffs claim they were: (1) not allowed to hold premeal blessings on various Jewish holidays; (2) not allowed Chanukah candles on at least one occasion; (3) verbally harassed, threatened and ridiculed by corrections officers because of their Jewish faith on a number of occasions; (4) denied the opportunity to attend a service held for Shavuot because the corrections officers claimed there was no facilitator available, when the inmate Jewish community facilitator was available; and (5) denied requests to form a Jewish organization to raise funds for the purchase of religious books and articles for Riverview inmates. (Dkt. No. 1.)

Plaintiffs have sued Defendants Brian Fischer ("Fischer"), Commissioner of the New York State Department of Corrections and Community Supervision ("DOCCS"); Calvin Rabsatt, incorrectly sued as Calvin Rabassat ("Rabsatt"), Superintendent of Riverview; Corrections Officers Perry, Osgood, Gravlin, Beldock, and Bell; John

Does # I and # II; and DOCCS. *Id.* at ¶ 2. Defendants Fischer, Rabsatt, Perry, Osgood, Gravlin, Beldock, and Bell have been sued in their individual and official capacities. [1] *Id.* at 1. The named defendants, with the exception of Defendant Bell, who has not been served, have moved for summary judgment dismissing Plaintiffs' Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure. [2] (Dkt. Nos. 53; 53–5 at ¶ 2.) Kravitz has filed papers in opposition to the motion. (Dkt. No. 70.) Stoddard has not.

[1]  Although the caption to Plaintiffs' Complaint does not include Defendants John Doe # 1 and John Doe # 2 among the corrections officers sued in both their individual and official capacities, the Court will assume that since the Doe defendants are also corrections officers the omission was an oversight on Plaintiff's part.

[2]  The Defendants' motion has been referred to me for Report and Recommendation by the Hon. Lawrence E. Kahn, D. J., pursuant to 28 U . S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).

For the reasons set forth below, the Court recommends that the moving Defendants' motion for summary judgment (Dkt. No. 53) be granted. The Court also recommends that the Complaint be *sua sponte* dismissed with prejudice against non-movants Bell and John Does # 1 and # 2 pursuant to 28 U.S.C. § 1915A. [3]

[3]  28 U.S.C. § 1915A provides that, "[o]n review, the court shall ... dismiss [the prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief can be granted...." 28 U.S.C. § 1915A(b).

### I. BACKGROUND

**\*4**  During the time period relevant to their claims, Plaintiffs were inmates confined at Riverview. [4] (Dkt. No. 1 at ¶ 4.) Kravitz has been a life-long member of the Jewish faith. (Dkt. Nos. 53–5 at 29;70 at ¶ 5.) According to Kravitz, Stoddard, who may have been "partially Jewish" and maintained a Kosher diet, was a student of the Jewish faith with a great desire to learn more about Judaism. (Dkt. No. 53–5 at 32–33.)

[4]  This action was commenced on June 21, 2012. (Dkt. No. 1.) Original Plaintiffs Juarez F. Barreto, Anthony Sidle and Michael Orthodox have been dismissed

from the action. (*See* Dkt. Nos. 10 and 43.) Kravitz and Stoddard were both released on parole during the pendency of the lawsuit. (*See* Dkt. Entry 01–16–2013; Dkt. No. 34.) Kravitz has since been returned from parole into DOCCS custody. (Dkt. No. 71.)

**A. Restrictions on Prayer**
On September 25, 2011, Riverview Corrections Officer Beldock ordered Plaintiffs not to say a pre-meal blessing at a Rosh Hashanah holiday meal in the mess hall. (Dkt. No. 1 at ¶ 5.) On September 27, 2011, during Yom Kippur, Beldock again refused to allow Plaintiffs to say a pre-meal blessing in the mess hall. [5] *Id.* at ¶ 6. When Plaintiffs complained, Beldock replied, "I run the mess hall you Jews are here to eat not pray, just fuckin eat and ge[t] the fuck out, I have had [i]t with you fucking Jews." *Id.* On September, 29, 2011, when Beldock was once again hostile to Plaintiffs in the mess hall, Corrections Officer Jones stepped in and apologized for Beldock's behavior, and Plaintiffs were allowed to have a normal holiday in accordance with DOCCS rules. *Id.* at ¶ 8.

[5]     The Jewish calendar for 2011 indicates that Rosh Hashana began on the evening of September 28, 2011, and ended September 30, 2011, and Yom Kippur began at sundown on October 7, 2011, and continued through October 8, 2011. *See* http://www.hebcal.com/ hebcal /?year=2011 & month=x & yt=G & v=on & nx=on & mf=on & ss=on & s= on & i=on & lg-a & vis=on & d=on & c=on & geo=city-Jerusalem & m=72 & .cgifields-nx & . cgifieldsnh & .cgifields=+ ss & .s=Preview+Calendar (Jewish Calendar'). The Court will assume for purposes of this motion that the two incidents involving Beldock's refusal to allow the Jewish inmates to recite a pre-meal blessing occurred during Rosh Hashana and Yom Kippur, and that Plaintiff has inadvertently alleged incorrect dates.

The evening of October 12, 2011, during the Jewish holiday of Sukkot, when the Jewish inmates attempted to pray together at the Holiday Booth provided each year by Riverview for the pre-meal group prayer and blessing, they were barred from praying as a group by Beldock and only allowed to go into the booth one at a time. *Id.* at ¶ 9. When Beldock attempted to bar the group prayer again on the last day of Sukkot, another corrections officer apologized and allowed the inmates to pray as a group. *Id.* ¶ 10.

In support of their motion for summary judgment, Defendants have submitted the Declaration of DOCCS

employee, Kristina Monnet ("Monnet"), supervisor of the Riverview Inmate Grievance Program ("IGP"). Monnet searched grievance records for Kravitz and Stoddard and found no grievances filed by them with respect to being prohibited from praying in the mess hall between April 2011, and May 2012. (Dkt. No. 53–3 at 1–2.) Jeffrey Hale ("Hale"), DOCCS Assistant Director of the IGP, searched records of appeals made to CORC during the same time period and found no appeal by Plaintiffs regarding being prohibited from praying in the mess hall. (Dkt. No. 53– 4 at 1–2.)

Kravitz claims that Juarez Barreto ("Barreto") filed a grievance regarding not being allowed to pray in the mess hall on behalf of the Jewish community at Riverview as a whole, and that Kravitz's name was attached to the grievance. (Dkt. No. 70 at 2, 6.)

**B. Chanukah Candles**
On December 27, 2011, per the instructions of Rabbi T. Snyder, Kravitz asked Defendant Corrections Officer Osgood for the Chanukah candles for the traditional holiday lighting. *Id.* at ¶ 12. Osgood responded, "[t]here are no Fuckin candles, get you[r] Jewish Ass out of here, I don't have any Jew Candles, and y[o]u Jews are a pain in the ass." *Id.*

**C. Shavuot Service**
**\*5** Rabbi Snyder sent a memo to the Riverview administration requesting a 1:30 call-out for a Shavuot service on May 27, 2012. *Id.* at ¶ 16. Kravitz went to the activities building for the service and was told by a corrections officer that there was no memo. *Id.* Barreto asked two sergeants about the call-out not being made and was told that there was no call-out because there was no facilitator, even though almost every corrections officer knew that Barreto was the Jewish community facilitator. [6] *Id.*

[6]     Plaintiffs have not implicated any of the defendant corrections officers in their Shavuot service call-out claim. Therefore, it will be addressed by the Court in its analysis of Plaintiffs' general supervisory claim against Defendants Fischer and Rabsatt.

**D. Verbal Harassment and Threats and Derogatory Comments**

Plaintiffs allege a pattern of verbal harassment and derogatory comments about Judaism and adherents of the Jewish faith by defendant corrections officers and acceptance by supervisory defendants of an unofficial policy of antisemitic behavior towards Jewish inmates. According to Plaintiff, on April 23, 2012, Corrections Officer Gravlin ("Gravlin") commented to John Doe # 1: "Here it is we just received another radical pain in the Ass fuckin, just what we need another fuckin Jew." *Id.* at ¶ 14. On May 27, 2012, as inmates Barreto, Anthony Sidle ("Sidle"), and Michael Orthodox ("Orthodox") were leaving the mess hall with their Shavuot holiday meal, John Doe # 2 said to Corrections Officer Perry, "[h]ey look at this shit, special diets and fuckin Jews." *Id.* at ¶ 15. Perry laughed out loud at the remark. *Id.*

On June 18, 2012, while Kravitz was in the recreation yard, Corrections Officer Bell commented to him, "Kravitz you Fuckin Pain in the ass Jew, I am going to get your Jew ass one way or the another." *Id.* at ¶ 18. On June 22, 2011, in the Riverview mess hall, Bell told Plaintiff to "[j]ust eat and get out fuckin Jew." *Id.* at ¶ 19.

### E. Denial of Permission for a Jewish Fund Raising Organization

In 2011, Jewish inmates applied for permission to create a Jewish organization at Riverview to raise funds for the purpose of buying religious books and articles for study by Jewish inmates. (Dkt. No. 1 at ¶ 21.) The request was denied by supervisory officials at both Riverview and DOCCS. *Id.* According to Plaintiffs, Riverview has Christian, Latino, African American, Rastafarian, and Native American organizations for the purpose of raising funds for their community festivals and religious purposes. *Id.*

On June 7, 2011, a month and a half after receiving an April 26, 2011, denial from Catherine Jacobsen ("Jacobsen"), then Acting Deputy Commissioner of Programs for DOCCS, Kravitz requested a written explanation for the denial. *Id.* at 13. In a June 13, 2011, memorandum to Plaintiff, Jacobsen explained that the request for a fund raising group was denied because the Jewish inmates' desire for books and materials to study Judaism could be easily accommodated by a coordinated effort of the DSP (Deputy Superintendent of Program Services), Coordinating Chaplain, and the facility Rabbi, and did not require a formal organization. *Id.* at 14.

*6 Kravitz filed a grievance from the denial on July 12, 2011, claiming that without being able to do fund raising, there would be no money to purchase the necessary materials to learn Hebrew and study the Torah, Talmud, Kaballah, and Zohar. (Dkt. No. 53–5 at 10–11.) Kravitz noted in the grievance that other groups at Riverview were allowed to have fund raising organizations. *Id.* The Inmate Grievance Resolution Committee ("IGRC") denied the grievance, recommending that Kravitz address his grievance—establishing an organization for fund raising for books and supplies—to the Rabbi and Riverview administration because a Jewish fund raising organization might not be necessary to acquire whatever was needed. *Id.* at 8.

Defendant Rabsatt affirmed the IGRC denial, noting Jacobsen's rationale for the denial and indicating that the Rabbi at Riverview was in the process of establishing a study group for Jewish inmates where they would have access to learning materials to further advance knowledge of their religion and religious practices. *Id.* at 9. The materials for the study group were to be provided by the Rabbi and with facility funds. *Id.* CORC upheld Rabsatt's affirmance of the IGRC determination. *Id.* at 9.

At his deposition, Kravitz testified that DOCCS Deputy of Programs, Paul Frank ("Frank") (Dkt. No. 53–5 at 34), who is alleged in Plaintiffs' Complaint to have acted in the interest of the Jewish inmates on a number of occasions (*see, e.g.,* Dkt. No. 1 at ¶¶ 7, 12), stepped in and allotted considerable funds for the purchase of books for study.[7] (Dkt. No. 53–5 at 49.) According to Kravitz, they were able to purchase numerous excellent books so that they could meet and try to interpret the work of God. *Id.* The Riverview administration suddenly became very kind-hearted towards the Jewish inmates, and the Jewish inmates studied Judaism for almost a year prior to the time Kravitz was paroled. *Id.* at 30. The inmates who were not well educated in Judaism, and some who were, all enjoyed the last year Kravitz was at Riverview when the Jewish inmates were allowed to meet on the Sabbath. *Id.* at 31.

[7]     In his deposition, Plaintiff testified that Frank, with 100 percent sincerity, tried very hard to intervene on behalf of the Jewish inmates, and that when he was around the corrections officers spoke kindly to the inmates, but behind his back were derogatory and condescending towards them. (Dkt. No. 53–5 at 34–35, 44.) Plaintiff also testified at his deposition

that Frank intervened during one Passover when corrections officers mistreated and pillaged from the Jewish inmates so that the celebration of Passover could go forward. *Id.* at 51. In the middle of another Jewish holiday, Frank removed the corrections officers who were in the dining area, including defendant corrections officers, because they were intent on harassing Plaintiffs. *Id.* at 51–52.

**F. Passover Food and Grape Juice**

At his deposition in this case, Kravitz claimed, for the first time, that in 2011 corrections officers drank the grape juice meant for Passover while they were playing cards. (Dkt. No. 53–4 at 40.) Kravitz did not identify the person or persons responsible for taking the food and grape juice. He did identify Beldock and Bell as two of the officers he observed drinking the grape juice and Osgood as having been present. Plaintiff testified at his deposition that he filed grievances for all of the incidents about which he complained. In his unsworn Argument in Response to Defendants' Summary Judgment Motion, Kravitz made a cursory reference to his deposition testimony that the "officer [s] were eating [their] food and drinking [Plaintiffs'] juice while playing cards." (Dkt. No. 70 at 4.) However, he has submitted no evidence supporting his assertions regarding the Passover food and grape juice.[8] (Dkt. No. 70.)

[8]    "Although a complaint need not correctly plead every legal theory supporting the claim ..., at the very least, plaintiff must set forth facts that will allow each party to tailor its discovery to prepare an appropriate defense." *Beckman v. U.S. Postal Serv.,* 79 F.Supp.2d 394, 407 (S.D.N.Y.2000). Plaintiff did not move to amend his Complaint to include the claim regarding the Seder food and grape juice prior to the filing of Defendants' summary judgment motion, nor has he sought leave to amend in his opposition to the motion. "A plaintiff may not amend his complaint by making new allegations in his deposition, or in response to a motion for summary judgment." *Edwards v. Bezio,* No. 9:08–CV–256 (LEK/RFT), 2010 WL 681369, at *3 n. 4, 2010 U.S. Dist. LEXIS 16527, at *7 n. 4 (N.D.N.Y. Feb.5, 2010). Therefore, as in *Edwards,* the Court has not considered Plaintiff's new claim regarding the Passover food and wine in its summary judgment analysis. *Id.*

**II. PROCEDURAL HISTORY**

 **\*7**  This action was filed by Plaintiffs Kravitz and Stoddard, along with Barreto, Orthodox, and Sidle

on June 21, 2012. (Dkt. No. 1.) Plaintiffs filed joint motions to proceed *in forma pauperis* (Dkt. No. 2) and for appointment of counsel. (Dkt. No. 3.) The Court thereafter issued an Order advising Plaintiffs that for the action to proceed, they would have to comply with the filing fee requirements by either paying the filing fee or submitting a current inmate authorization form within thirty days of the Order. (Dkt. No. 3.) Plaintiffs Kravitz, Stoddard, and Orthodox filed authorization forms. (Dkt. Nos. 5, 6, and 9.)

On October 24, 2013, Judge Kahn issued a Decision and Order: (1) denying Barreto's motion to proceed *in forma pauperis* and ordering that Barreto be dismissed from the action without prejudice if he did not pay the filing fee and notify the Court of his current address within thirty days of the filing of the Decision and Order; (2) denying Kravitz's motion to proceed *in forma pauperis* without prejudice to renew upon the submission of a proper application within thirty days, and ordering that Kravitz be dismissed from the action without prejudice if he did not pay the filing fee or file a proper *in forma pauperis* application within thirty days of the filing of the Decision and Order; (3) dismissing Sidle from the action without prejudice for failure to comply with the Court's prior order, and denying his *in forma pauperis* application as moot; (4) granting Stoddard and Orthodox's *in forma pauperis* applications; (5) directing service; and (6) denying the motion for appointment of counsel.[9] (Dkt. No. 10.)

[9]    A subsequent motion for appointment of counsel by Kravitz (Dkt. No. 45) was also denied without prejudice. (Dkt. No. 48.)

Kravitz paid the filing fee on June 3, 2013. (Dkt. Entry 06/03/2013.) Barreto did not comply with Judge Kahn's Decision and Order of October 24, 2013, and was dismissed from the action without prejudice by the terms of the thereof. Orthodox was dismissed from the action without prejudice as a result of failure to comply with Judge Kahn's Decision and Order of September 23, 2013 ordering that he would be dismissed from the action if he failed to notify the Clerk of his current address within thirty days, leaving Kravitz and Stoddard as the only plaintiffs. (Dkt. No. 43.)

The Summons and Complaint were served on each of the named defendants except for Defendant Bell. (Dkt.Nos.12–15, 17–18, 20–21.) Named Defendants, with the exception of Bell, filed their Answer on June 22, 2013

2014 WL 4199245

(Dkt. No. 38), and moved for summary judgment on February 12, 2014. [10] (Dkt. No. 52.)

[10]     Defendants' motion was made pursuant to Rule 56 but was described by the movants as a "motion to dismiss plaintiff's complaint" and originally docketed as a motion to dismiss rather than one for summary judgment. (Dkt. No. 53 at 1.) In a March 3, 2014, Text Order (Dkt. No. 54), the Court concluded that based upon the submission by Defendants of a Local Rule 7.1 Statement and two affidavits, it appeared that Defendants intended to move for summary judgment. In the Text Order, the Court informed the parties that unless Defendants notified it within ten days that they wanted the motion to remain docketed as a motion to dismiss, the Court would convert it to a motion for summary judgment. *Id.* Defendants thereafter confirmed that they intended to move for summary judgment, and the Court direct the Clerk to reflect that the motion was one for summary judgment. (Dkt. Nos. 55 and 56.)

## III. APPLICABLE LEGAL STANDARDS

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*8** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann,* 604 F.3d 72, 81 (2d Cir.2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. [11] *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ....") (citations omitted).

[11]     Plaintiff's Complaint (Dkt. No. 1) was properly verified under 28 U.S.C. § 1746. *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with 28 U.S.C. § 1746). In addition, under oath in his deposition, Kravitz adopted the Complaint as his own and testified that everything in the Complaint was true and there was nothing he wished to modify. (Dkt. No. 53–5 33–34.)

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at \*3, 1999 U.S. Dist. LEXIS 16767 at \*8 (S.D.N.Y. Oct. 28, 1999) [12] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

[12]     Copies of unpublished decisions cited herein will be provided to Plaintiff by the Clerk in accordance with *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009). [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

## IV. ANALYSIS

### A. Plaintiffs' Official Capacity Claims For Money Damages Against Defendants

Plaintiffs have asserted official capacity claims for money damages under 42 U.S.C. § 1983 against all of the individual defendants as well as claims against DOCCS. (Dkt. No. 1 at ¶ 8.) The moving Defendants seek summary judgment dismissing those claims on Eleventh Amendment grounds.[13] (Dkt. No. 23–4 at 3–4.) The Eleventh Amendment protects states against suits brought in federal court. *Alabama v. Pugh,* 438 U.S. 781, 782, 98 S.Ct. 3057, 57 L.Ed.2d 1114 (1978). The immunity granted the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state. (*Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.,* 466 F.3d 232, 236 (2d Cir.2006). Since DOCCS is a state agency for purposes of the Eleventh Amendment, claims for money damages against DOCCS are barred under the Eleventh Amendment. *See Rother v. NYS Dept. of Corrections and Community Supervision,* 970 F.Supp.2d 78, 89–90 (N.D.N.Y.2013). The Eleventh Amendment also bars all money damages claims against state officials acting in their official capacities, including the Defendants herein. *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *see also Davis v. New York,* 316 F.3d 93, 101 (2d Cir.2002) (an inmate plaintiff's claims for damages against all individual DOCCS employees sued in their official capacities are considered claims against New York and are thus barred by the state's Eleventh Amendment immunity).

[13] Although only the moving Defendants seek dismissal of Plaintiffs official capacity claims for money damages, the District Court is empowered to *sua sponte* dismiss those official capacity claims as against Defendants John Doe # 1 and # 2 and unserved Defendant Bell. *See Atlantic Healthcare Benefits Trust v. Googins,* 2 F.3d 1, 4 (2d Cir.1993) (Eleventh Amendment may be raised *sua sponte* because it affects the court's subject matter jurisdiction); *see also Saxon v. Attica Medical Dept.,* 468 F.Supp.2d 480, 484 (W.D.N.Y.2007) (recognizing that 28 U.S.C. § 1915A directs district courts *sua sponte* to dismiss prisoner claims barred by the Eleventh Amendment).

**\*9** Therefore, I recommend that the moving Defendants be granted summary judgment dismissing Plaintiffs' § 1983 claims for money damages against DOCCS and the individual Defendants in their official capacities, and that the claim for money damages against Bell and John Does # 1 and # 2 in their official capacities be *sua sponte* dismissed with prejudice on Eleventh Amendment grounds pursuant to 28 U.S.C. § 1915A.

### B. Beldock's Refusal to Allow Pre–Meal Blessings in the Mess Hall

Plaintiffs claim that Corrections Officer Beldock prohibited Jewish inmates, including Kravitz, from saying a pre-meal blessing in the mess hall at a Rosh Hashanah meal and a meal on Yom Kippur in September of 2011, in violation of Plaintiffs' First Amendment right to the free exercise of their religious beliefs. (Dkt. No. 1 at ¶¶ 5–6.) Defendants have submitted no evidence disputing Plaintiffs' claim regarding Beldock's actions.

"Prisoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause."[14] *Ford v. McGinnis,* 352 F.3d 582, 588 (2d Cir.2003) (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)). Alleged infringements of an inmate's free exercise rights are judged by whether the restriction is "reasonable." *Ford,* 352 F.2d 588. Prison officials may not "substantially burden an inmate's First Amendment right to religious exercise without some justification...." *Salahuddin,* 467 F.3d at 275–76. A prison regulation that impinges on an inmate's right to freely exercise his religion is valid "if it is reasonably related to legitimate penological interests." *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987). Individualized decisions to deny an inmate the ability to engage in a religious exercise, as is alleged with regard to Defendant Beldock, are analyzed under the same standard as DOCCS policies. *See Salahuddin,* 467 F.3d at 274, n. 4.

[14] Plaintiff has also asserted a free exercise of religion claim under N.Y. Const., art. 1, § 3. (Dkt. No. 15 at ¶ 55.)

Defendants seek summary judgment dismissing Plaintiffs' claim for the violation of their right to free exercise of their religious belief with regard to pre-meal blessings in the mess hall during Rosh Hashanah and Yom Kippur solely on the ground that Plaintiffs failed to exhaust their administrative remedies. (Dkt. No. 53–3 and 53–4.) The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996) imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, and expressly requires that no action

2014 WL 4199245

shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp.Codes R. & Regs. tit. 7, Part 701. (2013).

**\*10** The first step requires an inmate to file a grievance complaint with the facility's IGP clerk. *Id.* at § 701.5(a). If there is no informal resolution, the IGRC holds a hearing. *Id.* at § 701.5(b)(2). If the grievance is denied by written decision of the IGRC, *id.* at § 701.5(b)(3), the grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c)(1). The appeal of a grievance involving an institutional issue is decided by the superintendent of the facility. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(i).

The third step is an appeal to CORC, *id.* at 701.5(d)(1)(i), which issues a written decision. *Id.* at 701.5(d)(3)(ii). If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at \*4, 2010 U.S. Dist. LEXIS 32014, at \*16 (N.D.N.Y. Mar.31, 2010); *Bailey v. Fortier,* No. 09–CV–0742 (GLS/DEP), 2012 WL 6935254, at \*6, 2012 U.S. Dist. LEXIS 185178, at \*14–15 (N.D.N.Y. Oct.4, 2012)

(the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

Defendants submitted declarations from Monnet and Hale establishing that a review of grievances filed at Riverview from April of 2011 to May of 2012, and a review of the appeals filed with CORC during that same time period, did not uncover any grievances filed by either Plaintiff regarding being prohibited from praying in the mess hall. (Dkt. Nos. 53–3 and 53–4.)

If, as in this case, defendants meet the burden of establishing plaintiffs' failure to exhaust, the exhaustion review does not end. "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004)]." *Murray,* 2010 WL 1235591, at \*4. *Hemphill* sets forth a three-part inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff. The DOCCS IGP is well established, and Kravitz has acknowledged filing grievances while at Riverview, including one with regard to denial of permission to for a Jewish fund raising organization, showing that he was well aware of the administrative remedies available to him. (Dkt. Nos. 53–5 at 5–12; 44–47.)

**\*11** Second, courts must determine if the defendants are estopped from presenting nonexhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by " 'beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility.' " *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Plaintiffs have asserted no such claim, nor have they provided evidence that they were prevented from filing grievances with regard to the prayer prohibition. In fact, Kravitz claims that prohibiting the pre-meal blessings was grieved by Barreto on behalf of all of the Jewish inmates. (Dkt. No. 70 at 2, 6.) There is no claim by Stoddard, who has not opposed Defendants' motion, or evidence establishing that he exhausted his administrative remedies.

Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified. [15] *Hemphill,* 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

[15] Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion"—"using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

The IGP cannot be reasonably interpreted to allow an inmate to file a grievance on behalf of a class of inmates. The IGP specifically provides that "[a]ll grievances must be filed in an individual capacity." § 701.3(b); *see also Shariff v. Coombe,* 655 F.Supp.2d 274, 286 (S.D.N.Y.2009) (relying on § 701.3(b) in rejecting plaintiff's argument that where there are issues affecting a class of inmates, the issues should be grievable as a class action); *Jamison v. Franko,* No. 12 C 0242, 2013 WL 5166626, at *2, 2013 U.S. Dist. LEXIS 35915, at *9–10 (N.D.Ill. Sept.13, 2013) (finding failure to exhaust where plaintiff attempted to rely on a grievance filed by another inmate, and the applicable IGP did not authorize one inmate to file on behalf of another); *Douglas v. Marvin,* Civil No. 12–2070, 2013 WL 2631875, at *3, 2013 U.S. Dist. LEXIS 82582, at *8 (W.D.Ark. June 12, 2013) (finding failure to exhaust where plaintiff failed to submit a grievance and attempted to rely on grievance of another inmate); *Torres v. Cormier,* Civ. Action No. 5:12–CV–63, 2012 WL 5330980, at *3 n. 3, 2012 U.S. Dist. LEXIS 155410, at *11 n. 3 (D.Vt. Sept.19, 2012) (a plaintiff cannot rely on the fact that another inmate filed a grievance "as evidence that he has in any way initiated (let alone exhausted) the administrative grievance procedure himself").

**\*12** Given Plaintiffs' failure to exhaust their administrative remedies under the IGP with respect to Beldock's refusal to allow Jewish inmates to recite a pre-meal blessing in the mess hall on two occasions during Rosh Hashana and Yom Kippur, the Court recommends that Defendant Beldock be granted summary judgment dismissing Plaintiffs' claims arising out of that refusal on failure to exhaust grounds.

### C. Beldock's Refusal to Allow Group Prayer by Jewish Inmates During Sukkot

Plaintiffs claim that during Sukkot, Riverview officials provided a Holiday Booth for a pre-meal group prayer and blessing for Jewish inmates. (Dkt. No. 1 at ¶ 9.) On October 12, 2011, when Plaintiffs attempted to pray as a group in the Holiday Booth, Beldock refused to allow it and required them to go in one at a time. *Id.* When on the last day of Sukkot, Beldock again refused to allow group prayer, another officer apologized for Beldock and allowed the group prayer. *Id.* at ¶ 10. According to Plaintiff, group prayer was allowed during Sukkot with the exception of October 12, 2011. *Id.*

Defendants' evidence of failure to exhaust covered only the refusal to allow prayer in the mess hall. (*See* Dkt. Nos. 53–3 at ¶¶ 5–6; 53–4 at ¶ 9.) Neither Plaintiff's Complaint nor Defendants' Answer or motion papers identifies the location of the Holiday Booth, leaving some question as to whether Plaintiffs' Holiday Booth claim falls within the failure to exhaust defense relied upon by Defendants that is limited to the mess hall. [16] That question may be answered by Plaintiff's Affidavit in opposition, in which he states that Plaintiffs were stopped from prayer in the mess

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 104 of 183

hall during Rosh Hashana, Yom Kippur, *and* Sukkot, suggesting that the Holiday Booth was located in the mess hall. (Dkt. 70 at ¶ 9.)

16    Defendants' failure to identify the specific claims they intend to include in their failure to exhaust argument on summary judgment and further failure to present any legal argument at all in support of the exhaustion defense, has left the Court unable to determine the scope of the exhaustion defense with certainty.

If the Holiday Booth was in the mess hall, Plaintiffs' free exercise claims related to Beldock's refusal to allow group prayer on October 12, 2011, fall within Defendants' failure to exhaust argument, and Defendant Beldock is entitled to summary judgment dismissing claims arising out of the incident for failure to exhaust administrative remedies. Beldock is entitled to summary judgment even if the Holiday Booth was located outside of the mess hall.

As discussed above, in order to succeed on a free exercise clause claim, a plaintiff must show at the threshold that defendants' conduct "substantially burdens his sincerely held religious beliefs." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 (S.D.N.Y.2008) (quoting *Salahuddin,* 467 F.3d at 274–75.) The substantial burden requirement is not met by a *de minimis* imposition on the free exercise of religion. *See Leach v. New York City,* No. 12 Civ. 3809(PAC)(JCF), 2013 WL 3984996, at *5, 2013 U.S. Dist. LEXIS 110658, at *10 (S.D.N.Y. Aug. 2, 2013).

By Plaintiffs' own admission, Beldock was successful in preventing the group prayer on only one occasion during Sukkot, and having to recite their pre-meal blessing alone rather than as a group on a single occasion, was *de minimis* and did not constitute a substantial burden on their free exercise rights. *See, e.g., Halloum v. Ryan,* No. CV 11–0097 (PHX–RCB), 2014 WL 1047144, at *17, 2014 U.S. Dist. LEXIS 35077, at *55–56 (D.Ariz. Mar.18, 2014) (preventing Muslim inmates from bringing their prayer rugs into the dining room on two occasions during Ramadan, thereby prohibiting them from praying, did not constitute a substantial burden warranting summary judgment for defendants on the free exercise claim); *Robinson v. Jimminez,* No. 08–CV–902 (NGG)(LB), 2012 WL 1038917, at *6, 2012 U.S. Dist. LEXIS 43097, at *21–23 (E.D.N.Y. Mar. 6, 2012) (one-time interruption of a service celebrating Rosh Hashana, even if a violation of plaintiff's free exercise rights, was *de minimis* ); *Smith v. Graziano,* No. 9:08–CV–469 (GLS/RFT), 2010 WL

1330019, at *9, 2010 U.S. Dist. LEXIS 33811, at *30 (N.D.N.Y. Mar.16, 2010) (cancellation of two religious services, which appeared to have been isolated occurrences rather than a systemic problem or policy of denying religious services, constituted a *de minimis* burden on plaintiff's ability to freely exercise his religion).

 **\*13** In light of the foregoing, the Court recommends that Defendant Beldock be granted summary judgment dismissing Plaintiffs' claims arising out of his refusal to allow Plaintiffs to pray as a group in the Holiday Booth during Sukkot.

### D. Chanukah Candles

Kravitz claims that on one occasion, when he asked Defendant Corrections Officer Osgood for the Chanukah candles for the traditional lighting, Osgood responded that there were "no Fuckin candles," and told Kravitz to get his "Jewish Ass" out of there, that he had no "Jew Candle," and that the Jews were "a pain in the ass." (Dkt. No. 1 at ¶ 12.) Defendants have submitted no evidence refuting Plaintiffs' claim or providing an explanation or a penological justification for the denial. Moreover, Defendants have not submitted any legal argument supporting summary judgment dismissing Plaintiffs' First Amendment claim for violation of their right to the free exercise of their religious beliefs with regard to the Chanukah candles. Plaintiff, for his part, has submitted no evidence showing that the denial of Chanukah candles by Osgood was a matter of policy, or that Chanukah candles were available and intentionally withheld by Osgood.

Despite the parties' mutual failure to address the claim on summary judgment, a Court can search the record and award judgment to any party entitled to it as a matter of law as long as there are no genuine issues of material fact. *4Kids Entertainment, Inc. v. Upper Deck Co.,* 797 F.Supp.2d 236, 241 (S.D.N.Y.2011) (on a motion for summary judgment the court may search the record and grant judgment to either party whose claim has been proved or disproved). Searching the record, the Court finds that Defendant Osgood is entitled to summary judgment dismissing Plaintiffs' First Amendment claim regarding the Chanukah candles on the grounds that denying Plaintiffs Chanukah candles on a single occasion was *de minimis* and did not substantially burden their sincerely held religious beliefs. *See Leach,* 2013 WL 3984996, at *5 (substantial burden requirement not met by a *de minimis* imposition on the free exercise of religion).

### E. Verbal Harassment and Threats and Derogatory Comments

Plaintiffs contend that Defendant Corrections Officers Beldock, Osgood, Perry, Gravlin, Bell, and John Does # 1 and # 2 verbally harassed, threatened, and made derogatory comments regarding members of the Jewish faith in violation of Plaintiffs' First and Eighth Amendment rights. None of the moving Defendants have denied Plaintiffs' contentions in their summary judgment papers.

The harassing and derogatory comments by Beldock and Osgood are noted above. Plaintiff contends that Gravlin referred to a new Jewish inmate as a "pain in the Ass ... fuckin Jew." (Dkt. No. 1 at ¶ 14.) Perry laughed when John Doe # 2 made reference to "special diets and fuckin Jews." *Id.* Bell called Kravitz a "Fuckin pain in the ass Jew," and told him he was going to "get [his] Jew ass one way or the other."

**\*14** Verbal threats, name-calling, intimidation, and harassment alone, even when they pertain to race and religion, do not give rise to a First or Eighth Amendment claim. *See Cole v. Fischer,* 379 F. App'x 40, 43 (2d Cir.2010) (explaining that verbal harassments including racial epithets, derogatory comments about Muslims, and mocking plaintiff about wearing an adult diaper, absent physical injury, are not constitutional violations cognizable under § 1983); *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) (name-calling without appreciable injury did not violate inmate's constitutional rights); *Shabazz v. Pico,* 994 F.Supp. 460, 474 (S.D.N.Y.1998) ("[V]erbal harassment or profanity alone, unaccompanied by any injury no matter how inappropriate, unprofessional, or reprehensible it might seem does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983.").

Plaintiffs have not established any physical or other appreciable injury as a result of Defendants' verbal harassment and threats. Therefore, despite the unprofessional, reprehensible, and totally unacceptable nature of the comments made about members of the Jewish faith and the threats against Jewish inmates by defendant corrections officers, the Court is compelled to recommend summary judgment in Defendant Beldock, Osgood, Gravlin, and Perry's favor with regard to

Plaintiffs' claims, and also to recommend dismissal of the claims with prejudice against Defendants Bell and John Does # 1 and # 2 under 28 U.S.C. ¶ 1915A.

### F. Denial of Request for a Jewish Fund Raising Organization at Riverview

Plaintiffs claim that their rights to free expression under the First Amendment and to equal protection under the Fourteenth Amendment were violated by the denial at the facility and State levels of DOCCS of their request for permission to form a Jewish fund-raising group at Riverview to raise funds to buy religious books and materials. (Dkt. No. 1 at ¶ 21.) Plaintiff claims, and Defendants have submitted no evidence to the contrary, that Riverview has authorized Latino, Muslim, Christian, African American, Native American, and Rastafarian community organizations. (Dkt. No. 1 at ¶ 22.)

Since the only two administrators named as defendants are DOCCS Commissioner Fischer and Riverview Superintendent Rabsatt, the claim is presumably meant to be asserted against one or both of them. The facts in the summary judgment record, however, do not support Plaintiffs' claims against Fischer or Rabsatt, or any of the Defendants, with regard to denial of permission to form a Jewish fund-raising group.

#### 1. Supervisory Liability

The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal,* 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*"). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis,* No. 9:11–CV1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22–23 (N.D.N.Y. Feb.28, 2012) (citing *McKinnon,* 568 F.2d at 934); *see also Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (noting that a defendant may not be held liable in a § 1983 action merely because he or she held a high position of authority). Therefore,

"a plaintiff must ... allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

**\*15** The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.

The evidence shows that Acting Deputy Commissioner of Programs Jacobsen, who is not named as a defendant in this action, made the decision to deny Plaintiffs' request. *Id.* at 8, 14. Jacobsen denied the request based upon the belief that the goal of the fund-raising group, *i.e.,* funds for the purchase of religious books and materials for study by Jewish inmates, *id.* at 10, "could be easily accommodated by a coordinated effort of the DSP, Coordinating Chaplain, and facility Rabbi." *Id.* at 14. There is no evidence of any personal involvement by Fischer under the *Colon* categories, and the only personal involvement by Rabsatt revealed in the summary judgment record is Rabsatt's affirmance of the IGRC denial of Kravitz's grievance. (Dkt. No. 53–5 at 8–12.)

Although there is some dispute among district courts in the Second Circuit, a superintendent's mere affirmance of an IGRC denial of a grievance has generally been found insufficient to show personal involvement for purposes of liability under § 1983. [17] *Keitt v. Schun,* No. 11–CV–438, 2014 WL 347053, at \*8, 2014 U.S. Dist. LEXIS 184557, at \*23–24 (W.D.N.Y. Jan.30, 2014) (affirmance of denial of plaintiff's grievance is insufficient to establish personal involvement under § 1983); *Vogelfang v. Capra,* 889 F.Supp.2d 489, 503 (S.D.N.Y.2012); ("an officer tasked only with reviewing an administrative determination is not 'personally involved' even if the underlying determination implicates a plaintiff's constitutional rights."); *White v. Sears,* No. 9:10–CV–0721 (MAD/GHL), 2011 WL

2728443, at \*8, 2011 U.S. Dist. LEXIS 74689, at \*21 (N.D.N.Y. June 20, 2011) (merely denying a plaintiff's grievance is insufficient to establish personal involvement); *Henry v. Lempke,* 680 F.Supp.2d 461, 464 (W.D.N.Y.2010) (affirmance of denial of an inmate's grievances alone is insufficient to establish personal involvement).

17    *See, e.g., Burton v. Lynch,* 664 F.Supp.2d 349, 360 (S.D.N.Y.2009) (finding that where the grievance involves an ongoing violation that can be directly remedied by the supervisory official affirming denial of the grievance, personal involvement can be found for purposes of § 1983). Even if affirming the denial of Kravitz's grievance was sufficient to establish personal liability on Rabsatt, as discussed below, the evidence does not support a determination that Plaintiffs' constitutional rights were violated by denial of the request for a Jewish fund-raising group.

### 2. *First Amendment Free Exercise Claim*

The evidence in the record establishes that Plaintiffs' First Amendment right to the free exercise of their religious beliefs was not substantially burdened by the denial of the request for a Jewish inmate fund-raising group. Kravitz has acknowledged that the purpose for the fundraising group was to buy books and other materials for the purpose of learning Hebrew and studying the Torah, Talmud, Kaballah, and Zohar. (Dkt. No. 53–5 at 10–11.) Kravitz has admitted that after the request for a fund raising group was denied by Jacobsen, who believed that the desire for books and materials to study Judaism could be easily accommodated without a fund-raising group, considerable DOCCS funds were allotted for the purchase of books for study, allowing the purchase of "numerous excellent books ." *Id.* at 49. According to Kravitz, the Jewish inmates enjoyed studying Judaism during the last year of his incarceration. *Id.* at 30.

**\*16** Thus, rather than burden Plaintiffs' free exercise of their religious beliefs, the Riverview and DOCCS state administration facilitated Jewish inmates' exercise of their religious beliefs. Therefore, the Court recommends that Defendant Fischer and Rabsatt's motion for summary judgment dismissing Plaintiffs' claim for violation of their First Amendment right to free expression be granted.

### 3. *Equal Protection*

The Equal Protection Clause of the Fourteenth Amendment provides that the government shall treat all similarly situated people alike. *Giano v. Senkowski,* 54 F.3d 1050, 1057 (2d Cir.1995) (citing *Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). To prove a violation of this clause, a plaintiff must prove "purposeful discrimination ... directed at an identifiable or suspect class." *Giano,* 54 F.3d at 1057 (citation omitted).

Plaintiffs are very clear that the reason for requesting permission to establish a Jewish fund-raising group was to raise money for books and materials for the study of Judaism. The only evidence in the record with regard to the purpose for which the community organizations identified by Plaintiff in his Complaint were approved is Plaintiffs' assertion that they all had the purpose of "raising funds for their community purposes and religious festivals." (Dkt. No. 1 at ¶ 21.) There is no evidence in the record that establishes the denial of the request for a Jewish community fund-raising group was purposefully discriminatory. Rather, because the Riverview and DOCCS administrators actually followed through on providing the Jewish inmates with the requested study materials, the only rational conclusion that can be reached from the evidence is that the request for a fund-raising group was denied for the precise reason given to Kravitz by Jacobsen and not as the result of purposeful discrimination. Therefore, the Court recommends that Defendants Fischer and Rabsatt's motion for summary judgment on Plaintiffs' equal protection claim be granted.

### G. Claim against Defendants Fischer and Rabsatt for Accepting the Unofficial Policy of Anti–Semitism at Riverview and for Failure to Properly Supervise and Train DOCCS Employees

#### 1. *Acceptance of Unofficial Policy of Anti–Semitism*

The only evidence directly connecting either Fischer or Rabsatt to any of Plaintiffs' claims suggesting anti-Semitism is Rabsatt's affirmance of the denial of Kravitz's grievance regarding denial of the request for a Jewish fund-raising organization.[18] There is no evidence that either Fischer or Rabsatt was aware of an unofficial policy of anti-Semitism at Riverview or in the DOCCS system. Without the requisite personal involvement, liability cannot be established against Fischer or Rabsatt under any of the categories identified in *Colon. See Bass,*

790 F.2d at 263 (tangible connection needed between defendant's actions and plaintiff's damages).

| 18 | As previously noted, mere affirmance of the denial of a grievance is insufficient to support a § 1983 claim again Rabsatt. *See Keitt,* 2014 WL 347053, at *8. |
|---|---|

Moreover, the evidence in the record does not support the existence of an unofficial policy of anti-Semitism at Riverview. Granted, the individually named corrections officers have not disputed Plaintiffs' allegations regarding their shameful comments regarding members of the Jewish faith, Beldock's refusal to allow pre-meal blessings or group prayer, or Osgood's denial of Chanukah candles on one occasion. However, Plaintiff concedes that when Beldock attempted to prevent a pre-meal blessing for a second time during Yom Kippur, another corrections officer apologized for Beldock's unacceptable behavior and allowed the blessing. (Dkt. No. 1 at ¶ 8.) The failure to have a call-out for a Shavuot service as requested by the Rabbi on a single occasion because there was no facilitator present does not support the existence of an unofficial policy of anti-Semitism. *Id.* at ¶ 16.

**\*17** The evidence shows that Riverview officials provided Jewish inmates with a Holiday Booth for group prayer during Sukkot. *Id.* at ¶ 9. When Beldock attempted to prevent a group prayer in the Holiday Booth for the second time during Sukkot, another corrections officer present apologized for Beldock and allowed the group prayer. *Id.* In fact, according to Plaintiff, the only time group prayer was not allowed was when Beldock was present. *Id.* Plaintiff acknowledges that Deputy of Programs Frank worked very hard to intervene in the verbal harassment, threats, and anti-Semitic comments made by the handful of corrections officer defendants named in the action, but that when Frank wasn't around the officers resumed their unacceptable conduct. (Dkt. No. 53–5 at 34–35.) In addition, funding was provided for a number of excellent books so that the Jewish inmates could study Judaism, and Plaintiff himself concedes that "the Riverview administration suddenly became very kind-hearted towards the Jewish inmates." *Id.* at 30.

#### 2. *Failure to Supervise and Train Employees*

Plaintiffs claim a failure to properly train and supervise employees by Defendants Fischer and Rabsatt. "The mere fact of supervisory authority ... is insufficient to demonstrate liability, based on a failure to supervise,

under § 1983." *Colon, 58 F.3d at 874. See also Bridgewater v. Taylor,* 832 F.Supp.2d 337, 348 (S.D.N.Y.2011); *White v. Fischer,* No. 9:09–CV–240 (DNH/DEP), 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb.18, 2010) ("Vague and conclusory allegations that a supervisor failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) (vague and conclusory allegations that a supervisor has failed to properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement and support a finding of liability); *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987) (dismissal of a § 1983 claim is proper where plaintiff does no more than allege defendant was in charge of the prison).

4. *Recommendation*

There is no evidence of personal involvement of Rabsatt and Fischer in the acts complained of by Plaintiffs. There is no evidence of an unofficial policy of anti-Semitism at Riverview or DOCCS administration and considerable evidence to the contrary. Furthermore, there is no evidence causally connecting the alleged wrongful actions of the corrections officer defendants and a failure by Defendants Rabsatt and Fischer to properly train and supervise them. Therefore, the Court recommends that Defendants Fischer and Rabsatt's motion for summary judgment dismissing Plaintiffs' claims against them be granted.

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that the moving Defendants' motion for summary judgment be (Dkt. No. 53) be **GRANTED;** and it is further

**\*18 RECOMMENDED** that Plaintiffs' Complaint **BE DISMISSED WITH PREJUDICE** against Defendants Bell, John Doe # 1 and John Doe # 2 pursuant to 28 U.S.C.1915A; and it is further

**ORDERED** that the Clerk provide Plaintiffs with copies of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

Dated: June 18, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4199245

---

**End of Document** © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 125284
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Sean TAPP, Plaintiff,
v.
Sgt. SEPPIO, et al., Defendants.

No. 05–CV–6485–CJS–JWF.
|
Jan. 17, 2012.

**Attorneys and Law Firms**

Sean Tapp, Lancaster, PA, pro se.

Benjamin A. Bruce, A.A.G., New York State Office of the
Attorney General, Rochester, NY, for defendants.

DECISION & ORDER

CHARLES J. SIRAGUSA, District Judge.

## INTRODUCTION

**\*1** Siragusa, J. Sean Tapp ("Plaintiff"), a prison
inmate previously in the custody of the New York State
Department of Corrections and Community Supervision
("DOCCS"),[1] brought this *pro se* civil rights action
pursuant to 42 U.S.C. § 1983 against Defendants
Stanley Sepiol ("Sepiol," referred to in the Complaint
as "Seppio"), Jeffrey Hale ("Hale"), Richard Kwasnik
("Kwasnik"), Paul Chappius ("Chappius"), and Michael
McGinnis ("McGinnis") for alleged violations of his
Constitutional rights under the Eighth Amendment.
Compl., Sept. 15, 2005, ECF No. 1. Now before the Court
is Defendants' Notice of Motion for summary judgment,
Jan. 5, 2007, ECF No. 37, and Plaintiff's Notice of Motion
Opposing Summary Judgment, Feb. 1, 2007, ECF No.
49. For the reasons stated below, Defendants' motion is
granted, Plaintiff's cross-motion is denied, and this action
is dismissed.

[1] The New York State Department of Correctional
Services (DOCS) merged with the New York State

Division of Parole to become the DOCCS on April 1,
2011.

## BACKGROUND

The following facts are viewed in the light most favorable
to the Plaintiff. From December 22, 2003, to March
19, 2004, Plaintiff was housed in A Block, 6 Gallery,
20 cell at Southport Correctional Facility ("Southport").
During the time period in question, McGinnis was
the Superintendent at Southport, Chappius was Deputy
Superintendent for Security, Sepiol was a Correction
Sergeant, Kwasnik a Correction Officer, and Hale was the
Inmate Grievance Program ("IGP") Supervisor.

On March 1, 2004, Correction Officer Kevin Aiken
("Aiken"),[2] while assigned to A Block, was escorting a
nurse on 6 Gallery and observed what appeared to be
feces on the bars of 20 cell, which was then occupied by
Plaintiff. After Aiken and the nurse completed her rounds,
Aiken returned to 6 Gallery with another Sergeant to
examine the substance on 20 cell more closely. Based on its
odor, color, and appearance, Aiken determined that the
substance on the cell bars was fecal matter, which was also
found on a towel and blanket that had been hanging on the
front of 20 cell. Aiken concluded that the feces could have
only been thrown from cell 21, which was occupied by
another inmate. The inmate admitted to Aiken that he had
thrown the feces, and was subsequently moved to another
cell. The soiled blanket, towel, and a pillow case were
removed from Plaintiff's cell bars. DOCS Directive 4912
states that inmates are responsible for cleaning the interior
of their cells, while cadre inmates, assigned as porters,
cleaned the gallery floors and cell fronts. Inmates are
provided with materials to clean the inside of their cells.
Chappius Decl. Ex. F, Dec. 15, 2006, ECF No. 41. The
exterior of Plaintiff's cell was cleaned by Southport cadre
inmates at the direction of the correction officers. On
March 19, 2004, Plaintiff was transferred from Southport
to Franklin County for a grand jury appearance, and was
returned to Southport on March 30, 2004, where he was
then confined in A Block 3 Gallery 16 cell.

[2] Aiken is not a party to this action.

DOCCS records indicate that Plaintiff made one written
complaint at Southport after the March 1 incident
concerning the condition of his cell dated March 1,
2004. That complaint was received by the Division of

2012 WL 125284

Health Services on March 19, 2004 and by the Deputy Superintendent's Office on March 23, 2004. *Id.* Ex. D. Chappius, the Deputy Superintendent for Security, received the complaint on March 29, 2004, and ordered the A Block Sergeant to investigate Plaintiff's claims. At that point, however, Plaintiff had already moved out of A Block 6 Gallery 20 cell. On April 7, 2004, Lieutenant M. Sheehan, on behalf of Chappius, sent Plaintiff a memo advising him that his complaint had become moot in light of his transfer to another cell. *Id.* Ex. E.

**\*2** The records of the Southport IGP also reflect that Plaintiff did not file a grievance relating to the March 1, 2004 incident in the months that followed. A printout of grievances filed by Plaintiff shows that Plaintiff did file a grievance in March 2004, but it concerned a request to copy files and not the sanitary conditions of his cell. Hale Decl. Ex. B, Jan. 5, 2007, ECF No. *43.* Likewise, a search of the DOCCS Central Office Review Committee ("CORC") database revealed that Plaintiff filed no grievance appeals in 2004 from Southport in which he claimed that in March 2004 he had been confined in a fecessmeared cell. Eagen Decl. Ex. A, Jan. 5, 2007, ECF No. *42.*

### ANALYSIS

#### *Summary Judgment Standard*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 Moore's Federal Practice, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew,* 75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett,*

477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied,* 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson,* 477 U.S. at 249. The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party ." *Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993). The parties may only carry their respective burdens by producing evidentiary proof in admissible form. Fed.R.Civ.P. 56(c). Moreover, since Plaintiff is proceeding *pro se,* the Court is required to construe his submissions liberally, "to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994).[3]

---

[3]     In their Notice of Motion, ECF No. *37,* Defendants provided Plaintiff with the "Irby" Notice to *Pro Se* Litigants as required by Local Rule of Civil Procedure 56(b).

---

#### *Exhaustion of Administrative Remedies*

**\*3** Defendants argue in their motion for summary judgment that Plaintiff's Eighth Amendment claim must be dismissed pursuant to 42 U.S.C. § 1997e(a),[4] which provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Generally, in order to satisfy 42 U.S.C. § 1997e(a), a plaintiff must file a grievance with respect to the challenged behavior, using DOCCS's Inmate Grievance Program procedures. Assuming that the grievance is denied, he must then exhaust the grievance appeal process, by appealing to the facility Superintendent, and then to CORC.

Tapp v. Seppio, Not Reported in F.Supp.2d (2012)

2012 WL 125284

4  Also referred to herein as the Prison Litigation Reform Act ("PLRA") of 1995, § 101(a), 42 U.S.C. § 1997e(a).

However, the Second Circuit has identified circumstances in which an inmate's unsuccessful attempt to exhaust may still meet the exhaustion requirements of § 1997e(a). *See Hemphill v. N.Y.,* 380 F.3d 680 (2d Cir.2004), *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004), *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004). In that regard,

> [w]hile the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement: "when (1) administrative remedies are not available to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement."

*Chisholm v. New York City Dept. of Correction,* No. 08 Civ. 8795(SAS), 2009 WL 2033085 at *2 (S.D.N.Y. Jul.13, 2009) (quoting *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006)).

Here, Plaintiff did not file a grievance concerning his claim that he was confined in a feces-smeared cell at Southport from March 1 to March 23, 2004. In his cross-motion, ECF No. *49,* however, Plaintiff contends that he properly exhausted his administrative remedies pursuant to DOCCS Directive 4040, which provides that "an inmate must submit a complaint to the [clerk of the IGRC]" containing "a concise, specific description of the problem and the action requested and indicate what actions the grievant has taken to resolve the complaint." N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5 (Jun. 13, 2006).

However, Plaintiff's argument fails. Plaintiff's belief that Defendants' evidence establishes that his complaint was sent to the IGRC is erroneous. The exhibit upon which Plaintiff relies is his letter addressed "to whom it may concern," and dated March 1, 2004, Chappius Aff. Ex. D. In that regard, that correspondence concerned Plaintiff's cell conditions and was marked received by the Division of Health Services, the Assistant Commissioner, and the

Deputy Superintendent of Security Services. There is no record of it having been sent to or filed with the IGRC.

**\*4** Moreover, contrary to Plaintiff's argument that his March 1, 2004, letter constitutes a grievance for purposes of Directive 4040, it is well-settled that "[l]etters of complaint, regardless of the addressee, are not part of the grievance process and do not satisfy the exhaustion requirement." *Scott v. Gardner,* 287 F.Supp.2d 477, 488–89 (S.D.N.Y.2003) (citing *Hemphill,* 198 F.Supp.2d at 549 ("The remedies afforded an aggrieved prisoner are clear, and prisoners have no authority or ability to invent their own grievance procedures.")). It is therefore undisputed that Plaintiff did not follow the three-step IGP exhaustion procedures set forth in the Directive and described above.

With regard to the *Hemphill* factors, the Court finds that there are no other circumstances present on this record that would excuse Plaintiff's failure to utilize and exhaust the IGP procedures. Although Plaintiff's contends that Kwasnik, Sepiol, Chappius and McGinnis knew his cell was "covered in feces inside & out," Pl.'s Mem. of Law at 5, ECF No. *49,* this contention does not relieve him from filing a formal grievance. He further contends that because his complaint was dismissed as moot, there was no administrative remedy available to him subsequent to his transfer to a new cell. This, though, does not make the exhaustion remedy unavailable. Rather, it was Plaintiff who chose to direct his complaints to various DOCCS administration officials in lieu of following the required IGP procedures.[5] Furthermore, Plaintiff's follow-up letters to Defendant McGinnis dated March 1, March 4, April 4, and April 28, 2004, Compl. Exs. 1, 3–5, are unreliable. Although those exhibits were produced with the Complaint, there is no record of them having been filed, and one, Exhibit 5, appears to have been redacted by Plaintiff (the addressee's name is blacked out).

5  The Court notes that Plaintiff is no stranger to the IGP process; in 2004 Plaintiff filed dozens of grievances and subsequent appeals relating to a variety of prison issues. (Docket Nos. [# 42] Ex. A, [# 43] Ex. B.)

Even if the Court were to accept that Plaintiff's complaint to Chappius constitutes a grievance for purposes of DOCCS Directive 4040, and that it was filed with the IGRC, Plaintiff does not allege, nor is there any evidence, that he ever took an appeal to the CORC regarding his complaint about his cell conditions, which is required

under the PLRA. *See Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.2004) (complete exhaustion to the highest level is required for each claim).

The Court finds that because Plaintiff failed to file his complaint pursuant to the procedure set out in the DOCCS Directive and required by the PLRA, DOCCS was not able to address his claim on its merits. Therefore, Plaintiff was not justified in failing to exhaust his administrative remedies prior to filing his § 1983 suit, and his Eighth Amendment claim must be dismissed.

In the alternative, Defendants' have argued that there is no material issue of fact for trial because the Defendants were not personally involved and because the facts do not support the conclusion that an Eighth Amendment violation occurred. Because the record definitely establishes Plaintiff's failure to exhaust his administrative remedies before commencing suit, and has not made a showing that requirement of exhaustion should be excused in this case, the Court finds it unnecessary to address Defendants' remaining arguments.

**\*5** For all of the foregoing reasons, Defendant's motion for summary judgment is granted, and Plaintiff's cross-motion for summary judgment is denied.

## CONCLUSION

Defendants' summary judgment motion, ECF No. *37,* is granted, and Plaintiff's cross-motion, also seeking summary judgment, ECF No. *49,* is denied, and this action is dismissed. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a), that any appeal from this Order would not be taken in good faith and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal *in forma pauperis* should be directed on motion to the United States Court of Appeals for the Second Circuit in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 125284

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 1605770
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Edward HARRISON, Plaintiff,
v.
Glenn GOORD, William Mazzuca Roland Larkin,
Carlton Good Arlan Pelc, James Buonato Charles
Hobbs, Dale Larsen Sgt. Rama, Richard Woodward
Nicholas Volhos, Kenneth Conklin, Rene Hernandez,
Frank Woodward, and Enrique Torres, Defendants.

No. 07 Civ. 1806(HB).
|
June 9, 2009.

West KeySummary

1    **Civil Rights**

👉 Criminal Law Enforcement;Prisons

State prisoner failed to show that
administrative remedies were unavailable for
purposes of excusing his failure to exhaust
his administrative remedies prior to filing a
§ 1983 suit against prison officials. Prisoner
contended that he was unable to exhaust his
administrative remedies because his mail was
tampered with. However, prisoner admitted
that he was provided with grievance forms
by prison officials, that he filed numerous
complaints, both formally and informally,
and that he observed his formal complaints
being deposited into a locked box designated
for such complaints. Additionally, prisoner
continued to file grievance after grievance
during the same period of time when his
mail was allegedly being tampered with. 42
U.S.C.A. § 1983.

Cases that cite this headnote

**OPINION & ORDER**

Hon. HAROLD BAER, JR., District Judge.

 **\*1** Plaintiff Edward Harrison ("Harrison" or "Plaintiff")
brings this *pro se* civil rights action pursuant to 42
U.S.C. § 1983 against Defendants Glenn Goord, William
Mazzuca, Roland Larkin, Carlton Good, Arlan Pelc,
James Buonato, Charles Hobbs, Dale Larsen, Sgt.
Rama, Richard Woodward, Nicholas Volhos, Kenneth
Conklin, Rene Hernandez, Frank Woodward, and
Enrique Torres,[1] claiming that he was subject to
cruel and unusual punishment due to the conditions
of his confinement, harassment, retaliation and mail
tampering in violation of his rights under the First, Eighth
and Fourteenth Amendments. On January 21, 2009,
Defendants[2] moved for summary judgment pursuant
to Rule 56(c) of the Federal Rules of Civil Procedure
on the grounds that (1) Harrison failed to exhaust
his administrative remedies as required by the Prison
Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a);
(2) Harrison's allegations are incredible as a matter of law;
(3) Harrison's allegations fail to state a cause of action
for a constitutional violation; (4) Defendants are entitled
to qualified immunity; (5) Defendants lacked personal
involvement; and (6) Harrison has failed to establish
deliberate indifference. Plaintiff opposed Defendants'
motion. For the reasons set forth below, Defendants'
motion for summary judgment is granted.

1        Defendant Goord is the Commissioner of the
         New York State Department of Corrections
         Services ("DOCS"); Defendant Mazzuca is the
         Superintendent of the Fishkill Correctional Facility;
         Defendant Larkin is the Deputy of Programs
         at Fishkill Correctional Facility; Defendant Pelc
         is the Acting Deputy Superintendent at the
         Fishkill Correctional Facility; Defendant Good
         is a Supervising Corrections Counselor for
         DOCS; Defendant Buonato is a Lieutenant at
         Fishkill Correctional Facility; Defendant Hobbs
         is a Lieutenant at Fishkill Correctional Facility;
         Defendant Larsen is a Corrections Sergeant at
         Fishkill Correctional Facility; Defendant Rama is
         an Inmate Grievance Committee Sergeant at Fishkill
         Correctional Facility; Defendant Richard Woodward
         is a Sergeant at Fishkill Correctional Facility; and
         Defendants Volhos, Conklin, Hernandez, Frank

Woodward and Torres are Corrections Officers at Fishkill Correctional Facility.

2    Defendants Goord, Mazzuca, Rama and Frank Woodward were never served with process; therefore they are not parties to this case or to the instant motion for summary judgment. *See* Fed.R.Civ.P. 4(m).

## I. FACTUAL BACKGROUND [3]

3    This account of the facts is taken from the Complaint, Defendants' Statement Pursuant to Local Rule 56.1, with accompanying affidavits and exhibits and Plaintiff's Affidavit in Opposition to Defendants' Motion for Summary Judgment ("Pl.Aff.") and accompanying exhibits. Although Plaintiff did not submit a response to Defendants Rule 56.1 Statement, he did submit a detailed affidavit and exhibits. The Court has examined carefully Plaintiff's memorandum of law and proffered evidence in considering the instant motion. As required on a motion for summary judgment, the facts of this case are relayed in the light most favorable to Plaintiff.

Harrison has been incarcerated in the DOCS system since 2002. *See* Deposition of Edward Harrison ("Harrison Dep.") at 5:21–25. He was transferred from Five Points Correctional Facility Special Housing Unit ("Five Points") to Fishkill Special Housing Unit ("Fishkill") in July 2004. Complaint ("Compl.") ¶ 38. Before his transfer, Harrison had filed several grievances regarding misbehavior reports he had been issued at Five Points relating to an alleged work stoppage, which is unrelated to the allegations of this case. Harrison Dep. at 100:5–101:6. Shortly after arriving at Fishkill, in July 2004, Harrison was visited by a Mr. Davidow of the Inspector General's Office, who interviewed Harrison regarding his grievances related to the events that had occurred at Five Points. *See* Compl. ¶ 40. Directly after the interview with Inspector Davidow, as he was being escorted from the interview room to his housing unit, Defendants Conklin and Volhos warned Harrison that he should not have been contacting the Inspector General's office. *Id.* ¶ 41. Plaintiff alleges that beginning with this incident in July 2004, Defendants began a pattern of harassment and confrontation in retaliation for Harrison's complaints of events that occurred in correctional facilities.

Plaintiff does not allege that he encountered any other threats or harassment relating to this incident until over

two months later, on September 25, 2004, when Defendant Volhos came to his cell to make it "verbally clear that Plaintiff could and would get physically hurt or injurred [*sic* ]." *Id.* ¶ 42. [4] As a result of this confrontation, Harrison filed a formal complaint against Defendant Volhos. *Id.* ¶ 43. Several days later, after escorting him back to his cell after a dentist's appointment, Defendant Conklin failed to remove Harrison's shackles for upwards of 45 minutes. Harrison Dep. at 16:2–6. Plaintiff filed a formal complaint against Defendant Conklin as a result of this incident. Compl. ¶ 45. Several days later, Defendant Conklin approached Harrison in his cell block and called Harrison a "rat;" thereupon, Plaintiff filed another complaint against Defendant Conklin. *Id.* ¶ 46–47. Several days later, Defendants Larson and Frank Woodward visited Harrison's cell to investigate a complaint, where Woodward verbally abused Harrison, using curse words and a racial slur, and told Harrison to stop filing grievances. *Id.* ¶ 48. Defendant Larson, who was Defendant Frank Woodward's supervisor, merely stood by and did nothing. *Id.* Plaintiff filed yet another formal complaint based on this incident. *Id.* ¶ 49.

4    Harrison does not allege that Volhos, or any other Defendant, ever physically harmed him; his allegations are limited to threats of physical harm.

**\*2** Approximately one month later, Plaintiff was issued a number of misbehavior reports, including for possession of contraband, destruction of property, and failure to obey a direct order. *See id.* ¶¶ 50–52; Pl. Aff. Exh. 2, 3, 6. Plaintiff alleges that these misbehavior reports were issued in retaliation for having spoken with the Inspector General in July and for filing complaints against the various corrections officers at Fishkill. *See* Compl. ¶¶ 51–54. Plaintiff alleges that he appealed these "tickets" but never received any reply. *Id.* ¶¶ 58–59. As a consequence of having been "written up," Harrison was moved from his cell on the second floor to a different cell on the first floor. *See id.* ¶ 60. While escorting Harrison to the new cell, Defendant Hernandez told Harrison he was lucky he didn't fall and hurt himself on the walk down the stairs; Harrison interpreted this statement as a threat. *See id.* ¶ 61. Upon arriving in the cell, Harrison noticed a small amount of water that had collected on the floor, but did not complain about it. *See* Harrison Dep. at 97:22–98:7. As it turned out, the shower in the cell "did not have the proper equipment" and every time Harrison took a shower, the shower drain would back-up and approximately an inch and a half of water would

collect on the cell floor. Compl. ¶¶ 64–67; Harrison Dep. at 98:17–24. The cell was designated for handicapped inmates, and the flooding was apparently caused by the fact that the shower, which could accommodate a wheelchair, had a low "lip" and allowed water to spill over from the shower area into the cell. Harrison Dep. at 19:21–20:5; Declaration of Dale Larsen ("Larsen Decl.") ¶ 6. Because the door to the recreation pen ("rec pen") attached to the cell let in a draft, the water on the floor would become "freezing cold" and the collected water was "dirty" and "filthy." Compl. ¶ 68. Harrison alleges he informed numerous officers of the problem with the shower, but his complaints and requests for cleaning supplies were ignored. *Id.* ¶ 69. He further alleges that Sergeant Woodward was aware of the flooding situation, but did nothing to remedy it. *Id.* ¶¶ 71–72. Harrison and his cellmate both filed grievances concerning the shower conditions. *Id.* ¶ 75. Harrison also personally told Defendant Goode about the situation, and Goode told Harrison "he would look into the problem," but Harrison was never told what was being done to correct the problem. *Id.* ¶¶ 77–78. Unrelated to the shower conditions, on October 31, 2004, Plaintiff wrote a grievance complaining that he was being deprived of communication with his family, that his legal mail was being interfered with, that he was denied certain personal items and that he had been placed in mechanical restraints without due process. *Id.* ¶ 79–80.

On December 17, 2004, when Defendant Conklin was escorting Harrison's cellmate out of the cell, per standard procedure, he asked Harrison to step outside into the rec pen area. *See* Harrison Dep. at 64:13–23; Compl. ¶ 82; Declaration of Kenneth Conklin ("Conklin Decl.") ¶ 7. At the time, Harrison was dressed only in his undergarments. *See* Harrison Dep. at 64:5–6. As the door to the rec pen was closing, Defendant Conklin ordered Harrison to get dressed in his winter clothing, but he did not. *Id* . at 65:4–10. Plaintiff alleges that Conklin left him locked out in the rec pen in his underwear for an excessive period of time. Compl. ¶ 82. As a result of this incident, Defendant Conklin issued Plaintiff a misbehavior report for failure to obey a direct order. Pl. Aff. Exh. 14. Plaintiff filed a formal complaint relating to this incident. *See* Declaration of Arlan Pelc ("Pelc Decl.") ¶ 6, Ex. A. Plaintiff received a response from Defendant Pelc regarding this incident, to which he replied on December 31, 2004. *See* Compl. ¶ 90. Thereafter, Plaintiff embarked on a prolific letter-writing campaign, writing approximately 100 letters from

December 2004 to February 2005, both internal and external, to various individuals and organizations such as Commissioner Goord, the Inspector General's office, the Bureau of Prisons, the Legal Aid Society and the American Civil Liberties Union. *See id.* ¶¶ 86, 88–96, 98–99, 101–111. Plaintiff does not specify the contents of these letters or the grievances to which they may have related.

**\*3** Plaintiff does not dispute that he never appealed any of the formal grievances he did file that relate to the incidents that give rise to this lawsuit. Plaintiff alleges that, notwithstanding his many complaints and grievances, he received no responses to the majority of his correspondence. Because he never heard back, Plaintiff alleges the Defendants must have been tampering with his mail and causing it to be destroyed or deflected from its intended destination. However, Plaintiff testified at his deposition that he observed his grievances and letters being deposited into the locked box designated for outgoing mail, that he doesn't know who has the keys to the mailbox, and that his only basis for the contention that his mail was tampered with is that he never received responses to his grievances and letters. *See* Harrison Dep. at 84:13–91:7; *see also id.* at 73:2–11.

## II. LEGAL STANDARD

A motion for summary judgment must be granted if the moving party shows "there is no genuine issue as to any material fact" and it "is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment should be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In showing the existence of a genuine issue of material fact, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." *Golden Pac. Bancorp v. F.D.I.C.,* 375 F.3d 196, 200 (2d Cir.2004); *see also Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d

538 (1986) (finding party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts"). Rather, he "must come forward with evidence sufficient to allow a reasonable jury to find in [his] favor." *Brown v. Henderson,* 257 F.3d 246, 252 (2d Cir.2001); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported as provided in [the] rule, ... the adverse party's response ... must set forth *specific facts* showing that there is a genuine issue for trial.") (emphasis added). The facts must be presented in a form that would be admissible at trial. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Even if the parties dispute material facts, summary judgment must be granted "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Where, as here, the party opposing summary judgment is proceeding *pro se,* the Court must "read the pleadings ... liberally and interpret them to raise the strongest arguments that they suggest." *Corcoran v. New York Power Auth.,* 202 F.3d 530, 536 (2d Cir.1999); *see also Jacobs v. Ramirez,* 400 F.3d 105, 106 (2d Cir.2005). Still, "proceeding *pro se* does not otherwise relieve [a party] from the usual standards of summary judgment." *Price v. Engert,* 589 F.Supp.2d 240, 244 (W.D.N.Y.2008) (internal quotation marks and citation omitted). As is well-established by both the Supreme Court and the Second Circuit, even *pro se* litigants must comply with the relevant law and procedures. *See McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by [*pro se* ] prisoners be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) ("[*P* ]*ro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law.") (citation omitted).

### III. DISCUSSION

**\*4** "In an effort to address the large number of prisoner complaints filed in federal court, Congress enacted the [PLRA]. Among other reforms, the PLRA ... requires prisoners to exhaust prison grievance procedures before

filing suit." *Jones v. Bock,* 549 U.S. 199, 202, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citations omitted). "The Supreme Court has held that 'the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " *Macias v. Zenk,* 495 F.3d 37, 40 (2d Cir.2007) (quoting *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). The exhaustion provision of the PLRA states:

> No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a). The exhaustion requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones,* 549 U.S. at 204. As the Supreme Court has held, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Id.* at 211 (citation omitted). Moreover, the Supreme Court has held that the PLRA requires "proper exhaustion" of administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 101, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.; see also Davis v. State of New York,* No. 07–3262–pr, 2009 U.S.App. LEXIS 3439, at \*3, 2009 WL 424151 (2d Cir. Feb. 20, 2009). Thus, for example, "filing an untimely or otherwise procedurally defective administrative grievance or appeal" does not satisfy the PLRA's exhaustion requirement. *See Woodford,* 548 U.S. at 83–84. Moreover, "[i]n the wake of *Woodford,* an inmate can no longer claim that partial exhaustion of administrative remedies is sufficient because prison officials have notice of his claim." *Petrucelli v. Hasty,* 05–cv–2002 (DLI)(LB), 2009 U.S. Dist. LEXIS 24889, at \*17, 2009 WL 766200 (E.D.N.Y. Mar. 25, 2009) (citing *Macias,*

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    4

495 F.3d at 43 (overruling *Braham v. Clancy,* 425 F.3d 177, 183 (2d Cir.2005)). As the Second Circuit has noted, this "proper exhaustion" requirement is necessary because the "benefits of exhaustion can be realized only if the prison grievance system is given a fair opportunity to consider the grievance." *Macias,* 495 F.3d at 41. Prisoners are required to exhaust their administrative remedies "even if they believe that administrative remedies would be ineffective or futile." *Johnson v. Killian,* No. 07 Civ. 6641(LTS) (DFE), 2009 U.S. Dist. LEXIS 34670, at *8, 2009 WL 1066248 (S.D.N.Y. Apr. 21, 2009) (citation omitted); *see also Booth v. Churner,* 532 U.S. 731, 741 n. 6, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ("We will not read futility or other exceptions into statutory exhaustion requirements where Congress has provided otherwise.").

**\*5** As the Supreme Court has noted, "it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones,* 549 U.S. at 218. Thus, all that the PLRA requires is compliance with the prison's grievance procedures. *Id* . In this case, Defendants' undisputed evidence indicates that DOCS maintains a three-tiered grievance procedure, as set forth in the New York Code, Rules and Regulations ("N.Y.C.R.R."). 7 N.Y.C.R.R. § 701.5. Full exhaustion of administrative remedies in the New York system requires compliance with all three steps of the grievance procedure. *Veloz v. New York,* 339 F.Supp.2d 505, 514 (S.D.N.Y.2004) ("Complete exhaustion of the ... administrative remedies through the highest level for each claim is required."). First, the inmate must file a complaint within twenty-one calendar days of the incident about which he is complaining. 7 N.Y.C.R.R. § 701.5(a); Declaration of Karen R. Bellamy ("Bellamy Decl.") ¶ 3. Upon receiving the complaint, the Inmate Grievance Resolution Committee ("IRGC"), which is made up of inmates and prison officials, has sixteen calendar days to resolve the matter informally, or if that is unsuccessful, to hold a hearing. 7 N.Y.C.R.R. § 701.5(b). After a hearing, the IGRC has two working days to reach a decision. *Id.* at § 701.5(b)(3). The second step in the process, after an adverse decision on an initial grievance, the grievant may file an appeal with the superintendent of the facility within seven calendar days of the superintendent's determination. 7 N.Y.C.R.R. § 701.5(c), 701.8(h); Bellamy Decl. ¶ 6. Third, if the inmate is not satisfied with the superintendent's response, he may then appeal to the Central Office Review Committee ("CORC"). 7 N.Y.C.R.R. 701.5(d). Where an inmate

alleges harassment on the part of prison personnel, the procedure provides for an expedited grievance process wherein the first step is skipped and the complaint is made directly to the official's supervisor in the first instance. 7 N.Y.C.R.R. § 701.8; Bellamy Decl. ¶ 4–5. However, even when this alternative procedure is prescribed, "the final step in the grievance procedure always remains the appeal to CORC." *Gardner v. Daddezio,* 07 Civ. 7201(SAS), 2008 U.S. Dist. LEXIS 92715, at *9, 2008 WL 4826025 (S.D.N.Y. Nov. 5, 2008) (citing 7 N.Y.C.R.R. § 701.8(h)).

In this case, it is undisputed that Harrison failed to exhaust administrative procedures as to any of his sixteen causes of action. While the record shows that Harrison filed at least one formal I.R.G.C. complaint relating to incidents giving rise to this lawsuit, *see* Pelc Decl., Ex. A, he never appealed any of these grievances to the CORC. *See* Bellamy Decl. ¶ 10, Exh. A. [5] Each of his claims in this lawsuit is grievable under the expedited procedure for filing of harassment complaints, described above. *Id* . ¶ 9. However, Harrison argues that his failure to exhaust should be excused under the Second Circuit's line of cases, beginning with *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), that recognized certain exceptions to the exhaustion requirement. Specifically, Harrison argues that "although prison officials provided grievance forms, they unlawfully confiscated Plaintiff's mail and threatened him, thereby essential[ly] barring Plaintiff from exhausting his administrative remedies." Plaintiff's Memorandum of Law ("Pl.Mem.") at 8.

[5]    Plaintiff clearly was familiar with the procedures for appealing complaints, however, as is evidenced by the fact that he successfully appealed two claims unrelated to this lawsuit, arising out of incidents at Five Points prior to his transfer to Fishkill. *See id.*

**\*6** Under the *Hemphill* line of cases, a court must make a three-step inquiry before it dismisses a prisoner's complaint for failure to exhaust his remedies. First, a court should consider whether administrative remedies were unavailable. *Hemphill,* 380 F.3d at 686; *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) ("A court may not dismiss for failure to exhaust administrative remedies unless it determines that such remedies are available.") (alterations and citations omitted). The test for assessing the availability of administrative remedies is "an objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Hemphill,* 380 F.3d at 686. Second, a court

2009 WL 1605770

should inquire into whether the defendant's actions, by threat or otherwise, inhibited the inmate's exhaustion of remedies, so as to estop the defendant from raising the plaintiff's failure to exhaust as a defense. *Hemphill,* 380 F.3d at 686; *see also Ziemba v. Wezner,* 366 F.3d 161, 163 (2d Cir.2004) (finding exhaustion is not jurisdictional, but that it is an affirmative defense that is subject to estoppel). Finally, a court should consider whether there are "special circumstances" that plausibly justify the prisoner's failure to comply with administrative procedure, such as a reasonable misinterpretation of the requirements of the prison system's regulations. *Hemphill,* 380 F.3d at 686, 689. The existence of such special circumstances "must be determined by looking at circumstances which might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004). [6]

[6] There is some doubt among courts of this Circuit as to whether the three-part inquiry under *Hemphill* has survived the Supreme Court's holding in *Woodward. See, e.g., Toomer v. County of Nassau,* No 07–CV–01495 (JFB)(ETB), 2009 U.S. Dist. LEXIS 38160, at *25 n. 8, 2009 WL 1269946 (E.D.N.Y. May 5, 2009) (collecting cases). The Second Circuit analyzed the PLRA's exhaustion requirement in light of *Woodward* in *Macias v. Zenk,* 495 F.3d 37 (2d Cir.2007), but did not hold explicitly whether the *Hemphill* analysis remains the rule of this Circuit. However, the Second Circuit has, in recent cases, applied the *Hemphill* analysis. *See, e.g., Vogelfang v. Riverhead County Jail Officers,* 07–1268–cv, 2009 U.S.App. LEXIS 1914, 2009 WL 230132 (2d Cir. Feb. 2, 2009) (finding it was error for district court not to consider plaintiff's arguments that failure to exhaust should be excused under *Hemphill* ). Nonetheless, because I find, as detailed below, that Harrison does not satisfy his burden to show he is excused from exhaustion under the *Hemphill* analysis, I need not address this somewhat thorny open question.

In this case, Harrison argues that he "tried to exhaust administrative remedies" but was unable to do so because he was threatened and because his mail was tampered with. *See* Pl. Mem. at 6–8. It is unclear whether, by making this argument, Harrison contends that administrative avenues were not available to him, under the first prong of the *Hemphill* analysis, or whether he contends that Defendants hampered his ability to exhaust and are thus estopped from raising the failure to exhaust as a defense, under the second *Hemphill* prong. *See* 380

F.3d at 686. With respect to whether administrative remedies were available, the Second Circuit has held that "threats or other intimidation by prison officials may well deter a prisoner of ordinary firmness from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." *Id.* at 688. Moreover, Plaintiff admits that he was provided with grievance forms by prison officials, Pl. Mem. at 8, and that he filed numerous complaints, both formally and informally. Indeed, Plaintiff testified that he personally observed his formal complaints being deposited into a locked box designated for IRGC complaints. Additionally, viewed in the light most favorable to Plaintiff, the record reflects that he continued to file grievance after grievance during the same period of time when he was allegedly being threatened and harassed and his mail was allegedly being tampered with. The last threat that Harrison alleges any of the Defendants made to him was in October 2004, when Defendant Hernandez commented that Harrison was lucky he didn't fall and hurt himself on the stairs while being escorted to his new cell. However, almost immediately upon arriving at the new cell, Harrison began grieving the condition of the shower. He continued to file grievances throughout the winter of 2004 up through his transfer from Fishkill in February 2005. Accordingly, it is apparent that a reasonable person of ordinary firmness in Harrison's position, as well as Harrison himself, would not have thought that administrative remedies were unavailable, and Harrison has not satisfied the first prong of the *Hemphill* analysis. *See, e.g., Winston v. Woodward,* No. 2:05 Civ. 3385(RJS), 2008 U.S. Dist. LEXIS 43208, at *21–23, 2008 WL 2263191 (S.D.N.Y. May 30, 2008) (finding that plaintiff's attempts to file grievances and appeals "cuts against his contention that administrative remedies were functionally unavailable to him"); *Amador v. Superintendents of Dep't of Corr. Servs.,* No. 03 Civ. 0650(KTD), 2007 U.S. Dist. LEXIS 89648, at *28, 2007 WL 4326747 (S.D.N.Y. Dec. 4, 2007) (rejecting plaintiffs claims that administrative remedies were made unavailable by prison officials' threats against them because the fact that plaintiffs were able to file formal grievances "directly [cut] against" their argument that remedies were unavailable).

**\*7** Plaintiff also appears to argue that because his mail was tampered with, Defendants should be estopped from raising his failure to exhaust his remedies as a defense.

However, Plaintiff has presented no evidence from which a reasonable jury could conclude that the Defendants were engaged in mail tampering. It is true that Plaintiff has alleged that he sent numerous complaints and grievances, and that he never received a response; he also notes that M.P. Stone, an officer on the IRGC, informed him that the Committee never received any of his grievances and advised him that he could resubmit them, which he did. However, as Plaintiff acknowledged at his deposition, his only reason for believing that his mail was actually being tampered with was that he never received any responses to his many grievances and letters. He has no proof that his mail was ever opened or tampered with, and if it was, that it was the Defendants who engaged in such misconduct. Cutting even further against his contentions is the fact that he personally observed his mail being deposited into a locked box, and that he does not know who has the key to open that mail box. Since Harrison cannot present any evidence that the Defendants even had access to his mail, there is certainly insufficient evidence that they tampered with it. *See Petrucelli, 2009 U.S. Dist. LEXIS 24889 at \*25–27, 2009 WL 766200* (finding plaintiff failed to fully exhaust administrative remedies because, although he suggested that prison officials had either inadvertently or intentionally failed to mail his appeal, he had provided no evidence to support this claim); *Winston v. Woodward, 2008 U.S. Dist. LEXIS 43208 at \*24, 26, 2008 WL 2263191* (finding that because plaintiff failed to produce any direct or circumstantial evidence to substantiate plaintiff's claims of mail tampering, he failed to satisfy PLRA's exhaustion requirement); *see also Rauso v. Vaughn, No. 96–6977, 2000 U.S. Dist. LEXIS 9035, at \*, 2000 WL 873285 (E.D.Pa.2000)* (dismissing mail tampering claim because "[a]t a minimum, Plaintiff had to create a record" connecting defendant's knowledge of grievances against him to mail tampering, and "there [was] no evidence that defendant ... ever tampered with Plaintiff's mail"). Moreover, there is direct evidence, provided by Harrison himself, that indicates that during the same timeframe when Harrison alleges his mail was being destroyed, his mail was indeed reaching its intended destination. *See, e.g.,* Pl. Aff. Ex. 16 (12/18/04 letter to "I.R.G.C." stamped "Received" by Inmate Grievance Program 12/20/04); Pl. Aff. Ex. 22 (1/6/05 letter acknowledging receipt of Harrison's complaint dated 12/25/04). Thus, although there may be some "metaphysical doubt" as to whether someone somewhere tampered with Harrison's mail, *see Matsushita, 475 U.S. at 586–87,* there is no evidence that any such misconduct occurred so that Harrison may

survive dismissal of his claims based on his estoppel argument.[7] Plaintiff did not argue that any special circumstances excuse his failure to exhaust administrative remedies, and the Court can conceive of none based on the record before it.

[7]    There is authority, including in recent district court cases in this Circuit, for the position that where questions of fact exist as to whether a plaintiff has exhausted administrative remedies, such fact questions are for the Court, rather than a jury, to decide. *See Pavey v. Conley, 544 F.3d 739, 740–42 (7th Cir.2008)* (en banc ) (Posner, J.); *Wyatt v. Terhune, 315 F.3d 1108, 1119–20 (9th Cir.)* (in motion to dismiss for failure to exhaust administrative remedies under PLRA, court may "decide disputed issues of fact"), *cert. denied, 540 U.S. 810, 124 S.Ct. 50, 157 L.Ed.2d 23 (2003)*; *Sease v. Phillips,* 06 Civ. 3663(PKC), 2008 U.S. Dist. LEXIS 60994, at \*9 n. 2 (S.D.N.Y. July 25, 2008); *Amador,* 2007 U.S. Dist. LEXIS 89648 at \*17 n. 7, 2007 WL 4326747; *Dukes v. S.H.U. C.O. John Doe # 1,* 03 Civ. 4639(CLB)(MDF), 2006 U.S. Dist. LEXIS 41517, at \*21, 2006 WL 1628487 (S.D.N.Y. June 12, 2006) (ordering evidentiary hearing on question of exhaustion); *Priester v. Rich,* 457 F.Supp.2d 1369, 1277 (S.D.Ga.2006), aff'd sub nom. *Bryant v. Rich,* 530 F.3d 1368 (11th Cir.), *cert. denied,* —— U.S. ——, 129 S.Ct. 733, 172 L.Ed.2d 734 (2008). However, because I find that there is no genuine issue of material fact on the exhaustion question, I need not weigh in on the debate as to whether the Court or the jury is in the proper position to decide those issues.

**\*8** It should be noted that although the undisputed evidence shows that Harrison did verbally convey his grievances to several of the Defendants, and that he sent numerous letters to various individuals and organizations relating to his complaints, including to the Superintendent of Fishkill and the Commissioner of DOCS, these efforts, for better or worse, just don't cut the mustard so as to satisfy the strict exhaustion requirement. *See Collins v. Goord, 438 F.Supp.2d 399, 413 (S.D.N.Y.2006)* ("Although Collins wrote letters and completed forms in repeated efforts to obtain photocopies, these letters and forms are not sufficient absent facts excusing Collins' use of the IGP process."); *Lee v. Carson, 310 F.Supp.2d 532, 537 (W.D.N.Y.2004)* (holding that prisoner could not exhaust by verbally conveying grievance to two prison guards); *Colon v. Farrell,* No. 01 Civ. 6480(FE), 2004 WL 1126659, at \*5 (W.D.N.Y. Sept. 23, 2004) (noting

that "letters of complaints to DOCS employees and officials do not satisfy the grievance procedure exhaustion requirement"); *Conner v. Hurley,* No. 00 Civ. 8354(LTS) (AJP), 2004 WL 885828, at *2 (S.D.N.Y. Apr. 26, 2004) (explaining that letters to facility superintendent and DOCS commissioner "may not be deemed substitutes for strict compliance with the requirements of the IGP"). In addition, even assuming that Harrison filed the initial complaints that he claims to have filed, and never received a response, this does not excuse the failure to exhaust his remedies. *See* 7 N.Y.C.R.R. § 701.8; *Donahue v. Bennett,* 02–CV–6430 CJS (B), 2004 U.S. Dist. LEXIS 17189, at *20, 2004 WL 1875019 (W.D.N.Y. Aug. 17, 2004) ("Plaintiff is incorrect when he argues that the failure of prison officials to respond to a grievance eliminates further obligations on plaintiff's part."); *Lashley v. Artuz,* No. 01–Civ.–11542 (SAS), 2004 U.S. Dist. LEXIS 9707, at *5–6, 2004 WL 1192090 (S.D.N.Y. May 27, 2004) (noting that "[e]ven where an inmate receives no response to his initial level grievance, he is still required to file an appeal in order to satisfy the exhaustion requirement"); *Arce v. Keane,* No. 01 Civ. 2648(BSJ), 2004 U.S. Dist. LEXIS 3698, at *7, 2004 WL 439428 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance."); *see also* Bellamy Decl. ¶ 7 ("[I]f an inmate does not receive a response to a grievance alleging employee harassment in a timely fashion, he may appeal his grievance to CORC by filing a notice of decision to appeal with the Inmate Grievance Program clerk at his facility.") (citing 7 N.Y.C.R.R. § 701.8(g)). Thus, because there is no dispute that Harrison did not appeal any of his grievances to which his claims in the instant lawsuit relate to the CORC, as required by the DOCS grievance procedure, and because Harrison has not sufficiently shown that any of the exceptions under *Hemphill* excuses his failure to exhaust, summary judgment in favor of the Defendants is appropriate on all of Harrison's claims. As such, the Court need not address Defendants' myriad other arguments in support of their motion for summary judgment.

**\*9** Typically, the dismissal of a claim for failure to exhaust administrative remedies is without prejudice, because a "prisoner who brings suit without having exhausted these remedies can cure the defect simply by exhausting them and then reinstituting his suit." *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004) (quoting *Snider v. Melindez,* 199 F.3d 108, 111–12 (2d Cir.1999)). However,

"where exhaustion was required but administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust," dismissal with prejudice is warranted. *Id.* at 88. Here, Defendants have not argued that dismissal should be with prejudice, nor have they shown that administrative remedies have become unavailable. *See Donahue,* 2004 U.S. Dist. LEXIS 17189, at *27 & n. 13, 2004 WL 1875019. Accordingly, although dismissal is appropriate due to Harrison's failure to exhaust his remedies, such dismissal will be without prejudice to Plaintiff's ability to re-file in accordance with the DOCS procedure, appealing those grievances to the CORC, and reinstating the instant suit.

Should Harrison choose to pursue his administrative remedies and file a new federal complaint, the court advises him to be mindful of the requirement that all defendants in a suit under 42 U.S.C. § 1983 must be shown to have been personally involved in the constitutional violations alleged. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). A supervisor may be shown to be personally involved if:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

2009 WL 1605770

*Colon v. Coughlin,* 58 F.3d 865, (2d Cir.1995) (citations omitted). The doctrine of *respondeat superior* does not apply to claims under § 1983; that is, a defendant cannot be held liable merely because he occupied a supervisory position. See *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) ( "[P]laintiff's claim for money damages against [the Commissioner] requires a showing of more than linkage in the prison chain of command."). "Further, a Section 1983 plaintiff must allege a tangible connection between the acts of the defendant and the injuries suffered." *Brown v. Eagen,* 08–CV–0009 (TJM/DRH), 2009 U.S. Dist. LEXIS 24876, at *16–17, 2009 WL 815724 (N.D.N.Y. Mar. 26, 2009) (citations omitted). A complaint that fails to allege personal involvement is "fatally defective on its face." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987). Here, in particular, although it is unnecessary to explicitly decide at this time, the Court is skeptical as to whether valid claims exist as against Defendants Goord, Mazzuca, Larkin, Goode, Buonato, Hobbs, Larson, or Rama. Plaintiff should be aware that prison supervisors cannot be deemed personally involved based simply on a response to a complaint, and should Plaintiff draft a new complaint, he is advised to analyze the validity of naming each defendant before filing any such complaint. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997). For instance, the receipt by certain defendants of letters complaining of alleged constitutional violations do not necessarily indicate that those defendants satisfy the personal involvement requirement, even if the letters are "ignored"; when the letters are forwarded to the appropriate party, supervisory personnel is entitled to rely on the established administrative complaint system to resolve the issue. *See, e.g., id.* (holding DOCS Commissioner not liable for referring plaintiff's first letter of appeal to subordinate or for summarily responding to plaintiff's second letter requesting a status update on his appeal); *Westbrook v. City Univ. of N.Y.,* 591 F.Supp.2d 207, 225 (E.D.N.Y.2008) ("Even if [defendant] had not forwarded plaintiff's letters, ... the fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement.") (citations omitted); *Ortiz–Rodriguez v. New York State Dep't of Corr. Servs.,* 491 F.Supp.2d 342, 347 (W.D.N.Y.2007); *Greene v. Mazzuca,* 485 F.Supp.2d 447, 452 (S.D.N.Y.2007); *Swindell v. Supple,* 02–CV–3182, 2005 WL 267725, at *10 (S.D.N.Y. Feb.3, 2005); *Gayle v. Lucas,* 97 Civ. 0883(MGC), 1998 U.S. Dist. LEXIS 3919, at *11–12, 1998 WL 148416 (S.D.N.Y. Mar. 30, 1998).

**\*10** Since this argument is persuasive, I decline to examine the remaining concerns voiced by the Defendants.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and Plaintiff's complaint is dismissed without prejudice. The Clerk of this Court is instructed to close all open motions in this matter and remove the matter from my docket.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1605770

                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

   © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 498277
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tiquan DAVIS, Plaintiff,

v.

Correction Officer T. GRANT and
Sgt. Todd Paroline, Defendants.

No. 15-CV-5359 (KMK)
|
Signed 02/08/2019

**Attorneys and Law Firms**

Tiquan Davis, Ossining, NY, Pro Se Plaintiff.

Yan Fu, Esq., New York State Attorney General, New York, NY, Counsel for Defendants.

**OPINION & ORDER**

KENNETH M. KARAS, UNITED STATES DISTRICT JUDGE

**\*1** Tiquan Davis ("Plaintiff"), proceeding pro se, brings this Action against Correction Officer T. Grant ("Grant") and Sergeant Todd Paroline ("Paroline") (collectively, "Defendants"), employees of the New York State Department of Correction and Community Supervision ("DOCCS"), pursuant to 42 U.S.C. § 1983, alleging retaliation arising out of allegedly false misbehavior reports filed by Defendants. (*See* Second Am. Compl. ("SAC") (Dkt. No. 88).) [1] Before the Court is Defendants' Motion for Summary Judgment. (*See* Not. of Mot. (Dkt. No. 94).) For the reasons explained herein, Defendants' Motion for Summary Judgment is granted.

---

[1]    Plaintiff's retaliation claims against Defendants Grant and Paroline are the only remaining claims in this case. The Court dismissed all other Defendants and claims in a September 30, 2016 Opinion and Order, (*see* Opinion & Order (Sept. 30, 2016) ("Sept. 30, 2016 Opinion") (Dkt. No. 52) ), and a January 8, 2018 Opinion and Order (*see* Opinion & Order (Jan. 8, 2018) ("Jan. 8, 2018 Opinion") (Dkt. No. 86).)

I. Background

A. Factual Background

The Court has described the allegations and procedural history of this case in two prior published Opinions. *See Davis v. Jackson*, No. 15-CV-5359, 2016 WL 5720811 (S.D.N.Y. Sept. 30, 2016); *Davis v. Jackson*, No. 15-CV-5359, 2018 WL 358089 (S.D.N.Y. Jan. 8, 2018). The Court therefore assumes familiarity with the dispute and will provide factual and procedural background only as relevant to the instant Motion.

The following facts are taken from Defendants' statements pursuant to Local Civil Rule 56.1, (Defs.' Local Rule 56.1 Statement ("Defs.' 56.1") (Dkt. No. 95) ), and Plaintiff's "Reply to Summary Judgment" and "Declaration in Support of Reply," both filed in the same document, (Pl.'s Reply in Opp'n to Mot. for Summ. J. ("Pl.'s Reply") (Dkt. No. 101); Decl. of Tiquan Davis ("Pl.'s Decl.") (Dkt. No. 101) ), and the admissible evidence submitted by the Parties. [2] The facts are recounted "in the light most favorable to" Plaintiff, the non-movant. *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018) (internal quotation marks omitted). [3] The facts as described below are in dispute only to the extent indicated.

---

[2]    Plaintiff submitted a Declaration in which he stated that he made his Declaration "pursuant to 28 U.S.C. § 1746." (Pl.'s Decl. 1.) The Court notes that Plaintiff's Declaration is nearly identical to a supplement to the SAC Plaintiff filed on April 10, 2018. (*See* Letter from Tiquan Davis to Court ("SAC Supp.") (Dkt. No. 93).) That Supplement, like the Declaration, fails to include the "under penalty of perjury" language. The Second Circuit has held that the absence of the "under the penalty of perjury" language constitutes a substantial departure from § 1746. *See In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d 483, 488 (2d Cir. 2013) (holding that failure to include the phrase "under penalty of perjury" in a declaration constituted a substantial departure from § 1746 such that the district court did not err in invalidating a declaration that lacked such language); *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61, 65–66 (2d Cir. 1999) (reversing summary judgment granted to plaintiff where district court excluded defendant's unsworn letter that "substantially" complied with the requirements of § 1746, because it included

the language "[u]nder penalty of perjury, I make the statements contained herein," and was signed and dated, even though it did not include language that the contents of the letter were "true and correct"); *Stair v. Calhoun*, No. 12-CV-6121, 2015 WL 1966345, at \*1 (E.D.N.Y. May 1, 2015) (finding that pro se plaintiff's unsworn declaration that did not include the language "true under penalty of perjury" did not meet the requirements of § 1746 because "[i]nclusion of the language 'under penalty of perjury' is an integral requirement of the statute" (citations, quotation marks, and alterations omitted) ); *Ed-George v. Burns*, 09-CV-0869, 2009 WL 2957796, at \*2 (N.D.N.Y. 2009) (finding that although § 1746 "requires only that a declaration [ ] 'substantially' " conform with its requirements, the words "under penalty of perjury" are "expressly required" because without them "it is far from clear to the court that [the] [p]laintiff fully appreciates the consequences, or is impressed with the solemnity of his declaration" (citations, quotation marks, and alterations omitted) ).

Plaintiff's Declaration does not include the language "under penalty of perjury" nor does it state that the contents are "true and correct." It therefore lacks precisely the "integral requirement of the statute" that is meant to impress upon every declarant "the specific punishment to which he or she is subjected for certifying to false statements." *In re World Trade Ctr. Disaster Site Litig.*, 722 F.3d at 488. The Court could therefore decide this Motion without considering Plaintiff's Declaration. However, because Plaintiff fails to raise a triable issue of fact even if his Declaration is considered, the Court will consider Plaintiff's Declaration, especially in light of the "special solicitude" afforded to pro se litigants. *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988).

3    Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." Local Civ. R. 56.1(b). "If the opposing party ... fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F.

Supp. 3d 414, 418 (S.D.N.Y. 2014) (quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). "A pro se litigant is not excused from this rule," *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at \*3 (S.D.N.Y. Mar. 13, 2014) (italics omitted). Here, Defendants filed and served their 56.1 Statement, (Defs.' 56.1), in addition to a statement notifying Plaintiff of the potential consequences of not responding to the Motion, as required by Local Rule 56.2, (Dkt. No. 99). Despite this notice, Plaintiff failed to submit a response to Defendant's 56.1 Statement of Facts. Accordingly, the Court may conclude that the facts in Defendant's 56.1 Statement are uncontested and admissible. *See Brandever*, 2014 WL 1053774, at \*3 (concluding that because the pro se plaintiff did not submit a Rule 56.1 statement in response to the defendant's statement of facts, "there [were] no material issues of fact"); *Anand v. N.Y. State Div. of Hous. & Cmty. Renewal*, No. 11-CV-9616, 2013 WL 4757837, at \*7 (S.D.N.Y. Aug. 29, 2013) (same).

Nevertheless, in light of the "special solicitude" afforded to pro se litigants "when confronted with motions for summary judgment," *Graham*, 848 F.2d at 344, the Court will "in its discretion opt to conduct an assiduous review of the record," when deciding the instant Motion, *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (quotation marks omitted); *see also Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 349 (E.D.N.Y. 2014) ("Although [the] plaintiffs did not file a Rule 56.1 statement, the Court has independently reviewed the record to ensure that there is uncontroverted evidence to support the paragraphs referenced in [the] defendants' Rule 56.1."); *Pagan v. Corr. Med. Servs.*, No. 11-CV-1357, 2013 WL 5425587, at \*2 (S.D.N.Y. Sept. 27, 2013) (explaining that "[t]he [c]ourt ha[d] considered the [motions for summary judgment] in light of the entirety of the record to afford [the pro se] [p]laintiff the special solicitude to which he [was] entitled" where the plaintiff failed to submit a Rule 56.1 response); *Cherry v. Byram Hills Cent. Sch. Dist.*, No. 11-CV-3872, 2013 WL 2922483, at \*1 (S.D.N.Y. June 14, 2013) ("[W]here a pro se plaintiff fails to submit a proper ...Rule 56.1 statement in opposition to a summary judgment motion, the [c]ourt retains some discretion to consider the substance of the plaintiff's arguments, where actually supported by evidentiary submissions." (italics and quotation marks omitted) ). The Court also will consider Plaintiffs' opposition papers.

**\*2** At all times relevant to the claims in the SAC, Plaintiff was incarcerated at Sing Sing Correctional Facility ("Sing Sing"). (Defs.' 56.1 ¶ 1.) DOCCS has an inmate grievance procedure. (*Id.* ¶ 3.) An Inmate Grievance Program ("IGP") procedure exists at Sing Sing. (*Id.* ¶ 4.)

In his SAC, Plaintiff alleges that: (1) at some time in March 2014, Grant issued a false misbehavior report against him in retaliation for an incident involving Plaintiff and Correction Officer Angela Jackson;[4] (2) on October 31, 2015, Grant issued a misbehavior report against Plaintiff in retaliation for filing a lawsuit against Jackson; (3) on August 4, 2015, Paroline confiscated Plaintiff's belt buckle, falsely told Office of Mental Health ("OMH") officials that Plaintiff was suicidal, and wrote a false misbehavior report; and (4) on August 8, 2015, Paroline wrote Plaintiff another misbehavior report after Plaintiff was found not guilty of the charges in the August 4, 2015 misbehavior report. (*Id.* ¶ 2; *see generally* SAC.)

[4]    Defendant Jackson was dismissed from this Action with prejudice by the Jan. 8, 2018 Opinion.

Plaintiff filed a grievance on August 13, 2015, which was assigned grievance number 55380-15 (the "55380-15 Grievance"). (Defs.' 56.1 ¶ 5.) In the grievance, Plaintiff claimed, among other things, that on August 4, 2015, Paroline confiscated his belt buckle, falsely told OMH officials that Plaintiff was suicidal, and wrote a false misbehavior report. (*Id.* ¶ 6.) Because Plaintiff alleged harassment by DOCCS staff, his grievance was forwarded to the Sing Sing Superintendent pursuant to 7 NYCRR § 701.8. (*Id.* ¶ 7.) Following an investigation, Plaintiff's grievance was denied on September 3, 2015. (*Id.* ¶ 8.) Sing Sing has no record of any appeal by Plaintiff of the denial of the 55380-15 Grievance to the DOCCS Central Office Review Committee ("CORC"). (*Id.* ¶ 9.)

With respect to the August 4, 2015, Paroline grievance report, Plaintiff claims that after he received his "response from the superintendent," which the Court takes to mean the September 3, 2015 denial of the grievance, Plaintiff "wrote [his] appeal out for CORC ... and was personally able to hand [his] appeal to the grievance sgt who told [him] that they would make sure [his] appeal got filed." (Pl.'s Decl. ¶ 4.) Plaintiff claims he has still not heard from CORC regarding his appeal. (*Id.*)

With respect to the October 31, 2015, incident involving Grant, Plaintiff states in his Declaration that on October 31, 2015, he wrote a harassment and retaliation grievance and gave this grievance to the B-block IGRC representative to file. (*Id.* ¶ 2.) After three weeks Plaintiff claims he asked the same representative whether he had filed his grievance because he had not heard anything. (*Id.*) The representative told him he had filed the grievance and that he would check on the status with the IGP supervisor. A week later the representative told Plaintiff that the IGP had told him they would get back to him but never did. (*Id.*) The representative suggested to Plaintiff that he appeal it to the CORC "because the grievance was a 'code 49' and would be sent straight to the superintendent." (*Id.*) Plaintiff alleges he then drafted his appeal "that night," included a copy of his original grievance dated October 31, 2015, and gave it to the representative the next morning. Plaintiff claims he has still not heard anything regarding this grievance. (*Id.*)

**\*3** Plaintiff filed eight other grievances while at Sing Sing between 2014 and 2017, including complaints that (1) the "staff failed to follow instructions," (2) he "wants cooling system in the hallways," (3) he "claims dental is not providing him treatment," (4) he "wants decision of tier 2," (5) involve "in-cell movie and DVD issue," (6) he "wants to know why he was not allowed to run for ILC," (7) involve "staff interference with AVP," and (8) he "wants to be placed in the program." (Decl. of Quandera Quick ("Quick Decl.") ¶¶ 6–7, Ex. A (Plaintiff's Sing Sing Grievance Record) (Dkt. No. 96).) Besides the 55380-15 Grievance, none of the grievances filed by Plaintiff between 2014 and 2017 involved an allegedly false misbehavior report or harassment by staff. (Quick Decl. ¶ 12.) Since Plaintiff has been incarcerated under his current Department Identification Number (#95-A-0305), he has appealed 39 grievances to CORC. (Decl. of Rachael Seguin ("Seguin Decl.") ¶ 6, Ex. A, at 3 (Plaintiff's CORC Grievance Record) (Dkt. No. 97).)[5] According to CORC records, Plaintiff did not appeal any grievances to CORC between 2012 and 2016. (Seguin Decl. ¶ 8; Plaintiff's CORC Grievance Record at 3.) Plaintiff appealed one grievance in 2016 and it involved television programming. (Plaintiff's CORC Grievance Record at 3.)

[5]    For non-paginated exhibits, the Court cites to the ECF-generated page numbers at the top right corner of the relevant page.

In his Declaration, Plaintiff claims that he made copies of his grievances but cannot find them. (Pl.'s Decl. ¶ 6.) He states that he knows he followed the "steps of the PLRA [Prison Litigation Reform Act of 1995] to the best of [his] abilities," because he used to be a grievance representative himself and was "fully aware that in order to exhaust [his] claims [he] had to follow thr[ough] all the way to the CORC." (*Id.*) Plaintiff further states that in doing so he had to "rely on the IGRC to carry out their functions which they clearly did not do." (*Id.*) [6]

[6]    In his Declaration, Plaintiff also makes several general statements about Sing Sing's grievance-filing process. "Between 2014 until the present there have been numerous complaints made by the ILC to the administration about the IGRC's failure to hold timely hearing, lose and not file appeals, especially those made against corrections staff. These complaints caused the director of CORC to physically come to [Sing Sing] to investigate." (Pl.'s Decl. ¶ 5.) However, "where a party relies on affidavits ... to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated.' " *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4) ). Plaintiff does not point to any admissible evidence documenting any complaints that other inmates allegedly made about the grievance-filing process, nor does he explain the basis of his personal knowledge of the CORC director's alleged visit to Sing Sing. Plaintiff does not explain how he knows or what he knows about these alleged complaints made by the ILC. Defendants, on the other hand, have submitted evidence to show that an IGP exists at Sing Sing, (Defs.' 56.1 ¶ 4), and that Plaintiff had successfully used the IGP, given that he filed eight other grievances while at Sing Sing between 2014 and 2017, (*id.* ¶ 10), and appealed 39 grievances to CORC, (*id.* ¶ 13). Thus, although the Court considers portions of Plaintiff's Declaration that are based on personal knowledge and set out facts that would be admissible as evidence, *DiStiso*, 691 F.3d at 230, the Court will not consider these statements by Plaintiff about the general flaws in Sing Sing's grievance process and the issues other inmates allegedly had with filing grievances, of which Plaintiff has no personal knowledge. *See Baity*, 51 F. Supp. 3d at 419–20 (disregarding plaintiff's affidavit that "contain[ed] a surfeit of improper averments, including statements not based on [the] [p]laintiff's

personal knowledge and conclusory statements that are nothing more than speculation").

    B. Procedural History

On July 7, 2015, Plaintiff filed his Complaint, (*see* Compl. (Dkt. No. 2) ), and sought leave to proceed in forma pauperis, (*see* Dkt. No. 1), which was granted on July 15, 2015, (*see* Dkt. No. 4). On December 28, 2015, Defendants filed their Motion to Dismiss and accompanying papers. (*See* Dkt. Nos. 22–27.) After several extensions, Plaintiff filed his Opposition on June 7, 2016, (*see* Dkt. No. 33), and, on June 29, 2016, Defendants submitted their Reply, (*see* Dkt. No. 37). Plaintiff submitted a surreply on July 22, 2016, (*see* Dkt. No. 41), and Defendants filed their own surreply and accompanying papers on September 13, 2016, (*see* Dkt. Nos. 48–50).

**\*4** On September 30, 2016, the Court issued an Opinion and Order dismissing, without prejudice, Plaintiff's official capacity claims and finding that Plaintiff's due process and retaliation claims were time-barred absent application of an applicable tolling doctrine. (*See generally* Opinion & Order (Sept. 30, 2016) ("Sept. 30, 2016 Opinion") (Dkt. No. 52).) The Opinion allowed Plaintiff time to file an Amended Complaint. (*Id.* at 28.)

On December 1, 2016, Plaintiff filed an Amended Complaint. (*See* Am. Compl. (Dkt. No. 65).) On June 20, 2017, Defendants filed their motion to dismiss the Amended Complaint and accompanying papers, (*see* Dkt. Nos. 77–80). On August 14, 2017, Plaintiff filed his Opposition papers. (*See* Dkt. Nos. 83–84.) Defendants filed a letter brief in Reply in lieu of a formal Memorandum of Law. (*See* Letter from Yan Fu, Esq., to Court (Aug. 29, 2017) (Dkt. No. 85).)

On January 8, 2018, the Court issued an Opinion and Order granting in part and dismissing in part Defendants' Motion to Dismiss. (*See* Opinion & Order (Jan. 8, 2018) ("Jan. 8, 2018 Opinion") (Dkt. No. 86).) The Court dismissed Plaintiff's retaliation and due process claims against Defendants Jackson, Ortiz, Shibah, Donahue, George, and O'Cana with prejudice as time-barred and barred by the collateral estoppel doctrine. (*Id.* at 19, 24, 29.) Plaintiff's retaliation claim against Grant was also dismissed, but without prejudice. (*Id.* at 25–26.) Plaintiff's retaliation claims as to Paroline survived. (*Id.* at 29.)

On February 16, 2018, Plaintiff filed a Second Amended Complaint. (*See* SAC.) On February 28, 2018, the Court granted the remaining Defendants request for an extension to answer the SAC. (Dkt. No. 90.) On March 23, 2018, Defendants submitted a pre-motion letter requesting permission to file a Motion for Summary Judgment. (*See* Letter from Assistant Attorney General Yan Fu, Esq., to Court (Dkt. No. 91).) On April 10, 2018, the Court granted Defendants' request and set a briefing schedule. (Dkt. No. 92.) On April 10, 2018, Plaintiff submitted a letter supplementing the SAC. (*See* Letter from Tiquan Davis to Court ("SAC Supp.") (Dkt. No. 93).)

On May 3, 2018, Defendants filed the instant Motion for Summary Judgment, accompanying papers and exhibits, and a Rule 56.1 Statement. (Not. of Mot.; Defs.' 56.1; Quick Decl.; Seguin Decl.; Defs.' Mem. Of Law. in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 98).) That same day, on May 3, 2018, Defendants sent a Rule 56.2 notice to Plaintiff. (Dkt. No. 99.) On May 14, 2018, Plaintiff filed his Opposition to the Motion and a Declaration in support of his Opposition. (Pl.'s. Mem.; Pl.'s Decl.) Plaintiff did not file a response to Defendants' Rule 56.1 Statement. On June 29, 2019, Defendants filed a reply. (Defs.' Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt. No. 103).)

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v.*

*Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

**\*5** "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' " *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) ), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading...."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) ). However, a district court should consider only evidence that would be admissible at trial.

See *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits ... to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated.' " *DiStiso*, 691 F.3d at 230 (quoting Fed. R. Civ. P. 56(c)(4) ).

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham*, 848 F.2d at 344; *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and quotation marks omitted). And, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should ... be[ ] made in light of the opposing party's pro se status" (italics omitted) ). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence ... are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Ben. Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

### B. Analysis

**\*6** Defendants argue that the Court should grant summary judgment in their favor because Plaintiff failed to exhaust his available administrative remedies as required by the PLRA. (Defs.' Mem. 1, 4–7.) Plaintiff counters that he "followed all the requirements needed to satisf[y] the exhaustion prongs of the PLRA" and that "[t]he fact that there is no record on file is not due to the [P]laintiff not filing his grievance or appeals, and [that] he should not be faulted because of such." (Pl.'s Mem. 1–2.)

### 1. Applicable Law

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under [§] 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This "language is 'mandatory': An inmate 'shall' bring 'no action' (or said more conversationally, may not bring any action) absent exhaustion of available administrative remedies." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (citation and some quotation marks omitted). The exhaustion requirement applies to "all inmate suits about prison life," *Porter v. Nussle*, 534 U.S. 516, 520, 532 (2002), and includes actions for monetary damages even if monetary damages are not available as an administrative remedy, *see Booth v. Churner*, 532 U.S. 731, 741 (2001). Moreover, the PLRA "requires proper exhaustion, which means using all steps that the prison grievance system holds out." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016) (citations, alterations, and quotation marks omitted). Indeed, the PLRA demands "strict compliance with the grievance procedure ..., or else dismissal must follow inexorably." *McCoy v. Goord*, 255 F. Supp. 2d 233, 246 (S.D.N.Y. 2003) (citations, alteration, and quotation marks omitted). Exhaustion must occur *prior* to Plaintiff's filing suit; "[s]ubsequent exhaustion after suit is filed therefore is insufficient." *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001).

The PLRA contains a "textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. "[T]he exhaustion requirement hinges on the 'availab[ility]' of administrative remedies: An inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* Available "grievance procedures ... are capable of use to obtain some relief for the action complained of." *Id.* at 1859 (citation and quotation marks omitted). In *Ross*, the Supreme Court identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Id.* An administrative remedy is unavailable: (1) where "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates," *id.* (citation omitted); (2) where the procedure is "so opaque that it becomes, practically speaking, incapable of use" such that "no ordinary prisoner can discern or navigate it,"

*id.*; or (3) where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," *id.* at 1859–60. It bears noting, however, that the "three circumstances discussed in *Ross* do not appear to be exhaustive," *Williams*, 829 F.3d at 123 n.2 (declining to opine on "what other circumstances might render an otherwise available administrative remedy actually incapable of use"), but rather "guide the Court's inquiry," *Khudan v. Lee*, No. 12-CV-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) (citation omitted).

**\*7** "[I]t is well settled that conclusory allegations of intimidation are not sufficient to create a genuine disputed issue of fact regarding the availability of administrative remedies." *Khudan*, 2016 WL 4735364, at *6 (citations, quotation marks, and alterations omitted); *see also Heyliger v. Gebler*, No. 06-CV-6220, 2014 WL 4923140, at *3 (W.D.N.Y. Sept. 30, 2014) (granting summary judgment, notwithstanding the plaintiff's testimony that his "original grievance was discarded by prison officials," where he "never described or named the individual who allegedly took this action"), *aff'd*, 624 F. App'x 780 (2d Cir. 2015); *Litchmore v. Williams*, No. 11-CV-7546, 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (granting summary judgment where there was "no evidence" that the "plaintiff's appeal was actually mailed, intercepted, or ignored" and no "evidence of any particular officer's misconduct"); *Rosado v. Fessetto*, No. 09-CV-67, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *report and recommendation adopted*, 2010 WL 3809991 (N.D.N.Y. Sept. 21, 2010); *Veloz v. New York*, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where, "[e]ven assuming the [plaintiff] did submit the grievances," he "offer[ed] no evidence that any particular officer thwarted his attempts to file," and instead, "simply contend[ed] that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost"), *aff'd*, 178 F. App'x 39 (2d Cir. 2006). Finally, failure to exhaust is an affirmative defense, not a pleading requirement. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013). As such, Defendants bear the burden of proving failure to exhaust. *See McCoy*, 255 F. Supp. 2d at 248.

## 2. Application

The grievance program applicable here is the DOCCS IGP, which provides for a three-step grievance process. *See Colon v. Annucci*, No. 17-CV-4445, 2018 WL 4757972, at *17 (S.D.N.Y. Sept. 28, 2018); *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *6 (S.D.N.Y. Sept. 28, 2018).

> To initiate the process, an inmate must file a written complaint with the [IGRC], a facility committee composed of inmates and appointed staff members. *See* N.Y.C.R.R. § 701.4–5 .... Second, the inmate can appeal an unfavorable IGRC determination to the superintendent of the facility. *See* [ ] N.Y.C.R.R. § 701.5(c) [ ]. Finally, an inmate can appeal an unfavorable superintendent's determination to [ ]CORC[ ]. *See* [ ] N.Y.C.R.R. § 701.5(d) [ ]; Directive No. 4040.

*Amador v. Andrews*, 655 F.3d 89, 97 (2d Cir. 2011) (alterations and quotation marks omitted); *see also Khudan*, 2016 WL 4735364, at *1 (describing three-step IGP procedure). Grievances alleging misconduct by staff are subject to an expedited administrative review—they are immediately referred to the superintendent of the facility and must also be exhausted through a final appeal to CORC. *Amador*, 655 F.3d at 97 (citing 7 N.Y.C.R.R. § 701.8.). Only after completing all three steps of the IGP may an inmate initiate suit, *see Ross*, 136 S. Ct. at 1856; *Williams*, 829 F.3d at 122, "provided no exception to exhaustion applies," *White v. Westchester County*, No. 18-CV-730, 2018 WL 6726555, at *6 (S.D.N.Y. Dec. 21, 2018).

### a. The March 2014 and the August 8, 2015 Incidents

Plaintiff's SAC summarily states that "Plaintiff has exhausted all the herein claims at Sing Sing and Southport Correctional Facilities." (SAC at 1.) Plaintiff

has submitted no evidence, other than his own unsworn Declaration, that relates to his filing of grievances or his appeal of unfavorable determinations.

Plaintiff only filed one grievance related to the misconduct alleged in this case, namely the 55380-15 Grievance, which related to the August 4, 2015 Paroline incident. Records show that while Plaintiff filed other grievances while at Sing Sing between 2014 and 2017, none involved the misconduct alleged in this case. (Quick Decl. ¶¶ 6–7, 12; Plaintiff's Sing Sing Grievance Record.) Neither Plaintiff's Declaration, nor any of his other submissions, mentions filing a grievance for the March 2014 Grant incident or the August 8, 2015 Paroline incident. Moreover, records show that Plaintiff did not appeal the 55380-15 Grievance. Plaintiff's only appeal between 2012 and 2016 involved television programming. (Plaintiff's CORC Grievance Record at 3.) Plaintiff offers no evidence whatsoever with respect to the March 2014 Grant incident or the August 8, 2015 Paroline incident, and has thus failed to "come forward with admissible evidence sufficient to raise a genuine issue of fact." *CILP Assocs., L.P.*, 735 F.3d at 123. Accordingly, Defendants have "adequately supported the affirmative defense of failure to exhaust." *See, e.g., Bennett v. Onua*, No. 09-CV-7227, 2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed); *see also Deebs v. Alstom Transp., Inc.*, 346 F. App'x 654, 656–57 (2d Cir. 2009) (affirming grant of summary judgment where "plaintiffs rel[ied] almost exclusively upon" their "speculative" and "vague" testimony in the face of the defendants' documentary evidence); *Toro v. City of New York*, No. 12-CV-4093, 2015 WL 1014044, at *5 (E.D.N.Y. Mar. 6, 2015) (granting summary judgment where "there is no evidence —beyond the allegations in his complaint and his own unsupported deposition testimony—that the [plaintiff] actually reported such misconduct to the authorities").

**\*8** Nor does any exception to exhaustion apply. Plaintiff makes no showing whatsoever that the IGP is "unable" to provide relief to grievances, or that prison officials are "consistently unwilling" to provide relief, or that he has been "thwart[ed] ... from taking advantage" of the IGP "through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1859–60. Nor can Plaintiff show that the IGP is "so opaque that it

[is] ... incapable of use," *id.* at 1859, given that Plaintiff successfully used the IGP, filing eight grievances while at Sing Sing between 2014 and 2017, (Defs.' 56.1 ¶ 10), appealing 39 grievances to CORC since he has been in prison, (Seguin Decl. ¶ 6, Plaintiff's CORC Grievance Record at 3), and having served as a grievance representative himself, (Pl.'s Decl. ¶ 6). *See, e.g., Mckinney v. Prack*, 170 F. Supp. 3d 510, 516–17 (W.D.N.Y. 2016) (finding that the plaintiff failed to present a question of fact as to whether the grievance process was available to him where the record showed the plaintiff appealed and exhausted 20 grievances during his 29 years of incarceration including four during the relevant period); *Taylor v. Thames*, No. 09-CV-72, 2010 WL 3614189, at *4 (N.D.N.Y. July 22, 2010) (finding that the plaintiff failed to present a question of fact as to whether the grievance process was available to him where the record showed he "utilized the administrative procedure over twenty times in the twenty-eight months [he] was incarcerated"). Moreover, here, Plaintiff makes no allegations in his SAC or his Declaration that anyone or anything prevented him from filing grievances related to these two incidents.

The Court concludes that Plaintiff failed to complete any of the steps of the IGP with respect to the March 2014 Grant incident or the August 8, 2015 Paroline incident, and that no exception to the exhaustion requirement applies.

### b. The August 4, 2015 and October 31, 2015 Incidents

Defendants admit that Plaintiff filed a grievance on August 13, 2015, namely the 55380-15 Grievance, (Defs.' 56.1 ¶ 5), that related to the August 4, 2015 Paroline incident. (*Id.* ¶ 6.) Plaintiff's grievance was ultimately denied on September 3, 2015. (*Id.* ¶ 8.) Defendants presented admissible evidence that Sing Sing has no record of any appeal by Plaintiff of the denial of grievance 55380-15 to CORC. (Seguin Decl. ¶ 6, Plaintiff's CORC Grievance Record at 3.) In the section of Plaintiff's Declaration where he addresses Paroline, Plaintiff claims that after he received his "response from the superintendent," which the Court takes to mean the September 3, 2014 denial of the grievance, he "wrote [his] appeal out for CORC ... and was personally able to hand [his] appeal to the grievance sgt who told [him] that they would make sure [his] appeal got filed." (Pl.'s Decl. ¶

4.) Plaintiff claims he has still not heard from CORC regarding his appeal. (*Id.*)

Defendants deny that Plaintiff ever filed a grievance related to the October 31, 2015 Grant incident. Defendants submitted evidence outlining what grievances Plaintiff filed between 2014 and 2017, and the October 31, 2015 Grant incident was not among them. (Defs.' 56.1 ¶¶ 10–11; Sing Sing Grievance Record.) Plaintiff counters in his Declaration that on October 31, 2015, he wrote a harassment and retaliation grievance and gave this grievance to the B-block IGRC representative to file. (Pl.'s Decl. ¶ 2.) Plaintiff then followed up repeatedly with the representative who told him he would check with the IGP supervisor and who assured Plaintiff the IGP would get back to him. (*Id.*) Plaintiff claims that the representative then suggested to Plaintiff that he appeal it to the CORC, and that Plaintiff drafted his appeal "that night," included a copy of his original grievance dated October 31, 2015, and gave it to the representative the next morning. Plaintiff claims he has still not heard anything regarding this grievance. (*Id.*)

In this case, Defendants have met their initial burden of demonstrating that Plaintiff failed to exhaust his retaliation claims. Defendants submitted admissible evidence showing that there is no record of Plaintiff filing a grievance regarding the October 31, 2015 incident, and no record of Plaintiff filing an appeal regarding the August 4, 2015 incident. (*See generally* Plaintiff's Sing Sing Grievance Record; Plaintiff's CORC Grievance Record.) Plaintiff maintains that, notwithstanding the lack of any record, he did file a grievance regarding Grant's October 31, 2015 retaliation, (Pl.'s Decl. ¶ 2), and that he did appeal the denial of his grievance regarding Paroline's August 4, 2015 retaliation, (*id.* ¶ 4).

**\*9** The Court takes Plaintiff's assertions that his grievances and appeals were lost or not properly processed as an argument that the grievance process was unavailable to him, either because the process "operates as a simple dead end," was "practically speaking, incapable of use," or because "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 136 S. Ct. at 1858–60.

"Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact." *Engles v. Jones*, No. 13-CV-6461, 2018 WL 6832085, at \*10 (W.D.N.Y. Dec. 28, 2018) (granting summary judgment to defendants for failure to exhaust where defendants demonstrated through admissible evidence that there was no record of the plaintiff filing his grievance and where the plaintiff merely alleged without any documentary support that his grievance was lost or destroyed); *see also Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018) ("[C]ourts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."); *Mims v. Yehl*, No. 13-CV-6405, 2014 WL 4715883, at \*4 (W.D.N.Y. Sept. 22, 2014) (holding that inmate's "unsupported statement" that he has submitted a grievance is "insufficient at the summary judgment stage"); *Khudan*, 2016 WL 4735364, at \*5 (granting summary judgment to defendants where the plaintiff asserted he filed his grievance with the IGRC, received no response, and then sent an appeal to "Albany," because the "[p]laintiff's self-serving and incomplete testimony ... is insufficient to create a genuine dispute of fact, particularly in light of [d]efendants' evidence that no grievance was ever sent" (quotation marks and alterations omitted) ); *Rosado*, 2010 WL 3808813, at \*7 (granting summary judgment to defendants where the plaintiff alleged that he filed a grievance, did not receive an answer, thereafter sent two letters to the superintendent, because the plaintiff's claim that officials must have "messed with" his grievance and his letters was insufficient to excuse the exhaustion requirement and the plaintiff could have further appealed the grievance to CORC); *Veloz*, 339 F. Supp. 2d at 515–16 (granting summary judgment to defendants because the plaintiff failed to exhaust available administrative remedies where the plaintiff alleged that his grievances were misplaced or destroyed by corrections officers but there was no evidence that any grievance was filed and the plaintiff failed to offer "evidence that any particular officer thwarted his attempts to file").

It is true that courts in the Second Circuit have excused failure to exhaust where a plaintiff identified an officer or officers who took some specified action to prevent the plaintiff from filing a grievance, *see Lopez v. Bushey*, No. 11-CV-0418, 2013 WL 1294477, at \*6 (S.D.N.Y. Mar. 4, 2013) (denying summary judgment because pro se plaintiff raised a triable issue of fact that special circumstances justified his failure to exhaust his administrative remedies where he named a specific

officer and alleged that officer repeatedly tore up his grievances before he could file them); *Gill v. Frawley*, No. 02-CV-1380, 2006 WL 1742738, at *8–9 (N.D.N.Y. June 22, 2006) (denying summary where plaintiff named three officers to whom he submitted his grievances and attached copies of correspondences with those officers in which they assured him his grievances had been submitted, and where defendants failed to submit admissible evidence that plaintiff had not filed the grievances at issue), or threatened the plaintiff for attempting to file a grievance, *see Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (holding that "administrative remedies may ... be deemed unavailable if the plaintiff can demonstrate ... threats from correction officers—rendered a nominally available procedure unavailable"); *Grafton v. Hesse*, No. 15-CV-4790, 2017 WL 9487092, at *7 (E.D.N.Y. Aug. 25, 2017) (finding that "specific threats of retaliation or intimidation by prison officials may render administrative remedies unavailable"). Here, however, Plaintiff offers no evidence that any particular officer thwarted his attempts to file his grievance or appeal. Plaintiff also does not allege that anyone threatened him. Instead, Plaintiff claims that he filed his October 31, 2015 grievance and appeal with the "B-block IGRC representative," (Pl.'s Decl. ¶ 2), and that he handed his August 4, 2015 appeal directly to the "grievance sgt," (*id.* ¶ 4). Putting aside that Plaintiff does not provide enough information about these officers to clearly identify them, he does not allege they destroyed his papers or attempted to keep him from filing them. (*Id.* ¶¶ 2, 4.) Plaintiff does not even expressly allege that his submissions were lost—he summarily states that it is not his fault that there is no record of his papers having been filed. (Pl.'s Mem. 1–2.)

**\*10** Courts in the Second Circuit have also held that administrative remedies are unavailable in extraordinary circumstances where, for example, an inmate must rely on prison officials to submit his grievance. *See Williams*, 829 F.3d at 122 (reversing dismissal of case where plaintiff was in a special housing unit segregated from the regular prison population, gave his grievance to a correction officer to file, and that officer failed to file it, because the applicable grievance regulations "gave no guidance whatsoever" to a prisoner in plaintiff's position); *Rodriguez v. Cross*, No. 15-CV-1079, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) (noting that "[c]ourts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU"); *Mena v. City of New York*, No. 13-CV-2430, 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (finding that *Williams*, 829 F.3d 118, "hinged on the 'extraordinary circumstances' specific to the case before it"). Here, Plaintiff was not segregated from the regular prison population and does not allege or submit any evidence that he did not have access to the grievance process—he in fact admits repeatedly speaking to the grievance representative and handing his appeal to the grievance sergeant directly. (Pl.'s Decl. ¶¶ 2, 4.) Instead, Plaintiff's bare assertions that he submitted his grievances but never received a response fall squarely into the category of assertions that courts in the Second Circuit have found do not excuse the exhaustion requirement. "Plaintiff's unsupported assertion that he filed a grievance but that it was somehow lost or destroyed is insufficient to establish a genuine issue of material fact." *Engles*, 2018 WL 6832085, at *10; *see also Scott*, 298 F. Supp. 3d at 555 (holding that "an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement"); *Shaw v. Ortiz*, No. 15-CV-8964, 2016 WL 7410722, at *6 (S.D.N.Y. Dec. 21, 2016) (finding that the IGP *does* contemplate the circumstance where a plaintiff merely alleges that he filed his grievance but never received a response because "the failure to render a timely decision at a lower level" is appealable "to the next level," and that this scenario is distinguishable from *Williams*, 829 F.3d 118, where the IGP did *not* contemplate the circumstances of a plaintiff in SHU).

Considering Plaintiff's statements, which "stand alone and unsupported," *Veloz*, 339 F. Supp. 2d at 516, along with the evidence Defendants have submitted showing there is no record of Plaintiff filing an appeal regarding the August 4, 2015 incident, or filing a grievance or appeal regarding the October 31, 2015 incident, (Defs.' 56.1 ¶¶ 9–12; Plaintiff's Sing Sing Grievance Record; Plaintiff's CORC Grievance Record), and evidence that Plaintiff has successfully used the IGP on 39 previous occasions, (*id.* ¶¶ 10, 13; Pl.'s Decl. ¶ 6), the Court concludes that no exception to the exhaustion requirement applies.

Because Plaintiff has failed to exhaust his available administrative remedies as to the remaining four instances of retaliation he alleges in his SAC, the Court grants summary judgment to Defendants on all remaining claims. *Khudan*, 2016 WL 4735364, at *5 (granting summary judgment to defendants because "[p]laintiff's self-serving and incomplete testimony ... is insufficient to

create a genuine dispute of fact, particularly in light of [d]efendants' evidence that no grievance was ever sent").

### III. Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment is granted. The Clerk of the Court is respectfully directed to terminate the pending Motion, (Dkt. No. 94), enter judgment for Defendants, close this case, and mail a copy of this Opinion and Order to Plaintiff.

SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 498277

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 7133696
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul RAMOS, Plaintiff,

v.

NEW YORK State, et al., Defendants.

No. 9:17-CV-0259 (BKS/CFH)
|
Signed 12/27/2018

**Attorneys and Law Firms**

Paul Ramos, 15-B-0310, Clinton Correctional Facility - Annex, P.O. Box 2002, Dannemora, New York 12929, Plaintiff pro se.

Attorney General for the State of New York, OF COUNSEL: ERIK BOULE PINSONNAULT, ESQ., Assistant Attorney General, The Capitol, Albany, New York 12224, Attorney for defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

**CHRISTIAN F. HUMMEL**, U.S. MAGISTRATE JUDGE

*1   Plaintiff pro se Paul Ramos ("plaintiff"), an inmate who was, at all relevant times, in the custody of the New York Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Captain ("Capt.") Thomas Short, Capt, K.E. Adamik, Capt. L.R. Goppert, Sergeant ("Sgt.") Steven Walrath, Deputy Superintendent of Security ("DSS") Joseph Ward, Lieutenant ("Lt.") Michael Hawk, and Superintendent ("Supt.") John Colvin — who, at all relevant times, were employed at Mid-State Correctional Facility ("Mid-State") — violated his rights under the Eighth and Fourteenth Amendments. See Dkt. No. 12 ("Am. Compl."). Presently pending before the Court is defendants' Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."). Dkt. No. 37.

Plaintiff opposed defendants' motion, and defendants filed a reply. Dkt. Nos. 44, 45. For the following reasons, it is recommended that defendants' motion be granted.

**I. Background**

**A. Plaintiff's Recitations of the Facts**

On March 22, 2015, a corrections officer requested that plaintiff be assigned to a "dry cell" on "special watch" status at Mid-State to be checked for the suspected presence of contraband. Am. Compl. at 1-2. A lieutenant and watch commander authorized plaintiff's placement on "special watch" status. Id. at 2. Plaintiff remained in the dry cell from March 22, 2015 until April 16, 2015. Id. Plaintiff contends that he was unable to address his personal hygiene while on "special watch" status, and that he was not properly released from the "dry cell" pursuant to DOCCS Directive 4910. Id. at 1-2.

**B. Defendants' Recitation of the Facts**

In support of this Motion for Summary Judgment, defendants filed a Statement of Material Facts. [2] Plaintiff was incarcerated at Mid-State from February 19, 2015 through June 4, 2015. Dkt. No. 37-3 ¶ 5. In the underlying action, plaintiff contends that defendants violated his Eighth and Fourteenth Amendment rights when they confined him in a "dry cell" for twenty-six days while he was on special watch to confirm the presence of drugs secreted in his body. Id. ¶ 3. On his arrival, plaintiff attended an orientation program that included an explanation on how to utilize the Inmate Grievance Program ("IGP") to file and appeal grievances. Id. ¶ 6. On April 27, 2015, plaintiff sent a letter entitled "Inmate Grievance Request" to Mid-State's Inmate Grievance Resolution Committee ("IGRC") regarding a Tier III misbehavior report charging him with destruction of state property (116.10) and unhygienic acts (118.22). Id. ¶ 7. In his grievance, plaintiff alleged that non-party corrections officer ("C.O.") Rose presented a false description of the incident underlying the March 27, 2015 misbehavior report. Id. ¶ 8. The grievance did not contain a complaint that plaintiff had been confined in a dry cell for an extended period of time or that his drug watch continued without necessary authorization. Id. This grievance was

the only correspondence Mid-State's IGP supervisor received from plaintiff. Id. ¶ 9.

[2]  Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

**\*2**  On June 4, 2015, plaintiff transferred from Mid-State to Cayuga Correctional Facility ("Cayuga"). Dkt. No. 37-3 ¶ 11. Plaintiff was incarcerated at Cayuga from June 5, 2015 through June 24, 2015. Id. While at Cayuga, plaintiff did not appeal any grievances to CORC prior to March 1, 2018 – the date he commenced this action in federal court. Id. ¶ 14.

Although Supt. Colvin is named in the caption of the amended complaint, plaintiff does not allege that he committed wrongdoing. Dkt. No. 37-3 ¶ 17.

## II. Discussion [3]

[3]  All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

[t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same

time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

### B. Exhaustion

**\*3** Defendants argue that plaintiff failed to exhaust his administrative remedies prior to commencing this action. See Dkt. No. 37-1 ("Def. Mem. of Law") at 9-14. Plaintiff contends that he has exhausted his administrative remedies. Dkt. No. 44-1 ("Pl. Opp.") at 7-9. Specifically, plaintiff contends that (1) he did not have access to writing materials while in his dry cell; and (2) he authored grievances concerning the dry cell confinement, but he failed to receive a response from the Mid-State IGRC. See id.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. See Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, —— U.S. ——, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016). [4]

[4]     In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001) ). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies? [5]

[5]     First, the inmate must file a complaint with an IGP clerk within twenty-one days of the alleged incident.

N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii). Parties do not dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5.

**\*4** There is no dispute that, on April 27, 2015, plaintiff submitted a document to the Mid-State IGRC entitled "Inmate Grievance Request," which challenged a Tier III misbehavior report charging plaintiff with destruction of property (116.10) and unhygienic act (118.22). See Dkt. No. 37-6 ("Tapia Decl.") ¶ 15; Pl. Opp. at 5. This grievance, which the Mid-State IGRC found to be untimely, sought plaintiff's placement back into the general population, as well as the expungement and dismissal of the misbehavior report. Id. at 9. However, this grievance does not challenge the duration of plaintiff's confinement on "special watch," or the conditions of that confinement. See id. Plaintiff filed a second grievance (CAY-17657-15) while housed at Cayuga, alleging that staff had restricted visitation between he and his fiancee. Dkt. No. 37-7 ("Ganey Decl.") ¶ 12. Grievance CAY-17657-15 does not reference any conduct that occurred while plaintiff was housed at Mid-State. See id. at 6. Mid-State IGP Supervisor Christopher Tapia declared that "Mid-State IGP office has no record of any grievance [filed] by plaintiff concerning his [ ] claims in this case, which are based on his continued confinement in a dry cell at Mid-State while on a drug watch." Tapia Decl. ¶ 17. Similarly, Cayuga IGP Supervisor Shawn Ganey declared that plaintiff never made a request to file a late grievance at Cayuga concerning his confinement in a dry cell at Mid-State. Ganey Decl. ¶ 15.

In response, plaintiff contends that he submitted a grievance dated April 26, 2015 concerning the surviving claims in this action. Pl. Opp. at 5. Plaintiff proffers a copy of the alleged grievance, which, in part, challenges the length of his confinement in the dry cell, as well as the conditions of that confinement, including his inability to shower, brush his teeth, or correspond with his friends and family for three and a half weeks. Dkt. No. 44-2 at 4. Plaintiff states that he received one response from the Mid-State IGP on May 5, 2015 stating that he had filed his grievances too late. Pl. Opp. at 5. Plaintiff further claims that when he arrived at Cayuga on June 5, 2015, he "made several attempts in writing to Cayuga's Inmate Grievance Resolution Committee ('IGRC') [i]n reference to his grievance complaint's [sic] that he filed at Mid-State." Id. Plaintiff does not proffer copies of this correspondence. Plaintiff did not receive a response to his alleged attempts at communication. Id.

Even if the undersigned were to assume that plaintiff properly submitted a grievance challenging the duration and conditions of his confinement in the dry cell from March 22, 2015 until April 16, 2015, and that the Mid-State IGP failed to respond to that grievance, plaintiff's claims still must fail. It is well-settled that where an inmate does not receive a response to a grievance, the inmate must appeal to the next level of review notwithstanding the lack of response at the first level of review. See Khudan v. Lee, No. 12-CV-8147, 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing the plaintiff's complaint where the plaintiff failed to appeal to the next level of review after failing to receive a response on his filed grievance). Thus, even if an inmate suspects that his grievances were discarded, he or she must still appeal the grievance despite the lack of response at the first step of review. Chiarappa v. Meyers, No. 09-CV-607, 2013 WL 6328478, at *5 (W.D.N.Y. Dec. 5, 2013) ("[E]ven if plaintiff attempted unsuccessfully to file a grievance in a timely manner, the lack of a response does not relieve him of the requirement to timely appeal the grievance through all three steps of the grievance process."); Belile v. Griffin, No. 9:11-CV-0092 (TJM/DEP), 2013 WL 1776086, at *8 (N.D.N.Y. Feb. 12, 2013), report and recommendation adopted by, 2013 WL 1291720 (N.D.N.Y. Mar. 27, 2013) ("Plaintiff's mere threadbare allegations that his grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant,

in particular, is responsible for discarding the grievances, are insufficient to excuse his failure to comply with the [Inmate Grievance Program]"). Although plaintiff does not suggest that Mid-State or Cayuga staff discarded or otherwise interfered with his April 26, 2018 grievance and other correspondence concerning the underlying claims, Mid-State and Cayuga IGPs' alleged failures to respond did not excuse plaintiff from completing the grievance process. See id. Plaintiff does not contend, and the record does not indicate, that he filed or attempted to file an appeal to the Superintendent regarding these claims. Thus, plaintiff's allegations that he failed to receive a response from either facility does not excuse his requirement to exhaust his claims. See Arce v. Keane, No. 01 Civ. 2648, 2004 WL 439428, at *2 (S.D.N.Y. Mar. 9, 2004) ("An inmate's failure to appeal a grievance is not excused because he has received no response to his initial grievance").

**\*5** To the extent that plaintiff contends that he did not have access to writing materials from March 22, 2015 until April 16, 2015 while housed in the dry cell, Mr. Tapia does not dispute that "inmates who are temporarily isolated in dry cell for drug watch do not generally have access to a pen and paper to draft a grievance." Tapia Decl. ¶ 7. However, Mr. Tapia declared that, if plaintiff had informed a staff member that he wanted to file a grievance or speak with him about filing a grievance, that staff member would have relayed the message to ensure that someone from the grievance office met with plaintiff. Id. ¶ 8. Although plaintiff argues that he did not have access to writing materials while in his dry cell in order to file a grievance, he does not claim that he asked for writing materials from defendants and that request was denied. See Pl. opp. at 8. Thus, plaintiff has failed to establish that lack of access to writing materials should excuse him from the exhaustion requirement.

Insofar as plaintiff references the May 5, 2015 letter from Mr. Tapia concerning plaintiff's untimely grievance submission, this letter is in reference to the April 27, 2015 grievance received by Mid-State IGP that challenged a misbehavior report that plaintiff received on March 27, 2015. See Tapia Decl. ¶ 15, at 9; Dkt. No. 44-2 at 12. Such letter does not refer to the alleged April 26, 2015 grievance authored by plaintiff, as defendants argue that Mid-State IGP never received that grievance. See Dkt. No. 45 ("Def. Reply") at 6-7; Tapia Decl. ¶ 17 ("Thus, the Mid-State IGP office has no record of any grievance by

plaintiff concerning his surviving claims in this case, which are based on his continued confinement in a dry cell at Mid-State while on a drug watch."). Thus, to the extent that plaintiff references untimeliness as a means to excuse his exhaustion requirement, such argument is misplaced.

Finally, DOCCS Assistant Director of the IGP declared, and DOCCS records confirm, that plaintiff has never appealed any grievance to CORC. See Dkt. No. 37-5 ("Seguin Decl.") ¶ 13, at 7-8. Therefore, it is clear that plaintiff has failed to exhaust his administrative remedies, and fails to provide a sufficient excuse for the exhaustion requirement.

Defendants argue that plaintiff's claims should be dismissed with prejudice as plaintiff's time to exhaust his claim concerning the drug watch has long expired. See Def. Mem. of Law at 13. The undersigned agrees, and recommends that plaintiff's claims should be dismissed with prejudice as he would be barred by the three-year statute of limitations from reinstating this suit, and "[b]ecause this and any subsequently amended or reinstituted complaint is subject to dismissal for failure to exhaust administrative remedies, it would be futile to grant plaintiff leave to amend or allow him to reinstitute the suit." Baez v. Kahanowicz, 469 F.Supp.2d 171, 180 (S.D.N.Y. 2007); see Bridgeforth v. Bartlett, 686 F.Supp.2d 238, 240 (W.D.N.Y. 2010) ("Since the time limits for plaintiff to file an administrative appeal have long since passed, administrative remedies are no longer available to him[.]").

Accordingly, as defendants have met their burden establishing that plaintiff has failed to exhaust his administrative remedies as to his remaining claims, it is recommended that defendants' motion on this ground be granted.

### C. Personal Involvement

Defendants argue that, "[i]n the event that the Court does not dismiss the complaint in its entirety for the reasons set forth ... above, the Amended Complaint should be dismissed as against Superintendent Colvin for lack of personal involvement." Def. Mem. of Law at 14. Although the undersigned recommends dismissal of plaintiff's claims for failure to exhaust, for the sake of completeness, the undersigned will address defendants'

argument. "[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (quoting Moffitt v. Town of Brookfield, 950 F.2d 880, 885 (2d Cir. 1991) ). Thus, supervisory officials may not be held liable merely because they held a position of authority. See id.; Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996). However, supervisory personnel may be considered "personally involved" if

   *6 (1) the defendant participated directly in the alleged constitutional violation;

   (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;

   (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom;

   (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or

   (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (citing Williams v. Smith, 781 F.2d 319, 323-24 (2d Cir. 1986) ).[6] Assertions of personal involvement that are merely speculative are insufficient to establish a triable issue of fact. See, e.g., Brown v. Artus, 647 F.Supp.2d 190, 200 (N.D.N.Y. 2009).

[6]   Various courts in the Second Circuit have postulated how, if at all, the Iqbal decision affected the five Colon factors which were traditionally used to determine personal involvement. Pearce v. Estate of Longo, 766 F.Supp.2d 367, 376 (N.D.N.Y. 2011), rev'd in part on other grounds sub nom., Pearce v. Labella, 473 F. App'x 16 (2d Cir. 2012) (summary order) (recognizing that several district courts in the Second Circuit have debated Iqbal's impact on the five Colon factors); Kleehammer v. Monroe Cnty., 743 F.Supp.2d 175 (W.D.N.Y. 2010) (holding that "[o]nly the first and part of the third Colon categories pass Iqbal's muster...."); D'Olimpio v. Crisafi, 718 F.Supp.2d 340, 347 (S.D.N.Y. 2010) (disagreeing that Iqbal eliminated Colon's personal involvement standard).

Even construing plaintiff's allegations liberally, the undersigned finds that plaintiff has not adequately demonstrated that Supt. Colvin's involvement in the alleged denial of plaintiff's constitutional rights. Nowhere in his complaint does plaintiff mention what role Supt. Colvin played in the alleged events that would give rise to any personal involvement in the action. In his opposition, plaintiff attempts to argue that Supt. Colvin "failed to provide written approval of [his] continue[d] stay in 'Drug & Special Watches – Temporary Isolation,' after 7 days [ ] [i]n violation with Directive 4910(IV)(J)(4)(e)." Pl. Opp. at 9. However, plaintiff's characterization of Directive 4910 is misplaced. Directive 4910(IV)(J)(4)(e) states, in its relevant part, that "the temporary isolation [of an inmate] may continue for up to 7 days with the written approval of the Superintendent *or his or her designee.*" Directive 4910(IV)(J)(4)(e), Dkt. No. 37-4 at 15 (emphasis added). Plaintiff's amended complaint makes clear that "[e]ach [A]rea Supervisor and Watch Commander who was assigned to Mid[-]State ... from March 23, 2015 through April 16, 2016 ... all authorized the continuance of [p]laintiff in this "Special Watch" status[.]" Am. Compl. at 3. Therefore, as defendants note, a lieutenant and Watch Commander, acting as a designee of the Superintendent, authorized plaintiff's continued confinement on drug watch. See id.; Def. Reply at 11.

   *7 Plaintiff alleges that Supt. Colvin "was well aware of the fact that [plaintiff was] in temporary isolation for more than 7 days[ ]" because he made "rounds on numerous occasions" and spoke with him. Pl. Opp. at 9. However, this fails to demonstrate Supt. Colvin's personal involvement as plaintiff fails to specify when his interactions with Supt. Colvin occurred; nor does plaintiff indicate that he informed Supt. Colvin of his alleged unconstitutional confinement, and Supt. Colvin then failed to remedy that wrong under the second Colon factor. See Colon, 58 F.3d at 873. Further, Supt. Colvin's alleged inaction does not demonstrate that he was grossly negligent in supervising his subordinates under the fourth Colon factor. See id.

Moreover, plaintiff seems to suggest that, in his role as Superintendent, Supt. Colvin is "the supervisor of the entire facility," and thus, is personally involved in the action. Pl. Opp. at 10. However, it is well-settled that supervisory officials may not be held liable merely because they held a position of authority. See Wright, 21 F.3d at 501. Further, as defendants argue, Supt.

Colvin, by definition, is not an area supervisor or Watch Commander. See Def. Mem. of Law at 15 (citing inter alia New York State Corr. Officers & Police Benev. Ass'n, Inc. v. Governor's Office of Employee Relations, 105 A.D.3d 1192, 1194, 963 N.Y.S.2d 746 (2013) ("classification standard for the position of correction sergeant provides that such employees 'function primarily in the capacity of an area supervisor or Assistant Watch Commander (assistant to the shift supervisor),' working under the supervision of a correction lieutenant. As an area supervisor, a correction sergeant, among other things, supervises a group of correction officers in an assigned area. The classification standard for a correction lieutenant provides that someone with that title can function as, among other things, a watch commander or shift supervisor, whereby he or she supervises all sergeants and officers on a given shift.") ). Thus, as plaintiff states that an Area Supervisor and/or Watch Commander continued his confinement, and it is clear that Supt. Colvin is not employed as either of those positions, plaintiff's argument must fail. The undersigned agrees with defendants' contention that "plaintiff cannot allege that the other defendants are at fault because they did not have the Superintendent's authorization to keep him on drug watch longer than usual while also arguing that the Superintendent is involved because he did not give the authorization." Def. Reply at 12. Thus, plaintiff has failed to establish that Supt. Colvin was personally involved in his underlying claims.

Accordingly, it is recommended that, in the alternative to dismissal for failure to exhaust, defendants' motion be granted, and all claims against Supt. Colvin be dismissed with prejudice for lack of personal involvement. See Liner v. Goord, 310 F.Supp.2d 550, 554 (W.D.N.Y. 2004) (dismissing the plaintiff's claims against for lack of personal involvement with prejudice).

## III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby,

**RECOMMENDED**, that defendants' Motion for Summary judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 37) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff Paul Ramos' amended complaint (Dkt. No. 12) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-

Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72.[7]

[7]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2018 WL 7133696

---

**End of Document**    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 330869
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Paul RAMOS, Plaintiff,

v.

NEW YORK STATE, et al., Defendants.

9:17-CV-0259 (BKS/CFH)
|
Signed 01/25/2019

**Attorneys and Law Firms**

Paul Ramos, 15-B-0310, Clinton Correctional Facility, P.O. Box 2002, Dannemora, NY 12929, Plaintiff, pro se.

Erik Boule Pinsonnault, Esq., Office of New York State Attorney General, The Capitol, Albany, NY 12224, Attorney for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. Brenda K. Sannes, United States District Judge:

 *1 Plaintiff Paul Ramos, a New York State inmate, commenced this action under 42 U.S.C. § 1983 alleging that Defendants violated his rights under the Eighth and Fourteenth Amendments by assigning Plaintiff to "Special Watch" status, to be checked for the suspected presence of contraband, at Mid-State Correctional Facility. (Dkt. No. 12). Defendants have moved for summary judgment seeking, *inter alia*, dismissal of the amended complaint because Plaintiff failed to exhaust his administrative remedies before commencing this action. (Dkt. No. 37). The motion has been fully briefed. (Dkt. Nos. 44, 45). This matter was assigned to United States Magistrate Judge Christian F. Hummel who, on December 27, 2018, issued a Report-Recommendation and Order recommending that Defendants' motion for

summary judgment be granted. (Dkt. No. 52). Magistrate Judge Hummel advised the parties that under 28 U.S.C. § 636(b)(1), they had fourteen days within which to file written objections to the report, and that the failure to object to the report within fourteen days would preclude appellate review. (Dkt. No. 52, at 17). No objections to the Report-Recommendation have been filed.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Report-Recommendation is adopted in its entirety.

For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 52) is **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 37) is

**GRANTED**; and it is further

**ORDERED** that Plaintiff's amended complaint (Dkt. No. 12) is **DISMISSED in its entirety, with prejudice**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 330869

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2006 WL 1555565
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jessica MARTIEN, Plaintiff,

v.

The CITY OF SCHENECTADY and M.L. LaFond,
individually and as Agent, Servant, and/or
Employee of the City of Schenectady, Defendants.

No. 1:04-CV-679 (FJS/RFT).
|
June 2, 2006.

**Attorneys and Law Firms**

Tobin & Dempf, LLP, Kevin A. Luibrand, Esq., of
counsel, Albany, NY, for Plaintiff.

Carter, Conboy, Case, Blackmore, Maloney & Laird,
P.C., Michael J. Murphy, Esq., of counsel, Albany, NY,
for Defendants.

**MEMORANDUM-DECISION AND ORDER**

SCULLIN, Senior Judge.

**I. INTRODUCTION**

**\*1** Plaintiff brought this action against Defendants City
of Schenectady and M.L. LaFond under 42 U.S.C. § 1983
for conduct arising out of a traffic stop that occurred
on December 1, 2003. Plaintiff asserts that Defendant
LaFond unreasonably seized and searched her and that
he used excessive force in their police-station seizing her. Plaintiff further
asserts that Defendant City of Schenectady is liable
for Defendant LaFond's conduct because it tolerated
and condoned an unconstitutional policy that allowed
its officers to use excessive force in their police-citizen
encounters and failed to properly train and supervise these
officers. Additionally, Plaintiff asserts two state law claims
against Defendant LaFond for assault and battery and
negligence.

Currently before the Court is Defendants' motion for
summary judgment pursuant to Rule 56 of the Federal
Rules of Civil Procedure.

**II. BACKGROUND** [1]

[1]    For purposes of this motion, where there is a factual
       dispute, the Court has adopted Plaintiff's version of
       the facts as stated in her answers to interrogatories
       and her deposition testimony.

On December 1, 2003, Plaintiff had an appointment
with her doctor because of a job-related wrist injury. [2]
Following that appointment, while Plaintiff was a
passenger in Mr. Antoine Edgehill's car, Patrol Sergeant
Doyle, a Schenectady City police officer, pulled the car
over for going through a yellow light. While the stop
was in progress, Defendant LaFond was dispatched to
that location to assist Sergeant Doyle. Defendant LaFond
approached the vehicle on the passenger side where
Plaintiff remained seated in the car. [3]

[2]    Plaintiff claims that the doctor diagnosed her injury
       as a sprained wrist.

[3]    According to Defendant LaFond, he approached Mr.
       Edgehill's vehicle after he spoke with Sergeant Doyle
       and discovered that Mr. Edgehill did not have a
       license and that his car would be towed as a result.

Plaintiff contends that, at this time, she began having
difficulty breathing and therefore attempted to open the
passenger-side door to get air. At the same moment,
Defendant LaFond forcefully closed the door with his
foot. When the door slammed shut, Plaintiff claims that
it hit her right hand, between her thumb and wrist, which
caused her to sustain an injury resulting in a small bone in
her hand breaking.

**III. DISCUSSION**

**A. Standard of Review**
A court should grant a motion for summary
judgment only "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as
to any material fact and that the moving party is entitled
to a judgment as a matter of law." Fed.R.Civ.P. 56(c).
In resolving a motion for summary judgment, a court
draws all inferences and resolves all ambiguities in favor
of the nonmoving party. *See Hayes v. N.Y.C. Dep't of*

*Corr.,* 84 F.3d 614, 619 (2d Cir.1996) (citation omitted). However, where reasonable minds, viewing the record as a whole, could not find for the nonmoving party, there is no genuine issue of material fact. *See id.* (citation omitted).

As to the initial burden, the moving party must demonstrate the absence of any genuine issues of material fact. *See Adams v. Dep't of Juvenile Justice of City of N.Y.,* 143 F.3d 61, 65 (2d Cir .1998) (citation omitted). Upon satisfying this burden, the non-moving party "must come forward with 'specific facts showing that there is a *genuine issue for trial.*' " *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (quoting Fed. Rule Civ. Proc. 56(e)) (other citation omitted). The non-moving party may not simply rest on its pleadings, but rather it must adduce significant probative evidence which tends to support its claims. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) (quotation omitted). Finally, in deciding a summary judgment motion, courts "should not weigh evidence or assess the credibility of witnesses" because these functions "are within the sole province of the jury." *Hayes,* 84 F.3d at 619 (citations omitted).

**B. Plaintiff's Claim that Defendant LaFond Unlawfully Searched and Seized Her**

**\*2** As a preliminary matter, the Court need not determine whether there is genuine issue of material fact regarding Plaintiff's claim that Defendant LaFond unlawfully searched and seized her because she does not address this claim in opposition to Defendants' summary judgment motion. As a result, the Court finds that Plaintiff has abandoned this claim and grants Defendants' motion for summary judgment with regard to the same. *See, e.g., Douglas v. Victor Capital Group,* 21 F.Supp.2d 379, 393 (S.D.N.Y.1998) (where a plaintiff only made passing reference to claims in response to the defendants' summary judgment motion, the court deemed those claims abandoned and granted the defendants summary judgement (citation omitted)); *Nat'l Commc'ns Ass'n, Inc. v. Am. Tel. & Tel. Co.,* 92 Civ. 1735, 1998 WL 118174, \*28 (S.D.N.Y. Mar. 16, 1998) (where a plaintiff did not address a claim in response to the defendant's summary judgment motion, the court deemed the claim abandoned and granted the defendant summary judgment).

**C. Plaintiff's Claim that Defendant LaFond Used Excessive Force During the Course of a Vehicle and**

**Traffic Stop by Kicking Closed the Vehicle's Passenger-Side Door**

Under § 1983, courts analyze claims based on the use of excessive force incident to arrest under the Fourth Amendment. *See Graham v. Connor,* 490 U.S. 386, 388 (1989).[4] As a result, courts measure all claims of excessive force arising out of an arrest, investigatory stop, or other seizure within the police-citizen sphere by an objective standard of reasonableness. *See id.* at 395. In determining reasonableness, a court must carefully consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396 (citing *Tennessee v. Garner,* 471 U.S., at 8-9, 105 S.Ct., at 1699-1700). Finally, the court must resist the urge to supplant its "20/20 vision of hindsight" when examining a particular case and instead judge reasonableness "from the perspective of a reasonable officer on the scene...." *Id.* (citation omitted).

[4]     The Court notes that, in situations such as this one, where "the plaintiff [was] not ... the actual target of the arrest, the rule is not diminished-Fourth Amendment analysis still governs." *Dismukes v. Hackathorn,* 802 F.Supp. 1442, 1449 (N.D .Miss.1992) (citing *Roach v. The City of Fredericktown,* 882 F.2d 294, 297 (8th Cir.1989)) (other citation omitted); *see also Teames v. Henry,* No. Civ. 3:03-CV-1236-H, 2004 WL 357961, \*2 (N.D.Tex. Feb. 26, 2004) (citing *Graham,* 490 U.S. at 395 (1989) (noting that "[a] bystander's right to be free from a law enforcement officer's use of excessive force springs from the unreasonable seizure clause of the Fourth Amendment ....")) (other citation omitted).

Applying the principles set forth in *Graham* and viewing the evidence in the light most favorable to Plaintiff, the Court concludes that Defendant LaFond's conduct does not rise to the level of a Fourth Amendment violation. Plaintiff was a passenger in a vehicle which was stopped for a routine traffic violation. After Defendant LaFond arrived on the scene to assist Sergeant Doyle, who had initiated the vehicle and traffic stop, he approached Mr. Edgehill's on the passenger side and kicked the door shut without first instructing Plaintiff to "[s]tay in the vehicle" as she was opening the door.[5] Although Defendant LaFond's response may possibly be viewed as negligent or disproportionate in relation to Plaintiff's actions, it does not amount to "excessive force" in the

context of a Fourth Amendment claim. *See Colbert v. City of Philadelphia,* 931 F.Supp. 389, 393 (E.D.Pa.1996) (citing *Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (holding that "[n]egligence is not a basis for a claim under 42 U.S.C. § 1983")) (other citation omitted).

5    At the moment that Plaintiff attempted to open the door, Defendant LaFond asserts that he simultaneously said "[s]tay in the vehicle." *See* Transcript of Deposition of M.L. LaFond, dated April 8, 2005 ("LaFond Dep."), at 37. Defendant LaFond also contends that, when the door was already slightly ajar and still progressing forward, he placed his foot on the door and forcefully closed it while Plaintiff was still in the car. He contests Plaintiff's characterization that he kicked the door; instead, he claims that he pushed the door with his foot. Since the parties dispute whether Defendant LaFond "kicked" or a "pushed" the door shut, the Court adopts Plaintiff's characterization that Defendant LaFond kicked the door shut. Moreover, although Defendant LaFond alleges that he instructed Plaintiff to stay in the car while simultaneously pushing the door shut with his foot, Plaintiff asserts that either she did not hear this instruction or Defendant LaFond never gave such an instruction. For purposes of this motion, the Court accepts Plaintiff's version of the facts as true.

**\*3** Alternatively, Plaintiff has not alleged any facts that would support an inference that Defendant LaFond acted with the intent to strike her or that he intended to harm her in any way. As previously stated, Plaintiff was a passenger in Mr. Edgehill's vehicle and was not the subject of the police seizure. In this situation, she was the equivalent of a bystander. It is well-established that "police action ... that negligently causes injury to bystanders does not equate to an excessive use of force toward those bystanders." [6] *Leuallen v. Paulsboro Police Dep't,* No. CIV. 990-4353, 2001 WL 1700432, \*11 (D.N.J.2001) (citing *Claybrook v. Birchwell,* 199 F.3d 350, 360-61 (6th Cir.2000)) (other citation omitted). In light of these circumstances, the Court cannot find that, from the perspective of a reasonable officer on the scene, Defendant LaFond's actions were constitutionally unreasonable. Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's claim of excessive force. [7] , [8]

6    The Court notes that there is no medical evidence in the record to substantiate Plaintiff's claim that a small bone in her hand was broken as a result of Defendant LaFond's kicking the door shut. In considering a motion for summary judgment, the Court considers only those facts in the record. Thus, although the Court has considered the fact that Plaintiff *claims she was injured,* it does not accept this representation as true for summary judgment purposes. *Cf. Johnson v. St. Clare's Hosp. & Health Ctr.,* No. 96 Civ. 1425, 1997 WL 113795, \*1 (S.D.N.Y. Mar. 12, 1997) (noting that, where no medical proof substantiates a plaintiff's claim of injury, a defendant's summary judgment motion cannot be defeated by mere conjecture or allegations of injury (citations omitted)).

7    To support her claim that Defendant LaFond is liable under § 1983 for the injuries that she suffered as a result of his kicking the vehicle door shut, Plaintiff relies upon *Warner v. Orange County Dep't of Probation,* 115 F.3d 1068 (2d Cir.1997), for the proposition that "tort defendants, including those sued under § 1983, are ' 'responsible for the natural consequences of [their] actions." ' " *Id.* at 1071 (quotation omitted). As a general proposition, this is an accurate statement of the law; however, it is not dispositive of the issue before the Court. There is no dispute that, had the Court found that Defendant LaFond's conduct constituted the use of excessive force and that he was not entitled to qualified immunity, he would be liable to Plaintiff under § 1983 for any injuries that she suffered as a result of that conduct, but that is not the case. Rather, because the Court has determined that, at most, Defendant LaFond's conduct constitutes negligence, he cannot be held liable under § 1983.

8    As a result of this conclusion, the Court need not address the issue of qualified immunity.

## D. Plaintiff's Claim that the City of Schenectady Is Liable for Defendant LaFond's Use of Excessive Force

Plaintiff claims that the City of Schenectady ("the City") is liable for Defendant LaFond's actions because the City permits an unconstitutional policy that tolerates its police officers' use of excessive force on citizens by failing to properly train and supervise them. To the contrary, Defendants argue that Plaintiff alleges no specific facts that link the City to Defendant LaFond's actions and offers no evidence to suggest that the City failed to properly train or supervise its officers.

Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 144 of 183
Martien v. City of Schenectady, Not Reported in F.Supp.2d (2006)
2006 WL 1555565

It is well-established that "[a] municipality is subject to liability for damages under § 1983 for the unconstitutional acts of its employees." *Thomas v. Roach,* 165 F.3d 137, 145 (2d Cir.1999) (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Municipal liability is not predicated on the tort theory of respondeat superior; rather, liability can only obtain if an employee's acts were executed in the service of a government policy or custom. *See id.* (quoting *Monell,* 436 U.S.] at 694, 98 S.Ct.2018) (other citation omitted). Moreover, in cases involving the use of excessive force, a municipality may be liable for failing to supervise or discipline its officers, which is tantamount to a policy of deliberate indifference. *See id.* (citations omitted). However, "a municipality cannot be liable for inadequate training or supervision when the officers involved in making an arrest did not violate the plaintiff's constitutional rights." *Curley v. Village of Suffern,* 268 F.3d 65, 71 (2d Cir.2001) (citations omitted).

In this case, Plaintiff presents no evidence to indicate that the City has a policy, custom or practice of condoning unconstitutional conduct by its officers or that the City has failed to supervise and/or train its officers. Without such evidence, there is no triable issue of fact. As the Second Circuit stated, " '[t]he critical question here is whether there is sufficient evidence in the record of [a] municipal policy, custom or practice, so that a jury could reasonably infer that the individual conduct in this case was causally connected to the policy.' " *Myers v. County of Orange,* 157 F.3d 66, 73 (2d Cir.1998) (quoting *Gentile v. County of Suffolk,* 926 F.2d 142, 152 (2d Cir.1991)). Plaintiff's conclusory allegations in her complaint and her general citation to *DiSorbo v. City of Schenectady,* No. 99-CV-1131, 2004 WL 115009 (N.D.N.Y. Jan. 9, 2004), in her memorandum of law in opposition to Defendants' motion, without more, are insufficient to demonstrate that the City tolerated an unconstitutional policy or failed to train and/or supervise its officers. Accordingly, the Court grants Defendants' motion for summary judgment with respect to Plaintiff's claim against the City of Schenectady.

**E. Plaintiff's State Law Claims Against Defendant LaFond for Assault and Battery and Negligence**
**\*4** Plaintiff also alleges state law claims for assault and battery and negligence against Defendant LaFond. Since the Court has granted Defendants' motion for summary judgment on Plaintiff's constitutional claims, it abstains from exercising supplemental jurisdiction over Plaintiff's state law claims, pursuant to 28 U.S.C. § 1367, and dismisses these claims without prejudice. *See Cardona v. Connolly,* 361 F.Supp.2d 25, 34 (D.Conn.2005) (holding that, when a court dispossess of all of the defendant's federal claims on summary judgment, the court should also dismiss the state claims) (citation omitted)).

## IV. CONCLUSION

After carefully reviewing the entire file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is **GRANTED** with respect to all of Plaintiff's federal constitutional claims against Defendants; and the Court further

**ORDERS** that Plaintiff's state law claims against Defendant LaFond for assault and battery and negligence are **DISMISSED WITHOUT PREJUDICE** pursuant to 28 U.S.C. § 1367; and the Court further

**ORDERS** that the Clerk of the Court enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1555565

---

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 145 of 183

Walker v. Bellnier, Not Reported in Fed. Supp. (2017)

2017 WL 5135702

2017 WL 5135702
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Tyrone WALKER, Plaintiffs,

v.

Joseph BELLNIER, et al., Defendants.

9:17-CV-1008 (GTS/CFH)
|
Signed 11/03/2017

**Attorneys and Law Firms**

TYRONE WALKER, 94-A-5258, Upstate Correctional
Facility, P.O. Box 2001, Malone, NY 12953, pro se.

**DECISION AND ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review a pro
se civil rights complaint filed by plaintiff Tyrone Walker
("Plaintiff") pursuant to 42 U.S.C. § 1983 ("Section
1983"), asserting claims arising out of his confinement
in the custody of the New York State Department of
Corrections and Community Supervision ("DOCCS").
Dkt. No. 1 ("Compl."). Plaintiff, who has not paid
the statutory filing fee, seeks leave to proceed in forma
pauperis. Dkt. No. 2 ("IFP Application"). Plaintiff also
filed a motion for preliminary injunctive relief. Dkt. No. 4.

**II. IFP APPLICATION**

"28 U.S.C. § 1915 permits an indigent litigant to
commence an action in a federal court without
prepayment of the filing fee that would ordinarily be
charged." Cash v. Bernstein, No. 09-CV-1922, 2010 WL
5185047, at \*1 (S.D.N.Y. Oct. 26, 2010). Upon review of
Plaintiff's IFP Application, the Court finds that Plaintiff
has demonstrated sufficient economic need and filed the
inmate authorization form required in the Northern
District of New York. Plaintiff's IFP application (Dkt.
No. 2) is granted. [1]

[1]    Section 1915(g) prohibits a prisoner from proceeding
       in forma pauperis where, absent a showing of

"imminent danger of serious physical injury," a
prisoner has filed three or more actions or appeals
that were subsequently dismissed as frivolous,
malicious, or failing to state a claim upon which
relief may be granted. See 28 U.S.C. § 1915(g). Based
upon the Court's review of Plaintiff's litigation history
on the Federal Judiciary's Public Access to Court
Electronic Records ("PACER") Service, it does not
appear that Plaintiff has accumulated three strikes for
purposes of 28 U.S.C. § 1915(g).

**III. INITIAL SCREENING**

Having found that Plaintiff meets the financial criteria
for commencing this action in forma pauperis, and
because Plaintiff seeks relief from an officer or employee
of a governmental entity, the Court must consider the
sufficiency of the allegations set forth in the Complaint in
light of 28 U.S.C. §§ 1915(e) and 1915A. Section 1915(e)
of Title 28 of the United States Code directs that, when
a plaintiff seeks to proceed in forma pauperis, "the court
shall dismiss the case at any time if the court determines
that—... (B) the action ... (i) is frivolous or malicious; (ii)
fails to state a claim on which relief may be granted; or (iii)
seeks monetary relief against a defendant who is immune
from such relief." 28 U.S.C. § 1915(e)(2)(B). [2]

[2]    To determine whether an action is frivolous, a court
       must look to see whether the complaint "lacks an
       arguable basis either in law or in fact." Neitzke v.
       Williams, 490 U.S. 319, 325 (1989).

Similarly, under 28 U.S.C. § 1915A, a court must review
any "complaint in a civil action in which a prisoner seeks
redress from a governmental entity or officer or employee
of a governmental entity" and must "identify cognizable
claims or dismiss the complaint, or any portion of the
complaint, if the complaint ... is frivolous, malicious, or
fails to state a claim upon which relief may be granted;
or ... seeks monetary relief from a defendant who is
immune from such relief." 28 U.S.C. § 1915A(b); see also
Carr v. Dvorin, 171 F.3d 115, 116 (2d Cir. 1999) (per
curiam) (noting that Section 1915A applies to all actions
brought by prisoners against government officials even
when plaintiff paid the filing fee).

**\*2** Additionally, when reviewing a complaint, the Court
may also look to the Federal Rules of Civil Procedure.
Rule 8 of the Federal Rules of Civil Procedure provides
that a pleading which sets forth a claim for relief shall
contain, inter alia, "a short and plain statement of the

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 146 of 183

Walker v. Bellnier, Not Reported in Fed. Supp. (2017)

2017 WL 5135702

claim showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Hudson v. Artuz*, No. 95 CIV. 4768, 1998 WL 832708, at *1 (S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 Fed.Appx. 102, 104 (2d Cir. 2009).

## IV. SUMMARY OF THE COMPLAINT [3]

[3]    The Complaint includes exhibits. *See* Dkt. No. 1-1. To the extent that the exhibits are relevant to the incidents described in the Complaint, the Court will consider the Complaint as well as any documents attached as exhibits. *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v.*

*Fed. Home Loan Mortgage Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz*, No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). The Court will construe the allegations in the Complaint with the utmost leniency. *See, e.g.*, *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding that a pro se litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers.").

**\*3** On July 26, 1994, Plaintiff was committed to DOCCS' custody after being convicted of attempted robbery and criminal possession of a weapon. Dkt. No. 1-1 at 5. On January 17, 2014, Plaintiff received an Administrative Segregation Recommendation from Clinton Correctional Facility ("Clinton C.F.") issued by S.B. Duncan ("Duncan") and approved by Superintendent LaValley. [4] *Id.* at 5-6. The recommendation was based upon Plaintiff's "penchant for serious violence both in the correctional setting and in the community." *Id.* Specifically, Duncan cited to the following: (1) a 2000 assault on staff members at Green Haven Correctional Facility; (2) twenty-four misbehavior reports; and (3) a documented history of escape plots and threats to witnesses, staff and other inmates. *Id.* At the time the recommendation was prepared, Plaintiff was confined in the Special Housing Unit ("SHU") at Upstate Correctional Facility ("Upstate C.F."). Dkt. No. 1-1 at 5-6. The recommendation indicated that a hearing would be conducted within fourteen days and that Plaintiff would remain in the SHU pending the hearing. *Id.* at 6.

[4]    Duncan and LaValley are not named as defendants.

On February 26, 2014, Officer Bullis ("Bullis"), the Administrative Segregation Hearing Officer, accepted the recommendation. [5] Dkt. No. 1-1 at 9. Plaintiff appealed the decision to the Commissioner of DOCCS arguing that the hearing officer was biased, refused to allow Plaintiff to call witness, and failed to rely upon "some evidence." [6] *Id.* at 9-14.

Walker v. Bellnier, Not Reported in Fed. Supp. (2017)

2017 WL 5135702

[5]    Bullis is not a named defendant herein.

[6]    The Commissioner of DOCCS is not identified by
       name and is not a defendant herein.

On March 12, 2014, Plaintiff wrote to defendant
Counselor Melissa A. Cook ("Cook") claiming that there
was no reason to place him in administrative segregation.
Dkt. No. 1-1 at 18. Plaintiff stated that he posed no threat
and had not committed any act of violence in over thirteen
years. *Id.*

On March 13, 2014, a Sixty Day Administrative
Segregation Review/Hearing was held. Dkt. No. 1-1
at 37. The three member facility committee, including
Cook and defendant Superintendent Donald G. Uhler
("Uhler"), recommended that Plaintiff remain in
administrative segregation and refused to award Plaintiff
any "incentives" pursuant to the Pilot Incentive Program
for inmates in segregation. *Id.* at 8. On April 10,
2014, defendant Deputy Commissioner Joseph Bellnier
("Bellnier") reviewed and approved the decision. *Id.*

On May 5, 2014, Plaintiff wrote to Bellnier asking to be
released from administrative segregation or for "better
accommodations." Compl. at 4; Dkt. No. 1-1 at 37-42.
Plaintiff also objected to the March 2014 review claiming
that it was inaccurate and exaggerated his history. Dkt.
No. 1-1 at 37-42.

On May 29, 2014, Albert Prack ("Prack"), the Director
of the SHU, reversed the February 2014 decision and
remanded the matter for a new hearing. [7] Dkt. No.
1-1 at 31. Plaintiff was required to remain in the SHU
pending a rehearing. Compl. at 3. On June 11, 2014, the
rehearing was held at Upstate C.F. with Eric Gutwein
("Gutwein") presiding. [8] Compl. at 3; Dkt. No. 1-1 at
16-17. The hearing officer found "substantial evidence"
that Plaintiff "executed a savage assault on staff" and had
"numerous institutional violations over the years" which
"demonstrate a grave risk to the institutional safety." Dkt.
No. 1-1 at 17. Accordingly, administrative segregation
was imposed. Id.

[7]    Prack is not named as a defendant herein.

[8]    Gutwein is not named as a defendant herein.

In August 2014, Plaintiff filed a grievance regarding the
conditions of his confinement in the SHU. Dkt. No. 1-1 at
33. Plaintiff claimed that he was being treated like inmates
on "SHU status." *Id.* Plaintiff asked for a television,
commissary privileges, phone calls, and the ability to listen
to pre-recorded Jumuah services. *Id.* On August 19, 2014,
the Inmate Grievance Resolution Committee ("IGRC")
issued a response denying the grievance reasoning that
Plaintiff was receiving privileges in accordance with
DOCCS' Directive #4933. *Id.* at 34.

**\*4** On August 20, 2014, a Sixty-Day Administrative
Segregation Review/Hearing was held. Dkt. No. 1-1 at
49-54. On August 29, 2014, the facility committee found
that continued confinement was appropriate. *Id.* Pursuant
to the Incentive Program, Plaintiff was permitted one
additional visit per week, one personal pair of sneakers,
shorts, and pants, and one phone call, not to exceed
ten minutes, per month. *Id.* at 50, 54. On October 8,
2014, Bellnier concurred with the recommendation in
favor of Plaintiff's continued placement in administrative
segregation. *Id.*

On August 22, 2014, Plaintiff wrote to the Deputy
Superintendent of Security, identified as "Bell," and
asked to be removed from administrative segregation. [9]
Dkt. No. 1-1 at 43-48. Plaintiff complained about his
conditions of confinement and maintained that Cook
would not allow him to use the telephone, despite the prior
recommendation. *Id.*

[9]    Bell is not a defendant herein.

On March 2, 2015, a Sixty Day Administrative
Segregation Review/Hearing was held. Dkt. NO. 1-1
at 25-27. The facility committee opined that release
from administrative segregation was "not warranted." *Id.*
Plaintiff was permitted one additional visit per week, one
personal pair of sneakers, shorts, and sweat pants, and
one phone call per week, not to exceed fifteen minutes.
*Id.* at 28. On March 19, 2015, Bellnier approved the
recommendations. *Id.*

On April 12, 2016, Plaintiff sent a letter to
the Administrative Segregation Review Committee
("ASRC") claiming that the reviews were "a farce." Dkt.
No. 1-1 at 62-65. Plaintiff argued that defendant Paul P.
Woodruff ("Woodruff") "made it clear" that he would
not be released from administrative segregation for two

to three years. *Id.* Plaintiff objected to Cook's role in the
review process and asked for certain accommodations. *Id.*
To wit, Plaintiff asked that the plexiglass shield over his
cell door be removed, to participate in Jumuah Service via
listening to pre-recorded sermons, and for an alternative
to soy given his predisposition for colon cancer. *Id.* at
64-65.

In May 2016, Plaintiff filed a grievance requesting to
return to the general population. Dkt. No. 1-1 at 56.
During interviews, Woodruff and Cook told Plaintiff that
he would not be released from the SHU. *Id.* Plaintiff
complained that the review process was "perfunctory and
rote." Compl. at 4. The IGRC denied Plaintiff's grievance
and Plaintiff appealed. Dkt. No. 1-1 at 57. Sandra
Danforth ("Danforth"), the Acting Superintendent at
Upstate C.F., issued a decision concurring with the
IGRC. [10] *Id.* at 58. Plaintiff appealed Danforth's decision
to the Central Office Review Committee ("CORC")
noting that "Woodruff is not giving me meaningful
reviews[.]" *Id.* CORC upheld the Danforth's decision. *Id.*
at 60.

[10]     Danforth is not a defendant herein.

On July 4, 2016, Plaintiff sent a letter to Uhler and the
ASRC claiming that he did not receive his March 2016
review. Dkt. No. 1-1 at 66-71. Plaintiff complained that
the reviews were a "sham" and that Woodruff had no
intention of allowing Plaintiff to leave the SHU. *Id.*

On August 17, 2016, a Sixty Day Administrative
Segregation Review/Hearing was held. Dkt. No. 1-1 at
72. The three member committee, including Cook and
defendant Deputy Superintendent of Programs Joanne
Fitchette ("Fitchette"), reviewed Plaintiff's status and
determined that continued confinement was appropriate.
*Id.* As part of the Incentive Program, Plaintiff was
provided "out of cell time" once per month, the
opportunity to purchase food at the commissary, one
additional visit per month, personal items. and one thirty-
minute phone call per week. *Id.* at 75. On February
10, 2017, these decisions were approved by the Deputy
Commissioner. [11] *Id.*

[11]     The signature and name of the Deputy Commissioner
who executed the document is not legible.

**\*5** On January 30, 2017, a Sixty Day Administrative
Segregation Review/Hearing was held. Dkt. No. 1-1 at

177-179. On February 9, 2017, a three member committee,
including Fitchette, found that continued segregation
was appropriate. *Id.* Pursuant to the Incentive Program,
Plaintiff was provided "out of cell time" once per month,
the opportunity to purchase food at the commissary,
one additional visit per week, and one thirty-minute
phone call per month. *Id.* at 179. On July 31, 2017, the
recommendations and incentives were approved. [12] *Id.* at
177-179.

[12]     *See* Footnote No. 10, *supra.*

On April 20, 2017, Woodruff issued a memorandum to
administrative segregation inmates rescinding the Pilot
Incentive Program. Compl. at 4; Dkt. No. 1-1 at 77. On
April 21, 2017, Plaintiff wrote to Woodruff asking him to
reinstate the Pilot Program. *Id.* at 79-80.

On June 22, 2017, Plaintiff wrote to Bellnier complaining
that his August 2016 review was the last review that he
received. Dkt. No. 1-1 at 82. Plaintiff complained that
the review was not signed by Bellnier until February 10,
2017 and was not forwarded to Plaintiff until February
17, 2017. Compl. at 4; Dkt. No. 1-1 at 82-83. Plaintiff
reiterated his objections to the review process and the
decision to discontinue the Pilot Incentive Program. Dkt.
No. 1-1 at 82-83.

Construing the Complaint liberally, Plaintiff asserts the
following: (1) Fourteenth Amendment Due Process claims
related to Plaintiff's initial placement in administrative
segregation; (2) Fourteenth Amendment Due Process
claims related to the June 2014 rehearing; (3) Fourteenth
Amendment Due Process claims related to Plaintiff's
continued confinement in administrative segregation; (4)
Fourteenth Amendment Due Process claims related to
the Pilot Incentive Program; (5) Fourteenth Amendment
Substantive Due Process claims; (6) Eighth Amendment
claims related to Plaintiff's conditions of confinement
in the SHU; (7) Eighth Amendment claims related to
Plaintiff's medical needs; and (8) Eighth Amendment
claim against Cook related to threats. *See* Compl.,
*generally.*

## V. ANALYSIS

### A. Official Capacity Claims Pursuant to Section 1983
The Eleventh Amendment has long been construed as
barring a citizen from bringing a suit against his or

Case 9:17-cv-00047-MAD-TWD Document 78 Filed 02/19/19 Page 149 of 183

Walker v. Bellmer, Not Reported in Fed. Supp. (2017)

2017 WL 5135702

her own state in federal court, under the fundamental principle of "sovereign immunity." U.S. Const. amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); *see also Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267 (1997); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984); *Hans v. Louisiana,* 134 U.S. 1, 10-21 (1890). Eleventh Amendment immunity is lost only if Congress unequivocally abrogates states' immunity or a state expressly consents to suit. *Gollomp v. Spitzer,* 568 F.3d 355, 365-66 (2d Cir. 2009). It is well-settled that Congress did not abrogate states' immunity through Section 1983, *see Quern v. Jordan,* 440 U.S. 332, 343-45 (1979), and that New York State has not waived its immunity from suit on the type of claims asserted in plaintiff's complaint. *See generally Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38-40 (2d Cir. 1977); *see also Dawkins v. State of New York*, No. 93-CV-1298 (RSP/GJD), 1996 WL 156764 at *2 (N.D.N.Y. 1996). Actions for damages against a state official in his or her official capacity are essentially actions against the state. *See Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 71 (1989).

**\*6** Plaintiff's claims for money damages pursuant to Section 1983 against defendants in their official capacities are barred by the Eleventh Amendment and are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

## B. Procedural Due Process

### 1. Administrative Segregation
To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin,* 91 F.3d 349, 351-52 (2d Cir. 1996). "Prison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Ortiz,* 380 F.3d at 654 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)); *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658.

#### a. Liberty Interest

A prisoner "has a liberty interest that is implicated by SHU confinement if it 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *J.S. v. T'Kach*, 714 F.3d 99, 106 (2d Cir. 2013) (quoting *Sandin v. Conner*, 515 U.S. 472, 484, (1995)); *see also Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). In making this determination courts are to consider, "among other things, the duration and conditions of confinement." *J.S.,* 714 F.3d at 106; *Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir. 2009). The conditions of confinement are to be considered "in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration." *Davis,* 576 F.3d at 134; *Palmer,* 364 F.3d at 66 n.4.

Although the Second Circuit has "explicitly avoided" creating "a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights," the Court has established guidelines. *Palmer,* 364 F.3d at 65. Where the plaintiff is confined for "an intermediate duration—between 101 and 305 days —'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required.' " *Id.* (quoting *Colon v. Howard*, 215 F.3d 227, 234 (2d Cir. 2000)). While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 65; *see Davis,* 576 F.3d at 133. On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of typicality. *See Colon,* 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*."). Administrative segregation inmates are housed in the Special Housing Unit ("SHU") and are subject to most of the disciplinary restrictions of SHU inmates. *See Edmonson v. Coughlin*,

Walker v. Bellnier, Not Reported in Fed. Supp. (2017)

2017 WL 5135702

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 150 of 183

21 F.Supp.2d 242, 248–49 (W.D.N.Y. 1998) (footnote omitted).

*7 Construing the Complaint liberally, Plaintiff claims that he has been confined in continuous administrative segregation in the SHU since January 17, 2014. Thus, Plaintiff has sufficiently plead a liberty interest in remaining free of the confinement to which he was subjected.

### b. Sufficiency of Process

Plaintiff claims that his due process rights were violated during his initial hearing, his re-hearing, and his post-hearing reviews. *See* Compl. at 3.

### i. Initial Placement in Administrative Segregation

Due process requires that "[a]n inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation." *Hewitt v. Helms*, 459 U.S. 460, 476 (1983). Due process procedures for administrative segregation are minimal, requiring only an informal, non-adversary review. *See Smart v. Goord*, 441 F.Supp.2d 631, 641 (S.D.N.Y. 2006). In the New York State prison system, a regulatory scheme governs the practice of administrative segregation, and it requires that an inmate receive a hearing within fourteen days of entering administrative segregation. *See* 7 N.Y.C.R.R. § 301.4(a).

On January 17, 2014, Plaintiff was placed in administrative segregation pursuant to Duncan's recommendation. Despite the notice indicating that the hearing would be held within fourteen days, the hearing was not held until February 26, 2014. Compl. at 3; Dkt. No. 1-1 at 9. At this juncture, Plaintiff has sufficiently plead a Fourteenth Amendment due process claim related to his initial placement in administrative segregation. *See Soto v. Walker*, 44 F.3d 169, 172 (2d Cir. 1995) ("The failure to provide informal review procedures within even as short a time as seven days in connection with a transfer into administrative confinement states a due process claim."). However, the Court cannot end it's inquiry there and must address the issue of personal involvement.

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted). The administrative segregation recommendation was issued by Duncan and approved by LaValley. Bullis was the hearing office who presided over the February 2014 hearing. These individuals are not named as defendants in this lawsuit. As presently plead, the Complaint lacks facts suggesting that any named defendant was involved in Plaintiff's initial placement in administrative segregation or the February 2014 hearing. Consequently, Plaintiff's Fourteenth Amendment Due Process claims related to his initial placement administrative segregation are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief can be granted.

### ii. June 2014 Rehearing

*8 Plaintiff claims that his Due Process rights were violated during the rehearing process because he was required to remain in the SHU pending his rehearing. *See* Compl. at 3. Plaintiff maintains that the outcome of the second hearing was predetermined because a fellow inmate told him, two days prior to the hearing, that Uhler would not allow Plaintiff to "get anything in ad-seg status." *See id.*

In May 2014, Prack reviewed and overturned Bullis' February 2014 decision. The matter was remanded for a rehearing, which took place in June 2014, with Gutwein presiding. Prack, Bullis, and Gutwein are not defendants in this action. Moreover, while Plaintiff claims that Uhler made statements concerning Plaintiff's conditions of confinement in the SHU, the Complaint lacks facts suggesting that Uhler, or any other named defendant, was personally involved in the decision to confine Plaintiff to the SHU pending the rehearing. For the reasons set forth in Part V(B)(1)(b)(i), Plaintiff's Due Process claims related

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 151 of 183

Walker v. Bellnier, Not Reported in Fed. Supp. (2017)

2017 WL 5135702

to his rehearing are dismissed without prejudice for failure to sufficiently plead personal involvement.

### iii. Continued Confinement in Administrative Segregation

"[A]dministrative segregation may not be used as a pretext for indefinite confinement of an inmate. Prison officials must engage in some sort of periodic review of the confinement of such inmates." *Hewitt*, 459 U.S. at 477 n. 9. "New York law requires that these reviews be conducted every 60 days in accordance with the following procedure:

> (1) A three-member committee consisting of a representative of the facility executive staff, a security supervisor, and a member of the guidance and counseling staff shall examine the inmate's institutional record and prepare and submit to the superintendent or designee a report setting forth the following: (i) reasons why the inmate was initially determined to be appropriate for administrative segregation; (ii) information on the inmate's subsequent behavior and attitude; and (iii) any other factors that they believe may favor retaining the inmate in or releasing the inmate from administrative segregation."

*Proctor v. LeClaire*, 715 F.3d 402, 405–06 (2d Cir. 2013) (citing 7 N.Y.C.R.R. § 301.4(d)(1)). Periodic reviews should be "substantive and legitimate, not merely a sham." *Giano v. Kelly*, 869 F. Supp. 143, 150 (W.D.N.Y. 1994). A review is "substantive and legitimate" where the prisoner has an opportunity to relay information or make a statement to the individuals conducting the review and there is some indication that the information is actually considered. *See Edmonson*, 21 F.Supp.2d at 253-54.

Construing the Complaint liberally, Plaintiff claims that his post-hearing reviews were untimely, inaccurate, and that his disciplinary history was "exaggerated." *See* Compl. at 7. Mindful of the Second Circuit's instruction that a pro se plaintiff's pleadings must be liberally construed, *see, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), Plaintiff's Fourteenth Amendment Due Process claims against Cook, Uhler, Bellnier, Fitchette, and Woodruff related to the post-hearing reviews survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as

to whether these claims can withstand a properly filed dispositive motion. [13]

[13]    As presently plead, Plaintiff's challenges involve his administrative segregation placement and are considered condition of confinement claims. Therefore, at this juncture, the Court cannot conclude that Plaintiff's claims are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994). *See Leftuhandbull v. Hartley*, No. 09-CV-1345, 2010 WL 1930250, at *6-7 (D. Colo. Apr. 20, 2010).

### 2. Pilot Incentive Program

**\*9** Plaintiff claims that Woodruff and Bellnier violated his Due Process rights when they discontinued the Pilot Incentive Program, which had allowed Plaintiff to receive weekly telephone calls, extra commissary and recreation, sweat pants, shorts, and the opportunity to watch a movie once per month. *See* Compl. at 5; Dkt. No. 1-1 at 79-82. Courts in this Circuit have held that claims of this nature do not represent constitutional challenges because inmates do not have a constitutional right to participate in prison programs. *Boothe v. Hammock*, 605 F.2d 661, 664 (2d Cir. 1979); *see also Harrison v. Fischer*, No. 08-CV-1327 (NAM/DRH), 2010 WL 2653629, at *8 (N.D.N.Y. June 7, 2010) (reasoning that discharge from prison programming is also not a constitutional violation). Moreover, Plaintiff does not have a cognizable liberty or property interest concerning the loss of his telephone and commissary privileges while in SHU confinement. *See Johnson v. Enu*, No. 08-CV-0158 (FJS/DRH), 2011 WL 3439179, at *12 (N.D.N.Y. July 13, 2011) (citations omitted).

Accordingly, Plaintiff's Due Process claims related to the termination of the Pilot Incentive Program are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief can be granted.

### C. Substantive Due Process

"Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense ... but not against government action that is 'incorrect or ill-advised.'" *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) (internal quotation marks and citations omitted). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so

Walker v. Bellnier, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00047-MAD-TWD Document 78 Filed 02/19/19 Page 152 of 183

2017 WL 5135702

egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Okin v. Village of Cornwall–On–Hudson Police Dep't*, 577 F.3d 415, 431 (2d Cir. 2009) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998)). "Very few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process. In *Sandin v. Conner*, the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs." *Samms v. Fischer*, No. 10–CV–349 (GTS/GHL), 2011 WL 3876528, at *12 (N.D.N.Y. Mar. 25, 2011) (citations omitted).

In this instance, Plaintiff's administrative segregation status and conditions of confinement are not conscience shocking or oppressive in the constitutional sense. Plaintiff's administrative segregation was based on, among other facts, his alleged violent history. Accordingly, Plaintiff's substantive Due Process claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim.

### D. Eighth Amendment Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

#### 1. Conditions of Confinement

Plaintiff claims that Woodruff, Cook, and Bellnier violated his Eighth Amendment rights when they subjected him to unconstitutional conditions of confinement in the SHU. *See* Dkt. No. 1-1 at 40, 45. The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981). "To demonstrate that the conditions of his confinement constitute cruel and unusual punishment, the plaintiff must satisfy both an objective test and a subjective test." *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996) (citation omitted). To satisfy the objective element, "the plaintiff must demonstrate that the conditions of his confinement result 'in unquestioned and serious deprivations of basic

human needs.' " *Id.* (citation omitted). "Although the Constitution does not mandate a comfortable prison setting, prisoners are entitled to 'basic human needs— e.g., food, clothing, shelter, medical care, and reasonable safety.' " *Brown v. Doe*, No. 13 Civ 8409, 2014 WL 5461815, at *6 (S.D.N.Y. Oct. 28, 2014) (quoting, *inter alia, Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). "[T]he inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation omitted).

**\*10** With respect to the subjective element, plaintiff must "demonstrate that the defendants imposed those conditions with 'deliberate indifference.' " *Jolly*, 76 F.3d at 480 (citation omitted). "To constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.' " *Walker*, 717 F.3d at 125 (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)). In assessing the seriousness of the conditions of confinement, the Court examines the objective nature of those conditions. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) ("[T]he deprivation alleged must be, objectively, sufficiently serious.") (internal quotation marks omitted).

Plaintiff claims that defendants are improperly treating him as a "disciplinary SHU inmate." *See* Dkt. No. 1-1 at 40. Plaintiff's cell has a plexiglass shield over the door. Plaintiff does not have a television, cannot purchase items at the commissary, cannot make telephone calls, and cannot listen to pre-recorded religious services. Id. at 40-41; 44-47; 64. Essentially, Plaintiff takes issue with the normal conditions of SHU confinement and, thus, fails to state a constitutional cause of action. *See Sealey v. Giltner*, 197 F.3d 578, 581 (2d Cir. 1999) (holding that valid conditions for confinement include situations where the "inmate is confined to his cell 23 hours per day, can take no more than three showers per week, has limited library privileges and no telephone privileges"); *Booker v. Maly*, No. 12-CV-246 (NAM/ATB), 2014 WL 1289579, at *16 (N.D.N.Y. Mar. 31, 2014) ("Restrictive SHU conditions on their own do not, per se, rise to the level of cruel and unusual punishment."); *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004) ("[O]rdinarily, SHU prisoners are kept in solitary confinement for twenty-three hours a day, provided one hour of exercise in the prison yard per day, and permitted two showers per week."). Plaintiff's

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 153 of 183

Walker v. Bellnier, Not Reported in Fed. Supp. (2017)

2017 WL 5135702

subjective feelings about his cell are not relevant to the Court's inquiry.

Accordingly, Plaintiff's Eighth Amendment claims related to his conditions of confinement are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim.

### 2. Deliberate Indifference to Serious Medical Needs

Plaintiff allegedly suffers from hypertension, migraines, herpes, hemorrhoid, psoriasis, constipation, and foot pain. *See* Compl. at 6, 9. Plaintiff claims that the medical staff refuses to address his conditions and that his treatment is ineffective. *See id.* Plaintiff has received medication and undergone colonoscopies. *See id.*

To state an Eighth Amendment claim for medical indifference, a plaintiff must allege that the defendant was deliberately indifferent to a serious medical need. *See Farmer*, 511 U.S. at 834. The objective component of an Eighth Amendment deliberate indifference medical claim "requires that the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)) (internal quotation marks omitted). Under the subjective element, medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F. 3d 698, 703 (2d Cir. 1998) (quoting *Hathaway*, 99 F.3d at 553). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). To assert a claim for deliberate indifference, an inmate must allege that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer*, 511 U.S. at 837; *Chance*, 143 F.3d at 702. The inmate must also demonstrate that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer*, 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle*, 429 U.S. at 105-06.

*11 Even assuming plaintiff could satisfy the objective element of the Eighth Amendment analysis, plaintiff failed to sufficiently plead that defendants were aware that plaintiff suffered from any medical condition or that plaintiff was at risk of serious harm. Plaintiff claims that he was deprived of adequate medical care and argues that the medical staff and "Dr. Mary Kowalchuk [are] doing nothing to treat his severe headaches[.]" [14] *See* Compl. at 9. However, Dr. Mary Kowalchuk is not a defendant in this action. Further, the Complaint lacks facts suggesting that any of the named defendants were personally involved in Plaintiff's medical treatment. While Plaintiff alleges that Woodruff and Uhler were "aware of all his medical and other issues" because they "regularly made rounds in the SHU," Plaintiff has not plead facts suggesting that he made requests for treatment, when he requested treatment, the frequency of said requests, and defendants' response, if any to his requests. Consequently, to the extent that Plaintiff attempts to assert Eighth Amendment medical claims against Uhler and Woodruff, those claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

14    Only "persons" may act under the color of state law, a defendant in a § 1983 action must qualify as a "person." The use of the term, "medical department" as a name for alleged defendants, without naming specific staff members, is not adequate to state a claim against a "person" as required in § 1983 actions. *See Ferguson v. Morgan*, No. 90 Civ. 6318, 1991 WL 115759, at *1 (S.D.N.Y. June 20, 1991) (holding that Otisville Correctional Facility medical staff not a person under § 1983); *Fisher v. Cahill*, 474 F.2d 991, 992 (3d Cir. 1973) (concluding that state prison medical department is not a person for purposes of § 1983). Accordingly, to the extent that Plaintiff attempts to assert Eighth Amendment claims against the Medical Department, those claims are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. Threats

"[A]llegations of verbal harassment are insufficient to base a Section 1983 claim if no specific injury is alleged." *Johnson v. Eggersdorf*, 8 Fed.Appx. 140, 143 (2d Cir. 2001) (citing *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986)); *Shabazz v. Pico*, 994 F. Supp. 460, 474 (S.D.N.Y. 1998) ("verbal harassment or

profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under ... § 1983"). Here, Plaintiff does not allege that he sustained any physical injury as a result of Cook's threats. Consequently, Plaintiff's claim that Cook violated his constitutional rights when she verbally threatened to revoke his privileges, *see* Compl. at 6, is dismissed for failure to state a claim for relief.

### VI. Timeliness of Claims

With respect to Plaintiff's claims that arose prior to August 2014, the issue of timeliness must be addressed. Section 1983 actions, the applicable statute of limitations is the State's 'general or residual [state] statute [of limitations] for personal injury actions[.]' " *Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (quoting *Owens v. Okure*, 488 U.S. 235, 249-50 (1989)). In New York, a three-year statute of limitations applies for personal injury actions and thus to Section 1983 actions. N.Y. C.P.L.R. § 214(5). Although state law provides the relevant limitations period, federal law determines when a Section 1983 action accrues, which has been held to be the time "when the plaintiff knows or has reason to know of the harm." *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001) (quotation omitted); *see also Covington v. City of New York*, 916 F. Supp. 282, 285 (S.D.N.Y. 1996) (quotation omitted) (same). "Thus, in determining when the statute begins to run, the proper focus is on the time of the [wrongful] act, not the point at which the consequences of the act become painful." *Covington*, 916 F.Supp. at 285 (internal quotation marks omitted).

**\*12** The continuing violation doctrine provides that "[w]hen the plaintiff brings a Section 1983 claim challenging a discriminatory policy, the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it". *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009) (internal quotation marks omitted). "To invoke the doctrine, a plaintiff must show (1) a specific ongoing discriminatory policy or practice, or (2) specific related instances of discrimination that are permitted to continue unremedied for so long as to amount to a discriminatory policy or practice." *Harris v. City of N.Y.*, 325 F.3d 243, 248 (2d Cir. 1999). The Supreme Court has made clear that the continuing violation doctrine does not apply to discrete acts but only to ongoing circumstances that combine to

form a single violation that cannot be said to occur on any particular day. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-15 (2002).

On August 21, 2017, plaintiff signed the Complaint in this action. *See* Compl. at 21. Therefore, to be considered timely filed, any Section 1983 claim must have accrued no earlier that August 21, 2014. [15] In light of Plaintiff's pro se status, the Court has considered whether Plaintiff's Fourteenth Amendment claims that arose prior to that date might benefit from the continuing violation doctrine. In this case, Plaintiff claims that his due process rights were violated during the February 2014 hearing for his initial placement in administrative segregation and the June 2014 rehearing. Plaintiff's claims are based upon his continuous confinement in administrative segregation from January 2014 until the present. Accordingly, at this juncture, Plaintiff's has adequately asserted a continuing violation of his rights, for the purposes of the statute of limitations to survive sua sponte review. *See Edmonson*, 21 F.Supp. 2d at 246 (applying the continuing violation doctrine to the plaintiff's claims based upon his continuous administrative segregation confinement) (citation omitted); *see Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011) ("A statute of limitations provides an affirmative defense, and the burden is on the defendant to establish when a federal claim accrues.") (citation omitted). Defendants are, of course, free to assert the defense in a responsive pleading or by motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

[15]   Under the "prison mailbox rule," the date of filing is deemed to be the date that the prisoner-plaintiff delivered his complaint to a prison guard for mailing to the court, which is presumed to be the date that the complaint was signed. *See Houston v. Lack*, 487 U.S. 266, 276 (1988); *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2011) (citation omitted).

### VII. MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

Construing Plaintiff's submission with the special solicitude required, Plaintiff moves for an Order directing defendants to transfer him to the general population. *See* Dkt. No. 4 at 10. In the alternative, Plaintiff seeks any Order directing defendants to provide him with the following: daily access to the telephone; personal clothes; four hours of recreation per day; a chin-up bar; a basketball and hoop; a television; full commissary

Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 155 of 183

Walker v. Bellmer, Not Reported in Fed. Supp. (2017)

2017 WL 5135702

privileges; permission to participate in programming including the family reunion program; a typewriter; an extra visit each week; five showers per week; a tape with pre-recorded Muslim services; a cold diet; and a front cuff order without waist chains/shackles; and adequate medical care. *See id.* at 10-11.

"In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.' " *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted)). However, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (*citing Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted)). A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts.*, 598 F.3d at 35 n.4) (internal quotation marks omitted); *see also Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (a plaintiff seeking a mandatory injunction must make a "clear" or "substantial" showing of a likelihood of success on the merits of his claim). The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Perri v. Bloomberg*, No. 06-CV-0403, 2008 WL 2944642, at * 2 (E.D.N.Y. Jul. 31, 2008). The district court has wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005).

**\*13** Assuming for purposes of this motion that Plaintiff alleges that he may suffer irreparable harm, Plaintiff fails to demonstrate with evidence in admissible form

a likelihood of success on the merits of his underlying claims, or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in his favor. *See Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp. 547, 561 (E.D.N.Y. 1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Additionally, since defendants have not yet answered, and, indeed, have not even been served in the action, the Court cannot ascertain Plaintiff's likelihood of success. Accordingly, Plaintiff's motion for preliminary injunctive relief (Dkt. No. 4) is denied.

## VIII. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that Plaintiff's in forma pauperis application (Dkt. No. 2) is **GRANTED**; [16] and it is further

[16]   Plaintiff should note that, although the Court has granted his application to proceed in forma pauperis, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk provide the Superintendent of the facility, designated by Plaintiff as his current location, with a copy of Plaintiff's inmate authorization form, and notify the official that this action has been filed and that Plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915 [17]; and it is further

[17]   "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010) (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

**ORDERED** that the Clerk of the Court provide a copy of Plaintiff's inmate authorization form to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that Plaintiff's § 1983 claims for monetary damages against defendants in their official capacity are **DISMISSED with prejudice** pursuant to 28 U.S.C. §

Walker v. Bellnier, Not Reported in Fed. Supp. (2017)

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 156 of 183

2017 WL 5135702

1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that the following claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted: (1) Fourteenth Amendment Due Process claims related to Plaintiff's initial placement in administrative segregation, the June 2014 rehearing, and the Pilot Incentive Program; (2) Fourteenth Amendment substantive Due Process claims; (3) Eighth Amendment claims related to Plaintiff's conditions of confinement; (4) Eighth Amendment claims related to Plaintiff's serious medical needs; and (5) Eighth Amendment claim against Cook related to threats;[18] and it is further

> [18]    If Plaintiff wishes to pursue any claim dismissed without prejudice, he is advised to that, if accepted for filing, any amended complaint will entirely replace the original complaint and incorporation of prior claims is not permitted.

**ORDERED** that Plaintiff's Fourteenth Amendment Due Process claims related to his continued confinement in administrative segregation against Cook, Uhler, Bellnier, Fitchette, and Woodruff survive the Court's sua sponte review under 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) and requires a response; and it is further

**ORDERED**, that upon receipt from Plaintiff of the documents required for service of process, the Clerk shall issue a summonses and forward them, along with copies of the Complaint, to the United States Marshal for service upon the defendants. The Clerk shall forward a copy of the summonses and Complaint to the Office of the Attorney General, together with a copy of this Decision and Order; and it is further

**\*14** **ORDERED**, that a response to the Complaint be filed by the defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure;

**ORDERED**, that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his address; their failure to do so will result in the dismissal of his action**; and it is further

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 4) is **DENIED**; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Decision and Order on Plaintiff in accordance with the Local Rules.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 5135702

---

**End of Document**

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 4233810
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Drahcir PARSON, Plaintiff,
v.
Christopher MILLER, Defendant.

No. 9:16-CV-167 (DNH/CFH)
|
Signed 05/24/2018
|
Filed 05/25/2018

**Attorneys and Law Firms**

Drahcir Parson, 917 Altamont Avenue, Schenectady,
New York 12303, pro se.

Attorney General for the State of New York, OF
COUNSEL: MARK G. MITCHELL, ESQ., Assistant
Attorney General, The Capitol, Albany, New York 12224,
Attorney for Defendant.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]   This matter was referred to the undersigned for
Report-Recommendation and Order pursuant to 28
U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Drahcir Parson ("plaintiff"), a former
pretrial detainee who was, at all relevant times, in the
custody of the New York Department of Corrections and
Community Supervision ("DOCCS"), brings this action
pursuant to 42 U.S.C. § 1983, alleging that defendant
Superintendent ("Supt.") Christopher Miller – who, at
all relevant times, was employed at Great Meadow
Correctional Facility ("Great Meadow") – violated his
constitutional rights under the Fourteenth Amendment.
Dkt. No. 18 ("Am. Compl."). Presently pending before
the Court is defendant's Motion for Summary Judgment
pursuant to Rule 56 of the Federal Rules of Civil
Procedure ("Fed. R. Civ. P."). Dkt. No. 46. Plaintiff
opposed that motion, and defendant filed a reply. Dkt.
Nos. 51, 52. For the following reasons, it is recommended
that defendant's motion be granted.

**I. Background**

**A. Plaintiff's Recitation of the Facts**

The facts are related herein in the light most favorable
to plaintiff as the nonmoving party. See subsection II.A.
infra. In 2014, plaintiff arrived at Warren County Jail as
a pre-trial detainee. Am. Compl. at 2. Plaintiff contends
that on December 8, 2014, Warren County Jail staff
transferred him to Great Meadows. Id. The Substitute
Jail Order ("SJO") allowing plaintiff's transfer was not
signed until January 29, 2015, thirty days after he arrived
at Great Meadows. Id. On his arrival, Great Meadows
staff placed him directly in administrative segregation.
Id. During this initial thirty-day period, Supt. Miller
denied plaintiff's request to attend his mother's funeral.
Id. Plaintiff remained in administrative segregation until
he was released from prison on August 10, 2015. Id.

**B. Defendant's Recitation of the Facts**

In support of this motion, Supt. Miller filed a Statement
of Material Facts. [2] In March 2014, plaintiff was arrested
during a traffic stop in Warren County and charged with
multiple counts of criminal possession of a controlled
substance in the third degree. Dkt. No. 46-14 ¶ 5; Dkt.
No. 46-4 at 14. On or about March 23, 2014, plaintiff entered
the Warren County Jail. Dkt. No. 46-14 ¶ 6; Dkt. No. 46-4
at 21. During his approximately nine-month confinement
at the Warren County Jail, plaintiff acquired 199 Unusual
Incident Reports as a result of his behavior, and had more
than sixty disciplinary hearings for violations of facility
rules. Dkt. No. 46-14 ¶ 7; Dkt. No. 46-11 at 4. Warren
County Jail staff allege that plaintiff was aggressive, and
physically and verbally assaulted staff members. Dkt. No.
46-14 ¶¶ 8, 10; Dkt. No. 46-2 ("Pl. Dep.") at 38-39, 64-65;
Dkt. No. 46-4 at 27-46; Dkt. No. 46-8; Dkt. No. 46-9;
Dkt. No. 46-11 at 4-5. On approximately nine occasions,
plaintiff slid fecal matter and urine out from under his cell.
Dkt. No. 46-14 ¶ 9; Dkt. No. 46-11 at 4; Pl. Dep. at 37-38,
63. Plaintiff also broke two broom handles, which Warren
County Jail staff accused him of keeping as weapons. Dkt.
No. 46-14 ¶ 11; Pl. Dep. at 64. At an unspecified time,
Warren County Jail staff placed a spit mask on plaintiff's
face. Dkt. No. 46-14 ¶ 12; Pl. Dep. at 65-66.

2    Local Rule 7.1(a)(3) states:

Summary Judgment Motions

Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.

N.D.N.Y. L.R. 7.1(a)(3).

**\*2** As a result of an unidentified incident that occurred on September 10, 2014 at the Warren County Jail, plaintiff was indicted on two counts of assault in the second degree and one count of obstructing governmental administration in the second degree. Dkt. No. 46-14 ¶ 13; Pl. Dep. at 67-69 Dkt. No. 46-8. In December 2014, the Warren County Sheriff's Office requested, pursuant to New York Correction Law § 504, that plaintiff be transferred to a DOCCS facility for the purpose of safely confining him. Dkt. No. 46-14 ¶¶ 14, 15; Dkt. No. 46-11 at 4-5, 6. DOCCS agreed, and plaintiff was transferred to Great Meadow on December 8, 2014. Dkt. No. 46-14 ¶¶ 15, 17; Pl. Dep. at 70; Dkt. No. 46-11 at 4-5, 6. The New York State Commission of Correction approved a substitute jail order, and the arrangement was ultimately extended through August 2015. Dkt. No. 46-14 ¶ 16; Pl. Dep. at 108; Dkt. No. 46-11 at 1-3, 6-13.

On January 2, 2015, nonparty Sergeant ("Sgt.") Fraser submitted plaintiff's administrative segregation recommendation. Dkt. No. 46-14 ¶ 24; Dkt. No. 46-4 at 4. Plaintiff received a copy of that recommendation. Dkt. No. 46-14 ¶ 24; Pl. Dep. at 74-75; Dkt. No. 46-4 at

2. On January 14, 2015 and January 20, 2015, plaintiff attended an administrative segregation hearing. Dkt. No. 46-14 ¶ 25; Ex. D; Ex. C at 2-3; Ex. A at 75-76. Sgt. Fraser testified at the hearing, and plaintiff questioned him as to his recommendation. Dkt. No. 46-14 ¶ 26; Pl. Dep. at 76. After considering Sgt. Fraser's recommendation and testimony, as well as plaintiff's disciplinary action summary, the hearing officer concluded that, "due to [plaintiff's] assaultive and disruptive behavior," he should be placed in administrative segregation "for the safety of staff and for the good order of the facility." Dkt. No. 46-14 ¶¶ 27, 28; Dkt. No. 46-4 at 2. Supt. Miller agreed with the hearing officer's determination that plaintiff's presence in the general population would threaten the safety of the facility, and confined plaintiff to administrative segregation. Dkt. No. 46-14 ¶ 30; Dkt. No. 46-10 ("Miller Decl.") ¶ 6.

On February 23, 2015, plaintiff received a misbehavior report charging him with harassment and refusing a direct order. Dkt. No. 46-14 ¶ 21; Dkt. No. 46-6 at 8. A disciplinary hearing was held, and a hearing officer found plaintiff guilty of all charges and sentenced him to thirty days of keeplock, and thirty days loss of package, commissary, and phone privileges. Dkt. No. 46-14 ¶ 22; Pl. Dep. at 126-27; Dkt. No. 46-6 at 2-5; Dkt. No. 46-7.

While in administrative segregation, Great Meadows officials conducted periodic reviews to determine whether plaintiff remained a security risk. Dkt. No. 46-14 ¶ 37; Miller Decl. ¶¶ 7-11; Dkt. No. 46-12; Dkt. No. 46-13. On March 20, 2015, a three-member committee conducted a sixty-day review of plaintiff's administrative segregation. Dkt. No. 46-14 ¶¶ 38-39; Dkt. No. 46-12. The committee, which consisted of the deputy superintendent for security, a security supervisor, and the offender rehabilitation coordinator, analyzed plaintiff's institutional record and recommended that his administrative segregation continue. Id. In addition to plaintiff's history of disruptive behavior in both county and DOCCS facilities, the committee noted his history of bail jumping and the disciplinary sanctions incurred on February 23, 2015. Dkt. No. 46-14 ¶ 40; Dkt. No. 46-6 at 2-8; Dkt. No. 46-12. Supt. Miller affirmed the committee's decision. Dkt. No. 46-14 ¶ 41; Miller Dec. ¶¶ 8-9. On May 20, 2015, the committee conducted a second sixty-day review of plaintiff's administrative segregation. Dkt. No. 46-14 ¶ 44; Miller Decl. ¶ 10; Dkt. No. 46-13. The committee recommended that plaintiff's administrative segregation

be continued based on his history of disruptive behavior and bail jumping, as well as the February 23, 2015 incident. Dkt. No. 46-14 ¶ 45; Dkt. No. 46-13. Although plaintiff had not received a misbehavior report during that sixty-day period, Supt. Miller affirmed the committee's decision, citing that he remained extremely concerned by plaintiff's past behavior. Dkt. No. 46-14 ¶¶ 46, 47; Miller Decl. ¶ 11.

**\*3** In May 2015, a jury in Warren County Court found plaintiff guilty of criminal possession of a controlled substance in the seventh degree. Dkt. No. 46-14 ¶ 51; Pl. Dep. at 26-28. Plaintiff was sentenced to one year in jail. Id. Plaintiff remained at Great Meadow awaiting trial on assault charges. Dkt. No. 46-14 ¶ 52; Pl. Dep. at 26, 28. In August 2015, plaintiff pleaded guilty to assault in the third degree with intent to cause physical injury in satisfaction of the charges against him arising from the incident at Warren County Jail. Dkt. No. 46-14 ¶ 53; Pl. Dep. at 17-18, 102; Dkt. No. 46-9. Plaintiff was sentenced to one year in jail, but had already served that time. Dkt. No. 46-14 ¶ 53; Pl. Dep. at 19, 102-03; Dkt. No. 46-9. On August 10, 2015, plaintiff was released from Great Meadow. Dkt. No. 46-14 ¶ 54; Pl. Dep. at 100-01; Miller Decl. ¶ 12.

At Great Meadows, plaintiff received daily exercise and three meals per day. Dkt. No. 46-14 ¶ 18; Pl. Dep. at 130. Plaintiff also visited with family members and his lawyer in preparation for criminal trials, and was permitted access to legal research materials. Dkt. No. 46-14 ¶¶ 19, 20; Pl. Dep. at 130, 134; Dkt. No. 46-6 at 8.

## II. Discussion [3]

[3]   All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

Plaintiff contends that Supt. Miller violated his constitutional rights by confining him in administrative segregation for eight months without due process. See generally Am. Compl. Supt. Miller argues that (1) plaintiff has failed to state a procedural due process claim regarding his initial placement in administrative segregation and his continued confinement; (2) to the extent that plaintiff sets forth a substantive due process claim, it must be dismissed; and (3) he is entitled to

qualified immunity. See Dkt. No. 46-16 ("Def. Mem. of Law").

### A. Legal Standard

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. See id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

**\*4** [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read

2018 WL 4233810

to raise the strongest arguments that they "suggest," ....
At the same time, our cases have also indicated that
we cannot read into pro se submissions claims that are
not "consistent" with the pro se litigant's allegations, ...
or arguments that the submissions themselves do not
"suggest," ... that we should not "excuse frivolous or
vexatious filings by pro se litigants," ... and that pro se
status "does not exempt a party from compliance with
relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed
Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d
Cir. 2008).

### B. Fourteenth Amendment

#### 1. Procedural Due Process

Plaintiff alleges that Supt. Miller violated his due process
rights by "wrongfully restrict[ing him] to [his] cell in
SHU for 26 days before notice of recommendation
and without a hearing or procedural protections." Am.
Compl. at 4. Plaintiff further contends that the periodic
reviews of his administrative confinement were "without
substance" and "nothing but a 'hollow formality' in
violation of the Fourteenth Amendment." Id. Supt. Miller
argues that "this Court has already determined that
Plaintiff failed to state a due process claim concerning
his initial placement in administrative segregation." Def.
Mem. of Law at 16. Further, Supt. Miller declares
that the evaluations recommending plaintiff's continued
confinement in administrative segregation were justified.
Id.

The Due Process Clause of the Fourteenth Amendment
states: "[n]o State shall ... deprive any person of
life, liberty, or property without due process of law."
U.S.CONST. amend. XIV § 1. To state a claim for
procedural due process, there must first be a liberty
interest which requires protection. See generally Valmonte
v. Bane, 18 F.3d 992, 998 (2d Cir. 1994) ("[P]rocedural due
process questions [are analyzed] in two steps: the first asks
whether there exists a liberty or property interest which
has been interfered with by the State; the second examines
whether the procedures attendant upon that deprivation
were constitutionally sufficient.") (citing Kentucky Dep't
of Corr. v. Thompson, 490 U.S. 454, 460 (1989) ).
"Aside from any state policy or regulation, the force of

the Due Process Clause itself protects pre-trial detainees
from restrictive confinement." Shine v. Hofmnn, No. 06-
CV-237, 2009 WL 2179969, at *5 (D. Vt. July 22, 2009)
(citing Kentucky Dep't of Corr., 490 U.S. at 459-60).
An individual generally has a protected liberty interest in
being free from segregated confinement but only where the
alleged deprivation imposed amounts to an "atypical and
significant hardship in relation to the ordinary incidents
of prison life." Sandin v. Connor, 515 U.S. 472, 483-84
(1995). However, the Second Circuit has held that this
standard only applies to convicted inmates, not pretrial
detainees. See Iqbal v. Hasty, 490 F.3d 143, 163 (2d Cir.
2007) ("This Court has said that Sandin does not apply to
pretrial detainees and that, accordingly, pretrial detainees
need not show that an imposed restraint imposes atypical
and significant hardships to state deprivation of a liberty
interest protected by procedural due process."), rev'd other
on other grounds sub nom. Ashcroft v. Iqbal, 556 U.S. 662
(2009). As a pretrial detainee, a plaintiff's "liberty interest
in freedom from restraint is highly qualified and must be
balanced against the state's reasons for restraining that
liberty[; thus,] restrictions on pretrial detainees ... may not
amount to punishment...." Benjamin v. Fraser, 264 F.3d
175, 188 (2d Cir. 2001) (citations and internal quotation
marks omitted).

**\*5** In assessing whether a pre-trial detainee's
administrative segregation confinement violates the
Due Process Clause, the Court may only evaluate
whether a defendant's method in coming to his or her
administrative segregation determination is sufficient.
See Proctor v. LeClaire, 846 F.3d 597, 608 (2d Cir.
2017). Administrative segregation "is appropriate when
necessary to incapacitate a detainee who 'represents a
security threat' or to 'complet[e] ... an investigation into
misconduct,' " and "[s]o long as prison officials seek to
achieve one or both of those goals, they have wide latitude
in the procedures they deploy." Id. (quoting Hewitt v.
Helms, 459 U.S. 460, 474 (1983) ).

Prior to confining a pretrial detainee in administrative
segregation, "prison officials must provide 'some notice
of the charges against him and an opportunity to present
his views to the prison official charged with deciding
whether to transfer him to [administrative segregation],'
although not necessarily a full hearing." Proctor, 846
F.3d at 609 (quoting Hewitt, 459 U.S. at 476). "Once
that has occurred, prison officials need only conduct 'an
informal, nonadversary evidentiary review' of whether

the confinement is justified." Id. (quoting Hewitt, 459 U.S. at 476). During this periodic review, prison officials must verify that the individual "remains a security risk." Id. (quoting Hewitt, 459 U.S. at 477 n.9). Such determination turns on the specific facts relating to a particular individual, as well as the prison official's knowledge of the prison's conditions and tensions. See Hameed v. Coughlin, 37 F. Supp. 2d 133, 138 (N.D.N.Y. 1999) (quoting Hewitt, 459 U.S. at 477 n.9). The periodic review guarantees that the "state's institutional interest justifying the deprivation of the confined [detainee's] liberty has not grown stale and that prison officials are not using [administrative segregation] as a pretext for indefinite confinement[.]" Proctor, 846 F.3d at 609 (internal quotation marks and citation omitted).

#### a. Initial Administrative Segregation Determination

Supt. Miller argues that any dispute regarding plaintiff's initial placement in administrative segregation at Great Meadows has been resolved by the undersigned's February 28, 2017 Report-Recommendation and Order. Def. Mem. of Law at 14 (citing Dkt. No. 31, adopted in full by Dkt. No. 33). In opposition, plaintiff contends that his "liberty interest to be free from punishment or indefinite solitary confinement as a pretrial detainee was clearly established and clearly deprived without any due process at all." Dkt. No. 51 at 10. Specifically, plaintiff claims that the twenty-six days spent in SHU without notice of his administrative confinement violated his due process rights. Id.

Supt. Miller is correct that in the February 28, 2017 Report-Recommendation and Order, the undersigned, citing documentation of plaintiff's "assaultive and disruptive behavior," determined that "there [was] no dispute that [plaintiff's] placement in the SHU at Great Meadow C.F. was administrative, rather than punitive" and that his "initial placement in administrative segregation [did] not trigger a protected liberty interest." Dkt. No. 31 at 11, 12; Def. Mem. of Law at 14. Moreover, the record demonstrates that Great Meadow staff provided plaintiff " 'some notice of the charges against him and an opportunity to present his views.' " Proctor, 846 F.3d at 609 (quoting Hewitt, 459 U.S. at 476). As to notice, Supt. Miller proffered an Administrative Segregation Recommendation dated January 2, 2015 wherein non-party Sgt. C. Fraser recommends plaintiff's

confinement based on his prior disciplinary history at Warren County Jail. Dkt. No. 46-4 at 4. As to opportunity to be heard, it is clear that plaintiff received an administrative segregation hearing as both he and Supt. Miller have proffered the Administrative Segregation Hearing Determination dated January 20, 2015. See id. at 2-3; Dkt. No. 51-1 at 68-69. The transcript of that hearing establishes that not only was plaintiff present and an active participant in that hearing, but that when plaintiff indicated that he had not received certain documentation which he felt was necessary to defend his release to general population, the hearing office adjourned the hearing to provide plaintiff with those documents. See Dkt. No. 46-5 at 3-7. Additionally, the hearing officer provided plaintiff the opportunity to ask Sgt. Fraser questions. See id. at 5-7. Thus, as this Court has already determined, plaintiff's initial placement in administrative segregation does not implicate a protected liberty interest. Dkt. No. 31, adopted by Dkt. No. 33.

**\*6** Insofar as plaintiff argues that Supt. Miller violated his due process rights by failing to conduct the initial hearing within fourteen days of his confinement in administrative segregation pursuant to N.Y. COMP.CODES R. & REG. tit. 7, §§ 254.6, 301.4(a), Am. Compl. at 4; Dkt. No. 51-1 at 72, "a violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." Burroughs v. Petrone, 138 F. Supp. 3d 182, 219 (N.D.N.Y. 2015) (quoting Cusamano v. Sobek, 604 F. Supp. 2d 416, 482 (N.D.N.Y. 2009) (internal quotation marks omitted) ). Therefore, plaintiff's initial placement in administration segregation in insufficient to support a constitutional violation.

#### b. Periodic Administrative Segregation Review

Assuming that plaintiff has established a liberty interest in his extended confinement in administrative segregation, plaintiff claims that Supt. Miller denied him meaningful periodic reviews of his administrative segregation confinement in violation of the Fourteenth Amendment. See Am. Compl. at 4; Dkt. No. 51-1 at 75-76. Supt. Miller argues that "the periodic reviews of plaintiff's administrative segregation status satisfied due process as a matter of law." Def. Mem. of Law at 14. Periodic reviews of administrative segregation are "flexible and may be based on 'a wide range of administrative considerations,' including but not limited to observations of the inmate

in [administrative segregation], 'general knowledge of prison conditions,' misconduct charges, ongoing tensions in the prison, and any ongoing investigations." Proctor, 846 F.3d at 609 (quoting Hewitt, 459 U.S. at 477 n.9). The prison official's final determination may be based on "purely subjective evaluations and on predictions of future behavior." Id. (quoting Hewitt, 459 U.S. at 474 (internal quotation marks omitted) ).

Nevertheless, it is well-settled that wherever constitutionally mandated, due process must be meaningful – i.e., "[i]t must be granted at a meaningful time and in a meaningful manner." Proctor, 846 F.3d at 609 (quoting Armstrong v. Manzo, 380 U.S. 545, 552 (1965) (internal quotation marks omitted) ). In determining what constitutes meaningful process, courts may weigh the government's interest in recommending an individual's segregated confinement against the private interest of the individual. See id. at 609-10 (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976) ).

The Second Circuit has stated that

> The state's interest in flexible [administrative segregation] review procedures — maintaining institutional security — is substantial. Institutional safety and security are perhaps a prison facility's most important considerations. Courts must preserve prison officials' free[dom] to take appropriate action to ensure the safety of inmates and corrections personnel and to prevent escape. Prison administrators therefore should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

Proctor, 846 F.3d at 610 (internal quotation marks and citation omitted). Nevertheless, this public interest must be weighed against the individual's private interest

"implicated by an extended and indefinite stay in [administrative segregation]." Id.

Therefore, in this Circuit, a meaningful periodic review must fulfill a three-step process:

> First, the reviewing prison officials must actually evaluate whether the inmate's continued [administrative segregation] confinement is justified. It is not sufficient for officials to go through the motions of nominally conducting a review meeting when they have developed a pre-review conclusion that the inmate will be confined in [administrative segregation] no matter what the evidence shows. Review with a pre-ordained outcome is tantamount to no review at all.

> *7 Second, the reviewing officials must evaluate whether the justification for [administrative segregation] exists at the time of the review or will exist in the future, and consider new relevant evidence as it becomes available.

> Third and finally, the reviewing officials must maintain institutional safety and security (or another valid administrative justification) as their guiding principles throughout an inmate's [administrative segregation] term. SHU confinement that began for proper [administrative segregation] purposes may not morph into confinement that persists for improper purposes.

Proctor, 846 F.3d at 610-11 (internal citations omitted).

The undersigned finds that the periodic reviews of plaintiff's administrative confinement satisfied the due process requirements set forth in Proctor. On March 20, 2015, a three-member committee consisting of the deputy superintendent for security, a security supervisor, and the offender rehabilitation coordinator issued a recommendation as to plaintiff's continued administrative segregation. See Miller Decl. ¶ 7; Dkt. No. 46-12 at 1. As to the initial justification for plaintiff's administrative segregation and his behavior, the committee considered plaintiff's "extensive history of disruptive behavior with both staff and inmates in county facilities and within DOCCS," as well as plaintiff's "history of bail jumping, which involved fleeing to the state of Pennsylvania on one occasion and fleeing to the state of Nevada on another occasion." Dkt. No. 46-12 at 1. As to whether justification existed at the time of the review, the committee noted that on February 23, 2015, plaintiff

Case 9:17-cv-00047-MAD-TWD    Document 78    Filed 02/19/19    Page 163 of 183

received a Tier II misbehavior report for harassment and failure to obey a direct order. Id. They also acknowledged that plaintiff maintained his cell and person, and was "usually appropriate" when interacting with staff. Id. The committee recommended that plaintiff remain in administrative segregation. Id. On the basis of the committee's report, and in conjunction with his thirty-one years of corrections experience, Supt. Miller determined that plaintiff's administrative segregation should be continued. Miller Decl. ¶¶ 1, 8. On May 20, 2015, the committee conducted a second periodic review of plaintiff's administrative segregation that largely mirrored the first, with the added notation that plaintiff had "no further disciplinary incidents since his last review." Dkt. No. 46-13 at 1. Based on the committee's recommendation, Supt. Miller continued plaintiff's confinement. Miller Decl. ¶¶ 10, 11.

Plaintiff's claims that the periodic reviews were "without substance" and "nothing but a 'hollow formality' " are not supported by the record. See Am. Compl. at 4. At the outset, it is clear that the March 20, 2015 and May 20, 2015 reviews complied with minimum due process required by the Constitution — " 'an informal, nonadversary evidentiary review' of whether the confinement is justified.' " Proctor, 846 F.3d at 609 (quoting Hewitt, 459 U.S. at 476). As to whether these reviews were meaningful, although the undersigned acknowledges that plaintiff, as a pretrial detainee, has a significant interest in freedom from segregated confinement, see Benjamin, 264 F.3d at 188, the state's interest in maintaining the safety and security of the prison facility is evident as the basis for plaintiff's continued status in administrative segregation. See Proctor, 846 F.3d at 609-10 (quoting Mathews, 424 U.S. at 335 ("Guiding that analysis are the three Mathews factors — the government's interest in limited fiscal and administrative burdens, the private interest in freedom from restraint, and 'the risk of an erroneous deprivation of [the private] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards.") ).

**\*8** As to the March 2015 review, Supt. Miller declared that, in continuing plaintiff's administrative segregation, his "paramount concern in [recommending continued segregation] was the safe, secure operation of the prison and whether [plaintiff] presented an immediate threat ... if he was released ... to the general population." Miller Decl. ¶ 8. Supt. Miller further declared that plaintiff's

"history of assaultive and disruptive behavior while in county custody coupled with the misbehavior report he received while in administrative segregation led [him] to conclude that his disruptive and assaultive behavior would likely continue if release to general population." Id. ¶ 9. As to the May 2015 review, Supt. Miller declared that "[a]lthough [plaintiff] had not received a misbehavior report since his previous sixty-day review, [he] remained extremely concerned by his recent behavior at the Warren County Jail, which had resulted in nearly 200 unusual incident reports in only a matter of months." Miller Decl. ¶ 11. Supt. Miller further declared that "even with the added security of administrative confinement at Great Meadow, [plaintiff] had exhibited harassing behavior toward staff." Id. Supt. Miller appropriately weighed plaintiff's history of "assaultive and disruptive behavior" in conjunction with his concern that, even within the confines of administrative segregation, plaintiff still acquired a misbehavior report, and determined that plaintiff be confined. See id. ¶¶ 8-11. Thus, it is clear that the safety and security of the facility was Supt. Miller's "guiding principle" in plaintiff's continued confinement. Proctor, 846 F.3d at 610-11.

Moreover, plaintiff has not proffered any evidence, other than conclusory allegations,[4] that Supt. Miller sought to punish plaintiff through indefinite confinement or developed an improper motivation for plaintiff's continued confinement. See Proctor, 846 F.3d at 610-11 ("SHU confinement that began for proper [administrative segregation] purposes may not morph into confinement that persists for improper purposes.").

[4]    In his opposition papers, plaintiff suggests that Supt. Miller "was part of the plot to keep [him] in SHU" and "orchestrated or allowed an illegal pretexual plot to keep [him] in administrative segregation as punishment [disguised] in administrative management of the safety and security of the facility." Dkt. No. 51 at 14, 15. To the extent that plaintiff now seeks to allege a conspiracy claim against Supt. Miller, it must be denied as "it is inappropriate to raise new claims for the first time in submissions in opposition to a summary judgment motion." Thomas v. Egan, 1 F. App'x 52, 54 (2d Cir. 2001) (summary order) (citing Beckman v. United States Postal Serv., 79 F. Supp. 2d 394, 407 (S.D.N.Y. 2000) ); see Jones v. Goord, 435 F. Supp. 2d 221, 261 (S.D.N.Y. 2006) (same). Nevertheless, plaintiff's conclusory allegations against Supt. Miller fail to

2018 WL 4233810

establish a prima facie conspiracy claim — i.e., "an agreement between two or more defendants to act in concert to inflict an unconstitutional injury, and an overt act done in furtherance of that goal causing damages." McCloud v. Prack, 55 F. Supp. 3d 478, 482 (W.D.N.Y. 2014) (citation omitted). There is no indication in the record that Supt. Miller agreed to act in concert with any Great Meadow staff member to confine plaintiff. As "[c]onclusory allegations of a conspiracy will not suffice," id., plaintiff fails to set forth a conspiracy claim.

To the extent that plaintiff's continued confinement could be considered punitive based on Supt. Miller's reliance on the February 2015 misbehavior report, the record indicates that plaintiff received the heightened due process required by Wolff v. McDonnell. See, e.g., Shine, 2009 WL 2179969, at *5 (finding that the defendant's decision to continue the plaintiff's, a pretrial detainee, confinement based on disciplinary violations could be deemed punitive); see also Benjamin, 264 F.3d at 190 ("[T]he procedures required by Wolff apply if the restraint on liberty is imposed [to pretrial detainees] for disciplinary reasons."). Courts in this Circuit state that, with respect to pretrial detainees, if "a purportedly administrative restraint ... is found to be tantamount to punishment," the due process standard governed by "Wolff [ ], which requires written notice of the charges at least twenty-four hour before any hearing, a written statement of factual allegations against the inmate, and at least a limited ability to present witnesses and evidence," applies. Taylor v. Santana, No. 05 Civ. 1860 (AKH), 2007 WL 737485, at *4 (S.D.N.Y. Mar. 6, 2007) (citing Benjamin, 264 F.3d at 190). On February 24, 2015, plaintiff received a misbehavior report charging him with harassment (107.11) and refusing a direct order (106.10). Dkt. No. 46-6 at 8. On February 25, 2015, a hearing officer commenced a Tier II disciplinary hearing, and sentenced plaintiff to thirty days keeplock and thirty days loss of packages, commissary, and phone privileges. Dkt. No. 46-7 at 3. Although plaintiff refused to attend the hearing, the hearing officer provided plaintiff with a written disposition outlining the evidence relied upon and his reasoning. See Dkt. No. 46-6 at 3-7. There is no indication that plaintiff was prevented from attending the hearing, and he testified that he voluntarily refused to attend. See Pl. Dep. at 124. The undersigned finds that, insofar as Supt. Miller relied on plaintiff's disciplinary infraction in continuing his administrative confinement, it is clear that plaintiff received heightened due process standards. See Ramsey v. Squires, 879 F. Supp. 270, 293

(W.D.N.Y. 1995) ("Because the record clearly shows that plaintiff got a Wolff hearing on June 7th in connection with the threatening charge and was found guilty, it is clear that continued administrative confinement in view of his pattern of behavior was supported by due process[.]"). Therefore, plaintiff received meaningful periodic reviews of his administrative segregation status.

*9 Insofar as plaintiff contends that Supt. Miller's failure to conduct a third sixty-day administrative segregation review in July 2015 constitutes a denial of due process, this argument is misplaced. As Supt. Miller has indicated, "an inadvertent denial of a periodic review does not give rise to a due process violation." Proctor v. Kelly, No. 9:05-CV-0692 (GTS/GJD), 2008 WL 5243925, at *7 (N.D.N.Y. Dec. 17, 2008) (hereinafter Proctor II). Further, "a violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." Burroughs, 138 F. Supp. at 219. There is no indication in the record that Supt. Miller or the review committee deliberately denied plaintiff his July 2015 review or attempted to punish him by keeping him administratively confined.

Accordingly, plaintiff fails to establish that Supt. Miller denied him meaningful periodic reviews in violation of the Fourteenth Amendment.

### c. Some Evidence

To the extent that plaintiff contends that both the initial administrative segregation placement and the subsequent periodic reviews were not supported by sufficient evidence, the record suggests otherwise. Due process mandates that a hearing determination be supported by "some evidence." Edmonson v. Coughlin, 21 F. Supp. 2d 242, 251 (W.D.N.Y. 1998) (quoting Sup't Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985) ); see Milner v. Lewis, No. 3:14-CV-1544(VLB), 2017 WL 1024268, at *9 (D. Conn. Mar. 16, 2017) (same). "Ascertaining whether [the some evidence] standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." Hill, 472 U.S. at 455-56. Courts in this Circuit have applied the "some evidence" standard to the decision to place an

inmate in administrative segregation. Milner, 2017 WL 1024268, at *9 (citing Taylor v. Rodriguez, 238 F.3d 188, 194 (2d Cir. 2001) (applying the "some evidence" standard to an officer's decision to place an inmate in "close custody."); Davis v. Barrett, No. 02-CV-0545 SR, 2011 WL 2421109, at *3 (W.D.N.Y. June 13, 2011) ("In accordance with the standards for such a hearing, the Court must find "some evidence" in the record that could support the hearing officer's conclusion that placement in administrative segregation was warranted.") (citation omitted) ).

The record establishes that, in making his initial administrative segregation recommendation, Sgt. Fraser relied on plaintiff's "assaultive and disruptive behavior" at Warren County Jail, including "199 Unusual Incident Reports, 63 disciplinary hearings that [had] been conducted for various rule violations, with several additional misbehavior reports awaiting disposition," as well as plaintiff's exposure of staff to fecal matter and urine, his "refusal to comply with strip frisk/search procedures," his destruction of "copious amounts of property and [attempts] to retain the broken or shattered portions in his cell," and his attempts to spit on staff. Dkt. No. 46-4. Nonparty hearing Officer Acting Captain Lieutenant Birrell relied on Sgt. Fraser's recommendation in assigning plaintiff to administrative segregation, and acknowledged such at the January 2015 hearing and in the written disposition. See Dkt. Nos. 46-4 at 2, 46-5. The review committee also referenced these incidents in the March 2015 and May 2015 periodic reviews, and Supt. Miller declared that he remained concerned by these incidents when approving the continuation of plaintiff's confinement. See Miller Decl. ¶ 11; Dkt. Nos. 12, 13. Thus, the record indicates that the initial January 2015 administrative segregation placement and the subsequent March 2015 and May 2015 periodic reviews were supported by sufficient evidence to support plaintiff's confinement.

*10 Insofar as plaintiff argues that the underlying disciplinary charges at Warren County Jail were fabricated or exaggerated, see Dkt. Nos. 51 at 13-14, 51-1 at 75, in assessing whether administrative segregation was proper, a court is not permitted to reevaluate the evidence that was before the Great Meadows staff and supersede their original determination; instead, the undersigned may only evaluate whether the defendant's method in coming to his administrative segregation determination

is sufficient. See Proctor, 846 F.3d at 608. As the record demonstrates that Supt. Miller based his determination on the plaintiff's institutional record from the Warren County Jail, see generally Miller Decl., the undersigned finds Supt. Miller's methodology sufficient, and it is recommended that defendant's Motion for Summary judgment be granted.

**2. Substantive Due Process**

Supt. Miller argues that to the extent that plaintiff asserts a substantive due process claim, that claim must be dismissed. Def. Mem. of Law at 17. In opposition, plaintiff contends that his placement in administrative segregation was "an abuse of discretion" depriving him of his "fundamental right to be free from punishment as a pretrial detainee and right to be free from indefinitely administrative segregation without due process." Dkt. No. 51-1 at 76, 77.

"Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense ... but not against government action that is 'incorrect or ill-advised.' " Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994) (internal citations omitted). "To establish a violation of substantive due process rights, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " Okin v. Village of Cornwall-On-Hudson Police Dep't, 577 F.3d 415, 431 (2d Cir. 2009) (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998) ). As already observed by this Court, "[v]ery few conditions of prison life are 'shocking' enough to violate a prisoner's right to substantive due process. In Sandin v. Conner, the Supreme Court provided only two examples: the transfer to a mental hospital and the involuntary administration of psychotropic drugs." Samms v. Fischer, No. 10-CV-349 (GTS/GHL), 2011 WL 3876528, at *12 (N.D.N.Y. Mar. 25, 2011) (citations omitted).

In the context of pretrial detainees, "the Supreme Court has held that because '[a] person lawfully committed to pretrial detention has not been adjudged guilty of any crime,' the Due Process clause of the Fourteenth Amendment dictates that he or she may not be punished in any manner — neither cruelly and unusually nor otherwise." Allah v. Milling, 982 F. Supp. 2d 172, 179

(D. Conn. 2013) (quoting Bell v. Wolfish, 441 U.S. 520, 536-37 (1979) ). Where a defendant does not verbally express punitive intent, such intent may be established through the conditions of confinement or restraint. Id. (quoting Turkmen v. Aschroft, 915 F. Supp. 2d 314, 338 (E.D.N.Y. 2013) ). "[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' " Bell, 441 U.S. at 538. It is well-settled that maintaining security and order within a prison facility justifies "restrictive conditions of confinement on pretrial detainees." Allah, 982 F. Supp. 2d at 179 (citing Bell, 441 U.S. at 540).

Aside from plaintiff's conclusory allegations, the record does not demonstrate that Supt. Miller maintained the requisite punitive intent in recommending plaintiff's continued confinement. See subsection II.B supra, at 8-21. At the initial determination and during the periodic review, the decisionmaker made clear the basis for plaintiff's administrative confinement: his past assaultive and disruptive behavior at Warren County Jail resulting in nearly 200 Unusual Incident Reports. See Dkt. Nos. 46-4 at 2, 46-5 at 8, 46-12, 46-13. In affirming those decisions, Supt. Miller not only referenced plaintiff's past behavior, but also considered plaintiff's recent disciplinary actions, and the concern that, even with additional security measures, plaintiff still exhibited "harassing behavior." Miller Decl. ¶¶ 8, 9, 11. Supt. Miller declared that based on past behavior and the likelihood that such behavior would be repeated, he "determined that [plaintiff] still presented a current threat to the safe, secure operation of the prison." Id. ¶ 11. Without more, Supt. Miller's actions do not amount to punishment in violation of the Fourteenth Amendment. See Bell, 441 U.S. at 538.

*11 Moreover, plaintiff's conditions of segregated confinement were not so egregious or outrageous to shock the "contemporary conscience" in violation of the Fourteenth Amendment. See Okin, 577 F.3d at 431. As Supt. Miller notes, plaintiff received three meals a day, daily exercise, legal research materials, and visits from his family members and attorney. Def. Mem. of Law at 18 (citing Pl. Dep. at 129, 130, 134). There is no indication that plaintiff suffered inhumane conditions during his time in segregated confinement. See Petrucelli v. Hasty, 605 F. Supp. 2d 410, 429 ("Although a detainee has an understandable desire to be as comfortable as possible during his confinement, this desire to be free

from discomfort simply does not rise to the level of a fundamental liberty interest. A pretrial detainee's right to be free from punishment prior to an adjudication of guilt in accordance with the due process of law does not preclude prison officials from imposing significant restrictions.") (citation omitted). Therefore, as it is clear that plaintiff's past behavior at Warren County Jail and threat to the safety and security of Great Meadow resulted in the segregated confinement determination, it cannot be said that such confinement was arbitrary or conscious-shocking in violation of the Fourteenth Amendment. See Proctor II, 2008 WL 5243925, at *6 ("With [p]laintiff having thus created a threat to the security of the prison by his conduct over the years, his subsequent administrative confinement resulting from the December 2003 proceeding was not arbitrary or conscience-shocking in the constitutional sense.") (internal quotation marks and citation omitted). Accordingly, it is recommended that Supt. Miller's Motion for Summary Judgment on this ground be granted.

## C. Qualified Immunity

Supt. Miller argues that he is entitled to qualified immunity as (1) plaintiff's constitutional rights were not violation, and (2) it was "objectively reasonably for an official in his position to believe that his conduct did not violate [p]laintiff's rights." Def. Mem. of Law at 19. Qualified immunity shields public officials from being sued for conduct undertaken in the course of their duties so long as that conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982) (internal quotation marks and citation omitted); Eng v. Coughlin, 858 F.2d 889, 895 (2d Cir. 1988). However, even if the constitutional privileges "are so clearly defined that a reasonable public official would know that his actions might violate those rights, qualified ... immunity might still be available ... if it was objectively reasonable for the public official to believe that his acts did not violate those rights." Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted). A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation. See Saucier v. Katz, 533 U.S. 194, 201 (2001). Only if there is a constitutional violation does a court proceed to determine whether the

constitutional rights were clearly established at the time of the alleged violation. See Aiken v. Nixon, 236 F. Supp. 2d 211, 230 (N.D.N.Y. 2002).

Here, plaintiff has not established a constitutional violation to satisfy the first prong of the qualified immunity test. See subsection II.B.1, 2. supra. Because there is no constitutional violation, the undersigned does not reach whether plaintiff's constitutional rights were clearly established at the time of the alleged violation. See Aiken, 236 F. Supp. 2d at 230.

### III. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**RECOMMENDED**, that defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 (Dkt. No. 46) be **GRANTED**; and it is further

**RECOMMENDED**, that plaintiff's amended complaint (Dkt. No. 18) be **DISMISSED** in its entirety, with prejudice; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989) ); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [5]

[5]     If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2018 WL 4233810

---

**End of Document**                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.

2004 WL 3037730
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Diallo Rafik Asar MADISON, Plaintiff,

v.

William P. MAZZUCA,
Superintendent, et al., Defendants.

No. 02 Civ.10299 RWS.
|
Dec. 30, 2004.

**Attorneys and Law Firms**

Diallo Rafik Asar Madison, Clinton Correctional
Facility, Dannemora, NY, pro se.

Honorable Eliot Spitzer, Attorney General of the State
of New York, New York, NY, By: Nicola Nadine Grey,
Assistant Attorney General, for Defendants, of Counsel.

*OPINION*

SWEET, J.

**\*1** Defendants Lester Wright ("Wright"), Chief
Medical Officer of New York State Department of
Correctional Services ("DOCS"); Fishkill Correctional
Facility ("FCF") superintendent William Mazzuca
("Mazzuca"); FCF deputy superintendent D. Schramm
("Schramm"); Eastern Correctional Facility ("ECF")
superintendent David Miller ("Miller"); ECF doctor
Mikhail Guzman ("Guzman"); Upstate Correctional
Facility ("UCF") nurse Riley ("Riley"); Southport
Correctional Facility ("SCF") superintendent Michael
McGinnis ("McGinnis"); SCF Doctor Alves ("Alves");
and SCF Nurse Dyal ("Dyal") (collectively, "the
Defendants") have moved to dismiss the complaint filed
by *pro se* plaintiff Diallo Madison ("Madison") on the
grounds that Madison has failed to exhaust administrative
remedies and has failed to state claims upon which relief
can be granted. Defendants also argue that they are
entitled to qualified immunity and that venue in the
Southern District of New York is improper.

*Parties*

Madison is a prison inmate in New York State
Department of Correctional Services ("DOCS") custody
and was incarcerated at FCF, ECF, UCF, and SCF
during the period of time in which the events in his
complaint are alleged to have occurred. Madison is
currently incarcerated in Clinton Correctional Facility
("CCF") in Dannemora, New York.

Wright was the Associate Commissioner and Chief
Medical Officer for DOCS at all relevant times.

Mazzuca was the FCF superintendent at all relevant
times.

Schramm was the FCF deputy superintendent of
administration at all relevant times.

Miller was the ECF superintendent at all relevant times.

Guzman was an ECF physician at all relevant times.

Thomas Rick, who was the UCF superintendent at all
relevant times, is not a party to this action because he
was never served with the summons and complaint or the
amended complaint.

Riley was a UCF nurse at all relevant times.

McGinnis was SCF superintendent at all relevant times.

Alves was an SCF physician at all relevant times.

Dyal was an SCF nurse at all relevant times.

*Prior Proceedings*

On January 3, 2002, Madison commenced this
action, alleging violations of his constitutional rights
while incarcerated at Coxsackie, Auburn, and Fishkill
Correctional Facilities. The Honorable Michael B.
Mukasey, Chief Judge of the Southern District of New
York, directed Madison to file an amended complaint
detailing his allegations regarding his claims at FCF. *See
Madison v. Mazzuca, et. al.,* 02 Civ. 10299 (S.D.N.Y. Dec.
27, 2002). The only common defendant between the initial
complaint and the amended complaint is Mazzuca.

On March 3, 2003, Madison filed the amended
complaint. On September 12, 2003, the Defendants moved
for dismissal of the amended complaint pursuant to

Fed.R.Civ.P. 12(b)(6). On April 13, 2004, Defendants' Rule 12(b)(6) motion was denied without prejudice on the grounds that the question of exhaustion needed to be determined before the merits of the complaint were addressed. *Madison v. Wright,* No. 02 Civ. 10299(RWS), 2004 WL 816429 at *2 (S.D.N.Y. Apr.13, 2004). Since that opinion was entered, the Second Circuit has held that the presence of unexhausted claims in an inmate's § 1983 complaint does not compel dismissal of the action in its entirety. *See Ortiz v. McBride,* 380 F.3d 649, 662 (2d Cir.2004), petition for cert. filed,-U.S.L.W.-(U.S. Nov. 16, 2004) (No. 04-668).

**\*2** Pursuant to the Court's April 13, 2004 memorandum opinion, [1] on June 28, 2004, Defendants filed a combined motion for summary judgment and dismissal for failure to state a claim on which relief can be granted. Plaintiff's opposition was filed on July 21, 2004. The motion was marked fully submitted without oral argument on August 4, 2004.

[1]    In the April 13, 2004 memorandum opinion, the Court stated that "defendants' motion to dismiss is denied without prejudice to renewal by April 26, 2004 as a combined motion for summary judgment, solely on the issue of exhaustion, and to dismiss pursuant to Rule 12(b)(6)." Extensions of time were subsequently granted to the parties.

*Facts*

The following facts are drawn from the amended complaint and the affidavits and affirmations filed by the parties. These facts do not constitute findings by the Court.

Madison alleges that on October 16, 2001, while incarcerated at FCF, "he slipped and fell while exiting the in-cell shower." (Am.Compl.¶ 3.) He alleges that he "fell because the floor towels used for the in-cell shower were continuously denied." (*Id.* at ¶ 4.) Madison further alleges that as a result of the slip and fall, he injured his right elbow, which became swollen and painful. (*Id.* at ¶ 5.)

On October 23, 2001, Madison filed grievance number FCF 22342-01, in which he requested: (1) to be issued towels for the floor on shower day, (2) to be provided with an elbow pad for his injured right elbow, and (3) to be compensated for the injuries that he allegedly suffered "due to the negligence and deliberate indifference

of laundry civilian Pat DeCarlo." (Egan Decl. Ex. B.) On October 30, 2001, the Inmate Grievance Resolution Committee ("IGRC") recommended: (1) that plaintiff be provided with extra towels or a mop on shower day, (2) that plaintiff use sick call procedures to address medical concerns, (3) that plaintiff's request for compensation be denied as beyond the IGRC's purview. (*Id.*) Madison appealed the IGRC recommendations to FCF Superintendent Mazzuca, who concurred with the IGRC recommendations. (*Id.*) On November 16, 2001 Madison was transferred from Fishkill to Eastern Correctional Facility ("ECF"). (Am.Compl.¶ 9.) Madison alleges that he was transferred because "defendants Mazzuca and Schramm did not want to address [his] medical concerns." (*Id.*) Madison appealed Mazzuca's decision to the DOCS Central Office Grievance Review Committee ("CORC"), which denied the appeal on July 3, 2002. (Egan Decl. Ex. B.)

Madison began experiencing severe pain in his elbow upon his arrival at ECF. On December 12, 2001, Guzman examined Madison and prescribed medication for his pain and swelling. Madison alleges that a cyst on his right elbow was visible and that in March, 2002, x-rays of his elbow "read negative." (Am.Compl.¶ 12.) On April 10, 2002, Madison alleges, Guzman scheduled him to be "seen by an outside hospital orthopedic specialist for possible removal of the cyst." (*Id.* at ¶ 13.) Madison also alleges that the "ganglion cyst" had grown since October, 2001. (*Id.*) Madison was transferred from ECF to UCF on April 11, 2002. He alleges that this transfer was "based upon the fact the defendants Guzman and Miller did not want to undergo the medical expenses" associated with treating his right elbow. (*Id.* at ¶ 14.)

**\*3** As a new inmate at UCF, Madison was examined by nurse Riley on April 11, 2002. (*Id.* at ¶ 15.) He alleges that he was rescheduled for an orthopedic consultation on April 23, 2002. (*Id.* at ¶ 15.) On May 27, 2003, Madison filed grievance number UST 12363-02, which requested a consultation with an orthopedic specialist. On June 20, 2002, the IGRC recommended that this request be accommodated. (07/14/04 Madison Aff. Ex. 3.)

On June 14, 2002, Madison was transferred to SCF. He alleges that this transfer was motivated by Riley's desire to avoid incurring medical expenses associated with treatment of his injured elbow. (*Id.* at ¶ 18.)

2004 WL 3037730

Madison arrived at SCF on June 17, 2002. Shortly after his arrival, he was allegedly examined by SCF medical personnel and rescheduled for an appointment with an outside orthopedic specialist. Around the same time, Madison allegedly complained to Dyal about the severe pain in his elbow and Dyal allegedly told him that Alves would not return from vacation until August, 2002.

On June 17, 2002, Madison filed grievance number SPT 24033-02 based on this meeting with Dyal. [2] In this grievance, Madison requested: (1) that he be permitted to see an orthopedic specialist about his elbow and (2) that Dr. Alves be reprimanded for tampering with his records. (Egan Decl. Ex. B.) On June 20, 2002, the IGRC stated that Alves had submitted Madison for an orthopedic consultation on June 18, 2002. (*Id.*) On July 1, 2002, McGinnis affirmed the IGRC, stating that "Grievant is currently awaiting scheduling." (*Id.*) On July 3, 2002, Madison appealed McGinnis' affirmance of the IGRC recommendation to CORC. (*Id.*) On July 31, 2002, CORC upheld the McGinnis' affirmance, noting that plaintiff was scheduled for an orthopedic appointment in the future. (*Id.*)

[2]    The amended complaint alleges that Madison filed this grievance on June 17, 2002. However, the events underlying the grievance allegedly took place on June 20, 2002.

On August 14, 2002, Alves allegedly determined that based on Madison's injury, consultation with an orthopedic specialist was "no longer medically necessary." (Am.Compl.¶ 50.)

On August 19, 2002, Madison allegedly met with Alves, who was allegedly "outright angry, hostile, belligerent, as well as verbally abusive" because he had filed the June 17 grievance. (Am. Compl. at ¶ 30.) Madison alleges that Alves told him that it was a "waste of taxpayer money" to send him to an orthopedic specialist and that he could wear an elbow sleeve for his injury. (*Id.* at ¶ 31.) Madison also alleges that Alves asserted that he would not be permitted to see an outside specialist during the term of his incarceration at SCF. Alves allegedly told Madison to "get the fuck out of his office." (*Id.*)

On August 20, 2002, Madison filed grievance number SPT 24542-02, which sought the following relief: (1) copies of the April 10, 2002 consent form and all of his requests for a consultation with an orthopedic specialist relating,

(2) the opportunity to see an orthopedic specialist on September 2, 2002, and (3) assurance that Alves would not file specious reports or tamper with his records. (07/14/04 Madison Aff. Ex. 3.) On August 29, 2002, the IGRC recommended denial of the requested actions on the grounds that a doctor had determined on August 19, 2002 that there was no need for a consultation with an orthopedic surgeon and that copies of requested documents were provided to Madison on August 23, 2002. (*Id.*) The IGRC was subsequently affirmed by defendant McGinnis. On October 16, 2002, CORC denied Madison's appeal concerning grievance number SPT 24542-02 on the grounds (1) that "the Facility Health Services Director (FHSD) [had] indicated that [an orthopedic] consultation [was] not medically necessary" and (2) that "CORC [had] not been presented with sufficient evidence to substantiate any malfeasance by the employees referenced in this instant complaint." (07/14/04 Madison Aff. Ex. 3.)

**\*4** On August 22, 2002 Dyal allegedly refused Madison an Ibuprofen prescription refill and told him that "You blew it, the Defendant Alves don't want to give you anything." (Am. Compl. at ¶ 33.) On August 23, 2002, Madison filed grievance number SPT 24621-02, requesting (1) medication for pain in his right elbow, (2) copies of requested medical records, and (3) assurance that Alves would not act with bias against his medical needs. (07/14/04 Madison Aff. at Ex. 3.) On August 27, 2002, the IGRC denied the grievance because another nurse had filled the prescription a few days later. (*Id.*) Madison alleges that he appealed this decision to McGinnis, who concurred with the IGRC recommendation. (Am. Compl. at ¶ 37.) Madison further alleges that he appealed McGinnis' concurrence to CORC in September of 2002, and CORC denied the appeal in October of 2002. (*Id.* at ¶ 38.) Defendants argue that there is no evidence that Madison appealed the IGRC recommendation.

On September 3, 2002, Madison filed grievance number SPT 24693-02, which (1) requested a consultation with an orthopedic specialist and (2) complained that Dr. Alves had improperly changed the diagnosis concerning his elbow. (Egan Decl. Ex. B.) On September 12, 2002, the IGRC recommended denial of these requests. On September 26, 2002, McGinnis affirmed the IGRC recommendations. (*Id.*) Madison appealed this decision to CORC on October 2, 2002, and McGinnis' decision was upheld on November 7, 2002. (*Id.*)

2004 WL 3037730

On October 15, 2002, Madison filed grievance number SPT 25027-02, requesting replacement of his elbow sleeve and to determine the cost of removal of the cyst from his elbow so that such cost could be paid by his family. (*Id.*) On October 23, 2002, the IGRC recommended replacement of his elbow sleeve and denial of his request for an orthopedic consultation. (*Id.*) On November 8, 2002, McGinnis concurred with the IGRC recommendation. (*Id.*) On December 18, 2002, CORC upheld this affirmance. (*Id.*)

Madison alleges that he was in pain during psychological counseling sessions on September 12 and October 11, 2002, and he could not complete these sessions due to discomfort caused by having his hands cuffed behind his back.

On September 30, 2002, Kate Rainbolt ("Rainbolt"), an attorney from Prisoner's Legal Services of New York, allegedly wrote to Alves inquiring whether Madison would receive a consultation with an orthopedic specialist and inquiring into the medical basis for any determination that such consultation was unnecessary. Rainbolt allegedly did not receive a reply from Alves and wrote a follow-up letter six weeks later on November 15, 2002 requesting a reply. Rainbolt allegedly did not receive a response to this follow-up letter. On December 16, 2002, Rainbolt allegedly wrote a letter to Wright concerning Madison's medical situation. Rainbolt allegedly never received a response from Wright concerning her inquiry.

On January 13, 2003, Madison was transferred to Great Meadow Correctional Facility ("GCF"), a move allegedly motivated by the fact that "defendant McGinnis, and Alves did not want to spend any money" on Madison's medical treatment. (Am.Compl.¶ 60.) Madison alleges that shortly after his arrival to GCF, he was examined and scheduled for "surgical removal of the overgrown cyst." (*Id.* ¶ 62.) Madison alleges that the cyst was subsequently removed.

**\*5** As stated above, Madison's amended complaint was filed on March 7, 2003.

On March 7, 2003, Madison filed grievance number GM 34282-03, requesting to be seen by an orthopedic specialist for his elbow. (Egan Decl. at Ex. B.) On March 24, 2003, the IGRC recommended that a facility physician determine whether referral to an orthopedic

specialist was warranted. (*Id.*) On April 7, 2003, GCF Superintendent George B. Duncan denied Madison's request on the grounds that a GCF doctor had determined that a referral was not necessary. (*Id.*) On April 9, 2003, Madison appealed this decision to CORC, and on May 14, 2003, CORC upheld the determination of the GCF superintendent. (*Id.*)

Madison was subsequently transferred to Clinton Correctional Facility ("CCF"). On October 24, 2003, Madison filed grievance number CL 49291-03, requesting (1) consultation with an orthopedic specialist, (2) pain medication for his elbow, and (3) compensation for his suffering. (*Id.*) Madison stated that the grievance was filed "because of the deliberate indifference" of Mazzuca, Schramm, Miller, Rick, Riley, Alves, Dyal, McGinnis, and Miller. (*Id.*) On October 28, 2003, the IGRC recommended that Madison be permitted to see his doctor about his elbow. (*Id.*) On October 31, 2003, CCF superintendent Dale A. Aotus concurred with the IGRC recommendation. (*Id.*) Madison appealed the superintendent's ruling on the grounds that he wanted "to be compensated for the deliberate indifference of each person mentioned in the complaint & Dr. Lester N. Wright & Dr. M. Guzman to be added for their deliberate indifference." (*Id.*) On December 11, 2003, CORC upheld the superintendent, stating that "monetary damages are not an available remedy through the inmate grievance mechanism." (*Id.*)

*Discussion*

In addressing the present motion, the Court is mindful that the plaintiff is proceeding *pro se* and that his submissions should be held to "less stringent standards than formal pleadings drafted by lawyers ..." *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting *Haines v. Keener,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)); *see also Ferrand v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993). Indeed, district courts should "read the pleadings of a *pro se* plaintiff liberally and interpret them to raise the strongest arguments they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, *pro se* status does not exempt a party from compliance with relevant rules of procedural and substantive law. *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (quotations omitted).

### § 1983 Pleading Requirements

"To state a claim for relief in an action brought under § 1983, [plaintiff] must establish that [he was] deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Ins. Co. v. Sullivan,* 526 U.S. 40, 49-50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999). An individual defendant is not liable under § 1983 absent personal involvement. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994); *Morris v. Eversley,* 205 F.Supp.2d 234, 241 (S.D.N.Y.2002). According to the Second Circuit, a DOCS employee defendant is deemed to be personally involved in a § 1983 violation if:

> **\*6** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)).

### Defendants' 12(b)(6) Motion

Pursuant to 42 U.S.C. § 1997c(c)(2),[3] the first step in the present analysis is to determine whether the amended complaint states a claim as to each of the defendants. The amended complaint, which is deemed to assert claims pursuant to 42 U.S.C. § 1983, alleges that the defendants acted with deliberate indifference to plaintiff's medical needs, thereby violating the Eight Amendment and the Fifth and Fourteenth Amendments.

[3] This statutory provision states that "in the event that a claim ... fails to state a claim upon which relief can be granted, ... the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies." 42 § 1997e(c)(2).

For the purpose of evaluating a Rule 12(b)(6) motion, the Court must accept as true all properly plead allegations. *See, e.g., Chance v. Armstrong,* 143 F.3d 698, 701 (2d. Cir.1998). Dismissal is not appropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000); *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). (stating that this standard "is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se*" ). In the context of a 12(b)(6) motion, "[t]he issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Branham v. Meachum,* 77 F.3d 626, 628 (2d Cir.1996) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995) (internal quotation marks omitted)).

Pursuant to Rule 12(b)(6), "a § 1983 complaint must set forth specific factual allegations indicating a deprivation of constitutional rights." *Rivera v. Goord,* 119 F.Supp. 327, 335 (S.D.N.Y.2000); *see also Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987) ("[B]road, simple, and conclusory statements are insufficient to state a claim under § 1983.").

The Supreme Court has held that "deliberate indifference to serious medical needs of a prisoner constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." *Estelle v. Gamble* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (quoting *Gregg v. Georgia* 428 U.S. 153, 172, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). To state a § 1983 claim based on deliberate indifference, plaintiff must allege two elements. First, plaintiff must allege a "sufficiently serious" deprivation of medical treatment-*i.e.,* a deprivation reasonably likely to result in death, degeneration, or extreme pain. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (internal quotation omitted). Second, plaintiff must allege facts tending to show that the defendant acted "with a sufficiently culpable state of mind"-*i.e.,* that the defendant

knew of and disregarded the excessive risk to the inmate's health arising from the deprivation of medical treatment. *Id.* (citing *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

a. *Mazzuca and Schramm*

**\*7** Madison has asserted deliberate indifference claims against FCF superintendent Mazzuca and FCF deputy superintendent Schramm on the theory that these defendants transferred him from FCF to ECF to prevent him from seeing an FCF physician. However, Madison has not alleged any facts demonstrating that these defendants were personally involved in the decision to transfer him from FCF. Moreover, even if personal involvement had been alleged, Madison's pleadings are nonetheless defective to the extent that they fail to allege that either of these defendants acted with a sufficiently culpable state of mind. That is, Madison has failed to allege facts indicating that either Mazzuca or Schramm knew of and disregarded an excessive risk to his health that would arise if he was transferred before an FCF doctor had the opportunity to examine his injured elbow.

Therefore, the Eighth Amendment claims against Mazzuca and Schramm are dismissed.

b. *Guzman*

The amended complaint alleges that ECF doctor Guzman, one day after scheduling Madison for a consultation with an orthopedic specialist, caused him to be transferred from ECF to UCF for the purpose of denying him medical treatment. However, Madison has not alleged any facts demonstrating that Guzman was personally involved in the decision to transfer him from ECF to FCF. Furthermore, the amended complaint contains no allegations that Guzman knew of and disregarded an excessive medical risk that would result from the decision to transfer Madison prior to the scheduled consultation. Therefore, the Eighth Amendment claim against Guzman is dismissed.

c. *Miller*

The amended complaint alleges that ECF superintendent Miller acted in concert with Guzman to effect Madison's transfer from ECF to UCF. However, this conclusory allegation, which is unsupported by proper factual assertions, is insufficient to defeat a Rule 12(b)(6) motion.

*See, e.g., De Jesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996) (stating that " '[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." ') (quoting *Palda v. General Dynamics Corp.,* 47 F.3d 872, 875 (7th Cir.1995)).

Madison has failed to allege facts showing that defendant Miller was personally involved in the decision to transfer him. He has similarly failed to allege that Miller knew of and disregarded an excessive medical risk that would result from the decision to transfer him prior to the scheduled consultation. Therefore, the Eighth Amendment claim against Miller is dismissed.

d. *Rick*

As stated in Defendants' motion papers, Rick is not a party to this action because he was never served with the summons and complaint or the amended complaint.

e. *Riley*

With respect to UCF nurse Riley, the sole allegation contained in the amended complaint is that she examined Madison upon his transfer to UCF. Based on this allegation, Madison asserts the conclusory allegation that Riley caused him to be transferred to SCF in order to avoid incurring the costs associated with his medical care. There are no factual allegations that Riley was personally involved in the decision to transfer Madison. Nor is there any allegation that Riley took any action with the requisite culpable mental state. Therefore, Madison's Eight Amendment claim against Riley is dismissed.

f. *Alves and Dyal*

**\*8** Madison alleges that SCF doctor Alves (1) cancelled his appointment for a consultation with an orthopedic specialist, (2) instructed SCF medical staff not to issue pain medication to him, (3) refused to issue a "front-cuff order," thereby requiring his injured arm to be twisted behind him whenever he was placed into handcuffs, and (4) refused to replace the worn-out brace that he wore on his injured elbow. Madison alleges that Alves' actions were motivated in large measure by Alves' anger that Madison had filed grievances concerning the medical care he received from Alves. Likewise, it is alleged that SCF nurse Dyal refused to refill Madison's prescription on several occasions (Am.Compl.¶ 34), allegedly also in retaliation

2004 WL 3037730

for grievances that Madison had filed concerning Alves' conduct.

The Defendants seek dismissal of Madison's Eighth Amendment claims against Alves on the grounds that the course of treatment selected by Alves was adequate, and Madison's preference for an alternative treatment does not create a constitutional claim. *See, e.g., Chance,* 143 F.3d at 703; *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). Defendants are correct that where a prison doctor selects among treatment options with reasonably equivalent efficacy rates, an inmate cannot make out a deliberate indifference claim merely by second guessing the doctor's choice. However, a physician may be deliberately indifferent if he or she consciously chooses "an easier and less efficacious" treatment option. *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974) (holding that where a portion of plaintiff's ear had been detached, merely closing the wound rather than attempting to reattach the detached portion could constitute deliberate indifference); *Chance,* 143 F.3d at 703. Here, Madison has alleged that the treatment options selected by Alves were considerably less efficacious than the alternative-*i.e.,* permitting him to see an orthopedic specialist to determine if surgery was warranted. Furthermore, Madison has alleged that Alves opted for a course of treatment that he knew to be significantly less efficacious based on two improper factors: (1) personal animus toward Madison and (2) his opinion that a consultation with an orthopedic specialist would constitute a waste of public funds.

Pursuant to the *Williams* holding, these allegations state a deliberate indifference claim against defendant Alves. 508 F.2d at 844. Madison has also stated deliberate indifference claims with respect to Alves' other actions-*i.e.,* refusing Madison's pain medicine, refusing to issue a "front-cuff order," and refusing to order a replacement elbow brace. All of these actions are alleged to have caused Madison severe pain, and all of these actions were allegedly taken in retaliation for Madison's decision to file grievances against Alves. Therefore, Madison has stated an Eighth Amendment claim against Alves with respect to the above-described conduct.

 *9 Madison alleges that defendant Dyal withheld pain medication from him on several occasions. He alleges that Dyal was aware of his injury and the "severe pain" associated with it, but nonetheless allegedly refused to provide him with additional Ibuprofen because Madison

had angered Alves. Courts of this district have held that denial of pain medication, under proper circumstances, can form the basis for a deliberate indifference claim. *See, e.g., Rivera v. Goord,* 119 F.Supp.2d 327, 337 (S.D.N.Y.2000) (holding that plaintiff had stated a deliberate indifference claim where he alleged that he "suffered 'severe,' 'unbearable,' and 'great' pain because the defendant refused to provide him with pain medication"). Based on Madison's allegations concerning Dyal-*i.e.,* (1) that she denied him pain medication, (2) that he suffered "extreme pain" as a result, and (3) that Dyal had a culpable mental state-Madison has stated an Eighth Amendment claim against Dyal.

### g. *Alves and Dyal Are Not Entitled to Qualified Immunity as a Matter of Law*

Defendants argue that Alves and Dyal are entitled to qualified immunity. Public officials are "immune from liability for money damages in suits brought against them in their individual capacities if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' ' *Anthony v. City of New York,* 339 F.3d 129, 137 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

Defendants argue that it was objectively reasonable for Alves and Dyal to believe that they were not violating Madison's Eighth Amendment right when they denied him medical treatment for his elbow. However, because it has been found that Madison's allegations state a claim for deliberate indifference against these defendants, it cannot be determined as a matter of law that it was objectively reasonable for Alves and Dyal to believe that their conduct did not violate Madison's right to be free from cruel and unusual punishment. In other words, "[a]ssuming that [Alves and Dyal] [were] deliberately indifferent to [plaintiff's] serious medical needs, [they] [are] not entitled to qualified immunity because it would not be objectively reasonable for them to believe [their] conduct did not violate [Madison's] rights." *Hathaway,* 37 F.3d at 69.

### h. *McGinnis and Wright*

Madison has asserted intentional indifference claims against SCF superintendent McGinnis and DOCS chief medical officer Wright, both of whom were allegedly involved in denying his appeals of grievances concerning

the conduct of Dyal and Alves. To state a § 1983 damages claim against a state official, the complaint must allege that the official was personally involved in the conduct at issue. *See, e.g., Koehl v. Dalsheim,* 85 F.3d 86, 89 (2d Cir.1996) (citing *Al-Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989)). With respect to prison personnel who act in a supervisory capacity, the Second Circuit has stated that under certain circumstances, the personal involvement requirement can be satisfied where the plaintiff alleges that "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong...." *Colon,* 58 F.3d at 873.

 *10 Here, Madison alleges that he brought the conduct of Alves and Dyal to the attention of defendants McGinnis and Wright (Alves' alleged supervisor) by initially filing and subsequently appealing grievance number SPT 24693-02. Furthermore, Madison alleges that attorney Rainbolt wrote letters to both defendants concerning the conduct of Alves. Madison alleges that McGinnis and Wright failed to address the conduct of Alves and Dyal.

Based on decisions from this district, Defendants argue that McGinnis cannot be deemed to have been personally involved in the conduct of Alves and Dyal merely because he affirmed the denial of Madison's grievances against them. *See, e.g., Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) (quoting *Scott v. Scully,* No. 93 Civ. 8777(HB), 1997 WL 539951 at *4 (S.D.N.Y. Aug.28, 1997)). It should be noted that other courts of this district have held that personal involvement is present where a supervisory official reviews a prisoner's grievance with respect to a constitutional violation and decides against taking any corrective action. *See, e.g., McKenna v. Wright,* No. 01 Civ. 6571(HB), 2004 WL 102752 at *5 (S.D.N.Y. Jan.21, 2004); *Williams v. Fisher,* No. 02 Civ. 4558(LMM), 2003 WL 22170610 at *31 (S.D.N.Y. Sep.17, 2003) (citing *Walker v. Pataro,* No. 99 Civ. 4607(GBD)(AJP), 2002 WL 664040 at *13 (S.D.N.Y. Apr. 23, 2002)).

This Court is not persuaded that the Second Circuit has adopted the rule that an inmate can state a § 1983 claim against a DOCS official merely by alleging that such official reviewed an inmate's grievance and failed to take any corrective action in response. Such a rule would lead to the untenable consequence that "virtually every inmate who sues for constitutional torts by prison guards could name the [s]uperintendent as a defendant since the plaintiff must pursue his prison remedies [pursuant to] 42 U.S.C. § 1997e(a) ... and invariably the plaintiff's grievance will have been passed upon by the [s]uperintendent." *Thompson v. New York,* 99 Civ. 9825, (GBD)(MHD), 2001 U.S. Dist. LEXIS 9450, *23-24 (S.D.N.Y. Nov. 15, 2001). Based on the foregoing, it is determined that the amended complaint fails to state a § 1983 claim against McGinnis.

The allegations concerning Wright's conduct are similarly defective. First, Madison's allegations that Wright acted in concert with the other defendants for the purpose of having him improperly transferred among correctional facilities is wholly conclusory. Second, Madison's allegations-*i.e.,* that Wright received letters written on Madison's behalf concerning the conduct of Alves and that Wright participated in CORC's adjudication of grievance number SPT 24693-02-fail to state a § 1983 claim for the reasons discussed above. Therefore, the Eight Amendment claim against Wright is dismissed.

*The Due Process Claim Is Dismissed As To All Defendants*

Madison's first cause of action alleges that the actions by Defendants "constituted a gross deprivation of Plaintiff's Civil Rights, as well as deliberate indifference to the Plaintiff's medical needs ... outlawed by the Fifth and Fourteenth Amendments of the U.S. Constitution." (Am.Comp.¶ 66.) Given its most generous reading, this allegation asserts an additional basis for § 1983 liability, *i.e.,* alleged violation of plaintiff's rights to substantive due process. However, this claim must be dismissed as duplicative of the Eight Amendment claims. "Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Velez v. Levy,* 274 F.Supp.2d 444, 454 (S.D.N.Y.2003) (quoting *Albright v. Oliver,* 510 U.S. 266, 272, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994)). "If a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *U.S. v. Lanier,* 520 U.S. 259, 272 n. 7, 117 S.Ct. 1219, 137 L.Ed.2d 432 (1997) (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

**\*11** Because Madison's deliberate indifference claim is covered by the Eighth Amendment, the substantive due process claims are duplicative under the rule articulated by the *Albright* and *Graham* courts. Therefore, the substantive due process claims are dismissed as to all Defendants. *See McKenna v. Wright,* No. 01 Civ. 6571, 2004 WL 102752, at \*8 (S.D.N.Y. Jan.21, 2004).

*Exhaustion*

Pursuant to Fed.R.Civ.P. 56, Defendants have moved for summary judgment on the grounds that Madison failed to exhaust administrative remedies prior to bringing this action.

*1. Summary Judgment Standard*

Under Rule 56(c), Fed.R.Civ.P., summary judgment is warranted when, in viewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A motion for summary judgment requires the party with the burden of proof at trial to "make a showing sufficient to establish the existence of an element essential to that party's case ... since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the "record taken as a whole could not lead a rational trier of fact to find for the moving party, there is no 'genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting *First Nat'l Bank v. Cities Serv. Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). Accordingly, summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to a material fact and that the moving party is entitled to judgment as a matter of law." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir.1997) (quoting Fed.R.Civ.P. 56(c)).

*2. PLRA Exhaustion Requirements*

The Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) ("PLRA"), states that:

> No action shall be brought with respect to prison conditions under section 1983 ... or any other federal law ... by a prisoner ... until such administrative remedies as are available are exhausted.

Complaints filed under § 1983 are to be dismissed if prisoners have failed to exhaust administrative remedies. *Booth v. Churner,* 532 U.S. 731, 742, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001); *Alexandroai v. California Dep't of Corrections,* 985 F.Supp. 968, 970 (S.D.Cal.1997) (plaintiff must "work within the prison system to have his case heard and then come to the Court after he has exhausted his administrative remedies as required by federal law"). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

*3. DOCS Grievance Procedures*

**\*12** New York's Inmate Grievance Program has three steps that generally must be exhausted before an action is brought in federal court. *See* N.Y. Correction Law § 139; N.Y. Comp.Codes R. & Regs. tit. 7, § 701. First, an inmate must file a complaint with the Inmate Grievance Resolution Committee (IGRC) within 14 days of the alleged event. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7(a)(1). The IGRC must then investigate and may resolve the issue informally within seven days. *See id.* at § 701.7(a)(3). If there is no informal resolution, a hearing is held, and the inmate may appeal to the superintendent of the facility within four days of the IGRC's action. *See id.* at §§ 701.7(a)(4) & (b). Finally, after receiving a response from the superintendent, the prisoner may appeal that decision to CORC within four days of its receipt. *See Id.* at § 701.7(c). CORC, in turn, must render a decision within 20 days. *See id.*

4. *Recent Second Circuit Decisions*

In a suite of five decisions issued in August 2004, the Court of Appeals for the Second Circuit clarified certain aspects of the nature and scope of the administrative exhaustion requirement set forth in the PLRA. As the Court of Appeals explains, although "our circuit has recognized that ... the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply." *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004) (quoting *Porter,* 534 U.S. at 524) (internal citation omitted).

In the first of the five decisions rendered, *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004), petition for cert. filed,-U.S.L.W.-(U.S. Nov. 16, 2004) (No. 04-668), the Court of Appeals held that the presence of unexhausted claims in an inmate's § 1983 complaint does not compel dismissal of the action in its entirety. *See Ortiz,* 380 F.3d at 662 (noting that, "in the ordinary case, once the district court dismisses the unexhausted claims, it will proceed directly to decide the exhausted claims without waiting for the plaintiff to attempt to exhaust available administrative remedies with respect to the dismissed claims"). In the second such decision, *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004), the Court of Appeals stated that "the PLRA does not require the exhaustion of all administrative remedies, but only those that are 'available' to the inmate," *Abney,* 380 F.3d at 667, and concluded that, under certain circumstances, a defendant's behavior may render administrative remedies unavailable to a prisoner. Such circumstances include the repeated failure to implement multiple administrative rulings in a prisoner's favor. *See id.* at 669. As the Court of Appeals explained, "[w]here, as here, prison regulations do not provide a viable mechanism for appealing implementation failures, prisoners in [the plaintiff's] situation have fully exhausted their available remedies." *Id.* Accordingly, "[a] prisoner who has not received promised relief is not required to file a new grievance where doing so may result in a never-ending cycle of exhaustion." *Id.* In *Giano v. Goord,* 380 F.3d 670 (2d Cir.2004), the third decision of the August decisions, the Court of Appeals held that,

> **\*13** [T]here are certain "special circumstances" in which, though administrative remedies may have been available and though the government may not have been estopped from asserting the

affirmative defense of non-exhaustion, the prisoner's failure to comply with administrative procedural requirements may nevertheless be justified.

*Giano,* 380 F.3d at 676. Specifically, the *Giano* Court held that failure to exhaust administrative remedies is justified where the inmate reasonably believed that "DOCS regulations foreclosed such recourse." *Id.* at 678.

In *Hemphill v. New York,* 380 F.3d 680 (2d Cir.2004), the Court of Appeals held that: (1) the standard for assessing the availability of a grievance procedures is whether " 'a similarly situated individual of ordinary firmness" ' would have deemed the procedure available, *Hemphill,* 380 F.3d at 688 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)); (2) a defendant's actions inhibiting an inmate's exhaustion of remedies may estop assertion of the failure to exhaust as an affirmative defense, *see id.* at 686; and (3) a reasonable fear of retaliation is a "special circumstance" justifying the failure to exhaust available administrative remedies. *Id.* at 690.

Finally, in *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004), the Court of Appeals held that failure to exhaust is an affirmative defense that is deemed waived if the defendant fails to assert it, *see Johnson,* 380 F.3d at 695, and separately concluded that, "[i]n order to exhaust, ... inmates must provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." *Id.* at 697 (remanding the matter to the district court to determine in the first instance whether complaints concerning a correction officer's conduct referenced during the plaintiff's disciplinary appeals afforded prison officials time and opportunity to take responsive measures and whether the plaintiff was justified in raising the complaint in the context of the disciplinary proceeding).

The above-described decisions bear upon several of the issues raised in the instant motion, including the process by which administrative exhaustion under the PLRA is analyzed. As set forth in *Hemphill,* these decisions require a determination as to (1) whether administrative remedies were "available" to the plaintiff; (2) whether Defendants forfeited the affirmative defense of non-exhaustion or

are estopped from asserting Madison's alleged failure to exhaust as a defense; and (3) in the event that plaintiff failed to exhaust available administrative remedies and there is no bar to defendant's assertion of the non-exhaustion defense, whether " 'special circumstances' have been plausibly alleged to justify 'the prisoner's failure to comply with administrative procedural requirements." ' *Hemphill,* 380 F.3d at 686 (quoting *Giano,* 380 F.3d at 676); *see also Veloz v. New York,* 339 F.Supp.2d 505, 513 (S.D.N.Y.2004) (summarizing the analytical steps elaborated in the Court of Appeals' recent jurisprudence).

### 5. *Madison Has Exhausted Administrative Remedies With Respect to Alves and Dyal*

**\*14** Much of the conduct at issue in this case occurred during the approximately seven months that Madison was incarcerated at SCF. Specifically, Madison has alleged that defendants Alves and Dyal improperly denied him needed medical treatment in retaliation for grievances that he had filed concerning his need to see an orthopedic specialist. Madison fully exhausted his administrative remedies with respect to at least three grievances-SPT 24542-02, SPT 24693-02, and SPT 25027-02-concerning the alleged improper conduct of defendants Alves and Dyal. These grievances described in significant detail the exact conduct giving rise to the present lawsuit. Based on these grievances, each of which was reviewed by CORC, there is no issue as to whether Madison exhausted his administrative remedies with respect to Alves and Dyal.

Defendants argue that because Madison failed to exhaust his administrative remedies prior to filing the complaint on January 3, 2002, this action must be dismissed in its entirety, and plaintiff must file a new lawsuit in order to pursue his claims against Alves and Dyal. Of course, neither Alves nor Dyal were named in the original complaint, and the conduct that they are alleged to have engaged in all purportedly occurred some eight months after the filing of that complaint. Moreover, courts of this district have held that where an inmate's complaint is dismissed pursuant to the PLRA for failure to exhaust administrative remedies, the court may grant the plaintiff leave to file an amended complaint once such remedies have been exhausted. *See, e.g., Graham v. Perez,* 121 F.Supp.2d 317, 322 (S.D.N.Y.2000).

Based on the foregoing, defendants' motion for dismissal of the claims against Alves and Dyal for failure to exhaust administrative remedies is hereby denied.

### *Venue*

Defendants argue that this action should be dismissed on the alternative grounds that the Southern District of New York is an improper venue. Where, as here, jurisdiction is based on the existence of a federal question, venue is appropriate in "a judicial district where any defendant resides, if all defendants reside in the same state." 28 U.S.C. § 1391(b)(1). "For the purposes of venue, § 1983 defendants reside where they perform their official duties." *Amaker v. Haponik,* 198 F.R.D. 386, 391 (S.D.N.Y.2000) (citing *Akbar, Islam v. Cuomo,* 94 Civ. 7757, 1995 WL 539638, at *1 (S.D.N.Y. Sept.8, 1995)); *Baker v. Coughlin,* No. 93 Civ. 1084(RWS), 1993 WL 356852 at *2-3 (S.D.N.Y. Sep.9, 1993). [4] Since defendants Schramm and Mazzuca are deemed to reside in this district based on the fact that FCF is located in Dutchess County, Madison properly filed this action in the Southern District.

[4]   In *Baker,* this Court stated:

It is settled law that under § 1391 the 'residence' of public officers such as these defendants means his or her 'official' and not 'actual' residence." *Canaday v. Koch,* 598 F.Supp. 1139, 1143 (E.D.N.Y.1984) (citing *Birnbaum v. Blum,* 546 F.Supp. 1363, 1366 (S.D.N.Y.)). While Madison's complaint states that the action is brought against the Defendants individually and in their official capacities, it is uncontested that all the Defendants are being sued for acts of commission and omission while functioning as agents of the State of New York.
*Baker,* 1993 WL 356852 at *3-4.

Defendants have moved to transfer this action to either the Western or Northern Districts of New York. This Court has the discretion to transfer an action "for the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). "The convenience of the parties and witnesses is considered 'the essential criteria under the venue statute.' " *Baker v. Coughlin,* 1993 WL 356852, at *4 (quoting *First City Federal Savings Bank v. Register,* 677 F.Supp. 236, 237 (S.D.N.Y.1988)).

**\*15** Alves and Dyal, the only defendants remaining in this action, are deemed to both reside in Chemung County, which is in the Western District of New York. Plaintiff Madison is currently incarcerated at Clinton Correctional Facility, which is in the Northern District. Therefore, venue over the remaining claims lies in both the Northern and Western Districts. To the extent that

Madison brought this action outside his home district, he has already demonstrated that the laying of venue elsewhere in the state will not be unduly burdensome for him. Therefore, defendants' motion to transfer this action to the Western District of New York is hereby granted.

*Conclusion*

The claims against defendants Wright, Mazzuca, Schramm, Miller, Guzman, Riley, and McGinnis are dismissed without prejudice for failure to state a claim upon which relief can be granted. Defendants' motion for dismissal for failure to state a claim is denied as to the claims against Alves and Dyal. Defendants' motion for summary judgment on the claims against Alves and Dyal for failure to exhaust administrative remedies prior to the initiation of this action is denied. Finally, Defendants' motion to transfer this action to the Western District of New York is hereby granted.

It is so ordered.

**All Citations**

Not Reported in F.Supp.2d, 2004 WL 3037730

---

**End of Document**                      © 2019 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2019 Thomson Reuters. No claim to original U.S. Government Works.    12

KeyCite Yellow Flag - Negative Treatment

Distinguished by Whitley v. Ort, S.D.N.Y., September 28, 2018

2011 WL 2973957
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Gotfried JEAN, Plaintiff,
v.
C.O. BARBER, et al., Defendants.

No. 9:09–CV–0430 (MAD/GHL).
|
June 28, 2011.

**Attorneys and Law Firms**

Gotfried Jean, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Adrienne J. Kerwin, Esq., of Counsel, Albany, NY, for Defendants.

*REPORT–RECOMMENDATION AND ORDER*

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Mae A. D'Agostino, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, Gotfried Jean ("Plaintiff") alleged that Defendants C.O. Barber, Sgt. Christopher, and Superintendent Graham violated his Eighth and Fourteenth Amendment rights by failing to provide him with mental health services prior to a suicide attempt.

On July 10, 2009, Superintendent Graham filed a Motion to Dismiss. Dkt. No. 13. By Order filed January 11, 2010, Judge David N. Hurd granted the motion, dismissing all claims against Superintendent Graham. Dkt. No. 20.

Currently pending before the Court is Defendant Barber and Defendant Christopher's motion for summary judgment pursuant to Fed.R.Civ.P. 56. Dkt. No. 39. Plaintiff opposes the motion. Dkt. Nos. 46, 48–50. For

the reasons that follow, I recommend that the motion be granted.

**I. BACKGROUND**

**A. Factual Background**

Plaintiff alleges in his complaint that his Eighth and Fourteenth Amendment rights were violated during his confinement at Auburn Correctional Facility ("Auburn C.F."). Complaint (Dkt. No. 1) at 4. Briefly, on December 16, 2006, while in his cell, Plaintiff told Defendant Barber that he wanted to commit suicide. *Id.* Plaintiff alleges that he then saw Defendant Christopher, who told Plaintiff that there was nothing wrong with him and that he should "do [his] time like a man," and told Defendant Barber not to call "any mental health staff." *Id.* at 4–5. Plaintiff claims that one or two hours later, he again told Defendant Barber that he wanted to commit suicide, but Defendant Barber said nothing and walked away. Jean Dep. (Dkt. No. 39–3 (Ex. A)) at 10. Later that day, Plaintiff attempted to commit suicide by "trying to sever [his] arm off with a can top." Complaint at 5. Plaintiff cut his arm five times. Jean Dep. at 12. A non-defendant officer arrived and took Plaintiff to receive medical attention. *Id.* at 13. Plaintiff was placed in a cell in the Mental Health Unit ("MHU") at Auburn C.F. and later spoke to a non-defendant individual from the Office of Mental Health ("OMH"). *Id.* at 14. Plaintiff was then released to the Special Housing Unit. *Id.* at 16.

**B. Summary of Grounds in Support of Defendants' Motion**

Defendants argue that (1) Plaintiff cannot prevail on his Eighth Amendment claim because Defendants were not deliberately indifferent to Plaintiff's serious medical needs; and (2) Defendants are entitled to qualified immunity. Defs.' Memo. of Law (Dkt. No. 39–7).

**C. Summary of Plaintiff's Response to Defendants' Arguments**

In response, Plaintiff argues that (1) Defendants were deliberately indifferent to Plaintiff's serious medical needs; and (2) Defendants are not entitled to qualified immunity. Plaintiff's Response (Dkt. No. 46).

**II. LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT**

**\*2** Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006).

The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material [1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

[1]    A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

### III. ANALYSIS

#### A. Eighth Amendment

Plaintiff alleges that Defendants acted with deliberate indifference in violation of his Eighth Amendment rights by leaving Plaintiff in his cell after he threatened to commit suicide. Complaint (Dkt. No. 1) at 5. Plaintiff alleges that he saw a mental health officer only after he injured himself. *Id.*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishment. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of

decency that mark the progress of a maturing society." *Estelle,* 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). In fulfilling this duty, prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27 (1984)).

There are two elements to a prisoner's claim that prison officials violated his Eighth Amendment right to receive medical care: "the plaintiff must show that she or he had a serious medical condition and that it was met with deliberate indifference." *Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). "The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003).

#### 1. Serious Medical Need

**\*3** Defendants argue that Plaintiff is unable to satisfy the objective component because Plaintiff cannot establish that he suffered from a serious medical need. Defs.' Memo. of Law at 2. Defendants point out that "there is no claim that the plaintiff suffered from any diagnosed mental health issue either before or after December 16, 2006." *Id.* (citation omitted). Plaintiff asserts that his suicide threat and his self-inflicted wounds "are consistent with a serious medical need." Jean Memo. of Law at 5.

" 'Because society does not expect that prisoners will have unqualified access to healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to state a cognizable claim. *Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) (quoting *Hudson v. McMillian,* 503 U.S. 1, 9 (1992)). Although there is no distinct litmus test, a serious medical condition is determined by factors such as "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain." *Brock v. Wright,* 315 F.3d 158, 162–63 (2d Cir.2003) (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). An inmate need not "demonstrate that he or she experiences pain that is at the limit of human ability to bear, nor do[es] [this Court] require a showing that his or her condition

2011 WL 2973957

will degenerate into a life threatening one." *Id.* at 163. This " 'component of an Eighth Amendment claim is ... [necessarily] contextual' and fact-specific." *Smith,* 316 F.3d at 185 (quoting *Hudson,* 503 U.S. at 8). Thus, the "serious medical need inquiry must be tailored to the specific circumstances of each case." *Id.*

In *Hamilton v. Smith,* No. 06–CV–805 (GTS/DRH), 2009 WL 3199531, at * 14 (N.D.N.Y. Jan. 13, 2009), Magistrate Judge Homer found that the plaintiff's "contentions that he had a history of suicidal thoughts" were "sufficient to raise a question of fact as to a serious medical need." Here, whether Plaintiff experienced previous suicidal thoughts is somewhat unclear. When asked whether he had any suicidal thoughts prior to the date of the incident, Plaintiff responded somewhat ambiguously by stating: **"Not any that I**—no." Jean Dep. at 8 (emphasis added). Given this ambiguity, and in light of my obligation to resolve all ambiguities and draw all reasonable inferences against the moving party, especially where Plaintiff asserts civil rights violations and is proceeding *pro se,* I find that a question of fact has been raised as to a serious medical need.

### 2. Deliberate Indifference

Defendants argue that even if Plaintiff had a serious medical need, they were not deliberately indifferent to that need. Defs.' Memo. of Law at 2–4. Defendants are correct.

Defendants are not medical personnel. "Non-medical personnel engage in deliberate indifference where they intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to attendant prison personnel." *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (Scullin, J., adopting Report–Recommendation of Sharpe, M.J.). Here, there is no indication that Defendants *intentionally* delayed access to medical care. Instead, the record shows that Defendants responded quickly to Plaintiff and took steps to assist him.

**\*4** When Plaintiff told Defendant Barber at approximately 7:00 a.m. that he wanted to commit suicide, Defendant Barber "immediately informed the first officer on the shift, who then informed [Defendant] Christopher." Barber Dec. at ¶ 5. The logbook entry confirms that Defendant Barber conveyed this information and that Defendant Christopher was notified at 7:10 a.m. Ex. F. Defendant Christopher saw Plaintiff at approximately 7:50 a.m. Christopher Dec. at ¶ 4.

Defendant Barber continued to observe Plaintiff until the conclusion of his shift at 3:00 p.m. Barber Dec. at ¶ 8. Plaintiff cut his arm after Defendant Barber finished his shift. *Id.* at ¶ 7; Jean Dep. at 10.

In addition, this Court has previously surveyed case law around the country and found that "in the context of suicide, jailers are not required to safeguard every inmate; only those presenting a 'strong likelihood of suicide' are entitled to protection." *Burke v. Warren County Sheriff's Dep't,* No. 900–CV–597, 1994 WL 675042, at *6 (N.D.N.Y. Nov. 25, 1994) (Munson, J.) (citations omitted). "In order to establish a strong likelihood of suicide, a detainee must have made a previous threat of or an earlier attempt at suicide." *Id.* (citing *Elliott v. Cheshire County,* 940 F .2d 7, 11 (1st Cir.1991) ("In the absence of a previous threat of or an earlier attempt at suicide, we know of no federal court in the nation that has concluded that failing to prevent a suicide constitutes deliberate indifference."); *Buffington v. Baltimore County,* 913 F.2d 113, 119 (4th Cir.1990) (liability could not be premised on the officers' failure to act on a speculative suicide risk); *Rellergert v. Cape Girardeau County,* 724 F.Supp. 662, 666 (E.D.Mo.1989) ("Obviously, in the absence of a previous threat or an earlier attempt at suicide, official misconduct in failing to prevent a suicide does not constitute deliberate indifference.").

Since Plaintiff had made no previous threat of suicide and given the Defendants' prompt responses to Plaintiff on the day at issue, I find no genuine issue of material fact showing that Defendants were deliberately indifferent. Accordingly, I recommend that Defendants' motion for summary judgment dismissing Plaintiff's Eighth Amendment claim be granted.

### B. Due Process Claim

Plaintiff also asserted a Fourteenth Amendment due process claim based on the same allegations as the Eighth Amendment claim in his complaint. Defendants fail to address the Fourteenth Amendment in their moving papers.

Where, as here, a plaintiff's Eighth Amendment and Fourteenth Amendment due process claims " 'overlap,' the due process claim will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners." *Rodriguez v. Morton,* No. 04 Civ. 3787, 2009 WL 414033, at *9 (S.D.N.Y. Feb.

Jean v. Barber; Not Reported in F.Supp.2d (2011)
Case 9:17-cv-00047-MAD-TWD   Document 78   Filed 02/19/19   Page 183 of 183
2011 WL 2973957

13, 2009) (citing *Felix–Torres v. Graham,* 521 F.Supp.2d 157, 164 (N.D.N.Y.2007) (Homer, M.J.) (quoting *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("any protection that 'substantive due process' affords convicted prisoners against excessive force is ... at best redundant of that provided by the Eighth Amendment")); *see also Whitley v. Albers,* 475 U.S. 312, 327, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) ("where the deliberate use of force is challenged as excessive and unjustified, ... the Due Process Clause affords respondent no greater protection than does the Cruel and Unusual Punishment Clause")).

**\*5** Here, Plaintiff's complaint alleges overlapping Eighth and Fourteenth Amendment violations. Since the Eighth Amendment offers greater protection to prisoners, Plaintiff's Fourteenth Amendment claim is subsumed. Therefore, I recommend that this claim be dismissed.

### C. Qualified Immunity

Defendants argue that even if Plaintiff's constitutional claims are substantiated, they are entitled to qualified immunity. Defs.' Memo. of Law at 4–6. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 811 (2009) (holding that, "while the sequence set forth [in *Saucier* ] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have

been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This Court need not address qualified immunity with respect to Plaintiff's various causes of action because, as discussed above, he has not established any violations of his constitutional rights.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 39) be *GRANTED;* and it is further

**ORDERED,** that the Clerk serve copies of the electronically-available-only decisions cited herein on Plaintiff.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 2973957

End of Document                    © 2019 Thomson Reuters. No claim to original U.S. Government Works.